LEV L. DASSIN
Acting United States Attorney for the
Southern District of New York
Attorney for the United States of America
By:   SEAN CENAWOOD
      JAMES COTT
      BENJAMIN H. TORRANCE
Assistant United States Attorneys
86 Chambers Street, 3rd Floor
New York, New York 10007
Tel. No.:  212.637.2705/2695/2703
E-mail:  Sean.Cenawood@usdoj.gov

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x
UNITED STATES OF AMERICA *ex rel.*       :
ANTI-DISCRIMINATION CENTER OF            :   No. 06 Civ. 2860 (DLC)
METRO NEW YORK, INC.,                    :
                                         :   **COMPLAINT-IN-INTERVENTION OF**
                       Plaintiff,        :   **THE UNITED STATES OF AMERICA**
                                         :
          -against-                      :
                                         :
WESTCHESTER COUNTY, NEW YORK,            :
                                         :
                       Defendant.        :
------------------------------------------------------------x

The United States of America, by and through its attorney, Lev L. Dassin, Acting United States Attorney for the Southern District of New York, having filed a notice of intervention pursuant to 31 U.S.C. § 3730(c)(3) and Rule 24(b) of the Federal Rules of Civil Procedure, alleges for its complaint-in-intervention as follows:

**PRELIMINARY STATEMENT**

1.     This is a civil action brought by the United States of America ("United States") against Westchester County, New York ("Westchester" or "defendant") to:  (i) recover, under the False Claims Act, 31 U.S.C. §§ 3729 *et seq.* (the "False Claims Act"), damages sustained by, and

penalties owed to, the United States as the result of Westchester, from in or about 2000 through 2009, having knowingly presented or caused to be presented to the United States false claims to obtain federal funding for housing and community development, as more specifically detailed infra; and (ii) seek, pursuant to 42 U.S.C. § 5311(b), appropriate remedies, including mandatory or injunctive relief, for Westchester's non-compliance with community development requirements during that time period.

2.      The United States brings additional claims against Westchester under the common law for fraud, unjust enrichment, and payment under mistake of fact.

## JURISDICTION AND VENUE

3.      This Court has jurisdiction over the claims brought herein pursuant to 28 U.S.C §§ 1331 and 1345, 31 U.S.C. § 3730(a), and 42 U.S.C. § 5311(b), as well as pursuant to the Court's general equitable jurisdiction.

4.      Venue lies in this District pursuant to 28 U.S.C. §§ 1391(b) and 1391(c), as well as 31 U.S.C. § 3732(a), because Westchester is located in this District, Westchester does business in this District, and the acts complained of herein took place in this District.

## PARTIES

5.      Plaintiff is the United States on behalf of its agency the United States Department of Housing and Urban Development ("HUD").

6.      Relator Anti-Discrimination Center of Metro New York, Inc. ("ADC") is a New York corporation.

7.      Defendant Westchester is a municipal corporation as defined by the laws of the State of New York.

## FACTS

### HUD Funding and Westchester's Obligation
### to Affirmatively Further Fair Housing

8.      The United States grants housing and community development-related funding to state and local entities.

9.      Westchester is comprised of 45 municipal entities.  All of the municipalities – except for Mount Pleasant, Mount Vernon, New Rochelle, White Plains and Yonkers – are part of the Westchester Urban County Consortium (the "Consortium").

10.     Westchester applied to HUD for federal funding, including Community Development Block Grants ("CDBG") funds, on behalf of itself and the Consortium each year from 2000 to the present (the "relevant time period").

11.     Westchester made claims for and received payments of such grant funds from the United States during the relevant time period.

12.     As a condition to receipt of federal funding, including CDBG funds, Westchester was required to certify that it met a variety of fair housing obligations, including the obligation to affirmatively further fair housing ("AFFH").

13.     Specifically, Westchester, as a grant recipient, was required to make certifications to HUD that, *inter alia*, "the grant will be conducted and administered in conformity with the Civil Rights Act of 1964 and the Fair Housing Act, and the grantee will affirmatively further fair housing." *See* 42 U.S.C. § 5304(b)(2).

14.     Westchester was aware of its AFFH obligations prior to and during the relevant time period.

15. Prior to and during the relevant time period, Westchester entered into Cooperation Agreements with municipalities participating in the Consortium.

16. The agreements expressly stated, *inter alia*, that Westchester was prohibited from expending CDBG funds for activities "in or in support of any local government that does not affirmatively further fair housing within its jurisdiction or that impedes the County's action to comply with its fair housing certifications."

### Distinction Between AFFH Actions and Affordable Housing Activities

17. Prior to the relevant time period, Westchester received a copy of the HUD Fair Housing Planning Guide. *See* U.S. Dept. of HUD, Fair Housing Planning Guide (1996) ("HUD Guide").

18. The HUD Guide provides guidance to help grantees fulfill the "fair housing requirements" of grants such as the CDBG.

19. The HUD Guide explains the distinction between AFFH actions and affordable housing activities: "The two concepts are not equivalent . . . When a jurisdiction undertakes to build or rehabilitate housing for low- and moderate-income families, for example, this action is not in and of itself sufficient to affirmatively further fair housing . . . When steps are taken to assure that the housing is fully available to all residents of the community, regardless of race, color, national origin, gender, handicap, or familial status, those are the actions that affirmatively further fair housing."

20. Prior to the relevant time period, Westchester was aware of that distinction in connection with its AFFH obligations.

21.     An outline concerning Westchester's AFFH obligations, prepared by Westchester prior to the relevant time period, contains the following reminder: "Remember: This is not a report on affordable housing, but FAIR HOUSING!!!"

22.     In a July 1996 letter to the non-profit housing counseling agency Westchester Residential Opportunities ("WRO"), an employee of the Westchester County Planning Department stated: "[T]he Planning department has prepared several reports that address affordable housing, which should not be confused with the Fair Housing Plan. The goals of the Fair Housing Plan are: 1) to analyze barriers to housing that are based on race, religion, sex, disabilities, familial status, or national origin; 2) to develop strategies to remove those barriers; and 3) to maintain records of Fair Housing efforts, thus indicating the County's commitment to fair housing choice."

### Analyses of Impediments and Westchester's Obligation to Consider Racial and Ethnic Discrimination and Segregation

23.     To AFFH, Westchester was required to undertake three tasks: "[i] conduct an analysis of impediments ['AI'] to fair housing choice within the area, [ii] take appropriate actions to overcome the effects of any impediments identified through that analysis, and [iii] maintain records reflecting the analysis and actions in this regard." 24 C.F.R. § 91.425(a)(1)(i), *see also id.* § 570.601(a)(2).

24.     In identifying impediments to fair housing choice as part of its AFFH responsibilities, Westchester had an obligation to consider and analyze impediments erected by racial and ethnic discrimination or segregation.

25. If impediments erected by racial and ethnic discrimination or segregation existed, Westchester had a further AFFH obligation to take appropriate actions to overcome the effects of those impediments, as well as maintain records reflecting the analysis and such actions.

26. Prior to and during the relevant time period, Westchester was aware of its AFFH obligations to analyze and take appropriate actions to overcome impediments erected by racial and ethnic discrimination or segregation.

27. Prior to and during the relevant time period, members of Westchester's Planning Department having responsibility for the administration of the grants associated with Westchester's affordable housing and CDBG programs attended HUD-sponsored training concerning AFFH and the proper preparation of an AI.

28. The training materials, which were titled "Affirmatively Furthering Fair Housing[:] Conducting the Analysis of Impediments and Beyond," noted that "[d]uring the past thirty-seven years, Congress has spent more than one trillion dollars in a failed attempt to remedy the effects of a dual housing market in America," and traced the evolution of the dual market to, *inter alia*, minorities migrating to cities and encountering obstacles "designed to segregate them from the majority, and to maintain a dual society."

29. The HUD Guide provided to Westchester states that, in preparing AIs and fulfilling the AFFH requirement, grantees must, *inter alia*, "[a]nalyze and eliminate housing discrimination in the jurisdiction" and "[p]rovide opportunities for inclusive patterns of housing occupancy regardless of race, color, religion, sex, familial status, disability and national origin."

30. The HUD Guide states that an AI involves an "assessment of conditions, both public and private, affecting fair housing choice for all protected classes."

31.     The HUD Guide defines impediments as "actions, omissions or decisions" that "restrict housing choices or the availability of housing choices," or that have the effect of doing so, based on "race, color, religion, sex, disability, familial status, or national origin," including "[p]olicies, practices, or procedures that appear neutral on their face."

32.     The suggested AI format set forth in the HUD Guide includes a housing profile describing "the degree of segregation and restricted housing by race, ethnicity, disability status, and families with children; [and] how segregation and restricted housing supply occurred."

33.     Prior to the relevant time period, Westchester received a letter from HUD, dated July 17, 1996, concerning its submissions for housing and community development-related funding.

34.     In setting forth "matters of advice" for "areas for future improvement," that letter informed Westchester that its AI should:  (i) contain a description of the degree of segregation and restricted housing by race, ethnicity, disability status and families with children; (ii) explain how segregation and restricted housing supply occurred; and (iii) relate this information by neighborhood and cost of housing.

**Consolidated Plans and Their Relationship to Analyses of Impediments**

35.     Federal housing fund grantees must periodically file Consolidated Plans that, *inter alia*, describe the grantee's "general priorities for allocating investment geographically within the jurisdiction . . . and among different activities and needs" for affordable housing, public housing, homelessness, other special needs (including the elderly, disabled, persons with alcohol or drug addiction, persons with HIV/AIDS and their families, and public housing residents), and non-housing development pursuant to the CDBG program.  24 C.F.R. § 91.215.

36. Consolidated Plans serve as: (i) planning documents for the grantee; (ii) a submission for federal funds under HUD's formula grant programs; (iii) the strategy to be followed in carrying out HUD programs; and (iv) a management tool for assessing performance and tracking results.  *Id.* § 91.1(b).

37. The HUD Guide cautions grantees that: "[T]he explanation of barriers to affordable housing to be included in the Consolidated Plan may contain a good deal of relevant AI information but may not go far or deep enough into factors that have made poor housing conditions more severe for certain groups in the lower-income population than for others. Jurisdictions should be aware of the extent to which discrimination or other causes that may have a discriminatory effect play a role in producing the more severe conditions for certain groups."

### Westchester's 2000 and 2004 Analyses of Impediments

38. Westchester submitted Consolidated Plans to HUD in 2000 and 2004.

39. Westchester's Consolidated Plans addressed housing and community development goals for four federal grant programs: (i) the CDBG grant program; (ii) the Emergency Shelter Grant; (iii) HOME Investment Partnership; and (iv) Housing Opportunities for Persons with AIDS programs.

40. In connection with the 2000 and 2004 Consolidated Plans, Westchester submitted two corresponding AIs to HUD.

41. Westchester's 2000 AI, set forth in Chapter Eight of Westchester's 2000 Consolidated Plan, states that Westchester has evaluated "the needs for handicapped persons, larger/smaller families, extended families, and tenure opportunities when planning for their future development."  No mention is made of evaluating housing needs for racial or ethnic

minorities, or for persons who have suffered the effects of racial or ethnic discrimination or segregation.

42. Westchester's 2000 AI lists 10 "obstacles" that the "Consortium most contends with [sic] in addressing the housing needs of its residents." Neither racial or ethnic discrimination nor segregation is identified as one of those ten obstacles.

43. Westchester's 2000 AI also discusses obstacles Westchester faces in addressing the housing needs of the homeless, at-risk populations, persons with disabilities, victims of domestic violence, and those with substance abuse problems, but does not refer to any specific housing needs or issues arising from, *inter alia*, race, ethnic background, or segregation.

44. Westchester's 2000 AI makes no explicit reference to race, ethnic background, racial discrimination, ethnic discrimination, or segregation as an impediment to fair housing.

45. In response to the impediments analyzed, Westchester's 2000 Consolidated Plan outlines four "[a]ctions to be taken":  (i) "[i]ncrease the supply of affordable housing rental units"; (ii) "[i]ncrease the supply of affordable homeownership housing for moderate and middle income families"; (iii) "[r]educe the number of elderly households that are cost burdened"; and (iv) "[i]ncrease the number of seniors assisted with grants and loans to rehabilitate their homes."

46. In setting out Westchester's responses to the analyzed impediments to fair housing, the 2000 Consolidated Plan makes no explicit reference to race, ethnic background, racial discrimination, ethnic discrimination, or segregation.

47. Westchester's 2004 AI, set forth in Chapter Nine of Westchester's 2004 Consolidated Plan, states that Westchester has evaluated "the needs for handicapped persons, larger/smaller families, extended families, and tenure opportunities when planning for their

future development."  No mention is made of evaluating housing needs for racial or ethnic minorities, or for persons who have suffered the effects of racial or ethnic discrimination or segregation.

48. Although the regulation requires an analysis of impediments to fair housing choice, not to affordable housing, *see* 24 C.F.R. § 91.425(a)(1)(i), Westchester's 2004 AI identifies 13 "Impediments to Affordable Housing."  Neither racial or ethnic discrimination nor segregation is identified as one of those 13 obstacles.

49. Westchester's 2004 AI analyzes impediments to meeting the housing needs of the "[u]nderserved," persons with disabilities, the homeless, and those with mental illness or addictive behaviors to seek assistance, but does not refer to any specific housing needs or issues arising from, *inter alia*, race, ethnic background, or segregation.

50. Westchester's 2004 AI makes no explicit reference to race, ethnic background, racial discrimination, ethnic discrimination, or segregation as an impediment to fair housing.

51. In response to the impediments analyzed, Westchester's 2004 Consolidated Plan lists five objectives:  (i) "[i]ncrease the supply of affordable housing rental units, particularly large size units for low and extremely low income families"; (ii) "[i]ncrease the supply of affordable homeownership units for moderate income families"; (iii) "[r]educe the number of elderly households that are cost burdened"; (iv) "[i]ncrease the number of seniors assisted with funding to rehabilitate their homes"; and (v) "[c]onduct [a] public relations and marketing campaign to raise awareness of who needs housing."

52. In setting out Westchester's responses to the analyzed impediments to fair housing, the 2004 Consolidated Plan makes no explicit reference to race, ethnic background, racial discrimination, ethnic discrimination, or segregation.

**Westchester Undertook No Analysis of Whether Its Housing
Efforts Had the Effect of Perpetuating or Increasing Segregation**

53. Prior to and during the relevant time period, Westchester was aware of the racial and ethnic makeup of its municipalities.

54. Prior to and during the relevant time period, Westchester was aware of the racial and ethnic segregation within its municipalities.

55. According to the 2000 census, over half of the municipalities in the Consortium had African-American populations of 3% or less.

56. In 1999, the Westchester Board of Legislators made a legislative finding that "there is no greater danger to the health, morals, safety, and welfare of the County than the existence of prejudice, intolerance, and antagonism among its residents because of . . . race, color, religion, ethnicity [and other protected classes]" and that "there ha[d] been repeated instances of intolerance and discrimination committed in Westchester County."

57. Westchester's 2000 and 2004 AIs focused on affordable housing, rather than fair housing.

58. In its 2000 and 2004 AIs, as well as the corresponding Consolidated Plans, Westchester did not analyze how its placement of affordable housing affected segregation and racial or ethnic diversity.

59. Westchester did not undertake an analysis of whether the production of affordable housing, prior to and during the relevant time period, had the effect of increasing or decreasing racial or ethnic diversity in the neighborhoods in which the housing was built.

### Westchester Did Not Take Actions to Overcome the Effects of Discrimination and Segregation on Fair Housing Choice

60. Prior to and during the relevant time period, Westchester did not take appropriate actions to overcome the effects of discrimination and segregation on fair housing choice.

61. Westchester has not deemed any municipalities to be failing to AFFH, nor has it deemed any municipalities to be impeding the County's ability to AFFH.

62. Westchester has not withheld any funds or imposed any sanctions on any participating municipalities for failure to AFFH.

63. When Westchester considers where to acquire land for affordable housing, it seeks the concurrence of the municipality where the land is situated.

64. Prior to and during the relevant time period, Westchester refused to acquire any such land without the municipality's agreement.

65. Prior to and during the relevant time period, Westchester did not fund or assist the production of affordable housing in any municipality where the municipality opposed such production.

66. Westchester knew that it had the authority and responsibility to direct participating municipalities to do that which is necessary to AFFH.

67. Although Westchester set a goal in a 1993 Affordable Housing Allocation Plan to create 5,000 affordable housing units, at least 16 municipal units in Westchester have not created any affordable housing units.

68. Westchester's production and placement of affordable housing, prior to and during the relevant time period, increased segregation in the jurisdiction.

### Westchester Knowingly Made False AFFH Certifications and False Statements to Get Claims Paid by HUD

69. As part of the Consolidated Plan process, Westchester annually submitted Action Plans, 24 C.F.R. § 91.220; *id.* § 91.420, that included applications for funding, as well as Westchester's express certification that it would AFFH, *see id.* § 91.225; *id.*§ 91.425.

70. Despite its failure to analyze the impediments to fair housing posed by discrimination and segregation and to take appropriate actions to address those impediments, Westchester, during the relevant time period, knowingly submitted false certifications that it would: "affirmatively further fair housing, which means it will conduct an analysis of impediments to fair housing choice within the jurisdiction, take appropriate actions to overcome the effects of any impediments identified through that analysis, and maintain records reflecting that analysis and actions in this regard."

71. As a result of those false certifications, Westchester, during the relevant time period, received at least $52 million from HUD in housing and community development funding.

72. Westchester uses an online system to submit payment vouchers to HUD to draw down the funds into Westchester's bank account from a line of credit. During the relevant time period, Westchester knowingly submitted approximately 25 such claims per month that were

based upon false statements and certifications, including explicit and implicit representations that Westchester was complying with the obligations set forth in paragraphs 13, 23, 24 and 25.

## FIRST CLAIM

**Violations of the False Claims Act
31 U.S.C. § 3729 (a)(1)
Presenting False Claims for Payment**

73.  The United States incorporates by reference paragraphs 1 through 72 above as if fully set forth herein.

74.  The United States seeks relief against Westchester under Section 3729(a)(1) of the False Claims Act, 31 U.S.C. § 3729(a)(1).

75.  As set forth above, Westchester knowingly presented, or caused to be presented, false or fraudulent claims for payment or approval in connection with the submission of its requests for federal housing and community development-related grants and funding.

76.  The United States paid to Westchester housing and community development-related grants and funding because of such false or fraudulent claims.

77.  By reason of Westchester's false or fraudulent claims, the United States has been damaged in a substantial amount to be determined at trial.

## SECOND CLAIM

**Violations of the False Claims Act
31 U.S.C. § 3729 (a)(1)(B)
Use of False Statements**

78.  The United States incorporates by reference paragraphs 1 through 72 above as if fully set forth herein.

79. The United States seeks relief against Westchester under Section 3729(a)(1)(B) of the False Claims Act, as amended, 31 U.S.C. § 3729(a)(1)(B).

80. As set forth above, Westchester knowingly made, used, and caused to be made and used, false records and statements material to the false or fraudulent claims for federal housing and community development-related grants and funding.

81. The United States paid such false or fraudulent claims because of the acts and conduct of Westchester.

82. By reason of Westchester's use of false statements, the United States has been damaged in a substantial amount to be determined at trial.

## THIRD CLAIM

**Non-compliance with Community Development Requirements**
**42 U.S.C. § 5311(b)**
**Failure to Affirmatively Further Fair Housing**

83. The United States incorporates by reference paragraphs 1 through 72 above as if fully set forth herein.

84. The United States seeks relief against Westchester under 42 U.S.C. § 5311(b).

85. As set forth above, Westchester failed to comply substantially with the express condition of eligibility for and receipt of federal housing and community development-related grants and funding, set forth in 42 U.S.C. § 5304(b), requiring Westchester to (i) conduct and administer such grants and funding in conformity with the Civil Rights Act of 1964 and the Fair Housing Act, and (ii) affirmatively further fair housing.

86. By reason of Westchester's failure to substantially comply with those requirements, the United States is entitled to such relief as may be appropriate, including recovery of the amount of the assistance HUD furnished to Westchester, or for mandatory or injunctive relief.

## FOURTH CLAIM

### Common Law Fraud

87. The United States incorporates by reference paragraphs 1 through 72 above as if fully set forth herein.

88. Westchester made material misrepresentations of fact to the United States with knowledge of, or in reckless disregard of, their truth, in connection with Westchester's requests for federal housing and community development-related grants and funding.

89. Westchester intended that the United States would rely upon the accuracy of the false representations referred to above.

90. The United States made substantial payments of money to Westchester in justifiable reliance upon Westchester's false representations.

91. Westchester's actions caused the United States to be damaged in a substantial amount to be determined at trial.

## FIFTH CLAIM

### Unjust Enrichment

92. The United States incorporates by reference paragraphs 1 through 72 above as if fully set forth herein.

93. By reason of the payments made by the United States to Westchester, based on the claims for payment Westchester submitted to HUD, Westchester was unjustly enriched.

94.     The circumstances of Westchester's receipt of these payments are such that, in equity and good conscience, it should not retain those payments.

## SIXTH CLAIM

### Payment Under Mistake of Fact

95.     The United States incorporates by reference paragraphs 1 through 72 above as if fully set forth herein.

96.     The United States seeks relief against Westchester to recover monies paid under mistake of fact.

97.     The United States paid Westchester based on certifications, statements and claims submitted by Westchester to HUD under the erroneous belief that Westchester was entitled to payment of such funds.  In making such payments the United States relied upon and assumed the truth of Westchester's certifications and representations that it had complied with the requirement to AFFH and that Westchester's claims for federal housing and community development-related grants and funding were true.  This erroneous belief was material to the United States' decision to pay Westchester.  In such circumstances, the United States' payments to Westchester were by mistake and not authorized.

98.     Because of those payments by mistake, Westchester has received monies to which it is not entitled.

99.     By reason of foregoing, the United States was damaged in a substantial amount to be determined at trial.

## REQUEST FOR JUDGMENT

WHEREFORE, plaintiff, the United States, requests that judgment be entered in its favor and against defendant Westchester as follows:

    (a)    On the First and Second Claims (Violations of the False Claims Act, 31 U.S.C. § 3729(a)(1) and, as amended, 31 U.S.C. § 3729(a)(1)(B)), for treble the United States' damages, in an amount to be determined at trial;

    (b)    On the First and Second Claims, for an $11,000 penalty for each violation pursuant to 31 U.S.C. § 3729(a)(1), as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990;

    (c)    On the First and Second Claims, for an award of costs pursuant to 31 U.S.C. § 3729(a)(3);

    (d)    On the Third Claim (Non-compliance with Community Development Requirements, 42 U.S.C. § 5311(b)), for such relief as may be appropriate, including recovery of the amount of the assistance HUD furnished to Westchester, in an amount to be determined at trial, and for mandatory and injunctive relief;

    (e)    On the Fourth Claim (Common Law Fraud), in an amount to be determined at trial, together with costs and interest;

    (f)    On the Fifth Claim (Unjust Enrichment), in an amount to be determined at trial, together with costs and interest;

    (g)    On the Sixth Claim (Payment Under Mistake of Fact), in an amount to be determined at trial, together with costs and interest; and

    (h)    awarding such further relief as is proper.

Dated:     New York, New York
           August 7, 2009

                                 LEV L. DASSIN
                                 Acting United States Attorney for the
                                 Southern District of New York
                                 Attorney for the United States

                        By:  /s/ Sean Cenawood
                                 SEAN CENAWOOD
                                 JAMES COTT
                                 BENJAMIN H. TORRANCE
                                 Assistant United States Attorneys
                                 86 Chambers Street, 3rd Floor
                                 New York, New York  10007
                                 Telephone:  212.637.2705/2695/2703
                                 Facsimile:  212.637.2686
                                 E-mail:  Sean.Cenawood@usdoj.gov

TO:
STUART GERSON, Esq.
Epstein, Becker & Green
1227 25th Street, NW
Washington, D.C.  20037
Telephone:  202.861.0900
Fax:  202.861.3540
E-mail:  sgerson@ebglaw.com
Counsel for Westchester County