UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------X
                                        :
UNITED STATES OF AMERICAN ex rel. ANTI- :
DISCRIMINATION CENTER OF METRO NEW       :
YORK, INC.,                             :    06 Civ. 2860 (DLC)
                         Plaintiff,     :
                                        :    OPINION & ORDER
              -v-                       :
                                        :
WESTCHESTER COUNTY, NEW YORK,           :
                         Defendant.     :
                                        :
----------------------------------------X

Appearances:

For Plaintiff/Relator:
Michael Allen
Stephen M. Dane
John P. Relman
Relman & Dane, PLLC
1225 19th Street, N.W., Suite 600
Washington, DC 20036-2456

For Defendant:
Stuart M. Gerson
Michael A. Kalish
Carrie Corcoran
Epstein Becker & Green, P.C.
250 Park Avenue
New York, NY 10177-1211


DENISE COTE, District Judge:

     This Opinion holds that a local government entity that

certifies to the federal government that it will affirmatively

further fair housing as a condition to its receipt of federal

funds must consider the existence and impact of race

discrimination on housing opportunities and choice in its

jurisdiction.  Plaintiff Anti-Discrimination Center of Metro New York, Inc. (the "Center") brings this qui tam action on behalf of the United States against Westchester County, New York ("Westchester") pursuant to the False Claims Act, 31 U.S.C. § 3729 et seq. ("FCA").  The Center claims that Westchester falsely certified that it was in compliance with its obligation to conduct an analysis of impediments to fair housing choice and affirmatively to further fair housing, which it was required to do by statute to receive Community Development Block Grant ("CDBG") and other federal funds.  Westchester has filed a motion to dismiss for failure to state a claim under Rule 12(b)(6), Fed. R. Civ. P.; for lack of subject matter jurisdiction under Rule 12(b)(1); and for failure to plead fraud with particularity under Rule 9(b).  For the following reasons, the motion to dismiss is denied.


## Background

The following facts are undisputed or taken from the complaint, unless otherwise noted.  The United States provides housing-related funding to a variety of state and local governmental entities.  Recipients of the grants are required to make certifications to the Secretary of Housing and Urban Development ("HUD"), including certifications that "the grant will be conducted and administered in conformity with the Civil

Rights Act of 1964 [42 U.S.C.A. § 2000a et seq.] and the Fair
Housing Act [42 U.S.C.A. § 3601 et seq.], and the grantee will
affirmatively further fair housing," and that "the projected use
of funds has been developed so as to give maximum feasible
priority to activities which will benefit low- and moderate-
income families or aid in the prevention or elimination of slums
or blight."  42 U.S.C. § 5304(b)(2), (3).

Westchester includes forty-five municipal entities.  With
the exception of Mount Pleasant, Mount Vernon, New Rochelle,
White Plains, and Yonkers, the entities are part of the
Westchester Urban County Consortium ("Consortium").  During the
period from April 1, 2000 to the present (the "false claims
period"), Westchester applied each year for federal funds,
including the CDBG, on behalf of itself and participating
municipalities.[1]  As a requirement of eligibility for those
funds, Westchester made multiple certifications under the
relevant statutes and regulations.  Specifically, it certified
that "it will affirmatively further fair housing, which means
that it will conduct an analysis to identify impediments to fair
housing choice within the area, take appropriate actions to
overcome the effects of any impediments identified through that
analysis, and maintain records reflecting the analysis and

---

[1] The complaint does not identify the participating
municipalities.

actions in this regard."  24 C.F.R. § 91.425(a)(1)(i); see also id. § 570.601(a)(2).

The Center claims that the certifications Westchester made were knowingly false.  According to the complaint, Westchester, through its employees, acknowledged to the Center that its demographic analysis for the purpose of identifying impediments to fair housing did not encompass race, but only examined housing needs based on income.[2]  Westchester explained that it sees discrimination as a problem of income discrimination, not racial discrimination, and does not treat as an impediment anything that is not brought to its attention by a Consortium member or other local government entity.  According to the complaint, Westchester "did not engage in any independent analysis or exploration of impediments," and "refused to identify or analyze [community resistance to integration on the basis of race and national origin] as an impediment."  Instead, it evaluated the needs of categories such as handicapped persons and extended families.  Westchester admitted to the Center that the reason its analysis of impediments did not study housing

---

[2] The Center explains in its opposition to the motion to dismiss, that the occasion on which Westchester acknowledged such information was in a meeting between the Center's Executive Director and Westchester's Deputy Commissioner for Planning, Norma Drummond ("Drummond").

discrimination based on race was because the Consortium did not include Yonkers.[3]

Not only did Westchester fail to conduct an appropriate analysis of impediments, as a matter of policy it also refused to monitor the efforts of participating municipalities to further fair housing and did not inform them that Westchester might withhold federal funds if the municipality did not take steps to further fair housing.  Westchester admitted to the Center that it permits participating municipalities to look only to the housing needs of existing residents, and not the housing needs of persons living outside the municipality.  Throughout the false claims period, Westchester never required a participating municipality to take any steps to increase the availability of affordable housing or otherwise affirmatively further fair housing.

In sum, the Center claims that Westchester acted with knowledge that the certifications and the basis for receipt of the federal funds it submitted were false, and has improperly

---

[3] The complaint does not explain the relationship between Westchester's refusal to analyze impediments considering race and its admission that the reason was because Yonkers is not part of the Consortium.  The complaint does, however, indicate that according to the 2000 Census Bureau data, most of the municipalities in Westchester had low percentages of African-Americans.  The complaint identifies only one Consortium member -- Peekskill -- and three of the five non-Consortium communities -- Mt. Vernon, New Rochelle, and Yonkers -- as having a significant minority population.

received more than $45 million in federal funds.  On April 12, 2006, the Center filed the complaint in this qui tam action under seal, as required by 31 U.S.C. § 3730(b)(2).  The Government had the option, under 31 U.S.C. § 3730(b)(4)(A), of conducting the action.  After several extensions, the United States notified the Court on December 14, 2006, that it was declining to intervene pursuant to 31 U.S.C. § 3730(b)(4)(B).  The Center then served the complaint on Westchester on January 8, 2007, and Westchester filed its motion to dismiss on April 17.  That motion was fully submitted on June 15.[4]


## Discussion

Westchester's argument that the complaint should be dismissed for lack of subject matter jurisdiction is considered first:

> Where, as here, the defendant moves for dismissal under Rule 12(b)(1), Fed. R. Civ. P., as well as on other grounds, the court should consider the Rule 12(b)(1) challenge first since if it must dismiss the complaint for lack of subject matter jurisdiction, the accompanying defenses and objections become moot and do not need to be determined.

United States ex rel. Kreindler & Kreindler v. United Techs. Corp., 985 F.2d 1148, 1155-56 (2d Cir. 1993) (citation omitted).

---

[4] The Center also filed a surreply on June 22, and Westchester sought to strike the surreply by letter of June 27.

I. Subject Matter Jurisdiction

On a motion to dismiss for lack of subject matter jurisdiction pursuant to Rule 12(b)(1), Fed. R. Civ. P., "[t]he plaintiff bears the burden of proving subject matter jurisdiction by a preponderance of the evidence." Aurecchione v. Schoolman Transp. System, Inc., 426 F.3d 635, 638 (2d Cir. 2005).  A court must "accept as true all material factual allegations in the complaint," Shipping Fin. Serv. Corp. v. Drakos, 140 F.3d 129, 131 (2d Cir. 1998) (citing Scheuer v. Rhodes, 416 U.S. 232, 236 (1974)), but refrain from "drawing from the pleadings inferences favorable to the party asserting [jurisdiction]," APWU v. Potter, 343 F.3d 619, 623 (2d Cir. 2003) (citation omitted).  In resolving factual challenges to subject matter jurisdiction, the court may consider evidence outside of the pleadings.  United States v. Space Hunters, Inc., 429 F.3d 416, 425-26 (2d Cir. 2005).  "[A] district court may properly dismiss a case for lack of subject matter jurisdiction under Rule 12(b)(1) if it lacks the statutory or constitutional power to adjudicate it." Aurecchione, 426 F.3d at 638 (citation omitted).  The inquiry is distinct from whether the plaintiff can state a claim for relief.  Carlson v. Principal Fin. Group, 320 F.3d 301, 305-06 (2d Cir. 2003).

"Congress enacted the [FCA] in 1863 'with the principal goal of stopping the massive frauds perpetrated by large private

contractors during the Civil War.'"  United States ex rel.
Lissack v. Sakura Global Capital Mkts., Inc., 377 F.3d 145, 151
(2d Cir. 2004) (citing Vt. Agency of Natural Res. V. United
States ex rel. Stevens, 529 U.S. 765, 781 (2000)).  The FCA
imposes liability on any person who "knowingly presents, or
causes to be presented, to an officer or employee of the United
States Government or a member of the Armed Forces of the United
States a false or fraudulent claim for payment or approval."  31
U.S.C. § 3729(a)(1).  The terms "knowing" or "knowingly" mean
that a person "(1) has actual knowledge of the information; (2)
acts in deliberate ignorance of the truth or falsity of the
information; or (3) acts in reckless disregard of the truth or
falsity of the information, and no proof of specific intent to
defraud is required."  Id. § 3729(b)(1).

     Under the qui tam provision of the FCA, "[a] person may
bring a civil action for a violation of [the FCA] for the person
and for the United States Government.  The action shall be
brought in the name of the Government."  Id. § 3730(b)(1).
"[T]he government may either intervene and prosecute the action,
§ 3730(b)(2), or allow the original plaintiff -- the qui tam
relator -- to proceed with the suit under § 3730(b)(4)(B)."
Kreindler & Kreindler, 985 F.2d at 1153.  Either way, "the
relator is entitled to a portion of the proceeds if the
prosecution is successful."  Id.; see also 31 U.S.C. § 3730(d).

Subject matter jurisdiction for <u>qui tam</u> actions under the FCA is limited by statute:

(e) Certain actions barred.
. . . .
(4)(A) <u>No court shall have jurisdiction over an action</u> under this section <u>based upon the public disclosure of allegations or transactions in a</u> criminal, civil, or administrative hearing, in a congressional, <u>administrative</u>, or Government [sic] Accounting Office <u>report</u>, hearing, audit, or investigation, or from the news media, unless the action is brought by the Attorney General or the person bringing the action is an original source of the information.
(B) For purposes of this paragraph, "original source" means an individual who has direct and independent knowledge of the information on which the allegations are based and has voluntarily provided the information to the Government before filing an action under this section which is based on the information.

31 U.S.C. § 3730(e)(4) (emphasis supplied); <u>see also Rockwell Int'l Corp. v. United States</u>, 127 S. Ct. 1397, 1405-06 (2007) (noting the jurisdictional nature of Section 3730(e)(4)).  This provision was part of the 1986 amendments to the FCA, and was an "attempt to strike a balance between encouraging private citizens to expose fraud and avoiding parasitic actions by opportunists who attempt to capitalize on public information without seriously contributing to the disclosure of the fraud." <u>United States ex rel. Doe v. John Doe Corp.</u>, 960 F.2d 318, 321 (2d Cir. 1992).  The 1986 amendments included several revisions to the FCA, including provisions to raise the penalties for violations, to define various terms, and to increase the

incentives for qui tam actions.  See S. Rep. No. 99-345, at *2
(1986), reprinted in 1986 U.S.C.C.A.N. 5266, 5267.

To determine whether the statutory bar to jurisdiction
applies, a court must examine, among other issues, whether there
was a "public disclosure" of the wrongdoing, and whether that
disclosure occurred in one of the ways listed in the statute.
Doe, 960 F.2d at 323.  "[A]llegations of fraud are publicly
disclosed when they are placed in the 'public domain.'"  Id. at
322 (citation omitted).  This requirement precludes "qui tam
suits based on information that would have been equally
available to strangers to the fraud transaction had they chosen
to look for it as it was to the relator."  Kreindler &
Kreindler, 985 F.2d at 1158 (citing United States ex rel.
Stinson, Lyons, Gerlin & Bustamante, P.A. v. Prudential Ins.
Co., 944 F.2d 1149, 1155-56 (3d Cir. 1991)).

Insofar as the manner of public disclosure is concerned,
the modes include state and federal hearings and trials, and
federal government reports, hearings, audits, and
investigations.  See, e.g., Kreindler & Kreindler, 985 F.2d at
1158 (civil lawsuit filed in federal court); Doe, 960 F.2d at
323 (federal government agency investigation).  The Second
Circuit has not yet addressed whether state government reports,
hearings, audits, and investigations are also encompassed by the
jurisdictional bar, and other circuits are divided on the issue.

Compare <u>United States ex rel. Dunleavy v. County of Delaware</u>, 123 F.3d 734, 745 (3d Cir. 1997) ("Congress was not referring to administrative reports produced by non-federal government sources."), <u>with</u> <u>United States ex rel. Bly-Magee v. Premo</u>, 470 F.3d 914, 918 (9th Cir. 2006) (agreeing with the Eighth Circuit in <u>Hays v. Hoffman</u>, 325 F.3d 982, 988 (8th Cir. 2003), that audit reports prepared by a state agency may be public disclosures).

The parties dispute whether information provided in response to a request under New York's Freedom of Information Law ("FOIL") is publicly disclosed and whether material obtained through use of a state's information disclosure law is a mode of public disclosure covered by the jurisdictional bar.  If so, then it must be determined whether the Center is an "original source."  Westchester argues that the Center's FCA claim is based on publicly disclosed information, because the Center relies upon Westchester's responses to the Center's FOIL requests.  The responses consisted in part of state and local administrative reports produced following an administrative investigation.  The Center counters that responses to FOIL requests should not be considered public disclosures, and in addition, that the state and local administrative reports provided to them are not a mode of public disclosure covered by the jurisdictional bar.  Even if there was a public disclosure

under the jurisdictional bar, the Center argues that it was an original source, a contention which Westchester disputes.

The information obtained by the plaintiff through its FOIL request is publicly disclosed information since it was as "equally available" to others as it was to the Center had others "chosen to look for it." Kreindler & Kreindler, 985 F.2d at 1158 (citation omitted).  In Kreindler & Kreindler, the Second Circuit found that documents produced in discovery during a lawsuit and filed with the district court were publicly disclosed.  Id. at 1157-58.  In a decision even more on point, the Third Circuit has found that documents produced pursuant to a Freedom of Information Act ("FOIA") request are publicly disclosed.  United States ex rel. Mistick PBT v. Housing Auth. of Pittsburgh, 186 F.3d 376, 383 (3d Cir. 1999).  In reaching this conclusion, the circuit court noted that the "central purpose" of FOIA is to open government to public scrutiny.  Id. (citation omitted).

Even if the disclosure of information made possible by a statute granting citizens access to government records is a "public" disclosure, the FCA jurisdictional bar will only apply if the mode of disclosure is through one of those enumerated in the statute.  This requires construction of the phrase "congressional, administrative, or Government Accounting Office report, hearing, audit, or investigation."  31 U.S.C. §

3730(e)(4).  Westchester contends that an "administrative . . .
report" includes a response from a state agency to a request for
documents made pursuant to a state sunshine law like New York's
FOIL statute.

Statutory interpretation must "begin with the language
employed by Congress and the assumption that the ordinary
meaning of that language accurately expresses the legislative
purpose."  Engine Mfrs. Ass'n v. S. Coast Air Quality Mgmt.
Dist., 541 U.S. 246, 252 (2004) (citation omitted).  Where, as
here, "the terms of a statute are ambiguous, we resort to the
canons of statutory construction" to resolve the ambiguity.
Frank G. v. Bd. of Educ. of Hyde Park, 459 F.3d 356, 368 (2d
Cir. 2006) (citation omitted).  "[W]hen a statute creates
jurisdiction in a federal court, courts must construe the
statute 'with precision and with fidelity to the terms by which
Congress has expressed its wishes.'"  The Cananda Life Assurance
Co. v. Converium Rückversicherung (Deutschland) AG, 335 F.3d 52,
57 (2d Cir. 2003) (citing Bread Political Action Comm. v. Fed.
Election Comm'n, 455 U.S. 577, 580 (1982)).

There is a canon of statutory construction that is of
particular assistance here.  The Third Circuit applied "the
doctrine of noscitur a sociis, which permits [the court] to
treat [a] word as one which gathers its meaning from the words
around it," to define the term "administrative."  Dunleavy, 123

13

F.3d at 745 (citation omitted); see also Green v. City of New
York, 465 F.3d 65, 78-79 (2d Cir. 2006) (applying noscitur a
sociis to construe the term "instrumentality" in the Americans
with Disabilities Act, 42 U.S.C. § 12131(1)(B)).  Under this
analysis, the words "congressional" and "Government Accounting
Office" bracket the term "administrative" and suggest that
"administrative" should be read to include only the federal
government, and therefore that "the word 'report' refers only to
those administrative reports that originate with the federal
government."  Dunleavy, 123 F.3d at 745.

      The Dunleavy analysis has not been followed by two other
circuits.  In Hays, the Eight Circuit rejected the "textual
approach" used in Dunleavy and held that state reports
authorized to administer a "cooperative federal/state program,"
in that case Medicaid, qualified as "administrative" reports
under Section 3730(e)(4)(A) so long as "they are prepared by or
at the behest of the relevant federal agency, or by or at the
behest of a state agency that administers the federal grant
program under significant Federal regulation and involvement."
Hays, 325 F.3d at 988-89 (citation omitted).  Agreeing with
Hays, the Ninth Circuit recently held that state and local
reports were "administrative" reports for purposes of Section
3730(e)(4)(A) where the "likelihood that the information will be
brought to the federal government's attention [was] heightened"

14

because the state report is "connected significantly to federal regulations and funds."  Bly-Magee, 470 F.3d at 918-19.

The Dunleavy analysis is more faithful to the language that Congress chose to express the scope of the jurisdictional bar and will be followed here.  While observing that it did not disagree with the Dunleavy decision, Hays, 325 F.3d at 989, the Eighth Circuit noted that it had already construed the term "administrative" broadly to include audits prepared by private contractors for the federal government.  Id. at 988-89.  There is no necessary tension, however, between finding that an independent contractor working on an audit at the behest of the federal government should be considered a federal "administrative" source of information for purposes of construing the FCA jurisdictional bar, while also finding that a state report is not a federal "administrative" source.

The other principal reason given by the Hays court for its construction of the statute was the fact that the FCA was amended in 1986 to include requests for money made to grantees of the federal government, where the grantees are "State, local, or private programs funded in part by the United States where there is significant Federal regulation and involvement."  Id. at 988 (citing S. Rep. No. 99-345, at *22).  It found a tension between such an amendment -- which permits those who make fraudulent claims to state grantees to be sued under the FCA --

and the fact that the <u>Dunleavy</u> analysis would find that a state grantee's audit of its use of federal funds was not an "administrative" audit. <u>Id.</u>  There is, however, no necessary tension between these two amendments.  To the contrary, if Congress intended, at the same time it was extending the FCA against those who made false claims to recipients of federal funds, to bar federal FCA lawsuits against those grantees themselves that were generated by access to information in local government files, one would certainly have expected that it would have done so explicitly.

The Ninth Circuit's construction is even less persuasive. It interprets the conjunction "or" so that each of "congressional, administrative, or Government Accounting Office" separately modifies the nouns that follow.[5] <u>Bly-Magee</u>, 470 F.3d at 918.  That construction is certainly correct, and no one has suggested otherwise.  The more relevant inquiry, however, is whether one can appropriately look to the terms which surround the word "administrative" to clarify its meaning.  It is appropriate and helpful to do so here.  The <u>Dunleavy</u> construction -- that "administrative" only includes federal

---

[5] The <u>Bly-Magee</u> court cites <u>Flora v. United States</u>, 362 U.S. 145, 150 (1960), for the proposition that "grammar can be relevant to statutory interpretation." <u>Bly-Magee</u>, 470 F.3d at 918. Although the proposition is uncontroversial, its application in this case is not revealing. Even in <u>Flora</u>, the Court derived meaning for the disputed term by looking at the meaning of the other terms. <u>Flora</u>, 362 U.S. at 149-50.

sources -- is firmly rooted in the text.  The term is grouped
with the adjectives "congressional" and "Government Accounting
Office," each of which is unquestionably a federal entity.

The legislative history for the 1986 amendments does not
contain any description of Congress's precise intent in
including "administrative . . . reports," but supports a finding
that "administrative" includes only federal sources.  The
previous version of the statute, amended in 1943, barred
jurisdiction where the federal government had the information.
It provided that "[t]he court shall have no jurisdiction to
proceed . . . whenever it shall be made to appear that such suit
was based upon evidence or information in the possession of the
United States, or any agency, officer or employee thereof, at
the time such suit was brought."  Act of Dec. 23, 1943, §
3491(C), Pub. L. No. 78-213, 57 Stat. 609 (emphasis supplied);
see also S. Rep. No. 99-345, at *12 (noting that the earlier
jurisdictional bar precluded qui tam suits "based on information
in the Government's possession, despit[e] the source").

The House Report for the False Claims Amendments Act of
1986, H.R. 4827, 99th Cong., does not discuss this provision at
all.  H. Rep. No. 99-660 (1986).  The provision was included in
the Senate bill, which was accompanied by Senate Report No. 99-
345, at *30, and revised the jurisdictional bar to include
information from any hearing, the news media, or "a

congressional or Government Accounting Office report."  It
proposed amending the 1943 version to read

> In no event may a person bring an action under this
> section based upon allegations or transactions which
> are the subject of a civil suit in which the
> Government is already a party, or within six months of
> the disclosure of specific information relating to
> such allegations or transactions in a criminal, civil,
> or administrative hearing, <u>a congressional or
> Government Accounting Office report</u> or hearing, or
> from the news media.

S. 1562, § 3730(e)(4), 99th Cong. (July 28, 1986) (emphasis
supplied).  The language "congressional, administrative, or
Government Accounting Office report, hearing, audit or
investigation," was added shortly thereafter as part of
"technical and clarifying amendments," without further
elaboration.  132 Cong. Rec. S11238-04 (Aug. 11, 1986) (adding
Amendment No. 2701); <u>see also</u> 132 Cong. Rec. S9805-01 (July 29,
1986).  This legislative history contains no hint of any
intention to sweep local government sources of information into
the jurisdictional bar through the addition of the word
"administrative."

Finally, <u>Dunleavy</u>'s textual analysis is fully supported by
a rational basis for Congress's line drawing.  If the
information is derived from a federal government report, then
the federal government has the information and can act
appropriately, and barring FCA actions in such situations serves
the legislative purpose of the 1986 amendments to "avoid[]

18

parasitic actions by opportunists who attempt to capitalize on public information without seriously contributing to the disclosure of the fraud." Doe, 960 F.2d at 321.  If the information is gleaned from state files, however, then there is value in having citizens bring this information to the federal government's attention, serving the legislative purpose of "encouraging private citizens to expose fraud." Id.  The reasoning is particularly persuasive where, as here, the local government's report was "the only source from which the public could have learned of the County's misrepresentations to the federal government." Dunleavy, 123 F.3d at 745.

In sum, although the Center's claim is based on publicly disclosed information obtained through a FOIL request, the information was not obtained from a source enumerated in the Section 3730(e)(4)(A) jurisdictional bar.  Therefore, the Center's FCA action is not jurisdictionally barred, and Westchester's motion to dismiss for lack of subject matter jurisdiction is denied.

II. Failure to State a Claim Under Rule 12(b)(6)

Westchester argues that the Center has failed to state a claim under the FCA because the Fair Housing Act does not impose upon it any obligation to identify racial discrimination and segregation as impediments to "fair housing" when it certifies

as a condition for receipt of federal funds that it will
affirmatively further fair housing.  Because the Fair Housing
Act and its implementing regulations do require a grantee to
identify impediments to nondiscriminatory housing choice within
its jurisdiction and to take appropriate steps to overcome any
such identified effects, the complaint does state a claim for a
violation of the FCA.

When considering a motion to dismiss under Rule 12(b)(6), a
trial court must "accept as true all factual statements alleged
in the complaint and draw all reasonable inferences in favor of
the non-moving party."  McCarthy v. Dun & Bradstreet Corp., 482
F.3d 184, 191 (2d Cir. 2007) (citation omitted).  At the same
time, "conclusory allegations or legal conclusions masquerading
as factual conclusions will not suffice to defeat a motion to
dismiss."  Achtman v. Kirby, McInerney & Squire, LLP, 464 F.3d
328, 337 (2d Cir. 2006) (citation omitted).  A court must apply
a "flexible 'plausibility standard,' which obliges a pleader to
amplify a claim with some factual allegations in those contexts
where such amplification is needed to render the claim
plausible."  Iqbal v. Hasty, --- F.3d ---, 2007 WL 1717803, at
*11 (2d Cir. 2007).  Although the focus should be on the
pleadings, a court may also consider any written instrument
attached to the complaint as an exhibit, "or any statements or
documents incorporated in it by reference."  Rothman v. Gregor,

20

220 F.3d 81, 88 (2d Cir. 2000) (citation omitted); see also

Cortec Indus., Inc. v. Sum Holding L.P., 949 F.2d 42, 47-48 (2d

Cir. 1991).

To impose liability under the FCA, the Center must show

that Westchester "(1) made a claim, (2) to the United States

government, (3) that is false or fraudulent, (4) knowing of its

falsity, and (5) seeking payment from the federal treasury."

Mikes v. Straus, 274 F.3d 687, 695 (2d Cir. 2001).  The Center's

claim relies on the "legally false" certification theory, which

is "predicated upon a false representation of compliance with a

federal statute or regulation or a prescribed contractual term."

Id. at 696.  In order to state a claim premised on a "legally

false" certification theory, the defendant must have certified

compliance with a statute or regulation "as a condition to

governmental payment."  Id. at 697.

Westchester receives its grant, the CDBG, from the

Secretary of HUD ("Secretary") pursuant to a certification.

Westchester certifies that "the grant will be conducted and

administered in conformity with the Civil Rights Act of 1964 [42

U.S.C.A. § 2000a et seq.] and the Fair Housing Act [42 U.S.C.A.

§ 3601 et seq.], and the grantee will affirmatively further fair

housing."  Id. § 5304(b)(2).

The first statute to which the certification refers, Title II of the Civil Rights Act of 1964, promotes equal access in public accommodation.  The statute provides that

> [a]ll persons shall be entitled to the full and equal enjoyment of the goods, services, facilities, privileges, advantages, and accommodations of any place of public accommodation, as defined in this section, without discrimination or segregation on the ground of race, color, religion, or national origin.

42 U.S.C. § 2000a(a).  "[T]he overriding purpose of Title II [was] 'to remove the daily affront and humiliation involved in discriminatory denials of access to facilities ostensibly open to the general public.'"  Daniel v. Paul, 395 U.S. 298, 307-08 (1969) (citing H.R. Rep. No. 88-914).  In submitting this provision to Congress, President Kennedy emphasized that "no action is more contrary to the spirit of our democracy and Constitution -- or more rightfully resented by a Negro citizen who seeks only equal treatment -- than the barring of that citizen from restaurants, hotels, theatres, recreational areas and other public accommodations and facilities."  Id. at 306 (citation omitted).

The second statute to which the certification refers is the Fair Housing Act, which was passed in 1968 with the declaration that it is the "policy of the United States" to provide "for fair housing" within the limits imposed by the Constitution.  42 U.S.C. § 3601.  It was enacted pursuant to "Congress' thirteenth

amendment powers." <u>United States v. Starrett City Assocs.</u>, 840 F.2d 1096, 1100 (2d Cir. 1988).  The statute bans discrimination because of "race, color, religion, sex, familial status, or national origin" in connection with the sale and rental of housing and other private real estate transactions, subject to limitations imposed by the statute.[6]  42 U.S.C. §§ 3604, 3605. Under the Fair Housing Act, the Secretary is required to "administer the programs and activities relating to housing and urban development in a manner <u>affirmatively to further the policies</u> of" the statute.  <u>Id.</u> § 3608(e)(5) (emphasis supplied). The Secretary must study the nature and extent of "discriminatory housing practices," <u>id.</u> § 3608(e)(1), and report annually to Congress "data on the race, color, religion, sex, national origin, age, handicap and family characteristics" of persons who participate in, benefit from, or who may benefit from HUD programs, <u>id.</u> § 3608(e)(6).  The Secretary must also confer with State and local officials on "the extent, if any, to which housing discrimination exists" in states and localities and how "State or local enforcement programs might be utilized to combat such discrimination."  <u>Id.</u> § 3609.

---

[6] The original Fair Housing Act, enacted as Title VIII of the Civil Rights Act of 1968, prohibited discrimination based on "race, color, religion, or national origin" only.  Pub. L. No. 90-284, § 804, 82 Stat. 83 (1968).  The 1974 amendments added sex, Pub. L. No. 93-383, § 808(b)(1), 88 Stat. 729 (1974), and the 1988 amendments added familial status, Pub. L. No. 100-430, § 6(b)(2), 102 Stat. 1622 (1988).

While the Fair Housing Act was "designed primarily to prohibit discrimination in the sale, rental, financing, or brokerage of <u>private</u> housing and to provide federal enforcement procedures for remedying such discrimination so that members of minority races would not be condemned to remain in urban ghettos," the Act also requires the Secretary to consider "the impact of proposed <u>public</u> housing programs on the racial concentration" in the area in which the public housing will be built.  <u>Otero v. N.Y. City Housing Auth.</u>, 484 F.2d 1122, 1133-34 (2d Cir. 1973) (emphasis supplied).  It bans practices that are motivated by a racially discriminatory purpose as well as those that "disproportionately affect minorities."  <u>Starrett City</u>, 840 F.2d at 1100.  Considered as a whole, the statute is designed to fulfill "the goal of open, integrated residential housing patterns and to prevent the increase of segregation, in ghettos, of racial groups."  <u>Otero</u>, 484 F.2d at 1134.

Given this broad goal, HUD must use its grant programs "to assist in ending discrimination and segregation, to the point where the supply of genuinely open housing increases."  <u>N.A.A.C.P. v. Sec. of HUD</u>, 817 F.2d 149, 155 (1st Cir. 1987) (Breyer, J.).  HUD must "consider the effect of a HUD grant on the racial and socio-economic composition of the surrounding area."  <u>Id.</u> at 156; <u>see also Darst-Webbe Tenant Assoc. Bd. v. St. Louis Housing Auth.</u>, 339 F.3d 702, 713 (8th Cir. 2003); <u>M&T</u>

24

Mortgage Corp. v. White, No.04CV4775NGGVVP, 2006 WL 47467, at *8
(E.D.N.Y. Jan. 9, 2006).  Overall, "Congress saw the
antidiscrimination policy [embodied in the Fair Housing Act] as
the means to effect the antisegregation-integration policy."
Starrett City, 840 F.2d at 1100.

   The CDBG funds Westchester receives[7] are allocated under 42
U.S.C. § 5306.  "The primary objective of this chapter and of
the community development program of each grantee under this
chapter is the development of viable urban communities, by
providing decent housing and a suitable living environment and
expanding economic opportunities, principally for persons of low
and moderate income."  Id. § 5301(c).  The obligations of
grantees are set out in Section 5304, including their duty to
certify to the Secretary that, among other things, "the grant
will be conducted and administered in conformity with the Civil
Rights Act of 1964 [42 U.S.C.A. § 2000a et seq.] and the Fair
Housing Act [42 U.S.C.A. § 3601 et seq.], and the grantee will
affirmatively further fair housing."  Id. § 5304(b)(2); see also
Comer v. Cisneros, 37 F.3d 775, 792 (2d Cir. 1994) (finding that
under Section 5304, a CDBG grantee must "handle CDBG funds in
conformance with the Constitution and applicable civil rights
laws").

---

[7] Both parties briefly refer to other federal grants that
Westchester receives as well, but it is the CDBG and its
requirements on which both parties focus.

The regulations governing the CDBG are found in 24 C.F.R. pt. 570, and identify a grantee's responsibilities as including the duties to identify impediments to fair housing choice, to take action to overcome those impediments, and to maintain records of its analysis and actions.  Specifically, the regulations

> require the grantee to assume the responsibility of fair housing planning by conducting an analysis to identify impediments to fair housing choice within its jurisdiction, taking appropriate actions to overcome the effects of any impediments identified through that analysis, and maintaining records reflecting the analysis and actions in this regard.

24 C.F.R. § 570.601(a)(2) (emphasis supplied); see also id. § 91.425 (setting similar requirements for certification under the consolidated plan, which includes the CDBG).

The same regulation also provides that President Kennedy's Executive Order 11,063 applies as well to CDBG funds.  Id. § 570.601(b).  Executive Order 11,063 states that "the granting of Federal assistance for . . . housing and related facilities from which Americans are excluded because of their race, color, creed, or national origin is unfair, unjust, and inconsistent with the public policy of the United States as manifested in its Constitution and laws," and expresses concern that "discriminatory policies and practices based upon race, color, creed, or national origin now operate to deny many Americans the benefits of housing financed through Federal assistance."  Exec.

Order No. 11,063, 27 Fed. Reg. 11,527 (1962).  The Executive

Order thus requires HUD

> to take all action necessary and appropriate to
> prevent discrimination because of race, color, creed,
> or national origin (a) in the sale, leasing, rental,
> or other disposition of residential property and
> related facilities [], or in the use or occupancy
> thereof, if such property and related facilities are .
> . . (ii) provided in whole or in part with the aid of
> loans, advances, grants, or contributions hereafter
> agreed to be made by the Federal Government.

Id.[8]

HUD publishes the Fair Housing Planning Guide to assist

grantees to fulfill the "fair housing requirements" of grants

including the CDBG.  U.S. Dept. of HUD, Fair Housing Planning

Guide at iii (1996) ("HUD Guide").  "Interpretations such as

those in opinion letters -- like interpretations contained in

policy statements, agency manuals, and enforcement guidelines,

all of which lack the force of law -- do not warrant Chevron-

style deference."  Christensen v. Harris County, 529 U.S. 576,

587 (2000) (emphasis supplied).  "Instead, interpretations

contained in formats such as opinion letters are 'entitled to

respect' . . . but only to the extent that those interpretations

have the 'power to persuade.'"  Id. (citation omitted).  The HUD

Guide is firmly rooted in the statutory and regulatory framework

---

[8] Executive Order 11,063 was amended in 1980, but the only
relevant change to the above-quoted sections was the addition of
"sex" as a nondiscrimination category.  Exec. Order No. 12,259,
46 Fed. Reg. 1253 (1980).

and consistent with the case law, and it is persuasive on the issue addressed in this Opinion.

The HUD Guide provides that HUD interprets the objective affirmatively to further fair housing to mean, among other things, to "[p]rovide opportunities for inclusive patterns of housing occupancy regardless of race, color, religion, sex, familial status, disability and national origin." HUD Guide at 1-3. An analysis of impediments under this duty involves an "assessment of conditions, both public and private, affecting fair housing choice for all protected classes." Id. at 2-7. Such impediments are "actions, omissions or decisions" which "restrict housing choices or the availability of housing choices," or which have the effect of doing so, based on "race, color, religion, sex, disability, familial status, or national origin," id. at 2-8, including "[p]olicies, practices, or procedures that appear neutral on their face," id. at 2-17. HUD's suggested analysis-of-impediments format includes a housing profile describing "the degree of segregation and restricted housing by race, ethnicity, disability status, and families with children; [and] how segregation and restricted housing supply occurred." Id. at 2-28.

Given this statutory and regulatory framework, Westchester's argument that it had no duty to consider race or race discrimination when identifying impediments to fair housing

choice must fail.  At a minimum, when a grantee certifies that
the grant will be "conducted and administered" in conformity
with the Civil Rights Act of 1964 and the Fair Housing Act, and
certifies that it "will affirmatively further fair housing," the
grantee must consider the existence and impact of race
discrimination on housing opportunities and choice in its
jurisdiction.  In identifying impediments to fair housing
choice, it must consider impediments erected by race
discrimination, and if such impediments exist, it must take
appropriate action to overcome the effects of those impediments.

The complaint alleges that Westchester violated the FCA
when it submitted a false certification to obtain federal funds.
It alleges that Westchester did not consider the existence and
impact of race discrimination on housing opportunities and
choice but nonetheless certified that it would administer its
grant in conformity with the two governing statutes and would
affirmatively further fair housing.  This is sufficient to state
a claim.

Westchester argues that nowhere in the statute itself or in
the implementing regulations is race mentioned specifically as
an impediment to fair housing that grantees were required to
consider.[9]  In the face of the clear legislative purpose of the

---

[9] The Center attempted to point out a provision in 24 C.F.R. §
570.904(c)(1) as requiring specific consideration of race, but

Fair Housing Act, enacted pursuant to Congress's power under the
Thirteenth Amendment as Title VIII of the Civil Rights Act of
1968, to combat racial segregation and discrimination in
housing, an interpretation of "affirmatively further fair
housing" that excludes consideration of race would be an absurd
result.  "Because we must interpret the statute to avoid [] an
absurd result," Troll Co. v. Uneeda Doll Co., 483 F.3d 150, 160

---

as Westchester responded, the provision was deleted after a 1995
amendment to the regulation.  The significance of such an
amendment, however, is unclear, and neither party's suggestions
are persuasive.  Section 570.904 sets out the performance review
criteria for CDBG grantees, with subsection (c)(1) specifically
setting forth the fair housing review criteria.  The current
version of that subsection, enacted in 1995, simply states, "See
the requirements in the Fair Housing Act [], as well as §
570.601(a), which sets forth the grantee's responsibility to
certify that it will affirmatively further fair housing."  24
C.F.R. § 570.904(c)(1).  The 1988 version, however, further
elaborates the criteria, including the review criteria that

> The recipient has conducted an analysis to determine
> the impediments to fair housing choice in its housing
> and community development program and activities.  The
> term "fair housing choice" means the ability of
> persons, regardless of race, color, religion, sex, or
> national origin, of similar income levels to have
> available to them the same housing choices.

24 C.F.R. § 570.904(c)(1) (1988).  Westchester points to a
passage which it argues shows that the same final rule
specifically declined to address the racial impact issue, but
the language to which Westchester points was addressed to a
different regulation, 24 C.F.R. § 91.205, which considers
"Housing and homeless needs assessment," not analysis of
impediments to or the duty affirmatively to further fair
housing.  60 Fed. Reg. 1878-01, 1890 (Jan. 5, 1995).
Furthermore, as noted above, the HUD Guide includes race as a
consideration in analysis of impediments, and overall the
amendment of the regulatory section is not significant here.

(2d Cir. 2007), an analysis of impediments that purposefully and explicitly, "as a matter of policy," avoids consideration of race in analyzing fair housing needs fails to satisfy the duty affirmatively to further fair housing.

Westchester portrays the Center's arguments as a matter of policy difference as to how the analysis of impediments should be conducted.  It points out that the statute and regulations do not specify what needs to be considered in the analysis, and in fact HUD has recognized that the regulations do not provide clear guidance.  Therefore, Westchester's failure to analyze race should be attributed to "imprecise statements or differences in interpretation growing out of a disputed legal question [that] are . . . not false under the FCA." United States ex rel. Lamers v. Green Bay, 168 F.3d 1013, 1018 (7th Cir. 1999).  Westchester's argument, however, misrepresents the Center's claim that Westchester made knowing false representations and concealed its failure to comply with its certifications.  The complaint is not asserting a policy preference; it is accusing Westchester of falsely representing that it will comply with a statutory mandate.  According to the complaint, Westchester excluded consideration of impediments to fair housing based on race when it was required by statute to consider them.  At this stage of the litigation, the Center has

sufficiently pled under the FCA that Westchester made false claims "knowing of [their] falsity." Mikes, 274 F.3d at 695.

In further support of its argument that the HUD regulations do not provide clear guidance, Westchester describes a failed rulemaking in 1998 which sought to "provide specific standards and the bases upon which these requirements [affirmatively to further fair housing] would be measured." 63 Fed. Reg. 57882-01, 57883 (Oct. 28, 2998). "Failed legislative proposals are a particularly dangerous ground on which to rest an interpretation of a prior statute," Lockhart v. United States, 546 U.S. 142, 126 S. Ct. 699, 702 (2005) (citation omitted), however, and the principle applies equally to failed regulations. Westchester has pointed to nothing from the abortive 1998 rulemaking effort that suggests that race discrimination -- the core concern behind passage of the Fair Housing Act -- need no longer be evaluated as an impediment to fair housing.

Finally, Westchester states that "income is arguably a better proxy for determining need than race when distributing housing funds,"[10] and points out that emphasis on income is

---

[10] Westchester further cites authorities from the affirmative action context and the Fair Housing Act case Starrett City, which stated that "[w]hile quotas promote Title VIII's [Fair Housing Act] integration policy, they contravene its antidiscrimination policy, bringing the dual goals of the Act into conflict." 840 F.2d at 1101. To the extent that Westchester is seeking to make a policy argument on the use of race, it is not relevant to this motion to dismiss, where the

required under HUD's regulations in 24 C.F.R. §§ 91.225(b)(4) & 570.208.  Reliance on income data, however, is not at issue here; the only issue is whether Westchester considered race. Westchester may be able to show that it really did consider race after all and properly used income disparity as a proxy for race, or as it also suggests in a footnote, that it determined that race was "not among the most challenging impediments" to fair housing, or any number of defenses that could be raised against the Center's argument that it was not properly considering impediments to fair housing while falsely certifying to the United States that it was doing so.  By showing that it did consider race in some appropriate way, Westchester may ultimately prevail on the merits.  Such disputes, however, cannot be resolved at this stage of the litigation, and the Center has sufficiently pled a cause of action to survive Westchester's Rule 12(b)(6) challenge.

III. Failure to Plead Fraud with Particularity Under Rule 9(b)

     Under Rule 9(b), "in all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity."  Fed. R. Civ. P. 9(b).  The Rule requires that a complaint "(1) specify the statements that the plaintiff

---

claim is that Westchester did not consider race at all, when it was required to analyze impediments to fair housing.

contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." <u>Lerner v. Fleet Bank, N.A.</u>, 459 F.3d 273, 290 (2d Cir. 2006).  Under Rule 9(b) "[m]alice, intent, knowledge, and other condition of mind of a person may be averred generally." Fed. R. Civ. P. 9(b).  Nonetheless, "plaintiffs must allege facts that give rise to a strong inference of fraudulent intent." <u>Lerner</u>, 459 F.3d at 290 (citation omitted).  The inference "may be established either (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness."  <u>Id.</u> at 290-91 (citation omitted).

The Center's complaint satisfies the heightened pleading requirement of Rule 9(b).  The complaint points out that the certifications Westchester made to the Secretary of HUD in receiving the CDBG money were false, that the statements were made by Westchester itself in its certifications, that they were made between April 1, 2000 to the present in each certification required under the statute, and that the statements were false because Westchester's activities as a matter of policy contradicted its certification affirmatively to further fair housing.  Since receipt of the CDBG funds was tied to its certifications, there is strong inference of fraudulent intent.

The admissions from Drummond recited in the complaint are further strong evidence of a knowing violation.  Overall, the Center has sufficiently pled fraud with particularity as required under Rule 9(b).

### Conclusion

The defendant's April 17, 2007 motion to dismiss is denied.

SO ORDERED:

Dated:     New York, New York
           July 13, 2007

_____

DENISE COTE
United States District Judge

35