UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

| | | |
|---|---|---|
| UNITED STATES OF AMERICA *ex rel.* | : | **ECF CASE** |
| ANTI-DISCRIMINATION CENTER OF | : | |
| METRO NEW YORK, INC., | : | 06 CV 2860 (DLC) |
| | : | |
| Plaintiff/Relator, | : | |
| | : | |
| -v- | : | |
| | : | |
| WESTCHESTER COUNTY, NEW YORK, | : | |
| | : | |
| Defendant. | : | |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X


# RELATOR'S OPPOSITION TO DEFENDANT'S
# MOTION FOR SUMMARY JUDGMENT


Michael Allen, *admitted pro hac vice*
Stephen M. Dane, *admitted pro hac vice*
John P. Relman, *admitted pro hac vice*
RELMAN & DANE, PLLC
1225 19th Street, N.W., Suite 600
Washington, D.C.  20036-2456
Telephone: 202/728-1888
FAX: 202/728-0848
Counsel for Plaintiff/Relator

## <u>TABLE OF CONTENTS</u>

Table of Authorities ................................................................................................. iii

INTRODUCTION ....................................................................................................... 1

ARGUMENT ............................................................................................................... 7

I.      FALSE CLAIMS ACT LIABILITY ATTACHES FOR BOTH EXPRESS AND
        IMPLIED REPRESENTATIONS MADE WITH RECKLESS DISREGARD
        FOR THEIR FALSITY, AND CONDUCT AND KNOWLEDGE MUST BE
        MEASURED DURING THE FALSE CLAIMS PERIOD, AND NOT
        AFTERWARD.................................................................................................... 7

II.     AFFH OBLIGATIONS ARE CLEAR AND ENFORCEABLE. ...................... 8

        A.      Affordable Housing Analysis is Not Analysis of Impediments to Fair
                Housing. ................................................................................................. 8

        B.      A Well-Established Body of Law Provides that Race-Based Impediments
                to Fair Housing Must be Identified, Analyzed and Acted Upon. ........... 9

                1.      History and purpose of the AFFH requirements......................... 9

                2.      Caselaw Confirms Both the Centrality of Racial Integration
                        as an AFFH Goal and the Enforceability of AFFH Obligations............... 12

                3.      HUD's *Fair Housing Planning Guide* Further Confirms the
                        Centrality of Race and the Need for Comprehensiveness in
                        Identifying and Working to Remedy Impediments to Fair
                        Housing Choice......................................................................... 13

                4.      Westchester's "anything goes" Standard Would Obliterate the
                        AFFH Obligation. .................................................................... 14

III.    UNDISPUTED EVIDENCE, INCLUDING ADMISSIONS, PROVES
        CONCLUSIVELY THAT THE COUNTY'S REPRESENTATIONS
        REGARDING ITS AFFH OBLIGATION WERE MADE IN RECKLESS
        DISREGARD FOR THEIR TRUTH OR FALSITY........................................ 15

        A.      The County Failed to Identify, Analyze and Act Appropriately to Remedy
                Critical Impediments to Fair Housing Choice. ..................................... 16

                1.      The County Ignored Residential Racial Segregation................. 16

                2.      The County Ignored Racial Discrimination in Housing. ........... 19

i

3.    The County Ignored Municipal Resistance to Affordable Housing and the Impact of that Resistance on Fair Housing Choice. ...................20

4.    Westchester Refused to Tailor its Actions to Conditions it Encountered. ................................................................................24

B.    The County Was Fully Aware, Throughout the False Claims Period, of its AFFH Obligations, and Represented That it Had Met Them Despite Not Having Done So. ...............................................................................27

IV.    WESTCHESTER'S ATTEMPT TO EXCUSE ITS RECKLESS DISREGARD BY REFERENCE TO HUD INACTION IS UNJUSTIFIABLE AS A MATTER OF LAW. ...................................................................................31

V.    WESTCHESTER'S AFFORDABLE HOUSING ANALYSIS WAS NOT A PROXY FOR AN ANALYSIS OF IMPEDIMENTS TO FAIR HOUSING CHOICE FOR AFRICAN-AMERICANS AND ITS AFFORDABLE HOUSING PROGRAM – NEVER DESIGNED TO OVERCOME RACE BASED IMPEDIMENTS – ACTUALLY RESTRICTED FAIR HOUSING CHOICES FOR AFRICAN-AMERICANS ...........................................................34

VI.    WESTCHESTER'S REPRISE OF ITS REJECTED JURISDICTIONAL ARGUMENT HAS NO MERIT........................................................35

CONCLUSION...............................................................................35

# TABLE OF AUTHORITIES

## CASES

*Berensen v. Town of New Castle*, 38 N.Y. 2d 102 (N.Y. 1975) ....................................................25

*Comer v. Cisneros*, 37 F.3d 775 (2d Cir.1994)...........................................................................12

*Cook County Ill. v. U.S. ex rel. Chandler*, 538 U.S. 119 (2003) ...................................................34

*Darst-Webbe Tenant Assoc. Bd. v. St. Louis Housing Auth.,* 339 F.3d 702
(8th Cir.2003)...............................................................................................................................12

*Huntington Branch, NAACP v. Town of Huntington*, 844 F.2d 926
(2nd Cir. 1988)......................................................................................................................12, 21

*In re County of Monroe*, 72 N.Y.2d 338 (N.Y. 1988) ..................................................................25

*Langlois v. Abington Housing Authority*, 234 F. Supp. 2d 33
(D.Mass. 2002)..............................................................................................................................12

*Lorillard v. Pons,* 434 U.S. 575 98 S.Ct. 866, 55 L.Ed.2d 40 (1978) ..........................................12

*Mikes v. Strauss*, 274 F.3d 687 (2d Cir. 2001) .............................................................................7

*M & T Mortgage Corp. v. White*, 2006 WL 47467 (E.D.N.Y. Jan. 9, 2006) ...............................13

*NAACP v. Sec'y of Housing and Urban Development*, 817 F.2d 149
(1st Cir. 1987) ...............................................................................................................10, 12, 13

*Otero v. New York City Housing Authority*, 484 F.2d 1122 (2d Cir. 1973) ...........................10, 12

*Overseas Educ. Ass'n, Inc. v. Federal Labor Relations Authority*, 961 F.2d 36 (2d Cir.
1992) .............................................................................................................................................15

*Reeves v. Sanderson Plumbing Products, Inc.,* 530 U.S. 133 (U.S. 2000)....................................8

*Shannon v. HUD*, 436 F. 2d 809 (3d Cir. 1970) .....................................................................12, 13

*U.S. ex rel. Anti Discrimination Center v. Westchester County,*
495 F. Supp. 2d 375 (S.D.N.Y. 2007)................................................................................. *passim*

*U.S. ex rel. A+ Homecare, Inc. v. Medshares Management Group, Inc.,*
400 F.3d 428 (6th Cir. 2005) ........................................................................................32, 33, 34

*U.S. ex rel. Bahrani v. Conagra, Inc.,* 465 F.3d 1189 (10th Cir. 2006) .........................................8

*U.S. ex rel. Harrison v. Westinghouse Savannah River Co.*, 352 F.3d 908
(4th Cir. 2003)..................................................................................................8, 33

*U.S. ex rel. Kreindler & Kreindler v. United Technologies Corp.*, 985 F.2d 1148
(2d Cir. 1993).......................................................................................................7, 8

*U.S. ex rel. Schell v. Battle Creek Health System*, 419 F.3d 535
(6th Cir. 2005).........................................................................................................8

*U.S. ex rel. Taylor v. Gabelli*, 345 F. Supp. 2d 313 (S.D.N.Y 1999) ...........................34

*U.S. v. Incorporated Village of Island Park*, 888 F. Supp. 419
(E.D.N.Y. 1995)........................................................................................7, 8, 27, 33

*U.S. v. Raymond & Whitcomb Co.,* 53 F. Supp. 2d 436 (S.D.N.Y. 1999)..........7, 27, 33

*U.S. v. Southland Corp.*, 326 F.3d 669 (5th Cir. 2003) ................................................33

*U.S.  v. Starrett City Assocs.,* 840 F.2d 1096 (2d Cir.1988) ........................................10

*Varljen v. Cleveland Gear Co., Inc.*, 250 F.3d 426 (6th Cir. 2006) ............................33

*Vaughn v. Consumer Home Mortgage, Inc.,* 293 F. Supp. 2d 206
(E.D.N.Y.2003)......................................................................................................13

*Westhab, Inc. v. Village of Elmsford*, 151 Misc.2d 1071 N.Y.S.2d 888 (N.Y. Sup. Ct.,
Westchester Co., 1991) ...........................................................................................25

## STATUTES

24 C.F.R. § 91 ...................................................................................................21, 30

24 C.F.R. § 570, *et seq.* ................................................................................. *passim*

31 U.S.C. §3729 .........................................................................................................7

42 U.S.C. §3601, *et seq.*.........................................................................................2, 11

42 U.S.C. §5304 .........................................................................................................10

## OTHER AUTHORITIES

Local Law No. 17-1999, codified as Westchester County Code §700.01 ...............19, 20

Local Law 25-2001, codified as Westchester County Code § 209.101(a) ...................................26

*The New Oxford American Dictionary, Second Edition*
(Oxford University Press, May 2005)...........................................................................................11

**INTRODUCTION**

Relator Anti-Discrimination Center ("ADC" or "Relator") is entitled to partial summary judgment against Defendant Westchester County, and the Court should deny the County's cross-motion, because undisputed facts establish that, with reckless disregard for their falsity, the County submitted false claims and certifications to the U.S. Department of Housing and Urban Development ("HUD"), seeking payment from the federal treasury. The County's claims were material in the sense that HUD would not have released funds had it known the truth, and they were false according to the clear and mandatory legal obligations on recipients of federal housing and community development ("HCD") funds to "affirmatively further fair housing" ("AFFH").

This is not a case in which the County missed some obscure fair housing impediment or failed to meet some technical planning requirement. Rather, it is about the County's studied and deliberate avoidance of long-standing race-based impediments to fair housing, the very impediments the Fair Housing Act seeks to overcome and that HUD repeatedly instructed Westchester to analyze. Closing its eyes to race-based impediments means that the County could not design appropriate actions to overcome them. Westchester did nothing to counter the decades-long intensification of racial segregation in the County,[1] and now admits that it did not even try.[2] Furthermore, because it avoided analyzing or confronting race-based impediments, the County's two major affordable housing initiatives—the Affordable Housing Allocation Plan and its Section 8 rental assistance program— actually perpetuated racial segregation rather than reducing it.[3]

---

[1] Expert Report of Andrew A. Beveridge, Ph.D., Declaration of Michael Allen in Support of Plaintiff/Relator's Motion for Partial Summary Judgment (Doc. 8), App. II, Tab 21, ¶¶23-27, Exhs. D, E and F. ("Beveridge Report")[hereafter, reference to such documents will be indicated by the format "App. ___, Tab ___."]

[2] Relator's Statement of Material Facts Not in Dispute ("Facts")¶15 ("In the period from 1996 through and including April 2006, Westchester did not adopt as a goal or objective a reduction of large inter-municipal variations in racial composition.")

[3] Beveridge Report at ¶¶39-59; Rebuttal Report of Andrew Beveridge, App. II, Tab 22, ¶¶5-7, Exhs. R-1, R-2

1

The County's AFFH obligations, established in statutes and regulations and elucidated in federal court decisions and HUD's *Fair Housing Planning Guide*, are sufficiently clear and specific to be judicially enforced.  Congress imposed AFFH obligations to ensure that HCD funds would be used "in a manner affirmatively to further the policies of [the Fair Housing Act]."  42 U.S.C. § 3608(e)(5).  This Court has recognized that "the clear legislative purpose of the Fair Housing Act [is] to combat racial segregation and discrimination in housing," *U.S. ex rel. Anti Discrimination Center v. Westchester County,* 495 F. Supp. 2d 375, 388 (S.D.N.Y. 2007), and relied on decisions from the Second Circuit and other courts in holding that an interpretation of AFFH that excludes an analysis of race-based impediments "would be an absurd result."  *Id.*

Undisputed evidence shows that the County failed to analyze race-based impediments when it conducted the Analysis of Impediments to fair housing choice ("AI") in 2000, and again in 2004. The evidence in this case demonstrates conclusively that the County knew what was required of it to comply with its representations regarding AFFH, and knew that it could not receive HCD funds without making those explicit and implicit representations.  Similarly, undisputed evidence shows that the County knew about the existence of race-based impediments in Westchester between April 2000 and April 2006 (the "false claims period"), but refused to identify them or analyze their impact on African-Americans and others protected by the Fair Housing Act,[4] let alone take appropriate actions to overcome those impediments.

The County's summary judgment papers advance three arguments for why it believes it did not violate the AFFH standards and why it should not be held liable for making false claims to the federal government.  Each is without legal or factual support, and each should be rejected.

---

[4] Throughout the false claims period, the FHA prohibited discrimination on the basis of race, color, national origin, religion, gender, familial status and disability, sometimes referred to as the "protected classes." Nothing in the FHA permits a recipient of HCD funds to pick and choose which protected classes will benefit from its AFFH activities.

First, the County contends that the standard for conducting an AI is so minimal that the County can altogether fail or refuse to analyze or act upon *fair housing* impediments experienced because of race so long as it analyzes impediments to *affordable housing*.[5]  This position is directly at odds with HUD's clear instruction, known to the County as early as 1996, that "build[ing] or rehabiltat[ing] housing for low- and moderate-income families … is not in and of itself sufficient to affirmatively further fair housing." (Declaration of Michael Allen in Support of Relator's Opposition to Defendant's Motion for Summary Judgment, Ex. A, *Fair Housing Planning Guide*, at 5-4.[hereafter, such documents will be indicated by the format "Ex. ___," employing capital letters.])  Rather, it is only "[w]hen steps are taken to assure that the housing is fully available to all residents of the community, regardless of race [or other protected class that building or rehabilitating such housing that] the actions … affirmatively further fair housing."  (*Id.*)  Knowing this standard, the County permitted most affordable units to be built in areas of minority concentration, or built subject to selection preferences that tended to exclude African-Americans from units in predominantly white communities, resulting in the reinforcement of racial segregation.

Westchester's AIs for 2000 and 2004 make no mention of race-based impediments to fair housing, yet it contends that it "appropriately considered race" in those documents.  (County's Memorandum of Law in Support of its Motion for Summary Judgment, Doc. 86 ("Def. Mem") at 5-12.) But the County cannot magically turn a complete failure to identify race-based impediments or act to overcome them into AFFH "compliance." Forty years of statutory authority, regulations and

---

[5] Although the County claims, in addition to housing affordability, to have considered "ten other obstacles" in its 2000 AI (Def. Mem. at 6), and "twelve additional impediments" in its 2004 AI (Def. Mem. at 7), each of these items is simply a subset of impediments to affordable housing production.  The 2000 AI mentions such factors as "lack of vacant land, high cost of land, limited availability of funds, limited number of Section 8 certificates and vouchers…[and] high construction cost area," all of which are presented as sub-issues of affordability. (*See* Affirmation of Michael A. Kalish in Support of Motion for Summary Judgment, Exhibit 1 at D0119068-71 (hereafter, citations to the County's summary judgment exhibits will be in the format "Ex. ___).)  The 2004 AI lists "12 impediments to the creation of affordable housing units," repeating all those cited in 2000 and adding one related to the prevalence of lead-based paint in housing units.

guidance from the federal courts and from HUD have produced a robust body of law that sets forth

clear and meaningful standards.  Most recently articulated in HUD's regulations and amplified in

its *Planning Guide*, a document the Court has found to be "firmly rooted in the statutory and

regulatory framework and consistent with case law, and [therefore] persuasive" on the extent of a

recipient's AFFH obligation, *Anti-Discrimination Center*, 495 F. Supp. 2d at 387, the actual AFFH

standard required the County to produce an AI that, among other things:

- Describes "the degree of segregation and restricted housing by race [and other protected class and] how segregation and restricted housing occurred and relate this information to neighborhood and cost of housing."  (Ex. A, *Planning Guide* at 2-28)

- Contains a "comprehensive review of [the] jurisdiction's laws, regulations, and administrative policies, procedures and practices [and an] assessment of how those laws, etc. affect the location [and] availability … of housing." (*Id.* at 2-7.)

- Includes an "assessment of conditions, both public and private, affecting fair housing choice for all protected classes."  (*Id.*)

A review of the AIs, together with the undisputed evidence and admissions in this case,

establishes that the County did none of these things, and that the County's contention that it

"undertook a comprehensive review of potential impediments to fair housing," (Def. Mem. at 22), is

simply unsupported by evidence.  Contrary to its AFFH obligation to "become fully aware of the

existence, nature, extent and causes of *all fair housing problems* and the resources available to solve

them," (Ex. A, *Planning Guide* at 2-8 (emphasis supplied)), the County dealt narrowly with

economic conditions only and refused to identify or act upon race-based impediments.

The County now claims to have appropriately used income as a "proxy" for race when it

identified the "lack of affordable housing" as the most significant impediment to fair housing

choice. (Def. Mem. at 10-11.)  There is no basis in law by which an HCD recipient is permitted to

pick and choose among impediments to fair housing.  The evidence shows that the County never

analyzed or identified the relationship between race and income during the false claims period and

demonstrates conclusively that income is *not* an adequate proxy for race.  For example, African-Americans in Westchester become *more* racially segregated as their level of household income rises.[6]  Further, the County's own expert admitted that more than 80% of African-Americans in Westchester do not meet any definition of poverty and Relator's expert reported HUD data showing nearly 50% of African-Americans in Westchester made too much money to qualify for the County's affordable housing programs.[7]

Worse still, the record demonstrates that the County's affordable housing programs actually resulted in increased racial segregation throughout the County – a fact not revealed to HUD, and utterly inconsistent with the County's AFFH certification.  Having unlawfully limited its AIs to the issue of affordable housing, the undisputed evidence demonstrates that the County permitted nearly three-quarters of new affordable housing units to be built in census tracts with high minority populations, and permitted many of those in white census tracts to employ residency preferences that may have limited occupancy by racial minorities.

The County's second defense is that even if it did not comply with the requirements for AFFH certification, it was only "negligent" in preparing AIs and in failing to take actions appropriate to affirmatively further fair housing. (Def. Mem. at 27-31; Ex. B, Clark 72:6 – 74:13; 75:23 – 78:25.)  This defense is also not supported by the record. The County's own internal records demonstrate that it knew race-based impediments to fair housing choice were critical to the AFFH certification.  Well before 2000, the County knew that reports that address affordable housing "should not be confused with the Fair Housing Plan,"[8]  and that, in preparing the AI, the County

---

[6] Beveridge Report, ¶38 ("From my analysis of income and racial segregation in Westchester County, it is obvious that racial segregation and concentration in Westchester County is not simply the result of income segregation.")

[7] Ex. B, Deposition of W.A.V. Clark ("Clark"), 72:6 – 74:13; 75:23 – 78:25

[8] *See* Ex. F, Holland Letter to Seligsohn (1996).

needed to avoid confusing the two concepts: "Remember: This is not a report on affordable

housing, but FAIR HOUSING!!!" (Ex. E, 1996 Fair Housing Plan Outline (emphasis in original).)

HUD provided additional reinforcement of the importance of race-based impediments in 2002,

conducting training attended by Norma Drummond, Westchester's point person for AFFH

compliance.  The extensive training materials, which Drummond kept in her office throughout the

false claims period, highlight the centrality of analyzing the scope and causes of racial segregation,

and taking actions to overcome its effects.  The County knew it had to look at race, and it chose not

to.  This evidence is sufficient to prove the County's submission of false claims in reckless

disregard of their truth or falsity, which is all that is required under the FCA.

Third, Westchester asserts that HUD's somehow endorsed or approved Westchester's AFFH

noncompliance.  But there is no evidence whatsoever that HUD's action or inaction had any impact

on Westchester's understanding of its AFFH obligations.  In any event, the law is clear that HUD

does not review or approve AIs, and lack of administrative sanction does not absolve the County of

liability for making false claims to the federal government.  Furthermore, undisputed evidence

shows that the County concealed from HUD many known fair housing impediments, and also

concealed from HUD the County's policies not to enforce AFFH compliance by the 40

municipalities comprising the Westchester Urban County Consortium ("Consortium Municipalities"

or "CMs").  Even if HUD had authority to dispense with AFFH requirements (which it does not),

the County's concealment of material facts would make such authority inapplicable.

The County's dilemma has been that it simply has no contemporaneous documents from the

false claims period evidencing any analysis of, or action to remedy, race-based impediments to fair

housing choice, even though HUD regulations require that all such records be maintained.  In its

brief, the County tries to divert the Court from this reality by presenting disconnected bits of data

from documents unrelated to its AIs, and facts that are immaterial to the legal issues involved in this

case.[9]  The County asks the Court to draw from the *availability of raw data* relating to race the

unwarranted inference that the County utilized that data to *conduct the analysis* required by federal

law.  The absence of evidence that an analysis was conducted precludes such an inference.

## ARGUMENT

**I.      FALSE CLAIMS ACT LIABILITY ATTACHES FOR BOTH EXPRESS AND
IMPLIED REPRESENTATIONS MADE WITH RECKLESS DISREGARD FOR
THEIR FALSITY, AND CONDUCT AND KNOWLEDGE MUST BE MEASURED
DURING THE FALSE CLAIMS PERIOD, AND NOT AFTERWARD.**

Relator can establish the County's FCA liability by showing that the County "(1) made

claims (2) to the United States government, (3) that were false or fraudulent, (4) knowing of their

falsity, and (5) seeking payment from the federal treasury."  *Anti-Discrimination Center,* 495 F.

Supp. 2d at 384, *citing to Mikes v. Strauss*, 274 F.3d 687, 695 (2d Cir. 2001).  The County has

conceded points (1), (2) and (5). (Facts ¶34, Ex. D, Deposition of Mark Massari ("Massari") 55:23 –

57:14, Exhs. 1, 2.)  The only remaining issues are the falsity of the claims and the County's

knowledge of their falsity.

Relator need not prove "intent," but simply that Westchester "knowingly" presented false

claims, and this can be established by demonstrating that it acted with reckless disregard for the

truth or falsity of its claims.  31 U.S.C. § 3729(b); *U.S. ex rel. Kreindler & Kreindler v. United

Technologies Corp.*, 985 F.2d 1148, 1157 (2d Cir. 1993); *U.S. v. Raymond & Whitcomb Co.,* 53 F.

Supp. 2d 436, 447 (S.D.N.Y. 1999); *United States v. Incorporated Village of Island Park*, 888 F.

Supp. 419, 439 (E.D.N.Y. 1995).

The County can be held liable under the FCA both for its explicit false claims and

certifications and for the implied false certifications it made each time it requested payment from

the federal government.  *Mikes*, 274 F.3d at 697-99.  *See also Kreindler*, 985 F.2d at 1157 ("[T]he

---

[9] As Relator makes clear elsewhere, many of the "facts" on which the County bases its affirmative motion
are entirely immaterial to claims or defenses in this case, which must be grounded in the FCA and the AFFH
requirements.  (Relator's Counter Statement to Defendant's Statement of Facts ("Response").)

number of assertable FCA claims is not measured by the number of contracts, but rather by the number of fraudulent acts committed by the defendant"); *Island Park*, 888 F. Supp. at 441 (holding that "a separate claim for liability under the False Claims Act exists with respect to *each* monthly mortgage subsidy claim submitted" by the lender [emphasis in the original]).

The falsity of the County's certifications and claims for payment must be measured as of the time it made them, and not in 2008, once it has been sued and had time to construct *post hoc* justifications for its failures to comply with its AFFH duties.[10] *See U.S. ex rel. Bahrani v. Conagra, Inc.* 465 F.3d 1189, 1206 (10th Cir. 2006) (question of whether the employees acted knowingly concerns their knowledge at the time they made the alleged false claims): *U.S. ex rel. Harrison v. Westinghouse Savannah River Co.*, 352 F.3d 908, 920 (4th Cir. 2003) (Defendant acted with the requisite knowledge because at the time it submitted invoices it intended for government to believe its alleged false statement); *U.S. ex rel. Schell v. Battle Creek Health System*, 419 F.3d 535, 540-41 (6th Cir. 2005). *See also Kreindler* 958 F.2d at 1156.

## II.   AFFH OBLIGATIONS ARE CLEAR AND ENFORCEABLE.

### A.   Affordable Housing Analysis Is Not Analysis of Impediments To Fair Housing.

To read defendant's brief, one would think that the concepts of affordable housing and fair housing are interchangeable.  Westchester knew as early as 1996 that this proposition was false.  An internal Planning Department document explaining how a fair housing impediments analysis should be conducted.  It set out this warning: "Remember: This is not a report on affordable housing, but FAIR HOUSING!!!" (Ex. E, 1996 Fair Housing Plan Outline.  *See also* Ex. F, 1996 Letter from Planning Department to Ann Seligsohn.)

---

[10] *Post hoc* rationalizations do provide affirmative evidence of guilt.  *Reeves v. Sanderson Plumbing Products, Inc.,* 530 U.S. 133, 120 S.Ct. 2097 (U.S. 2000) (internal citations omitted)(holding that it is a "general principle of evidence law that the factfinder is entitled to consider a party's dishonesty about a material fact as "'affirmative evidence of guilt'").

The County deliberately seeks to blur the difference between an AI (a civil rights analysis that must focus, among other things, on the eradication of race-based impediments to *fair housing)* and a Consolidated Plan (another other HUD-mandated planning document that focuses on *affordable housing* and community development programs).[11]  When the County's papers mention "plans" or "submissions," that should alert the Court that it is no longer referring to the AI's civil rights analysis, for which the County is required to maintain detailed records, but is to some other HUD program or reporting requirements with no relevance to the County's AFFH duties.

> **B.**      **A Well-Established Body of Law Provides that Race-Based Impediments to Fair Housing Must be Identified, Analyzed and Acted Upon.**

The County's attempt to avoid FCA liability rests principally on two false premises.  First, that the law "sets the bar low for assessing compliance with the AFFH certification," (Def. Mem. at 24); and second, that the County can satisfy its AFFH obligations by artificially limiting its AI to one impediment—the "lack of affordable housing," (Def. Mem. at 6, Defendant's Rule 56.1 Statement ("Stmt.") ¶10)—even as it closes it eyes to all other impediments. There is no basis in statute, regulation, guidance, training, *or in Westchester's own understanding of its AFFH obligations during the false claims period[12]* to suggest that the these obligations could fairly be interpreted as permitting the County to ignore impediments to fair housing choice, let alone race-based impediments, and the County cites no authority.

> 1.      History and purpose of the AFFH requirements.

---

[11] The County continues on this course even though Deputy Planning Commission Norma Drummond has acknowledged that she understood throughout the false claims period that the concepts of affordable housing and fair housing should not be confused.  (Ex. C, Drummond 390:3 – 392:13.) If the "County reasonably believed that the shortage of affordable housing disparately impacted classes protected by the FHA," (Def. Mem. at 10, Stmt. ¶ 25), and that "it is difficult to get municipalities to comply with" the County plan to build affordable housing (Stmt. ¶51), then the County's was obliged set forth these impediments in its AIs.

[12] Ex. C, Drummond 396:21 – 409:5 (adopting recommendations of Ex. E, Fair Housing Plan Outline and Ex. G, 1996 Fair Housing Plan Memo, produced by the County Planning Department).

Forty years ago, Congress enacted the original AFFH provisions as part of the Fair Housing Act ("FHA").  42 U.S.C. § 3608(e)(5) requires that HCD programs be conducted "in a manner affirmatively to further the policies of [the FHA]."[13]  Congress clearly intended that recipients of HCD funds "act affirmatively to achieve integration in housing," *Otero v. New York City Housing Authority*, 484 F.2d 1122, 1133 (2d Cir. 1973), and "saw the antidiscrimination policy [embodied in the Fair Housing Act] as the means to effect the antisegregation-integration policy." *United States v. Starrett City Assocs.,* 840 F.2d 1096, 1100 (2d Cir.1988).  The legislative history of § 3608 reflects Congressional "desire to have HUD use its grant programs to assist in ending discrimination and segregation, to the point where the supply of genuinely open housing increases…." *NAACP v. Sec'y of Housing and Urban Development*, 817 F.2d 149, 155 (1st Cir. 1987).

To further the AFFH principles of the FHA and the HCDA, Congress instructed HUD to promulgate regulations. [14]  These regulations "specifically require the grantee to assume the responsibility of fair housing planning by conducting an analysis to identify impediments to fair housing choice within its jurisdiction, taking appropriate actions to overcome the effects of any impediments identified through that analysis, and maintaining records reflecting the analysis and actions in this regard."  24 C.F.R. § 570.601(a)(2).[15]

---

[13] The Housing and Community Development Act of 1974 (HCDA) mirrors the obligations of § 3608 in providing that a recipient of HCD funds must, as a precondition to receiving those funds, certify to the HUD Secretary that it will affirmatively further fair housing.  42 U.S.C. § 5304.

[14] In its summary judgment papers, the County repackages an argument made in its motion to dismiss and rejected by the Court.  Citing to a failed 1998 HUD rulemaking, the County suggests that there is "confusion" over the application of the AFFH certification requirements. (Def. Mem. at 20, n. 16.)  The Court found the argument irrelevant to the County's obligation to analyze race-based impediments. *Anti-Discrimination Center*, 495 F. Supp. 2d at 388-89.

[15] Related regulations underline the breadth of a recipient's obligations to conduct its own programs and those of its subrecipients consistent with the AFFH requirements.  For instance, a recipient is obliged to demonstrate, through contemporaneous "fair housing and equal opportunity records," its "analysis of impediments and the actions the recipient has carried out with its [HCD] *and other resources* to remedy or ameliorate *any impediments* to fair housing choice in the *recipient's community*."  24 C.F.R. § 570.506(g)(1) (emphasis supplied).  In other words, the recipient must document the planning and execution of its AI, and

The AFFH regulations do not say that a jurisdiction can "analyze and act to overcome what the jurisdiction considers to be *the most significant impediment* to fair housing choice."  On the contrary, the regulations require an HCD recipient to identify all impediments to fair housing choice and act to overcome them.  Records of analysis of and actions to counter "any impediments" must be maintained pursuant to 24 C.F.R. § 570.506(g)(1) so that the performance according to those standards can be assessed.  Because conditions vary from jurisdiction to jurisdiction, HUD has entrusted each recipient conduct a comprehensive "analysis"[16] to determine which conditions may limit fair housing choice, and take "appropriate"[17] actions to be defined by the specific conditions in that jurisdiction.

Notwithstanding Westchester's claim that the AFFH statute and regulations are not specific enough (Def. Mem. at 22), courts have been enforcing the AFFH standard successfully for nearly 40 years.  The mandate to identify all impediments, and to take actions to overcome them, comes directly from the FHA, a law passed to "provide, within constitutional limitations, for fair housing throughout the United States," 42 U.S.C. § 3601.  Its broad policy and Congress's specific desire to ensure that federal funds be spent to broaden and not to constrict housing choice, have resulted in requirements applicable to every recipient of HCD funds.  Among other things, the law requires recipients to consider location and demographic patterns when developing affordable housing

---

the actions taken to overcome impediments, in a manner sufficiently robust to permit a determination of whether "the recipient has met the requirements…"  *Id.*  When a recipient chooses to form an Urban County Consortium including municipalities that would not be able to qualify for HCD funds in their own right, it is obligated to enter into "cooperation agreements" imposing AFFH obligations on those municipalities, 24 C.F.R. § 570.307, and requiring the recipient to sanction municipalities for noncompliance with those obligations, *id.,* 24 C.F.R. §§ 570.501, 570.503.  The recipient is held "accountable for the actions or failures to act" of those municipalities. 24 C.F.R. § 570.906.

[16] An "analysis" is a "detailed examination of the elements or structure of something, typically as a basis for discussion or interpretation." *The New Oxford American Dictionary, Second Edition* (Oxford University Press, May 2005).

[17] "Appropriate" means "suitable or proper *in the circumstances.*" *The New Oxford American Dictionary, Second Edition* (Oxford University Press, May 2005) (emphasis supplied).

11

because geographic concentrations of such housing has historically led to racial segregation, a condition condemned by the FHA.  A jurisdiction that seeks to build all of its affordable housing in minority-concentrated neighborhoods[18] may literally do more harm than good.  *Huntington Branch, NAACP v. Town of Huntington*, 844 F.2d 926 (2nd Cir. 1988).  The AFFH obligation requires a jurisdiction to "take off the blinders" and confront the sometimes difficult reality of race-based impediments.  *This is precisely what Westchester did not do.*

> 2.   Caselaw Confirms Both the Centrality of Racial Integration as an AFFH Goal and the Enforceability of AFFH Obligations.

Whether addressing race-based impediments to fair housing is at the core of the AFFH obligation is not some "policy" disagreement, as Defendant would like the Court to believe, nor is it a question that is open to dispute.  Since 1970, the federal courts have consistently held that the AFFH obligation requires HCD recipients to pay close attention to "the very real effect that racial concentration has had in the development of urban blight…[and] must utilize some institutionalized method" to analyze the impact of projects on housing opportunities on those in protected classes.[19]

The courts have routinely held that the AFFH provisions are s judicially enforceable.  *NAACP*, 817 F.2d at 149 (holding that "the court can find adequate standards against which to judge

---

[18] The County Executive testified that he would approve of building affordable housing units exclusively in minority-concentrated areas, such as Yonkers, Peekskill, Ossining and White Plains.  (Ex. H, Deposition of Andrew Spano ("Spano") 70:16-23.)

[19] *See, e.g., Shannon v. HUD*, 436 F.2d 809, 821 (3d Cir. 1970).  While § 3608 speaks directly to the Secretary's obligation to affirmatively further fair housing, an early Second Circuit case confirmed that obligation as extending to HCD recipients.  *See Otero v. New York City Housing Authority*, 484 F.2d 1122, 1133 (2d Cir. 1973) (holding that a local public housing authority is "under an obligation to act affirmatively to achieve integration in housing"); *Comer v. Cisneros,* 37 F.3d 775, 792 (2d Cir.1994) (recipient must "handle CDBG funds in conformance with the Constitution and applicable civil rights laws"); *Langlois v. Abington Housing Authority*, 234 F. Supp. 2d 33, 73 (D.Mass. 2002) (holding housing authority liable for local residency preferences that had a racially exclusive effect); *Darst-Webbe Tenant Assoc. Bd. v. St. Louis Housing Auth.,* 339 F.3d 702, 713 (8th Cir.2003).Congress strengthened § 3608(e) as part of the Fair Housing Amendments Act of 1988, thereby endorsing the body of Circuit Court law between 1968 and 1988 concerning the AFFH obligation.  *See, e.g., Lorillard v. Pons,* 434 U.S. 575, 580, 98 S.Ct. 866, 55 L.Ed.2d 40 (1978) ("Congress is presumed to be aware of an administrative or judicial interpretation of a statute and to adopt that interpretation when it re-enacts a statute without change").

the lawfulness of" an agency's conduct, and to determine whether its "pattern of activity reveals a failure to live up to its [AFFH] obligation"). *See also M & T Mortgage Corp. v. White,* 2006 WL 47467, (E.D.N.Y. Jan. 9, 2006); *Vaughn v. Consumer Home Mortgage, Inc.,* 293 F. Supp. 2d 206, 211 (E.D.N.Y.2003)(same).

3. HUD's *Fair Housing Planning Guide* Further Confirms the Centrality of Race and the Need for Comprehensiveness in Identifying and Working to Remedy Impediments to Fair Housing Choice

Defendant tries to minimize its non-compliance with the *Planning Guide* by its limited admission that it did not follow "each" of the *Planning Guide's* "suggestions." (Def . Mem. at 23.) In fact, Westchester proceeded throughout the false claims period in complete disregard of the *Planning Guide.*  As noted above, the *Planning Guide* forecloses the County's argument that it could build affordable housing heedless of its fair housing consequences, or that it could focus only on "significant" or "challenging" fair housing problems. *See* p. 3, *supra*; (Ex. A, *Planning Guide* at 2-8, 5-4); 24 CF.R. §570.506(g)(1); *NAACP*, 17 F.2d at 158.

The *Planning Guide* tells HCD recipients that an exclusive focus on affordable housing may actually be contrary to AFFH duties because it would not identify impediments experienced *because of race*, and would not consider the extent to which concentrating affordable housing in already-segregated communities diminishes housing and other opportunities for African-Americans by reinforcing and perpetuating racial segregation.  *See, e.g., Shannon*, 436 F. 2d at 820-821 (public agencies cannot "remain blind to the very real effect that racial concentration has had in the development of urban blight…. Increase or maintenance of racial concentration is prima facie likely to lead to urban blight and is thus prima facie at variance with the national housing policy").

The *Planning Guide* tells recipients that the AI must focus on "actions, omissions, or decisions taken *because of race [or other protected class or]…which have the effect of restricting housing choice [on that basis].*" (Ex. A, *Planning Guide*, at 2-8 (emphasis supplied).) Furthermore,

13

"the scope of the AI is broad.  It covers the *full array* of public and private policies, practices, and procedures affecting housing choice." (*Id.,* at 2-8 (emphasis supplied).) The AI should describe: "the *degree of segregation* and restricted housing by race, ethnicity, disability status, and families with children; *how segregation and restricted housing occurred*; and *relate this information by neighborhood and cost of housing*." (*Id.* at 2-28 (emphasis supplied).)

The *Planning Guide* explains that a recipient's obligations include a "*comprehensive review* of a State or Entitlement jurisdiction's laws, regulations, and administrative policies, procedures, and practices," and necessitates the recipient becoming "*fully aware* of the existence, nature, extent and causes of *all fair housing problems and the resources available to solve them."* (*Id.* at 2-7, 2-8 (emphasis supplied).)  As defined by HUD, "impediments to fair housing choice" are not limited to a subset of fair housing problems, are not limited to intentional discrimination, and are not limited to actions.  HUD defines "impediments to fair housing choice" as broadly as can be; they include: "*Any* actions, omissions, or decisions which have the effect of restricting housing choices or the availability of housing choices on the basis of race [or other protected class]."  *Id.* (emphasis supplied).  Through training and correspondence directly with the County, HUD reinforced the *Planning Guide* standards.  (Ex. A; Ex. I, HUD Letter to County Executive, July 17, 1996.)

4.    Westchester's "anything goes" standard would obliterate the AFFH  obligation.

In its brief, Westchester fails to articulate *any* standard for AFFH compliance other than the "anything goes" standard.  This case shows very concretely why Westchester's "low bar" approach would preclude any enforcement of the AFFH regulations: a jurisdiction could know about a variety of impediments to the fair housing choice of African-Americans; decide not to identify or analyze them at all in its AI; decide *not* to act upon those; blithely certify that it *has* analyzed, identified, and acted upon them; and then get to keep more than $50 million in federal funds while thumbing its nose at the federal AFFH obligations.

This "low bar" approach would violate the fundamental principle of statutory and regulatory construction in that it is impermissible to interpret a provision in a way to deprive that provision of its substance. *Overseas Educ. Ass'n, Inc. v. Federal Labor Relations Authority*, 961 F.2d 36 (2d Cir. 1992 (rejecting an interpretation that would "frustrate congressional intent and contravene fundamental precepts of statutory construction).  In view of the purpose of the FHA and implementing regulations, such an interpretation would be "absurd."  *Anti-Discrimination Center*, 495 F. Supp. 2d at 388.

This is why the County ultimately felt obliged to assert that it "undertook a comprehensive review of potential impediments to fair housing (Def. Mem. at 22), and "gathered and analyzed a variety of information and data to determine … what impediments to fair housing existed in the County." (Stmt. ¶18.)  But the assertions are as empty as the County's original representations to the federal government.  The Court will note that the County does not and cannot point to any documents explaining what it considered and how it reached any conclusions.  Moreover, the County has admitted that it did not review the most basic sources necessary to conduct a real analysis of race-based impediments, and it ignored many known impediments.[20]

III.   **UNDISPUTED EVIDENCE, INCLUDING ADMISSIONS, PROVES CONCLUSIVELY THAT THE COUNTY'S REPRESENTATIONS REGARDING ITS AFFH OBLIGATION WERE MADE IN RECKLESS DISREGARD FOR THEIR TRUTH OR FALSITY.**

The evidence is conclusive concerning the County's knowledge of its AFFH obligations, its failure to identify, analyze and respond to known race-based impediments to fair housing choice,

---

[20] Facts ¶¶15 (County did not adopt goal of reducing large inter-municipal variations in racial composition); 18 (AIs did not contain any reference to "housing discrimination" or "housing segregation"); 26-30 (County admits it did not discuss or cite to data from the County Human Rights Commission or any other governmental fair housing agency); 57 (County did not review data on race to determine whether  Section 8 recipients are able to live where they want); 66 (County did not identify "first refusal" law as impediment); and 84 (County Executive never asked Planning Commissioner to do a thorough assessment of race-based impediments to fair housing.

the absence of any contemporaneous records of an impediments analysis or appropriate actions, and the resulting falsity of its express and implied representations to HUD.

**A.**     **The County Failed to Identify, Analyze and Act Appropriately to Remedy Critical Impediments to Fair Housing Choice.**

There is no factual dispute concerning the County's knowledge that Westchester was residentially segregated on the basis of race during the false claims period, that African-Americans experienced housing discrimination on the basis of race, and that the County's affordable housing program experienced massive resistance from many overwhelmingly white municipalities to the detriment of residential integration.[21] Yet the County never identified any of these impediments in its AIs or its Consolidated Annual Performance Reports ("CAPERs") submitted to HUD, and took no action to grapple with race-based impediments to fair housing.

**1.**     The County Ignored Residential Racial Segregation.

The County is just not telling the truth when it says: "*No one* identified racial discrimination or segregation as a concern," Def. Mem. 9, Stmt. ¶20 (emphasis in the original). Westchester Residential Opportunities ("WRO"), a private fair housing organization in Westchester County, repeatedly expressed concerns about discrimination and segregation directly to the County. In August 1996, WRO's executive director wrote to the County Planning Department in response to its request for assistance with the County's first AI. (Ex. Q, WRO Letter to Planning Department, August 1996, at p.3.) In that letter, WRO described how resistance to the Section 8 rent subsidy program, "strict zoning requirements" in many of the County's predominantly White municipalities and community opposition to affordable housing, among other factors, result in racial segregation and a "message to minorities …[to] 'Stay Out.'" (*Id.*; Declaration of Ann Seligsohn, ¶3.) During

---

[21] Facts ¶¶6-11, 24, 25, *Housing Opportunities for Westchester: A Guide to Affordable Housing Development* ("Guide to Affordable Housing Development") [App. I, Tab 10], End of Decade Report [App. I, Tab 11] and the Affordable Housing Action Plan [App. I, Tab 12].

the County's development of its 2000 and 2004 AIs, WRO's Fair Housing Director (the person whose knowledge of local fair housing issues the County acknowledges as unsurpassed, (Ex. C, Drummond 422:4-20)), "raised concerns about the level of racial segregation in Westchester County and the extent of housing discrimination on the basis of race." (Seligsohn Declaration, ¶4.)

Furthermore, the County's own data confirm the existence of significant racial segregation and "hypersegregation" in Westchester, and there is no dispute that the County was aware of that fact throughout the false claims period. (*See, e.g.,* Facts ¶¶ 7-12, 77-80; Beveridge Report, App. II, Tab 21, p. 9 ("Westchester County's 'analysis of impediments' fails to note, much less analyze, the high level of racial segregation in the County, even though the data necessary for such an analysis are easily accessible and standard methods to conduct such an analysis are well known"); *see also* Expert Report of John R. Logan, App. II, Tab 25, pp. 6-8.)

From the *Planning Guide*, correspondence and training from HUD, and advice from its own employees and WRO, the County knew (or should have known) that its AIs were supposed to describe and analyze "the degree of segregation and restricted housing by race [and other protected classes]; how segregation and restricted housing occurred; and relate this information by neighborhood and cost of housing." (Ex. A, *Planning Guide*, 2-28. Ex. K, Deposition of Gerard Mulligan 56:14-57:10; Ex. G, 1996 Fair Housing Plan Memo; Ex. C, Drummond 398:14-19.)

Westchester wants to divert attention from its reckless disregard of this problem by suggesting that residential segregation does not necessarily result from intentional discrimination, and that residential segregation has complicated historical antecedents. (Def. Mem. at 11-12.) Indeed, Westchester goes further, and tries to write off residential segregation as something it cannot have been deemed to know about because of "historical population patterns." (Def. Mem. at 12.) As documented above and more completely in the Beveridge Report, historical population

17

patterns *do* put the County on notice of segregation,[22] but historical population patterns were not the only way that the County knew about the fact of segregation.[23]

Moreover, Westchester knew that intent is not an element of an AFFH violation. (Ex. A, *Planning Guide* at 2-8.)  As the County Executive put it, there is "de facto segregation that I'm aware of," and "that has to be addressed also." (Ex. H, Spano 84:6-14.) Westchester could have written in its AIs that it had not determined the extent to which current day racial segregation was a function of intentional discrimination, how much was *de facto,* how much resulted from the resistance of highly white municipalities to permit affordable housing to be built, and how much resulted from other factors.  Yet Westchester chose to write nothing.  (Ex. K, Mulligan 81:20 (stating "we decided to approach it the way we did," without further support).)

The County knew (or should have known) that it was supposed to take actions to overcome the negative effects of racial segregation on housing choice.  Its own expert on HUD requirements testified that a recipient of HCD funds must take steps to lessen segregation (Facts ¶50), and that it would have to take steps to undo any segregation-perpetuating effects of its affordable housing programs.  (Facts ¶49.)  The County Executive understood AFFH to require "having a proactive policy to make sure that you have an appropriate mixture of racial integration."  (Facts ¶14.)

Nevertheless, the County improperly seeks to delegate the County's AFFH obligations to racial and ethnic "Advisory Boards" with no policy authority,[24] the County Executive never asked his Planning Commissioner to do a thorough assessment of race-based impediments to fair housing,

---

[22]Beveridge Report, ¶¶12-27, App. II, Tab 21.

[23] Ex. C, Deposition of Norma Drummond ("Drummond") 232:17-20.

[24] While the County contends that "the voices of the African American and Hispanic communities are heard," (Def. Mem. at 16; Stmt. ¶46), it presents no evidence whatsoever that issues of race-based fair housing impediments, or municipal resistance to affordable housing, were ever discussed with representatives of these communities.  Moreover, even if these "voices" acquiesced in Westchester's segregation, that would have no impact on the County's obligation under the FHA or its AFFH certifications.

(Facts ¶84), and the County never undertook any analysis of whether the production of affordable housing between January 1, 1992 and April 1, 2006 had the effect of increasing or decreasing racial diversity in the neighborhood in which it was built.  (Facts ¶56. *See also* Ex. L, Deposition of Michael Lipkin ("Lipkin") 87:6-15.)  The County further admits that it never sought to reduce its very large inter-municipal variations in racial concentration (Facts ¶15), even though its own experts testified that racial segregation limits fair housing choice for African-Americans.  (Facts ¶¶79, 81.)  Without data or analytical support, the County decided segregation was inevitable because African-Americans and Whites prefer the "comfort level" of living with people of their own race. Facts ¶¶82, 83.  The County's refusal to confront race-based issues is well-reflected in an admission Drummond made to ADC: the AIs did not mention housing segregation (or discrimination), she said, "because we don't include Yonkers [in the Consortium]." (Ex. M, Contemporaneous Memo of Craig Gurian, July 7, 2005 ("Contemporaneous Memo").)

        2.       <u>The County Ignored Racial Discrimination in Housing</u>

In public hearings before the Housing Opportunity Commission ("HOC") in 1993, a number of witnesses and commissioners engaged in a detailed conversation about how racism, community opposition to pro-integrative housing and local preferences negatively affect housing opportunities for African-Americans. (Logan Report, App. II, Tab 25, pp. 8-9.)

In 1999, just one year before the start of the false claims period, the County Board of Legislators made a series of legislative findings to justify passage of the County Human Rights Law.  Among others, it found that "… there is no greater danger to the health, morals, safety, and welfare of the County than the existence of prejudice, intolerance, and antagonism among its residents because of … race, color, religion, ethnicity [and other protected characteristics]," Local Law No. 17-1999, codified at Westchester County Code §700.01, and that, despite federal and state law, "there have been repeated instances of intolerance and discrimination committed in

Westchester County." Local Law No. 17-1999, codified at Westchester County Code §700.01.

(Facts ¶¶23,24.)   The County's Human Rights Commissioner testified that she was "sure" there

was housing discrimination in Westchester County during the false claims period (Facts ¶25, Ex. N,

Deposition of Dolores Brathwaite 31:20-21), and that the Planning Department had never consulted

the Human Rights Commission as part of the AI process in 2004.  (*Id.* at 62:6-24.)  The County

admits that neither the 2000 AI (Ex. S) nor the 2004 AI mentions housing discrimination (Facts

¶¶27, 29), and neither cites data on housing discrimination from the Commission or any other

government fair housing agency. (Facts ¶¶26, 28, 30.)  WRO's Ann Seligsohn raised concerns

about the extent of housing discrimination.  (Seligsohn Declaration, ¶4.)

 In view of these findings and facts, it is entirely disingenuous for the County to claim that

"*No one* identified racial discrimination … as a concern."  (Def. Mem. 9, Stmt. ¶20 (emphasis in the

originals).)  The County set out determined not to see race-based impediments.  Its failure to

conduct the kind of comprehensive analysis required by the statutes, regulations and the *Fair

Housing Planning Guide* cannot be excused.

   3. <u>The County Ignored Municipal Resistance to Affordable Housing and the
Impact of that Resistance on Fair Housing Choice</u>

 The County knew that "[t]he hardest part about building affordable housing is not finding

the funding or the land.  It is finding the political and moral will."  (Def.Mem., Ex. #57; Ex. P,

Deposition of George Raymond, 88:12-90:16.)  The County knew that its own Housing Opportunity

Commission repeatedly identified municipal resistance as perhaps the most significant single

impediment to creating more affordable housing. (*See* "Guide to Affordable Housing Development"

[App. I, Tab 10], End of Decade Report [App. I, Tab 11] and the Affordable Housing Action Plan

[App. I, Tab 12].)  Yet the County's AIs never identify municipal resistance (Facts ¶31), let alone

relate that municipal resistance to the fair housing choices of African-Americans.

Moreover, Westchester persistently refused to address how the location of affordable housing has a critical impact on the fair housing choices of African-Americans, though even Westchester's own experts acknowledge that that location is obviously a critical factor in determining whether new affordable housing units will have a positive (segregation-reducing) or negative (segregation-reinforcing) effect.  (Facts ¶¶47, 79, 81.)[25]   The County certainly had all the data and maps and all the analytical tools it needed to conduct an analysis of whether such geographic segregation of affordable housing units amounted to an impediment to fair housing choice. (Beveridge Report, App. II, Tab 21, ¶10.)  The County certainly knew of the concerns of Westchester Residential Opportunities on this score. (Ex. Q, WRO Letter to Planning Department; Seligsohn Declaration.)  As such, the only way the County could have failed to identify the importance of the locational issue in affordable housing was by being willfully blind to the obvious, a posture illustrated by the fact that Westchester, from 1992 through the end of the false claims period, never even bothered to undertake any analysis of whether the production of affordable housing between January 1, 1992 and April 1, 2006, had the effect of increasing or decreasing racial diversity in the neighborhood in which it was built.  (Facts ¶¶56, 84, 89.)

As part of its "cooperative" approach to the Consortium Municipalities, the County abdicated its AFFH oversight obligations that are spelled out in regulations, 24 C.F.R. §§ 91.225, 570.601, the *Planning Guide* and HUD's instructions for qualification as an urban county consortium. (App. I, Tab 16.)

---

[25] A simple illustration demonstrates why:  If Westchester concluded that its sole impediment it had to worry about was the development of 18,000 additional affordable housing units, it might choose to address this impediment by building those units where there is the least resistance, even if that meant locating *all* of them in municipalities where minority populations were already high (Facts ¶¶7, 8, 11), and *none* of them in the 24 municipalities that have populations that are 3% Black or less.  (*Id.*)  While such an approach might have addressed the County's *affordable* housing problems, it would do nothing to overcome impediments to *fair* housing choice on the basis of race.   (*See* Beveridge Report, App. II, Tab 21 ¶¶39-56.) In fact, such a solution would simply perpetuate the segregation in Westchester County, an outcome the Second Circuit has condemned.  *See Huntington Branch, NAACP,* 844 F.2d at 937 (2nd Cir. 1988).

The County points to surveys of CMs in trying to excuse its failure to identify race-based impediments to fair housing. (Def. Mem. at 9, 10.)   In so doing, it confirms that admission first made by Norma Drummond at her meeting with ADC, and then repeated at her deposition: that the County would not would not identify anything as an impediment to fair housing unless it had been raised by a CM or other non-County entity (Ex. M, Contemporaneous Memo), and would not "invent [impediments] out of thin air." (Ex. C, Drummond 316:15 – 317:7.)  That policy is itself an abdication of the County's responsibility to open its own eyes to the abundant evidence of impediments to fair housing, and means that, when Westchester made representations that *it* would analyze, and had analyzed, impediments to fair housing, it was making those representations (at best) in reckless disregard of their truth or falsity.

Beyond this, the surveys represented nothing more than a ritual by which the County "went through the motions" of making inquiry (with instruments that did not even ask the municipalities to identify the level of discrimination or segregation).  If Westchester had actually taken the surveys seriously, it would have acted very differently.

Take, for example, the survey submitted by the Village of Buchanan on June 27, 2003.  (*See* Ex. V.)  Westchester saw that Buchanan indicated that "housing needs," including "insufficient number of affordable units" for both renters and owners was marked "not applicable" to the Village. In light of the HOC's allocation of responsibility for 56 affordable housing units, none of which had been built by late 2005 (App. I, Tab 13, *Affordable Housing Allocation Plan,* at Chart C), the County should have understood Buchanan's assertions to be an indicator of resistance to affordable housing and perhaps to its AFFH obligations.  Rather than sanction this noncompliant municipality, whose presence in the Consortium "generates" only $44,763 in HCD funds annually (Def. Ex. 4), the County rewarded the Village for its bad behavior by giving it more than $200,000 over the two succeeding years. (Ex. D, Massari at D0127611-12.)

The County's willingness to "cooperate" in this fashion with the very sub-recipients it was obligated to monitor pursuant to HUD regulations, 24 C.F.R. §§ 570.307, 570.503, 570.906, is further evidence of its cavalier attitude concerning its AFFH obligations.  The cooperative attitude stands in stark contrast to the way the County simply disregarded the advice of another sub-recipient, Westchester Residential Opportunities.  In each of the three AI cycles since 1996, WRO has made known its concerns about race-based impediments.  (*See* Exhs. Q, WRO Letter to Planning Department; Seligsohn Declaration, ¶¶2-4 (highlighting the expression of these concerns in 2000 and 2004 AI processes).)  Its concerns have been either ignored or rejected.  (*Id.*)

Without other documents to rely upon to evidence any analysis of race-based impediments, the County's summary judgment papers assert for the first time, and contrary to deposition testimony by top Planning Department officials, that passing and unexplained references to "NIMBY" or "local opposition" in the AIs were actually veiled references to municipal resistance or to race-based impediments.  The Court should reject this litigation-driven, after-the-fact explanation as pretextual.  The single PowerPoint slide in the 2004 AI that mentions "Local Opposition (NIMBY)" references only "existing homeowners and residents," not municipalities or their officials, and it says nothing about impediments based on race. (*See* Ex. R (2004 AI), at Slide 307.)  It is simply unreasonable to infer some hidden meaning when the County itself claims that the PowerPoint actually was successful in maximizing the clarity of its AI to the reader (Ex. L, Lipkin 136:20-24), where the creator of the graphic appearing on the slide testified that the only meaning intended was to show "[t]wo people going at it" (*Id.* 119:12-16), and where that creator, asked about who or what the figure in the slide that appears to be an "umpire" is intended to be, responds "You know, it was just a graphic, I never really gave it much thought." (*Id* 121: 8-12).[26]

---

[26] *See also* Ex. K, Mulligan at 145: 3-9 ("it is just an idea additional people moving into the community is not necessarily well received by some people") and 145:10-18 (the referee "could be any number of people");

4.      Westchester Refused to Tailor its Actions to Conditions it Encountered.

The County has characterized this litigation as a mere "dispute over policy" between ADC and itself (Def. Mem. at 3, 27), describing its approach as one that might "catch more flies with honey…." (Def. Mem. at 17.)  Westchester's dispute is not with ADC; it is with the dictates of the AFFH requirements.  There would be no point in having jurisdictions analyze impediments if it were permissible for jurisdictions to decide on their course of conduct prior to or independent of the results of analysis.  Yet that is exactly what the County did  It adopted a "one size fits all" approach with all municipalities, regardless of the conditions on the ground.  As disclosed by Norma Drummond to Craig Gurian in the meeting of July 7, 2005, the County did not require CMs to document how they were complying with their own AFFH obligations (imposed by statute, regulations and the cooperation agreements), nor did the County intend to "chastise" any CM for its failure to meet its affordable housing allocation.  (Ex. C, Drummond 313:25 – 314:5.) "Our message" to municipalities, Drummond told Gurian, was "You know your municipalities best, look to the needs of your residents.  (Ex. M, Contemporaneous Memo, at p. 2.)  The only impediments listed in the AI, she told Gurian, are those items that were "raised to us as an issue" by a municipality or grantee.  (*Id.*)  Finally, she confirmed that the County did not require recipients to demonstrate how they complied with their AFFH obligations, and had never applied any sanction or threat of sanction to secure AFFH compliance. (*Id.*)

Throughout the false claims period, the County's "one size fits all" approach applied to its *funding* of CMs as well.  Westchester was determined not to cut off HCD funding to *any* CM, regardless of its affordable housing or AFFH performance, even the 20 CMs in which *zero* affordable housing units were constructed. (Ex. M, Contemporaneous Memo; Defendant's

---

Ex. C, Drummond at 197:.3-7 (the slide involving NIMBY did not to Drummond's knowledge articulate the existence of opposition to affordable housing by local Planning Board members).

Response to Relator's First Request for Admissions, App. I, Tab 1, #52.) This posture did not represent a "policy dispute" with ADC; it represented Westchester's violation of the plain language of the HUD-required Cooperation Agreements with each CM, agreements that prohibit Westchester from funneling HCD funds to jurisdictions that fail to AFFH or interfere with the County's AFFH efforts. (Ex. O, Cooperation Agreement, at ¶6(a).)

Given Westchester's emphasis on affordable housing being *per se* an AFFH issue, it is impossible to assert credibly that every affordable-housing-resistant CM was AFFH compliant and entitled to funding pursuant to the Cooperation Agreements. Accordingly, Westchester has had to come up with excuses for its knowing violation of its obligations. For example, Westchester has been brazen enough to continue to deny its contractual authority to cut off funding from noncompliant CMs. (Defendant's Response to Relator's First Request for Admission, App. I, Tab 1, ##27, 28.) Yet even Drummond was obliged to admit at her deposition that the agreements did set forth the prohibitions on funding set forth above (Ex. C, Drummond: 278: 13-23).

Westchester has also denied its authority to cause affordable housing to be built in the face of municipal zoning barriers. *Berenson v. Town of New Castle,* 38 N.Y.2d 102 (N.Y. 1975); *In re County of Monroe,* 72 N.Y.2d 338 (N.Y. 1988). This excuse is belied by the fact that Westchester, well before the start of the false claims period knew (and successfully argued in court) that, pursuant to the *County of Monroe* doctrine, the importance of its interest in affordable housing construction superseded local zoning considerations. *Westhab, Inc. v. Village of Elmsford*, 151 Misc.2d 1071, 574 N.Y.S.2d 888 (N.Y. Sup. Ct., Westchester Co., 1991).

Further insight into Westchester's false and misleading framing of the issues it faced during the false claims period is provided by the County's statement that "the shortage of affordable housing is not a problem that can be solved overnight" (Def. Mem. at 14, n. 14.) The County, in other words, is suggesting to the Court that, at the start of the false claims period in 2000, it needed

some time to test out its "catch more flies with honey" theory.  The suggestion ignores the fact that, by the start of the false claims period, the County already had nearly a decade of experience: (a) identifying affordable housing problems; (b) allocating a fair share of units to each municipality; (c) learning that at least 20 municipalities—nearly all with African-American populations of less than 3%, (Facts ¶¶7, 11)—had built absolutely no affordable units (End of Decade Report, App. I, Tab 11, at p. 1-3); and (d) understanding that municipal resistance was a primary deterrent to affordable housing development.[27]  By the start of the decade, therefore, Westchester was not *testing* a "cooperative approach," it was stubbornly clinging to that approach because it did not want to "interfere" with municipalities. (Ex. M, Contemporaneous Memo.)[28]

The desire not to "interfere" with municipalities is reflected both by Westchester's policy of limiting acquisition of land and fostering affordable housing projects in locations where the relevant municipal government concurs with the project (Facts ¶60), and its active strengthening of municipal resisters.  Early in the false claims period, in 2001, the County Board of Legislators and County Executive worked together in 2001 to strengthen the hand of the resisters.  Together, they enacted Local Law 25-2001, now codified at County Code §209.101(a), which provides a first right of refusal to each Westchester municipality to purchase land being offered by the County within that municipality.  (Facts ¶¶61-64.)

Because of Westchester's insistence on acquiescing with resistant CMs, nearly three-quarters of all new affordable units were located in jurisdictions and neighborhoods that already had large African-American populations, and some of which are considered "hypersegregated."

---

[27] *See* Guide to Affordable Housing Development [App. I, Tab 10], End of Decade Report [App. I, Tab 11]

[28] The County can *assert* that "over time, it was able to work productively with its various municipalities" (Def. Mem. at 26), but that assertion is utterly contradicted by the evidence. In 2005, there were still 20 overwhelmingly white municipalities that had still not built any affordable units. (*Affordable Housing Allocation Plan,* App. I, Tab 13,Tables A,C.)  Fifteen years of no affordable housing progress in these jurisdictions cannot reasonably described as "productive."

(Beveridge Report, App. II, Tab 21, ¶48.)  Of the limited number of affordable units built outside

such areas, many are subject to County-endorsed admission preferences for seniors and for local

residents. (Facts ¶69, 74.)  Such preferences in segregated areas tend to subject African-Americans

to a disparate impact on the basis of race. (Ex. C, Drummond 101:2 - 102:9); *Village of Island Park*,

888 F. Supp. at 452-53 (S.D.N.Y 1999) (FCA liability arising out of fraudulent pre-selection

scheme for buyers of affordable homes which effectively excluded African-Americans from

participating).[29]

Westchester's assertion that AFFH enforcement would have led to municipalities

"dropp[ing] out of the Consortium," (Def. Mem. at 26) provides no defense to its violation of its

AFFH obligations.  HUD's Consortium Agreements have *mandatory*, not *optional* enforcement

provisions.  That is the only way to ensure that federal funds are spent in a way to AFFH.  To the

extent that Westchester believed that CMs would drop out of the Consortium if forced to abide by

AFFH requirements, the Court has further proof of Westchester's refusal to fulfill its obligation to

identify impediments to fair housing choice (the "threat to secede" impediment is not mentioned in

either the 2000 or 2004 AI).  As with the refusal to identify or act on race-based impediments, the

refusal to identify or act on municipality-based impediments proves that the County acted "like the

proverbial ostrich who buried its head in the sand so as to see no evil, hear no evil, and speak no

evil." *U.S. v. Raymond & Whitcomb Co.*, 53 F. Supp. 2d 436, 447 (S.D.N.Y. 1999).

    **B.**    **The County Was Fully Aware, Throughout the False Claims Period, of its AFFH Obligations, and Represented That it Had Met Them Despite Not Having Done So.**

In addition to knowledge of the AFFH statutes and regulations, the County had the *Planning*

*Guide* before the commencement of the false claims period (Facts ¶52), and perhaps as early as

1996.  (Facts ¶54.)  HUD told the County the AI should describe "the *degree of segregation* and

---

[29] Note that Westchester did not identify these admission preferences as an impediment to fair housing choice in the 2000 AI or the 2004 AI.

restricted housing by race, ethnicity, disability status, and families with children; *how segregation and restricted housing occurred*; and *relate this information by neighborhood and cost of housing*." (Ex. A, *Planning Guide* at 2-28 (emphasis supplied).)  The County's AIs are silent on these topics. (Ex. S (2000 AI) at D0119068-71; Ex. R (2004 AI).)  Notwithstanding the *Planning Guide's* clear instructions to focus on "actions, omissions, or decisions taken *because of race [or other protected class or]...which have the effect of restricting housing choice [on that basis]*," (Ex. A, *Planning Guide*, at 2-8) the County admits that neither its 2000 AI nor its 2004 AI even mentions "housing discrimination" or "housing segregation," (Facts ¶¶18, 27) and that it did not consider discrimination in terms of race. (Facts ¶72.)  The *Planning Guide* instructed the County to develop its AI to "cover[ ]the *full array* of public and private policies, practices, and procedures affecting housing choice." (Ex. A, *Planning Guide,* at 2-8 (emphasis supplied).)  But the County ignored this and determined that if an impediment was "insignificant," it would not report on it in its AIs and would not report it to HUD.  (Facts ¶68.)

Whereas the *Planning Guide* describes the AI as a "*comprehensive review* of a … jurisdiction's laws, regulations, and administrative policies, procedures, and practices, [a]n assessment of how those [factors] affect the location, availability, and accessibility of housing, [and an] *assessment of conditions, both public and private, affecting fair housing choice for all protected classes,* (Ex. A, *Planning Guide* at 2-7 (emphasis supplied)), the County produced AIs in 2000 and 2004 that identified only "impediments to affordable housing," (Ex. S at D0119068-71; Ex. R at p. 3) and were silent about race, with the County admitting to  "see[ing] discrimination [only] in terms of income, rather than in terms of race."  (Facts ¶72.)

Far from "becom[ing] *fully aware* of the existence, nature, extent and causes of *all fair housing problems and the resources available to solve them,"* (Ex. A, *Planning Guide* at 2-8 (emphasis supplied)), the County's AIs identified only the "lack of affordable housing" as a fair

housing impediment. (Ex. S at D0119068-71; Ex. R, at p. 3.) While it admits there are "other restrictions to housing choice (Stmt. ¶11), including race-based impediments (Facts ¶6), the County provides no explanation for why it failed or refused to list these in its AIs. (Ex. S at D0119068-71; Ex. R, at p. 3.) County Planning staff had outlined the County's AFFH obligations in two internal documents in 1996. The first of these, titled "Westchester County Fair Housing Plan Outline," (Ex. E) advises the County to use its AI to analyze segregation and to consider "[h]ow …communities demonstrate their resistance to certain groups" and whether "restrictions [are] violent, subtle, etc." As if to underline the message from the *Planning Guide* (Ex. A at 5-4), the outline concludes: "Remember: This is not a report on affordable housing, but FAIR HOUSING!!!" (Ex. E (capitals and exclamation points in the original).) The second internal document, a memorandum of June 19, 1996 titled "Fair Housing Plan," (Ex. G) is based on the outline. It incorporates the definition of "Impediments to Fair Housing" from the *Planning Guide*, and contains recommendations for expanding housing choice people living in racially impacted areas.[30]

HUD told the County that production of affordable housing "is not in and of itself sufficient to affirmatively further fair housing." (Ex. A at 5-4. *See also* Ex. T, Materials from February 2002 HUD Training (AFFH materials from February 2002 training attended by Deputy Planning Commissioner Norma Drummond).) In light of that instruction and warnings from its own employees, "reckless disregard" is a gentle term to describe the County's decision to substitute discussion of affordable housing need for an analysis of impediments experienced *because of race*, and to put forth instead AIs (in 1996, 2000 and 2004) that are each described as an "evaluation of the needs for handicapped persons, larger/smaller families, extended families, and tenure

---

[30] While Norma Drummond testified that she disagreed in 1996 with the recommendation of a centralized database for all assisted housing programs, she otherwise endorsed the recommendations in the "Fair Housing Plan" memorandum. (Ex. C, Drummond 369:9-14.)

opportunities when planning for their future development." (Ex. U (1996 AI) at D0492583; Ex. S (2000 AI), at D0119068; Ex. R (2004 AI) at Slide 299.)

In February 2002, Deputy Planning Commissioner Norma Drummond attended a two-day training conference titled "Affirmatively Furthering Fair Housing: Conducting the Analysis of Impediments and Beyond." (Facts ¶59; Ex. T.) Sponsored by HUD and held in Westchester County, that conference distributed the *Planning Guide* to each participant (Ex. C, Drummond 265:11-20), and involved detailed discussion of race-based fair housing impediments and HUD's expectations with respect to the content of AIs. Drummond testified that she kept a copy of the *Planning Guide* in her office, and that she had consulted it regularly, including just before the County conducted its 2004 AI. (*Id.* 265:11-267:9.) Through Drummond, the County understood that resistance to certain racial groups can and should be studied for an AI. (Facts ¶13.)

In addition to guidance, correspondence and training from HUD, the County was also aware that the "cooperation agreements" prohibited the County from expending HCD funds in, or in support of, any Consortium Municipality that does not affirmatively further fair housing within its own jurisdiction, or that impedes the County's action to comply with its own fair housing certifications. (Facts ¶37-40; Ex. O, Cooperation Agreements (at ¶6(a) of each relevant cooperation agreement).) The County Executive signed each of these agreements, and they were routinely submitted to HUD every three years (Facts ¶40), thereby communicating to HUD that the County was taking its monitoring obligations seriously.

Despite its clear regulatory duty to "maintain records reflecting the analysis [of impediments]," 24 C.F.R. §§ 91.225, 570.601, no document produced by the County in discovery, and no document relied upon in the County's summary judgment papers links fair housing barriers to affordable housing barriers at all. If the County had done such an analysis during the false claims period, it would have featured prominently in the County's moving papers. Together with the

absence of any document demonstrating a contemporaneous fair housing impediments analysis during the false claims period, the County's furious *post hoc* attempts to justify its failure to comply with its AFFH obligations confirms what Norma Drummond revealed to Relator's executive director on July 7, 2005: that the County did not view discrimination in terms of race, and therefore would not conduct race-conscious analysis or take race-conscious actions.  (Ex. M, Contemporaneous Memo.)

Westchester knew not only that it was making promises to the federal government in connection with certifications it submitted with applications for HCD grants.  It also knew that, when it submitted requests for payment to HUD, it was asking HUD to believe that it had complied with the terms of the AFFH certifications, and that payment was made based on the belief that such implicit certifications were true.  (Facts ¶16.)

When one combines Westchester's undisputed knowledge of its obligations with Westchester's undisputed knowledge of race-based and municipality-based impediments to fair housing choice, Westchester could only have made its AFFH representations in reckless disregard of their truth or falsity.

**IV.** **WESTCHESTER'S ATTEMPT TO EXCUSE ITS RECKLESS DISREGARD BY REFERENCE TO HUD INACTION IS UNJUSTIFIABLE AS A MATTER OF LAW.**

Westchester presents no evidence that HUD's inaction caused the County to modify its view of its AFFH obligations.  Indeed, Drummond confirmed that she accepted the description of the AFFH obligation that had been set forth in the Planning Department's 1996 memo throughout the false claims period.  (Ex. C, Drummond 396:21 – 409:5.)  As such, the excuse is just another *post hoc* rationalization, irrelevant to the issues before the Court.

Had there been reliance on HUD's inaction, however, such reliance would not have been justified.  HUD's receipt of Defendant's "submissions" says nothing about the falsity of its claims and certifications, nor does continued funding provide any defense to Relator's FCA claim.  HUD

31

does not review or approve the content of any AI (Ex. A, *Planning Guide* at 2-7), and employs

AFFH certifications because it lacks the resources to conduct an AI for each of the 1100 HCD

recipients around the country.  In the absence of evidence to the contrary, HUD relies on the

truthfulness of these certifications. 24 C.F.R. § 970.904; (Expert Report of Sara Pratt, App. II, Tab

23, at p. 6 (HUD assumes good faith by recipients with this obligation and with their certification);

Ex. V, Deposition of Gary Lacefield 231:22–233:3 (HUD relies on self-certification).)

When a recipient presents incomplete, false or misleading information to conceal its AFFH

noncompliance, HUD is prevented from learning the truth of the matter, and may continue to

disburse HCD funds.  Here, the County, *inter alia,* concealed from HUD its predetermined policy

not to identify or act upon race-based impediments to fair housing; its predetermined policies not to

monitor the AFFH performance of any of the CMs, and not to enforce AFFH obligations on them;

and concealed the existence of race-based and other impediments.  (*See generally,*

Plaintiff/Relator's Memorandum in Support of Motion for Partial Summary Judgment, at Section

IV.)  Westchester gave HUD contrary information: that it was analyzing, identifying, and acting to

overcome the impediments to fair housing choice; that it was overseeing municipal AFFH

compliance; and that it would not fund municipalities that did not AFFH or that interfered with

Westchester's efforts to AFFH.

As both common sense and case law demonstrate, the fact the government does not initially

recognize a claim as false or accepts a false claim assuming it is true neither diminishes the falsity

of the claim, nor bars future prosecution or liability when the fraud is discovered.  For example, the

fact that the government paid a health care agency's false claims for Medicare reimbursement and

never demanded the return of any overpayment, provides no defense to subsequent a qui tam FCA

action. *See U.S. ex rel. A+ Homecare, Inc. v. Medshares Management Group, Inc.*, 400 F.3d 428,

447 n.13 (6th Cir. 2005) (government's failure to issue a notice of provider reimbursement is

irrelevant to whether the Defendant is liable under the FCA).  In short, the government's payment on a false claim or failure to recognize the falsity of a statement or certification does not bar an FCA action.  *Varljen v. Cleveland Gear Co., Inc.*, 250 F.3d 426, 430 (6th Cir. 2006) ("The government's inspection and acceptance of a product do not absolve a contractor from liability for fraud under the FCA").[31]

This case does not present the circumstance where the government, in the face of complete and accurate information from a contractor, effectively modifies its agreement with that contractor.[32]  There is absolutely no evidence in the record that HUD relieved the County of its obligation to conduct an AI or otherwise instructed Westchester that it could be exempted from the normal certification requirement.  Moreover, since a defendant cannot simply depend on a regulatory agency to correct any false statements, Westchester cannot point to HUD's inaction as grounds for avoiding liability.  *See A+ Homecare*, 400 F.3d at 447 ("A party cannot file a knowingly false claim on the assumption that the fiscal intermediary will correctly calculate the value in the review process."); *U.S. v. Raymond & Whitcomb Co.*, 53 F. Supp. 2d 436, 447

---

[31] Nor does the government's failure to seek remuneration for money paid in reliance on a false claim or continued payment of a contract that includes a false statement provide a defense to an FCA action or override the claimant's knowledge of the falsity of the claim.  *A+ Homecare, Inc.,* 400 F.3d at 447 n.13 (6th Cir. 2005); *U.S. ex rel. Harrison v. Westinghouse Savannah River Co.*, 352 F.3d 908, 916 (4th Cir. 2003) (rejecting the argument that a contractor is shielded from FCA liability "if the government entity decides that it should continue to fund the contract even though it finds that the contractor made a false statement in connection with a claim."); *Village of Island Park*, 888 F. Supp. at 452-53 (S.D.N.Y 1999) ("HUD's continued payment of the CDBG benefits despite its knowledge of the fraudulent scheme does not give rise to a defense of estoppel.").  *United States v. Southland Corp.,* 326 F.3d 669 (5th Cir. 2003), upon which Defendant relies, is entirely distinguishable.  There, HUD worked in active partnership with the owner of a subsidized apartment complex to help it meet housing quality standards and keep its rent-subsidized units available to low-income tenants.  Here, the County was not working in active partnership with HUD, but was ignoring HUD instructions and concealing material information concerning its failure or refusal to consider race-based impediments and municipal resistance, and its failure or refusal to enforce AFFH obligations on the municipalities.

[32] *See, e.g., A+ Homecare, Inc.*, 400 F.3d at 454 n.21 (6th Cir.2005) (acknowledging that FCA liability may not lie "when what a defendant submitted was not actually false but conformed to a modified agreement with the government" but concluding that government knowledge did not prevent liability where the defendant "neglected to disclose all the pertinent information."); *Harrison*, 352 F.3d at 920 n.14 (4th Cir. 2003) (government awareness of facts related to a false claim did not bar claim because agency "did not have 'full knowledge' of  material facts," nor was Defendant following the government's instructions).

(S.D.N.Y. 1999).  Similarly, HUD's continued payment of funds to Westchester has no bearing on

Defendant's liability for FCA violations; HUD's failure to address Westchester's actions through its

own regulatory processes is similarly irrelevant because the availability of other remedial

mechanisms is no defense to an FCA action.[33]

**V.      WESTCHESTER'S AFFORDABLE HOUSING ANALYSIS WAS NOT A PROXY FOR AN ANALYSIS OF IMPEDIMENTS TO FAIR HOUSING CHOICE FOR AFRICAN-AMERICANS AND ITS AFFORDABLE HOUSING PROGRAM – NEVER DESIGNED TO OVERCOME RACE-BASED IMPEDIMENTS – ACTUALLY RESTRICTED FAIR HOUSING CHOICE FOR AFRICAN-AMERICANS**

Although it turned over 500,000 pages in discovery, the County has not produced a single

document tending to show that it analyzed the "proxy" question during the false claims period.

Even if it had, the evidence conclusively demonstrates that income is not an adequate "proxy" for

race in Westchester County.  Segregation for African-Americans in Westchester actually rises as

household income rises. (Beveridge Report, App. 2, Tab 21 ¶¶28-38 (Report Exhs. G, H).  In

addition, over 80% of African-Americans families are not poor, and nearly half are not even eligible

for affordable housing programs.  (*See* Beveridge Rebuttal Report, App. 2, Tab 22, ¶17, 18 (Report

Ex. R-3); Ex. B, Clark 72:6 – 74:13; 75:23 – 78:25.)

Further, the County's affordable housing policies restricted the fair housing choices of

African-Americans by placing nearly three-quarters of affordable units in minority-concentrated

neighborhoods and permitting predominantly white municipalities to evade their affordable housing

---

[33] *See A+ Homecare*, 400 F.3d at 456 (holding that Medicare regulations providing administrative mechanisms for handling overpayments are not meant as a remedy for fraud since "[t]he FCA is the exclusive remedy provided by Congress to recover for fraudulent claims made against the Government"); *U.S. ex rel. Taylor v. Gabelli*, 345 F. Supp. 2d 313, 334-35 (S.D.N.Y 1999) (rejecting Defendant's argument that the false statements made at an FCC auction should be remedied through the FCC's enforcement of its own regulatory scheme).  As court in this district has recognized, the legislative history of the FCA "indicates that Congress specifically contemplated the use of the Act to address regulatory violations." *U.S. ex rel. Taylor*, 345 F. Supp. 2d at 334.  Since, as the Supreme Court has noted, the FCA is intended "to reach all types of fraud, without qualification, that might result in financial loss to the Government," *Cook County Ill. v. U.S.  ex rel. Chandler*, 538 U.S. 119, 129 (2003) (internal quotations omitted), that would include AFFH regulatory violations.

obligations altogether, (Beveridge Report, App. 2, Tab 21,¶48) and to impose selection preferences for local residents and seniors. (Ex. C, Drummond 101:20 – 102:9; 324:23 – 325:2 (acknowledging senior and local resident preferences in affordable housing); Ex. H, Spano 79:24 – 83:21 (admitting that County accedes to municipal requests for housing limited to seniors and local residents).  These are policies likely to discourage African-Americans from living there.

Finally, the County's affordable housing programs actually increased segregation rather than reducing it (Beveridge Report, App. 2, Tab 21 ¶48); under those circumstances, a reasonable jury could conclude that the County's actions undermined its AFFH certification rather than advancing it.  (Facts ¶¶47, 48.)

## VI.   WESTCHESTER'S REPRISE OF ITS REJECTED JURISDICTIONAL ARGUMENT HAS NOT MERIT

The Court should reject the County's renewed assertion that the FCA's "jurisdictional bar" should prevent Relator from pressing its claims with respect to the County's false claims.

### CONCLUSION

For the foregoing reasons, the Court should deny the Defendant's motion for summary judgment and grant the Relator's motion for partial summary judgment.


Dated:  October 31, 2008

<div style="margin-left:40%">

Respectfully submitted,


  /s/ Michael Allen_____
Michael Allen, *admitted pro hac vice*
Stephen M. Dane, *admitted pro hac vice*
John P. Relman, *admitted pro hac vice*
RELMAN & DANE, PLLC
1225 19th Street, N.W., Suite 600
Washington, D.C.  20036-2456
Telephone: 202/728-1888
FAX: 202/728-1888
Counsel for Plaintiff/Relator

</div>