UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------X
                                        :
UNITED STATES OF AMERICA ex rel. ANTI-  :
DISCRIMINATION CENTER OF METRO NEW       :
YORK, INC.,                             :     06 Civ. 2860 (DLC)
                        Plaintiff,      :
                                        :     OPINION & ORDER
            -v-                         :
                                        :
WESTCHESTER COUNTY, NEW YORK,            :
                        Defendant.      :
                                        :
----------------------------------------X

Appearances:

For Plaintiff/Relator:
Michael Allen
Stephen M. Dane
John P. Relman
Relman & Dane, PLLC
1225 19th Street, N.W., Suite 600
Washington, DC 20036-2456

For Defendant:
Stuart M. Gerson
Michael A. Kalish
Carrie Corcoran
Epstein Becker & Green, P.C.
250 Park Avenue
New York, NY 10177-1211

DENISE COTE, District Judge:

        The Anti-Discrimination Center of Metro New York, Inc.

("ADC") has brought suit as relator for the United States of

America against Westchester County, New York ("Westchester" or

the "County"), alleging that Westchester violated the False

Claims Act, 31 U.S.C. § 3729, et seq. ("FCA"), through

1

certifications made to the Secretary of Housing and Urban Development ("HUD") between April 2000 and April 2006 to obtain over $52 million in federal funding for housing and community development.  On July 13, 2007, this Court denied the County's motion to dismiss, rejecting its contention that it had no legal obligation to consider race when it analyzed impediments to fair housing in connection with its certifications.  The Court held that a grantee that certifies to the federal government that it will affirmatively further fair housing as a condition to its receipt of federal funds must analyze "the existence and impact of race discrimination on housing opportunities and choice in its jurisdiction."  United States ex rel. Anti-Discrimination Center of Metro New York, Inc. v. Westchester Cty., 495 F. Supp. 2d 375, 376 (2007).[1]

Discovery having been completed, the ADC has now brought a motion for partial summary judgment, contending that there is no genuine issue of material fact that the County knowingly submitted false certifications that it would affirmatively further fair housing ("AFFH") by, inter alia, failing to analyze

---

[1] The Court also denied the County's motion to dismiss for lack of subject matter jurisdiction, finding that the statutory bar to jurisdiction set forth in 31 U.S.C. § 3730(e)(4) did not apply to the instant qui tam action.  Anti-Discrimination Center, 495 F. Supp. 2d at 379-83.  While the County restates its contention that the Court is without subject matter jurisdiction, this Court declines to reconsider its decision on the issue.

impediments to fair housing choice within the County in terms of race.  The County has filed a cross-motion for summary judgment, arguing that it did properly analyze race, and that even if its certifications were false in that regard, it did not make them with the requisite knowledge for liability to be imposed under the FCA.  Those motions were fully submitted on November 14, 2008.  For the following reasons, ADC's motion for partial summary judgment is granted in part and denied in part, and the County's motion for summary judgment is denied in full.

Before describing the evidentiary record created through this motion practice and the legal analysis of the ADC's FCA claims, a brief summary of the parties' contentions is in order. ADC contends that Westchester is a racially segregated county, and that to obtain the HUD funds at issue here the County had to analyze and record its analysis of the impediments to fair housing choice, and then take appropriate actions to overcome those impediments and also record those actions.  ADC contends that, despite certifying to the federal government that it had taken each of these steps, the County did none of these things, instead focusing exclusively on obtaining federal funds to increase the stock of affordable housing within the County, and ignoring the fact that its actions were increasing patterns of segregation.  ADC identifies several tactics that it contends the County could have (and should have) utilized to reduce the

barriers to fair housing choice based on race within its
jurisdiction.

The County has taken a variety of tacks in defending these
charges.  In addition to disputing that it was required to
analyze race when analyzing impediments to fair housing choice,
it contends principally that in any event it did analyze race,
determined that racial segregation and discrimination were not
significant barriers to fair housing choice, and concluded that
the most pressing impediment to fair housing was the lack of
affordable housing stock.  It argues that it did an outstanding
job in increasing the stock of affordable housing within the
County, and that this litigation represents little more than a
policy dispute over the most effective means for addressing
local government resistance to integration and affordable
housing.  The County has adopted a policy of cooperation with
municipalities, in light of what it terms "political reality"
and due to its belief that cooperation is the most productive
avenue for increasing the stock of affordable housing in the
County.

BACKGROUND

The undisputed facts of record, or, where disputed, taken
in the light most favorable to the County, establish the
following.

4

A.   <u>Statutory and Regulatory Framework</u>

Westchester County is comprised of 45 municipal entities. All of the municipalities are part of the Westchester Urban County Consortium ("Consortium"), except for the municipalities of Mount Pleasant, Mount Vernon, New Rochelle, White Plains, and Yonkers.  The County applied to HUD for federal funding, including Community Development Block Grants ("CDBG"), on behalf of itself and the Consortium each year from April 1, 2000 to April 1, 2006 ("the false claims period").[2]

The United States grants housing and community development-related funding to state and local entities.  In order to receive certain federal funding, including CDBG funds, the County was required to certify that it would meet a variety of fair housing obligations, including that the County would AFFH. Specifically, grant recipients are required to make certifications to HUD that, <u>inter alia</u>, "the grant will be conducted and administered in conformity with the Civil Rights Act of 1964 and the Fair Housing Act, and the grantee will affirmatively further fair housing."  42 U.S.C. § 5304(b)(2). To AFFH, the County was required to undertake three tasks: to "conduct an analysis of impediments to fair housing choice within the area, take appropriate actions to overcome the

---

[2] For ease of reference, this Opinion refers to the submissions the County submitted on behalf of the Consortium as the County's submissions.

effects of any impediments identified through that analysis, and maintain records reflecting the analysis and actions in this regard."  24 C.F.R. § 91.425(a)(1)(i), see also id. § 570.601(a)(2).  It is undisputed that the County was aware of its AFFH obligations during the false claims period, and that the County made claims for payments of grant funds from the United States during the period.

Westchester entered into Cooperation Agreements with municipalities participating in the Consortium.  The agreements pertained to, inter alia, CDBG grants, and provided that

> the County is prohibited from expending community
> development block grant funds for activities in or in
> support of any local government that does not
> affirmatively further fair housing within its
> jurisdiction or that impedes the County's action to
> comply with its fair housing certifications.

These Cooperation Agreements were submitted to HUD every three years.


B.   The Requirement to Consider Race

As set forth more fully in Anti-Discrimination Center, 495 F. Supp. 2d at 387-89, the statutory and regulatory framework set forth above -- in requiring the grantee of funds to certify that the grant will be "conducted and administered" in conformity with the Civil Rights Act of 1964 and the Fair Housing Act ("FHA"), and to certify that the grantee will AFFH

6

-- requires the grantee to analyze the impact of race on housing opportunities and choice in its jurisdiction.  In identifying impediments to fair housing choice, it must analyze impediments erected by race discrimination or segregation, and if such impediments exist, it must take appropriate action to overcome the effects of those impediments.  Id. at 387.[3]

C.  The County's AFFH Certifications

By the year 2000, Norma Drummond, a member of the County's Planning Department, was the person responsible for the County's administration of the grants associated with the County's affordable housing program and CDBG program.  As discussed above, one of the County's duties as part of the requirement to AFFH was to conduct an analysis of impediments or AI, as it is customarily called.  Two AIs were reduced to writing during the false claims period and included within the County's "Consolidated Plans" presented to HUD in 2000 and in 2004.

_____

[3] While the Opinion used the term "consider" as well as the term "analyze," the regulation requires an analysis and a record of that analysis from the entity applying for the federal government funds.  Thus, the Opinion rejected the County's claim in its motion to dismiss that it had no legal obligation to consider or analyze race.

1.   Consolidated Plans and Related Submissions

The County's Consolidated Plans addressed housing and community development goals for four federal grant programs.[4] Consolidated Plans serve four main functions: they are "[a] planning document for the jurisdiction," "[a] submission for federal funds under HUD's formula grant programs," "[a] strategy to be followed in carrying out HUD programs," and "[a] management tool for assessing performance and tracking results." 24 C.F.R. § 91.1(b).  Consolidated Plans are required to describe, inter alia, the jurisdiction's "general priorities for allocating investment geographically within the jurisdiction . . . and among different activities and needs" for the following categories: affordable housing, public housing, homelessness, other special needs (including the elderly, disabled, persons with alcohol or drug addiction, persons with HIV/AIDS and their families, and public housing residents), and nonhousing development pursuant to the CDBG program.  Id. § 91.215.

As part of the Consolidated Plan process, the County was required to make Action Plan submissions to HUD.  The Action Plans were annual submissions that addressed the goals and objectives for the County as they related to the categories

---

[4] Besides the CDBG grant program, the Consolidated Plan addressed the Emergency Shelter Grant, HOME Investment Partnership, and Housing Opportunities for Persons with AIDS programs.

discussed above.  See id. § 91.220; id. § 91.420.  The Action
Plans included the County's annual applications for funding, as
well as the County's annual express certification that it would
AFFH.  See id. § 91.225; id. § 91.425.  The County also made
annual submissions, called Consolidated Annual Performance and
Evaluation Reports ("CAPERs"), reviewing the "progress it has
made in carrying out its strategic plan and its action plan"
over the previous year.  Id. § 91.520(a).

    During the false claims period, the County submitted two
Consolidated Plans (one covering the years 2000-2004 and one
covering the years 2004-2008).  It also submitted annual Action
Plans (with express AFFH certifications) and CAPERs for each of
the years 2000-2006.  In its annual certifications during the
false claims period, the County certified that it would:
"affirmatively further fair housing, which means it will conduct
an analysis of impediments to fair housing choice within the
jurisdiction, take appropriate actions to overcome the effects
of any impediments identified through that analysis, and
maintain records reflecting that analysis and actions in this
regard."  The County included its 2000 and 2004 AIs in the
Consolidated Plans it submitted to HUD, although the regulations
did not require that the AIs themselves be submitted to HUD.

    The County's 2000 AI was one of eight components of the
County's 2000-2004 Consolidated Plan, and each component was

9

discussed in separate chapters of the Consolidated Plan.  In the chapter of the 2000-2004 Consolidated Plan addressed to the projected housing needs of the County for the next five years, the plan included figures showing the Consortium's 1990 population by race, and also by race and income level.  The 2000-2004 Consolidated Plan also identified communities in the County that had "areas of minority concentration," and identified which municipalities in the Consortium had the largest black population, as well as which ones had the largest gain in black population during the 1980s.  It also noted that blacks made up between .1% and 16% of all homeowners in the Consortium's municipalities, and between 1 and 30% of the renters in the Consortium's municipalities.  The 2000-2004 Consolidated Plan also reviewed the waiting list for Section 8 rental assistance, and broke down the waiting list by race.  The 2000-2004 Consolidated Plan noted that "[l]ow-income families and individuals and those with special housing needs (e.g., mentally ill, disabled and persons with AIDS) are frequently excluded from housing opportunities due to illegal discrimination," and that the non-profit housing counseling agency Westchester Residential Opportunities ("WRO") reported that they received approximately 120 housing discrimination complaints in 1999.

Similarly, in the County's 2004-2008 Consolidated Plan, the County noted that a key finding of the housing needs component of the Consolidated Plan (one of the nine components of the Consolidated Plan) was that while 72% of households in the Consortium own their own homes, only 46% of black households and 35% of Hispanic households own their own homes.  In the Housing and Homeless Needs Assessment Component, the County identified "impacted areas" of the County, which were defined as areas that had populations that were over 40% minority or 40% "poverty." The plan identified the municipalities in the Consortium that had the highest minority populations.  The 2004-2008 plan noted that "[m]inorities are priced out of the expensive homeownership market," citing the finding regarding the percentage of homeownership among all Consortium households and among minorities.  The Appendix to the Consolidated Plan for 2004-2008 includes, inter alia, data tables from the 2000 census, including tables showing 1) population by race and Hispanic Origin, 2) the population by age, 3) cost-burdened owners and renters, 4) overcrowded housing units, and 5) housing deficiencies.  The appendix also includes tables showing housing problems for Hispanic households and black, non-Hispanic households.  These tables showed the percentage of these populations that experienced housing problems at different income levels, where having "any housing problem" was defined as

11

a "cost burden [of] greater than 30% of income and/or without complete kitchen or plumbing facilities."

    2.   Materials and Communications Relating to the Preparation of AIs

    The County had received a copy of the HUD Fair Housing Planning Guide ("HUD Guide") by April 1, 2000.  The purpose of the HUD Guide is to help grantees fulfill the "fair housing requirements" of grants such as the CDBG.  As for the requirement to AFFH, HUD stated in the Guide that it interpreted the objectives of conducting the AI, taking appropriate actions, and maintaining records reflecting the analysis and actions taken, to mean, inter alia, to "[a]nalyze and eliminate housing discrimination in the jurisdiction" and to "[p]rovide opportunities for inclusive patterns of housing occupancy regardless of race, color, religion, sex, familial status, disability and national origin."  An AI involves an "assessment of conditions, both public and private, affecting fair housing choice for all protected classes."  Such impediments are "actions, omissions or decisions" which "restrict housing choices or the availability of housing choices," or which have the effect of doing so, based on "race, color, religion, sex, disability, familial status, or national origin," including "[p]olicies, practices, or procedures that appear neutral on

                                    12

their face."  HUD's suggested AI format includes a housing
profile describing "the degree of segregation and restricted
housing by race, ethnicity, disability status, and families with
children; [and] how segregation and restricted housing supply
occurred."

The HUD Guide also explains the relationship of the AI to
the Consolidated Plan, noting that the consolidated document
includes, among other things, the community development plan and
the submissions for various housing and development programs,
including the CDBG.  The HUD Guide notes that many of the fair
housing problems that relate to housing choice for low and
moderate income housing programs are addressed already elsewhere
in the consolidated plan.  The Guide cautions, however, that
grantees should prepare AI's using a "Fair Housing Perspective,"
and that this means that while

> the explanation of barriers to <u>affordable housing</u> to
> be included in the <u>Consolidated Plan</u> may contain a
> good deal of relevant AI information[, it] may not go
> far or deep enough into factors that have made poor
> housing conditions more severe for certain groups in
> the lower-income population than for others.
> Jurisdictions should be aware of the extent to which
> discrimination or other causes that may have a
> discriminatory effect play a role in producing the
> more severe conditions for certain groups.

(Emphasis supplied).

The distinction between AFFH actions and affordable housing
activities is further explained in the HUD Guide:

The two concepts are not equivalent but they are also
not entirely separate.  When a jurisdiction undertakes
to build or rehabilitate housing for low- and
moderate-income families, for example, this action is
not in and of itself sufficient to affirmatively
further fair housing.  It may be providing an
extremely useful service by increasing the supply of
decent, safe, and sanitary affordable housing.
Providing adequate housing and improving existing
neighborhoods are vital functions and should always be
encouraged.
       Additionally, the provision of affordable housing
is often important to minority families and to persons
with disabilities because they are disproportionately
represented among those that would benefit from low-
cost housing.  When steps are taken to assure that the
housing is fully available to all residents of the
community, regardless of race, color, national origin,
gender, handicap, or familial status, those are the
actions that affirmatively further fair housing.

(Emphasis supplied).

The HUD Guide informed grantees that "AIs are not to be
submitted to, or be approved by, HUD.  However, HUD could
request submission of the AI in the event of a complaint or as
part of routine monitoring."  Rather, the HUD Guide explained
that jurisdictions should provide a summary of the AI, along
with the jurisdiction's accomplishments for the past year, as
part of the CAPER submission.

The Prior to the false claims period, the County received a
letter from HUD, dated July 17, 1996, in relation to its 1996
Consolidated Plan submissions.  The letter set forth "matters of
advice" for "areas for future improvement."  One such matter of
advice informed the County that its AI

should contain a description of the degree of
segregation and restricted housing by race, ethnicity,
disability status and families with children; explain
how segregation and restricted housing supply
occurred; and relate this information by neighborhood
and cost of housing.  Minorities should be categorized
as follows: Black, Hispanic, Asian, Pacific-Islander,
and American Indian/Alaskan Native.  In addition, the
County should submit data on the housing needs of
homeless individuals and families by race/ethnicity in
subsequent Consolidated Plan submissions.

Additionally, the County had its own internal documents

from before the false claims period relating to its AFFH

obligations and the preparation of AIs.  One such document,

which is an outline of the County's Fair Housing Plan ("FHP"),

sets forth the requirements that the County conduct an AI, set

out actions to be taken, and maintain records.  The end of the

outline contains the following reminder: "Remember: This [the

FHP] is not a report on affordable housing, but FAIR HOUSING!!!"

Similarly, in a July 1996 letter to WRO, an employee of the

County's planning department thanked the WRO for meeting to

discuss the FHP.  The letter went on to say that

> [w]hile this document [the FHP] is required by HUD to
> analyze Fair Housing throughout the Westchester Urban
> County Consortium, it will also be a useful tool for
> future planning and development of affordable housing.
> As you know, the Planning department has prepared
> several reports that address affordable housing, which
> should not be confused with the Fair Housing Plan.
> The goals of the Fair Housing Plan are: 1) to analyze
> barriers to housing that are based on race, religion,
> sex, disabilities, familial status, or national
> origin; 2) to develop strategies to remove those
> barriers; and 3) to maintain records of Fair Housing

<u>efforts</u>, thus indicating the County's commitment to
fair housing choice.

(Emphasis supplied).

In 2002, Drummond attended HUD-sponsored training regarding
AFFH.  The training materials were titled "Affirmatively
Furthering Fair Housing[:] Conducting the Analysis of
Impediments and Beyond."  Those materials noted that "[d]uring
the past thirty-seven years, Congress has spent more than one
trillion dollars in a failed attempt to remedy the effects of a
dual housing market in America," and they traced the evolution
of the dual market to, <u>inter alia</u>, African-Americans migrating
to cities and encountering obstacles "designed to segregate them
from the majority, and to maintain a dual society."  They
explain that "Consolidated Planning blends community and
economic development planning with Fair Housing Planning."


3. <u>The County's 2000 AI</u>

Chapter Eight of Westchester's 2000-2004 Consolidated Plan
is titled "Impediments to Fair Housing."  The introduction to
the chapter notes that the "Fair Housing Plan (FHP)" is part of
the Consolidated Plan process and "consists of: 1) an Analysis
of Impediments (AI) which addresses specific restrictions to
housing choice; 2) actions taken to overcome the effects of
identified impediments and, 3) maintenance of records to support

16

the efforts to affirmatively further fair housing." The FHP "includes information gathered from Westchester County agencies, not-for-profit organizations and local municipal officials," and "[a] citizen participation component is part of the process" "to insure . . . that federal funds are actually administered based on the community's agenda." The chapter notes that this participation component is "significant in light of the fact that there are not scores of discrimination complaints on file." The chapter explains that lack of such complaints "does not mean that Westchester County does not experience fair housing complaints," but reflects the fact that "only those who are persistent enough to contact the proper agencies and generate an official complaint will be counted." Thus, the chapter notes that the "[t]he citizen participation component of the FHP will allow residents to work together to remove unfair obstacles to housing choice."

The Analysis of Impediments section of the Chapter provides as follows:

> The FHP provides an evaluation of the needs for handicapped persons, larger/smaller families, extended families, and tenure opportunities when planning for their future development.
>
> It is important to note that within Westchester County, the greatest impediment to fair housing is the lack of affordable housing. While there are other restrictions to housing choice, Westchester's housing stock is expensive relative to income and this significantly limits one's housing options.

(Emphasis supplied).

The AI states that several studies have been prepared regarding the lack of affordable housing, and that while progress has been made, "the lack of affordable housing remains the most significant impediment to fair housing."  The AI then lists the 10 "obstacles" that the "Consortium most contends with [sic] in addressing the housing needs of its residents."  These obstacles include: 1) the "Lack of Vacant Land"; 2) the "High Cost of Land" which "is often so expensive that it precludes the development of affordable housing thereon" 3) "Limited Availability of Funds" and the "fierce" competition for "other affordable housing dollars"; 4) "Limited Number of Section 8 Certificates and Vouchers"; 5) "Local Opposition" and the fact that "[a]ffordable housing remains a difficult concept to sell to existing homeowners and residents of communities throughout the Consortium" and that "such opposition is particularly strong when it involves proposed developments designed to assist the needs of the extremely low-income and low-income residents"; 6) "Limited Not-For-Profit Capacity" (the AI notes that "[t]ypically, not-for-profits are the most active in the creation of affordable housing"); 7) "High Construction Cost Area" which results in "fewer affordable housing units [that can] be built with the funds available"; 8) "Lengthy Review

Process" which "impede[s] the development of affordable
housing"; 9) "Few High Density Zones" which "limits the number
of affordable units that may be built"; and 10) "Higher Rents
Required for Some Public Assistance Recipients."

The AI then goes on to discuss obstacles Westchester faces
in addressing the housing needs of the homeless and at-risk
populations.  In this part of the analysis, the report considers
obstacles faced by the "physically disabled," "victims of
domestic violence[,] or persons with substance abuse additions
[sic] or mental disabilities."

In response to the impediments analyzed, the chapter
outlines four objectives as "[a]ctions to be taken."  These
include "[i]ncrease[ing] the supply of affordable housing rental
units, particularly large size units for low and extremely low-
income families," "[i]ncrease[ing] the supply of affordable
homeownership housing for moderate and middle income families,"
"[r]educ[ing] the number of elderly households that are cost
burdened," and "[i]ncreasing the number of seniors assisted with
grants and loans to rehabilitate their homes."  The chapter
notes that in the "next three years, an estimated 270 units are
anticipated for low and moderate income persons."

In the "Maintenance of Records" section of the chapter, the
County reports that through the CDBG program, the County
provides funds to WRO for fair housing counseling services.  WRO

"submits monthly progress reports to document the use of these funds and this includes descriptions of the cases and recommended solutions." Such reports are "one source of information to track the issues in the Fair Housing Plan." The chapter states that "residents are also referred to the Human Rights Commission and WRO for support with discrimination cases," and that "[l]ocal banks and the Federal Reserve Bank are resources for identifying potentially discriminatory lending practices throughout the Consortium." The chapter noted that an initial review of Home Mortgage Disclosure Act data did "not identify any restrictive lending patterns," but that "[f]urther investigation would be necessary to assess variables like race, gender, income and age." Additionally, public meetings are held for residents to "discuss fair housing issues."

Chapter Eight of the 2000-2004 Consolidated Plan makes no explicit reference to race or race discrimination as an impediment to fair housing other than as described above. For instance, race discrimination or segregation is not identified as one of the ten obstacles to fair housing. While the chapter mentions obstacles to housing faced by the disabled and those with substance abuse problems, it does not refer to any obstacles to housing based on, inter alia, race, national origin, or sex.

20

4.  <u>The County's 2004 AI</u>

The County's 2004 AI was part of Chapter Nine (titled "Fair

Housing Plan") of Westchester's 2004-2008 Consolidated Plan.

The introduction to this chapter states that "the Fair Housing

Plan is an evaluation of the needs for handicapped persons,

larger/smaller families, extended families, and tenure

opportunities when planning for their future development."  The

Introduction outlines the chapter's three sections: the

"[a]nalysis of impediments addressing specific restrictions to

housing choice," the "[a]ctions taken to overcome the effects of

identified impediments," and "[m]aintenance of records to

support the efforts to affirmatively further fair housing."

The AI section lists 13 "Impediments to <u>Affordable</u>[5] Housing

Identified."[6]  (Emphasis supplied).  The identified impediments

are 1) "Lack of Affordable Housing in the New York Region"; 2)

"Lack of Vacant Land"; 3) "High Cost of Land"; 4) "Limited

Availability of Funds"; 5) "Limited Number of Section 8 Vouchers

& Other Rental Assistance"; 6) "Local Opposition (NIMBY)"; 7)

"Limited Non-Profit Capacity"; 8) "High Construction Costs"; 9)

"Lengthy Review Process"; 10) "Few High Density Zones"; 11)

---

[5] As noted above, the regulation requires an analysis of
impediments to fair housing choice, not to affordable housing.
24 C.F.R. § 91.425(a)(1)(i).

[6] The thirteenth impediment is included on a slide within the
section, but is not listed at the beginning of the section.

"Limited Shelter Allowance for Public Assistance Recipients";
12) "High Prevalence of Lead-Based Paint in Housing Units;" and
13) "Limited Interest by Landlords and Developers."

In elaborating on these obstacles, the AI notes that the
"[g]reatest impediment to fair housing is the lack of affordable
housing throughout the New York Region."  As in the 2000 AI, the
2004 AI notes that the price of land "often precludes
development of affordable units" and that there is "fierce"
competition for "affordable housing dollars."  The AI notes that
Section 8 vouchers are a "major source of assistance for low and
very low income families" and that "[r]eluctance by landlords to
accept Section 8 continues to be a challenge."  As for the
obstacle of Local Opposition or NIMBY, the AI notes that
"Affordable Housing remains a difficult concept to sell to
existing homeowners and residents," especially for proposed
developments relating to extremely low income residents.  The AI
also notes that landlords and developers have limited interest
in affordable housing because "[m]ore profit can be made on
market rate housing than affordable housing."  The 2004 AI also
analyzes impediments to meeting the housing needs of the
"[u]nderserved," including the "[l]ack of accessible housing
units for [the] physically disabled," "NIMBYism and fear of
homeless populations," and the "[r]eluctance by many tenants --

22

especially those with mental illness or addictive behaviors to seek assistance."

In the section of the chapter pertaining to actions to be taken to overcome these identified impediments, five objectives are listed: to "[i]ncrease the supply of affordable housing rental units, particularly large size units for low and extremely low income families," to "[i]ncrease the supply of affordable homeownership units for moderate income families," to "[r]educe the number of elderly households that are cost burdened . . . and ensure appropriate services to meet their needs as they age," to "[i]ncrease the number of seniors assisted with funding to rehabilitate their homes," and to "[c]onduct [a] public relations and marketing campaign to raise awareness of who needs housing."  In the Maintenance of Records section of the chapter, in addition to listing the WRO reports and HMDA data mentioned in the 2000 Fair Housing Plan Chapter, the County noted that a Human Rights Commission was established "to process and investigate discrimination complaints."

As in the 2000-2004 Consolidated Plan, Chapter Nine of the 2004-2008 Consolidated Plan makes no explicit reference to race, or race discrimination or segregation as an impediment to fair housing other than as described above.  Race discrimination or segregation are not identified as one of the thirteen obstacles to fair housing.

23

D.  Race and the County

Westchester was aware of the racial makeup of its municipalities (as reflected in the relevant censuses) when it prepared its 2000 and 2004 analyses of impediments to fair housing.  According to the 2000 census, over half of the municipalities in the Consortium had African-American populations of 3% or less.  In 1999, the Westchester Board of Legislators made a legislative finding that "there is no greater danger to the health, morals, safety, and welfare of the County than the existence of prejudice, intolerance, and antagonism among its residents because of . . . race, color, religion, ethnicity[, and other protected classes]" and that "there ha[d] been repeated instances of intolerance and discrimination committed in Westchester County."

The County's expert witnesses acknowledge the existence of racial "concentration" in parts of the County.  An expert witness for the County testified that racial concentration may decrease if affordable housing opportunities were available in predominantly white areas and African-Americans chose to live or move to those areas.  The ADC contends that the County's focus on affordable housing in its AI, rather than fair housing, meant that the County did not analyze how its placement of affordable housing affected segregation and racial diversity, and in fact that the County's production and placement of affordable housing

increased segregation in the jurisdiction.  The County admits
that it did not undertake an analysis of whether the production
of affordable housing between January 1, 1992 and April 1, 2006,
had the effect of increasing or decreasing racial diversity in
the neighborhood in which the housing was built.

Drummond testified that she told the ADC that the County
"sees discrimination in terms of income, rather than in terms of
race."  She also testified that she informed the ADC that the
County's AI "is seen through the lens of income and
affordability, as opposed to race discrimination and segregation
by race."


E.  Actions Taken by the County to AFFH and to Provide
Affordable Housing

The County has not deemed any municipalities to be failing
to AFFH, nor has it deemed any municipalities to be impeding the
County's ability to AFFH.  As such, the County has not withheld
any funds or imposed any sanctions on any participating
municipalities for failure to AFFH.  When the County considers
where to acquire land for affordable housing, it seeks the
concurrence of the municipality where the land is situated, and
during the false claims period the County would not acquire any
such land without the municipality's agreement.  The County
produced no documentation showing that during the false claims

period it funded or assisted the production of affordable
housing in any municipality where the municipality opposed such
production.  The County set a goal in a 1993 Affordable Housing
Allocation Plan to create 5000 affordable housing units;
however, as of July 2005, at least 16 municipal units in the
County had not created a single affordable housing unit.

F.   The County's Requests for Payments from HUD

The ADC asserts that the County received over $52 million
from HUD in housing and community development funding during the
false claims period.  Mark Massari, an accountant in the
County's Planning Department, explained how the money would
actually get from HUD to the County's bank account.  He stated
that he would use an online system to submit payment vouchers to
HUD to draw down the funds from a line of credit.  Approximately
25 payment vouchers per month were approved for payment.

DISCUSSION

Summary judgment may not be granted unless all of the
submissions taken together "show that there is no genuine issue
as to any material fact and that the moving party is entitled to
a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The
moving party bears the burden of demonstrating the absence of a
material factual question, and in making this determination the

26

court must view all facts in the light most favorable to the
non-moving party.  Sista v. CDC Ixis N. Am., Inc., 445 F.3d 161,
169 (2d Cir. 2006).  When the moving party has asserted facts
showing that the non-movant's claims cannot be sustained, the
opposing party must "set forth specific facts showing that there
is a genuine issue for trial," and cannot rest on the "mere
allegations or denials" contained in the pleadings.  Fed. R.
Civ. P. 56(e); accord Sista, 445 F.3d at 169.  That is, the non-
moving party "must do more than simply show that there is some
metaphysical doubt as to the material facts."  Matsushita Elec.
Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).
Only disputes over material facts -- facts that might affect the
outcome of the suit under the governing law -- will properly
preclude the entry of summary judgment.  Anderson v. Liberty
Lobby, Inc., 477 U.S. 242, 248 (1986).

     The Second Circuit set forth the elements of a FCA claim
in Mikes v. Straus, 274 F.3d 687 (2d Cir. 2001).  In order to
impose liability under the FCA, the plaintiff must show that
defendants "(1) made a claim, (2) to the United States
government, (3) that is false or fraudulent, (4) knowing of its
falsity, and (5) seeking payment from the federal treasury."
Id. at 695.  The Second Circuit expressly declined to decide
whether a sixth element, damages to the United States, was

required to be proven, noting that there was a split of authority on the issue.  Id.

     As to the first element, the court noted that the FCA "expansively defines the term 'claim' to cover 'any request or demand, whether under a contract or otherwise, for money or property . . . if the United States Government provides any portion of the money or property which is requested or demanded.'"  Id. (quoting 31 U.S.C. § 3729(c)).  As to the fifth element, the court found that "the statute reaches only those claims with the potential wrongfully to cause the government to disburse money."  Id. at 696.

     In the instant case, the only elements of these five that are in dispute are the third and fourth elements, i.e., whether there is no genuine issue of material fact that the County submitted false or fraudulent claims, knowing of their falsity. The County argues that in addition the plaintiff should be required to prove two more elements –- that the falsity was material, and that the United States suffered damages.


A.   False or Fraudulent Claims

     Mikes describes two theories of falsity under the FCA. Under the "legally false" or "certification theory," liability is "predicated upon a false representation of compliance with a federal statute or regulation or a prescribed contractual term."

28

Id. at 696-97.  The "factually false" certification theory, on
the other hand, "involves an incorrect description of goods or
services provided or a request for reimbursement for goods or
services never provided."  Id. at 697.

    In explaining the legally false certification theory of
liability, the Second Circuit stated that "a claim for
reimbursement made to the government is not legally false simply
because the particular service furnished failed to comply with
the mandates of a statute, regulation or contractual term that
is only tangential to the service for which reimbursement is
sought."  Id. (emphasis supplied).  Because the FCA "is
restitutionary and aimed at retrieving ill-begotten funds, it
would be anomalous to find liability when the alleged
noncompliance would not have influenced the government's
decision to pay."  Id.  Thus, the FCA "does not encompass those
instances of regulatory noncompliance that are irrelevant to the
government's disbursement decisions."  Id. (emphasis supplied).
Therefore, the court held that "a claim under the Act is legally
false only where a party certifies compliance with a statute or
regulation as a condition to governmental payment."  Id.
Finally, the Second Circuit explained that this holding was
related to, but distinct from, adding a materiality element to a
claim under the FCA:

> We add that although materiality is a related concept,
> our holding is distinct from a requirement imposed by
> some courts that a false statement or claim must be
> material to the government's funding decision.   A
> materiality requirement holds that only a subset of
> admittedly false claims is subject to False Claims Act
> liability.   We rule simply that not all instances of
> regulatory noncompliance will cause a claim to become
> false.   We need not and do not address whether the Act
> contains a separate materiality requirement.

Id. (citation omitted).

Among legally false certifications, there are both "express" and "implied" false certifications.  "An expressly false claim is, as the term suggests, a claim that falsely certifies compliance with a particular statute, regulation or contractual term, where compliance is a prerequisite to payment."  Id. at 698.

The ADC principally relies on the "legally false" certification theory, and alleges that the County made both express and implied false certifications.  The ADC asserts that the County's seven annual certifications submitted to HUD during the false claims period that it would comply with the duty to AFFH were expressly false, while the approximately 25 requests per month for payments from HUD for housing and community development projects during that same period were impliedly false.[7]  The County contends a) that it made only seven express

---

[7] While the ADC refers in passing to the Cooperation Agreements submitted to HUD during the false claims period as documents which contained implied false certifications, it does not

certifications, and that its requests for payment were not
implied certifications, and b) that none of its certifications
(express or implied) were false, because it appropriately
complied with its AFFH obligations.


A.   Were the County's Certifications False?

Addressing the latter issue first, the County argues that
it truthfully certified that it would AFFH because it complied
with its AFFH obligations by, inter alia, conducting an AI and
taking appropriate actions to overcome impediments identified in
the AI.  As discussed above, however, the statutes and
regulations require not just any AI, but one that analyzes
impediments to fair housing that are related to race.  There is
no genuine issue of material fact such that a reasonable jury
could find that the County analyzed race in conducting its AIs.

A review of the 2000 and 2004 AIs demonstrates that they
were conducted through the lens of affordable housing, rather
than fair housing and its focus on protected classes such as
race.  Both AIs are devoted entirely to the lack of affordable
housing in the County and related obstacles.  While the AIs
specify that lack of affordable housing is the "greatest"
impediment to fair housing, a determination that affordable

---

develop this argument and therefore it will not be further
discussed.

housing is the greatest impediment does not absolve the County from its requirement to analyze race-based impediments to fair housing. Despite the regulatory obligation to maintain records reflecting the AI, there is simply no evidence that either of the County's AIs during the false claims period analyzed race-based impediments to fair housing within its jurisdiction.

The County weakly asserts that the AIs were not devoid of any analysis of race because the references in the 2000 and 2004 AIs to an obstacle described as "local opposition" or "NIMBY" should be understood to include local opposition to new affordable housing on several bases, including on the basis of race. ADC disputes that the County used the term NIMBY to refer to a municipality's opposition to integration or to anything other than an individual homeowner's opposition to low-income housing being built in her neighborhood. Even assuming the County's contention to be true, however, such a veiled reference, buried within a finding that local opposition was an obstacle to "affordable" housing, does not reflect any analysis of how race-based opposition impeded fair housing, as distinct from other forms of local opposition. Nor does this reference reflect an analysis of how race-based local opposition might be an impediment to fair, and not just affordable, housing. Without a targeted analysis of race as a potential impediment to fair housing, the County was unprepared to grapple with the

second component of its AFFH duty to take appropriate action to overcome the effects of any racial discrimination or segregation it might identify as an impediment.  As discussed above, while the Consolidated Plan was to focus broadly on several issues, including affordable housing, the AI was specifically focused on fair housing.  The County, however, used its AI to further analyze issues related solely to affordable housing.

Despite the fact that race-based impediments to fair housing were not analyzed in the County's AIs, the County contends that it did fulfill its obligation to analyze race in conducting its AIs, "in that it reviewed discrimination complaints filed with WRO, solicited and considered information on discrimination complaints from public housing agencies and Section 8 offices, analyzed census data, and consulted with a wide variety of sources, including fair housing organizations," and it argues that nothing mandated that it find after reviewing this data that there were race-based impediments to fair housing.[8]  While it is true that federal law does not require the

_____

[8] The County's argument in this regard might carry more weight if it took the position that neither discrimination nor segregation nor any other race-based factor was an impediment to fair housing during the false claims period.  Tellingly, it does not assert that.  Instead, its brief in opposition to the ADC's motion for summary judgment asserts that the information it received "did not reflect that racial discrimination constituted a significant barrier to fair housing" and that it did not find that "any race-based impediments were among the most challenging barriers to fair housing."  (Emphasis supplied.)  Moreover, even

County to find evidence of racial discrimination or segregation where none exists, federal law does require that to obtain the HUD funds at issue here, the County had to maintain records of its analysis of whether race created an impediment to fair housing. The County has pointed to no such record other than the AIs contained within the two Consolidated Plans created during the false claims period, and neither those AIs nor the Consolidated Plans taken as a whole contain such an analysis. Thus, no reasonable jury could conclude either that the County appropriately analyzed race in conducting its AIs or that it maintained the required report of that analysis.

Moreover, as discussed above, the HUD Guide explains that pursuing affordable housing is not in and of itself sufficient to affirmatively further fair housing, and that affordable housing data that is found elsewhere in the Consolidated Plan does not go far enough in addressing fair housing concerns for protected classes. Thus, the focus of the AI is to be on "actions, omissions or decisions" which "restrict housing choices or the availability of housing choices," or which have

---

if grant recipients were excused from the obligation to take actions to overcome the effects of minor impediments to fair housing, the County was still obligated to record its analysis of race-based impediments and it has been unable to point to any record of a contemporaneous analysis, much less one that embodies the conclusions recited in its summary judgment memorandum. Without such a contemporaneous analysis and record, the certification that one existed was false.

the effect of doing so, based on "race, color, religion, sex, disability, familial status, or national origin," including "[p]olicies, practices, or procedures that appear neutral on their face," and HUD suggests that the AI contain a housing profile describing "the degree of segregation and restricted housing by race, ethnicity, disability status, and families with children; [and] how segregation and restricted housing supply occurred." (Emphasis supplied). There is no dispute that the County's AIs did not contain this analysis of segregation and the housing supply.

The County argues that the HUD Guide is not persuasive on the issue of what is required for an AI. It tries to recast the issues in this litigation as a quibble over whether the County was required to follow the specific tasks and format HUD lays out, which are not spelled out in the case law and statutory and regulatory framework. As already described, however, the County's AIs during the false claims period utterly failed to comply with the regulatory requirement that the County perform and maintain a record of its analysis of the impediments to fair housing choice in terms of race. This failure is only compounded by the County's failure to follow the guidance provided by HUD.

As discussed in Anti-Discrimination Center, 495 F. Supp. 2d at 387, "[i]nterpretations such as those in opinion letters --

like interpretations contained in policy statements, agency manuals, and enforcement guidelines, all of which lack the force of law -- do not warrant <u>Chevron</u>-style deference," <u>Christensen v. Harris County</u>, 529 U.S. 576, 587 (2000), but "[i]nstead, . . . are 'entitled to respect' . . . only to the extent that those interpretations have the 'power to persuade.'" <u>Id.</u> (citation omitted).  Since the HUD Guide is firmly rooted in the statutory and regulatory framework and consistent with the case law, it is persuasive on the issue of whether the County was required to analyze race-based impediments in conducting its AI. <u>Anti-Discrimination Center</u>, 495 F. Supp 2d at 387.

The HUD Guide's suggestion that the AI is to focus on acts, omissions, and decisions that restrict housing choice for protected classes, and that the grantee should analyze the degree of segregation within its jurisdiction, are firmly rooted in the statutory and regulatory framework and case law reviewed in <u>Anti-Discrimination Center</u>.  <u>See id.</u> at 384-86 (reviewing fair housing statutes and case law underlying the obligation to AFFH and finding goal of HUD grant programs is "to assist in ending discrimination and segregation, to the point where the supply of genuinely open housing increases" (citation omitted)). While the County was certainly not required to follow every specific suggestion or every recommendation in the HUD Guide, it also cannot be completely wide of the mark regarding the

suggestions relating to the central goal of the obligation to
AFFH -- to end housing discrimination and segregation -- and
still be considered compliant with its AFFH obligations.

The actions cited by the County to argue that it
"considered race" and therefore conducted an appropriate AI
demonstrate in fact that it did not appropriately analyze race-
based housing discrimination as required by the obligation to
AFFH.  While the County claims that it reviewed housing
discrimination complaints from the WRO, it does not provide or
show any analysis of those complaints and whether they revealed
that either discrimination or segregation was an impediment to
housing choice.  Similarly, the fact that the Consolidated Plans
include certain demographic data as to the racial makeup of
County and municipality populations does not in any way show
that the County conducted any analysis as to how this
demographic data related to the existence or lack of race-based
impediments to fair housing choice.  In sum, the County has put
forth no evidence, despite the AFFH obligation to maintain
records of its AI, that it conducted an analysis of race as it
pertains to impediments to fair housing choice, and likewise no
evidence that after conducting any such analysis, the analysis
led it to conclude that race-based discrimination or segregation
was not an impediment to housing choice and relieved it of the

duty to take action to overcome the effects that any such discrimination or segregation posed to fair housing choice.

The County also proffers a fallback argument that, while it may not have explicitly analyzed race-based impediments to housing choice, as required to AFFH, it concluded that it could conduct the required race-based analysis by using income as a proxy for race. For example, a member of the County's planning department testified that statistics from the census and HUD showed that "there was a lack of affordable housing and it was more prominent among lower income persons and likewise racial minorities"; Drummond likewise testified that providing housing to protected classes "unfortunately . . . breaks down mostly to income." The County also cites to data from other parts of the Consolidated Plans for the proposition that minorities made up a disproportionate share of the low income group in need of affordable housing.

The HUD Guide explains that while it is often the case that minorities are disproportionately represented among the low-income population, simply providing affordable housing for the low-income population "is not in and of itself sufficient to affirmatively further fair housing." This unsurprising statement is grounded in the statutory and regulatory framework behind the obligation to AFFH, which as already discussed, is concerned with addressing whether there are independent barriers

38

to protected classes exercising fair housing choice.  As a matter of logic, providing more affordable housing for a low income racial minority will improve its housing stock but may do little to change any pattern of discrimination or segregation. Addressing that pattern would at a minimum necessitate an analysis of where the additional housing is placed.

Moreover, even if the County's analysis led it to conclude that income was an appropriate proxy for race, then it was required to report that analysis and demonstrate how it acted to overcome the effects of that race-based impediment to fair housing.  Again, however, the County has not pointed to records reflecting either that analysis or the actions driven by that analysis.[9]  The County has simply not shown that it analyzed whether there were race-based impediments to housing choice independent of the problem of low income, and as such, it did not comply with the requirement to AFFH.  Thus, the County has not demonstrated an issue of material fact as to whether it appropriately analyzed race in conducting its AI and recorded that analysis, and as such, its certifications to HUD that it would AFFH were false.

---

[9] While the County argues that the actions it took to address the barriers to affordable housing should be considered actions promoting fair housing and specifically redressing racial discrimination in housing, for the reasons already described, the County cannot defeat this summary judgment motion with this post-hoc analysis.  It was required to maintain records reflecting that analysis and those actions and it did not.

Finally, the parties spill much ink disputing whether the
County made a reasonable, or indeed, any effort to overcome
impediments to fair housing during the false claims period, and
thus whether the County's annual certifications that it had
taken appropriate actions to overcome the effects of any
impediments to fair housing choice were false.  The County
defends its record by pointing to affordable housing that was
built with its assistance and encouragement in municipalities
that agreed to accept it.  It argues that its cooperative
approach with municipalities in its campaign to expand
affordable housing stock within the County is the most prudent,
realistic, and productive approach.  The ADC lists several
tactics that it believes the County should have employed but did
not to encourage desegregation.  Neither of these positions
confronts directly the falsity at issue in this litigation.

The statutory and regulatory framework described above
imposes no duty on the County to undertake any particular course
of action to overcome an impediment to fair housing.  After all,
one course of action may be effective in one community and
futile in another.  The law does, however, require the recipient
of the federal funds to certify that it will take "appropriate"
actions to overcome the effect of the impediments to fair
housing choice that its analysis has identified, and to maintain
records reflecting both that analysis and those actions.  See 24

40

C.F.R. § 91.425(a)(1)(i).  Because the County never did the
required analysis of race-based impediments, it never created a
contemporaneous record of how its management of the HUD-acquired
funds or any other "appropriate" steps it could take would
overcome the effects of those impediments.  Thus, while the
parties' evidence regarding the actions the County took and
failed to take during the false claims period may be relevant at
trial to issues like motive and knowledge, by pointing to its
programs regarding affordable housing the County has failed to
raise a question of fact as to whether its certifications to HUD
were false when they represented that the County would take
appropriate actions to overcome the effects of race-based
impediments to fair housing choice that its analysis had
identified.


    B.   <u>Did the County Make Implied Certifications</u>?

    ADC asserts that the County made an implied false
certification each time it submitted a payment request to HUD in
connection with CDBG and other grants during the false claims
period.  "An implied false certification claim is based on the
notion that the act of submitting a claim for reimbursement
itself implies compliance with governing federal rules that are
a precondition to payment."  <u>Mikes</u>, 274 F.3d at 699.  The Second
Circuit in <u>Mikes</u> noted that this theory "was applied in <u>Ab-Tech</u>

Construction, Inc. v. United States, 31 Fed. Cl. 429 (Fed. Cl. 1994), aff'd, 57 F.3d 1084 (Fed. Cir. 1995) (unpublished table decision)," where "[t]he Court of Federal Claims held that the defendants' submission of payment vouchers, although containing no express representation, implicitly certified their continued adherence to the eligibility requirements of a federal small business statutory program," and that therefore "[t]he failure by defendants to honor the terms of this certification rendered their claims for payment false."   Mikes, 274 F.3d at 699.

   The Second Circuit noted that this implied false certification theory should not be read expansively in the particular context of Mikes, which involved the healthcare field, because "[i]nterests of federalism counsel that the regulation of health and safety matters is primarily, and historically, a matter of local concern," id. at 700 (citation omitted), and because of a concern that "permitting qui tam plaintiffs to assert that defendants' quality of care failed to meet medical standards would promote federalization of medical malpractice."   Id.   Thus, the court found that "a medical provider should be found to have implicitly certified compliance with a particular rule as a condition of reimbursement in limited circumstances," id., specifically, "only when the underlying statute or regulation upon which the plaintiff relies

42

expressly states the provider must comply in order to be paid."
Id. (first emphasis supplied).

In the instant case, 42 U.S.C. § 5304(b)(2), pertaining to
CDBG grants, expressly states that "[a]ny grant under section
5306 of this title shall be made only if the grantee certifies
to the satisfaction of the Secretary that . . . the grant will
be conducted and administered in conformity with the Civil
Rights Act of 1964 and the Fair Housing Act, and the grantee
will affirmatively further fair housing." (Emphasis supplied).
Likewise, the regulations governing the County's submissions for
its annual applications for housing and community development
funding provide that the County "must" certify that it will
AFFH.  See 24 C.F.R. 91.425(a)(1)(i).  Given this explicit
statutory and regulatory scheme, it is easy to find that federal
law conditioned payment of the housing and community development
funds on compliance with the duty to AFFH and that each time the
County submitted a request for payment of those funds it made an
impliedly false certification.

The County argues that because the certification to AFFH is
prospective in nature, the underlying provisions should be
analyzed as an eligibility requirement for future reimbursement
and not an express condition of payment.  See Mikes, 274 F.3d at
701-02.  The prospective nature of the certification, however,
stems from the fact that program at issue here is the awarding

of a grant, such that the eligibility and payment inquiries are in a sense the same.  Thus, the periodic requests for payment made between the annual certifications are properly considered implied false certifications.  See United States ex rel. Hendow v. University of Phoenix, 461 F.3d 1166, 1176 (9th Cir. 2006) (rejecting similar argument in the context of claims by a university for payments under the Higher Education Act, which inter alia banned institutions from paying recruiters on a per-student basis).

The County's claim that the payment requests cannot be implied certifications because they are related to the draw down of the grant and not the initial award are similarly unavailing. The requests for payments asked the United States to pay certain grant money -- grant money that been expressly conditioned on the certification that the County would AFFH.  As such, the requests for payment of those grants funds impliedly certified their compliance with the grant requirements, including the requirement to AFFH.

Finally, the County cites United States ex rel. Conner v. Salina Regional Health Center, Inc., 543 F.3d 1211 (10th Cir. 2008), to support its contention that the certifications involve participation requirements and not payment conditions.  Connor, however, is distinguishable.  Connor specifically notes that its distinction between payment and participation conditions is

44

important in contexts such as Medicare, "[w]here a contractor participates in [the] government program in order to perform the services for which payments are eventually made."  Id. at 1220. In the instant case, the County was not a contractor participating in a program to perform services and then bill the federal government for payment.  Rather, in the context of a grant applicant for government funds, the distinction between participation and payment collapses.  The County has therefore failed to raise a question of fact as to whether the County's requests for payment of the housing and community development grant funds during the false claims period were implied false certifications.


B.  <u>Knowledge of the Claims' Falsity</u>

Both the County and ADC contend that they are entitled to summary judgment on the issue of the County's knowing submission of false claims.  "The Act defines 'knowingly' as either: (1) possessing actual knowledge; (2) acting in deliberate ignorance of falsity; or (3) acting in reckless disregard of falsity." <u>Mikes</u>, 274 F.3d at 696 (citing 31 U.S.C. § 3729(b)).  "[N]o proof of specific intent to defraud is required."  31 U.S.C. § 3729(b).

In <u>U.S. ex rel. Kreindler & Kreindler v. United Technologies Corp.</u>, the Second Circuit adopted the position that

45

"[t]he requisite intent is the knowing presentation of what is known to be false. That the relevant [federal] government officials know of the falsity is not in itself a defense." 985 F.2d 1148, 1156 (2d Cir. 1993) (citation omitted). The court noted, however, that

> on the other hand, [federal] government knowledge may
> be relevant to a defendant's liability: The fact that
> a contractor has fully disclosed all information to
> the government may show that the contractor has not
> "knowingly" submitted a false claim, that is, that it
> did not act with "deliberate ignorance" or "reckless
> disregard for the truth."

Id. at 1157 (citation omitted).

The County has presented sufficient evidence to raise issues of fact as to whether it knowingly submitted false certifications and payment requests to the federal government. Conversely, the ADC also survives the County's motion for summary judgment on the element of knowledge.

Given the evidence ADC adduced, including the HUD Planning Guide, the training materials Drummond received, and the internal County Planning Department memoranda, all of which informed the County that failing to analyze race appropriately was a violation of its AFFH obligations, a reasonable factfinder could find that the County acted in knowingly or in reckless disregard as to the falsity of its certifications. This evidence, while supporting an inference of the County's knowing or reckless disregard for the falsity of its certifications,

46

however, does not compel such a conclusion.  As explained in
Kreindler, while the fact that the federal government officials
may have known of the falsity does not bar FCA liability,
disclosure by the County to the federal government is relevant
to the issue of the County's knowledge or reckless disregard.
Despite the fact that HUD regulations do not require the
submission of the AIs to HUD, the County submitted the AIs to
HUD as part of the Consolidated Plans.  While ADC cites the HUD
Guide to demonstrate that it was not HUD's role to review or
approve AIs, whether or not HUD was to review the submissions,
the County's voluntary submission at least permits the inference
that the County did not act in knowing and reckless disregard as
to the falsity of its certifications.


C.  Materiality and Damages

     The County argues that an FCA claim requires proof of
materiality and damages, in addition to the elements of the
claim outlined in Mikes, 274 F.3d at 695, and that it is
entitled to summary judgment on both elements.  While the ADC
will be required to show that the falsity in the certifications
was material, the FCA does not impose a duty to prove damages.
Moreover, disputed issues of fact require that the County's
motion for summary judgment on the issue of materiality be
denied.

As for the issue of damages, Mikes cites Harrison v. Westinghouse Savannah River Co., 176 F.3d 776 (4th Cir. 1999) ("Harrison I"), for the proposition that there is a split of authority as to whether damage to the government is an element of the offense.  Mikes, 274 F.3d at 695.  As Harrison I notes, there is no such requirement in the FCA itself of damages. Harrison I, 176 F.3d at 785 n.7.  The statute provides for recovery of both a) two to three times the damages to the government and b) a civil penalty for the false or fraudulent claims.  31 U.S.C. § 3729(a).  Blusal Meats, Inc. v. United States, 638 F. Supp. 824, 827 (S.D.N.Y. 1986), cited both by the County and the Fourth Circuit in Harrison I for the proposition that some courts consider damages as an element of an FCA offense, itself recognized that a violation of the (pre-1986 amendments) FCA could be found even in the absence of proof of damages to the United States, because of the civil penalty provisions of the FCA.  Thus, the most faithful interpretation of the statutory language is a conclusion that damages to the United States need not be shown in order to establish FCA liability.

While the Second Circuit has declined to decide whether there is a materiality element for FCA violations, and therefore has not adopted a definition of materiality in this context, Mikes, 274 F.3d at 697, several other Circuits have found that

48

an FCA claim requires a showing of materiality.  See United
States v. Bourseau, 531 F.3d 1159, 1170-71 (9th Cir. 2008)
(reviewing cases and finding that First, Fourth, Fifth, Sixth
and Eighth Circuits all have a materiality element for FCA
claims); see also Connor, 543 F.3d at 1219 n.6 (adopting
materiality element in Tenth Circuit for false certification
claims).  But see United States ex rel. Cantekin v. Univ. of
Pittsburgh, 192 F.3d 402, 415 (3d Cir. 1999) (questioning
whether materiality is an element, but declining to resolve the
issue).

     The circuits that have adopted a materiality element for an
FCA claim have adopted different standards for assessing
materiality.  Some have looked to the Supreme Court's statement
in Neder v. United States that "[i]n general, a false statement
is material if it has a natural tendency to influence, or [is]
capable of influencing, the decision of the decisionmaking body
to which it was addressed," 527 U.S. 1, 16 (1999) (citation
omitted), and therefore have "adopted a 'natural tendency test'
for materiality, which focuses on the potential effect of the
false statement when it is made rather than on the false
statement's actual effect after it is discovered."  Bourseau,
531 F.3d at 1171 (emphasis supplied); see also United States v.
Gaudin, 515 U.S. 506, 509 (1995) (applying natural tendency
definition of materiality in the context of 18 U.S.C. § 1001,

which proscribes making materially false or fraudulent
statements in a matter within the jurisdiction of a federal
agency).  Other courts have adopted "a more restrictive 'outcome
materiality test,' which requires a showing that the defendant's
actions (1) had the purpose and effect of causing the United
States to pay out money it is not obligated to pay, or (2)
intentionally deprive[d] the United States of money it is
lawfully due."  Bourseau, 531 F.3d at 1171 (citation omitted).

This Court finds the reasoning requiring proof of
materiality and adopting the "natural tendency test" for
materiality, with its focus on the potential effect of the
statement when made, more persuasive.  See, e.g., United States
ex rel. A+ Homecare, Inc. v. Medshares Management Group, Inc.,
400 F.3d 428, 446 (6th Cir. 2005) (explaining that natural
tendency test is more consistent with the plain language and
underlying purposes of the FCA).

As discussed above in regard to the related question of
legally false certifications, the grant funds at issue in this
case were expressly conditioned on the AFFH certification
requirement.  The AFFH certification was not a mere boilerplate
formality, but rather was a substantive requirement, rooted in
the history and purpose of the fair housing laws and
regulations, requiring the County to conduct an AI, take
appropriate actions in response, and to document its analysis

50

and actions.   The County's motion for summary judgment is
therefore denied.   See Hendow, 461 F.3d at 1175 (finding the
parties' argument over whether the false statements were
material "largely academic" where the government funding was
expressly conditioned on the particular requirement to which the
false statements pertained); see also United States ex rel.
Harrison v. Westinghouse Savannah River Co. ("Harrison II"), 352
F.3d 908, 915-17 (4th Cir. 2003) (rejecting argument that a
certification was not material simply because the federal
government continued to fund a subcontract after learning the
certification was false where the certification was a
prerequisite for bidding on the subcontract).

     The County contends that correspondence between the County
and HUD has shown that the certifications could not have been
material to HUD's funding decision as a matter of law, because
HUD "knew" how the County interpreted its AFFH requirements
based on the County's submissions to HUD, and funded the County
anyway.[10]   The County points to, inter alia, the fact that it
submitted its Action Plans and CAPERs to HUD, which the County
asserts showed HUD how it approached its AFFH obligations, and

---

[10] The ADC contends that the County admitted in its answer that
the certifications were a material condition for funding, while
the County seeks to distinguish that admission or amend its
answer in light of information it learned in discovery.   The
County's statement in its answer will not preclude the ADC from
having to prove materiality at trial.

the fact that the County received correspondence back from HUD related to these submissions approving the County's submissions and funding.  For example, a letter from HUD relating to the 2002 Action Plan states in a Matter of Advice that HUD's Office of Fair Housing and Equal Opportunity ("FHEO") "noted that the Action Plan did not describe activities to address all of the housing needs of racial/ethnic groups with a disproportionate need," and that "[p]olicies or actions that have a discriminatory impact on protected classes were not identified," and that "[f]uture[] submissions could be improved by including such information"; the letter for the 2001 Action Plan had a similar notice.  Additionally, a letter from HUD related to the 1999 CAPER advised the County that HUD's FHEO noticed that the CAPER did not "identify/indicate the benefits to minorities by activity, the extent that CDBG [and other] funded activities benefited each racial and ethnic group, racial and ethnic group housing needs, and the proportion of expenditures received in relation to the needs of each racial/ethnic group" and that "[t]he County should have this information on file in the event of a HUD on-site review."  The County received a similar notice of insufficiency from HUD for the 2000 and 2001 CAPERs.

Westchester's argument that its false certifications could not have been material because it submitted its AIs and related documents to HUD, and HUD continued to grant it funds, misses

52

the mark in several respects.  First, it overlooks the fact that submission of these materials does not establish that HUD "knew" precisely how the County was conducting its AI and its AFFH compliance.  More significantly, the test for materiality is an objective one.  There is no requirement that the plaintiff show that any grant official actually relied on the false certification in making the decision to send HUD fair housing and community development funds to the County.  Conversely, an individual government employee's decision to approve or continue such funding, even with full access to all relevant information or knowledge of the falsity of the applicants certification does not demonstrate that the falsity was not material.  After all, the FCA is intended to police the integrity of those claims submitted to the government for payment, and the materiality of statements made in those claims is tested as of the time of submission to the government and in the context of the regulatory requirements.  Thus, the assertion that certain HUD bureaucrats reviewed the County's submissions and continued to grant the County funding cannot somehow make the false AFFH certifications immaterial, where the funding was explicitly conditioned on the certifications.[11]

---

[11] The County also relies on United States v. Southland Management Corp., 326 F.3d 669 (5th Cir. 2003), to argue that its statements were not material, but that case is distinguishable.  There, the United States sued "the owners of

CONCLUSION

The ADC's September 30, 2008 partial motion for summary
judgment is granted in part and denied in part.  The motion is
granted as to the following elements of FCA liability: that the
defendant made a claim, to the United States government, that
was false or fraudulent, seeking payment from the Federal
treasury.  The ADC's motion is denied as to the knowledge
element of an FCA claim.  The County's September 30, 2008 motion
for summary judgment is denied in full.  The ADC's November 19,
2008 motion to strike is denied as moot.


SO ORDERED:

Dated:    New York, New York
          February 24, 2009

                                    _____
                                    DENISE COTE
                                    United States District Judge


_____

an apartment project for falsely certifying that the property
was decent, safe, and sanitary in requesting supplemental rent
payments funded under Section 8 of the United States Housing
Act."  Id. at 671.  The court found not that the statements were
immaterial, but that they were not in fact false.  Id.  The
Court based its conclusion on the contractual provisions between
the owners and HUD, which provided that the owners would still
be paid during a corrective period until HUD notified them
otherwise.