UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------- x
UNITED STATES OF AMERICA ex rel.     :
ANTI-DISCRIMINATION CENTER OF    :
METRO NEW YORK, INC.,           :
                             :
          Plaintiff,       :
                             :     No. 06 Civ. 2860 (DLC)
      v.                   :
                             :
WESTCHESTER COUNTY, NEW YORK,   :
                             :
          Defendant.     :
-------------------------------------------------------------- x

**MONITOR'S REPORT REGARDING IMPLEMENTATION OF THE
STIPULATION AND ORDER OF SETTLEMENT AND DISMISSAL
FOR THE PERIOD OF FEBRUARY 11, 2010 THROUGH JULY 6, 2010**

# TABLE OF CONTENTS

I.    Background on Lawsuit and Settlement ..................................................................1

II.   Monitor's Activities ............................................................................................2

  A.   Capacity Building ...........................................................................................3

    1.    Housing Advisor ....................................................................................3

    2.    Financing Consultant and Legal Advice..................................................5

  B.   Meetings with County Legislators, Municipal Leaders and Input from the
Public ...................................................................................................................6

    1.    The Board of Legislators .........................................................................6

    2.    Municipal Leadership ..............................................................................6

    3.    Not-for-Profit Organizations and Members of the Public ........................7

III.  The County's Performance ...................................................................................8

  A.   First IP ...........................................................................................................9

  B.   Revised IP ....................................................................................................10

    1.    Strategy and Benchmarks ......................................................................11

    2.    Site Identification and Assessment ........................................................12

    3.    Model Ordinance ..................................................................................13

    4.    Relationships with Municipalities; Incentives and Penalties...................15

    5.    Financing...............................................................................................17

    6.    Marketing and Outreach ........................................................................18

    7.    Capacity ...............................................................................................20

    8.    Reporting...............................................................................................20

  C.   First and Second Quarterly Reports .............................................................21

    1.    Affordable AFFH Units .........................................................................22

    2.    Census Analysis and Efforts to Identify Sites........................................22

    3.    Outreach and Advertising ......................................................................22

    4.    Local Approval Processes ......................................................................23

  D.   Terminology..................................................................................................23

  E.   Source of Income Legislation .......................................................................24

  F.   Inquiries to the Monitor ...............................................................................25

## I.      Background on Lawsuit and Settlement

In April 2006, the Anti-Discrimination Center of Metro New York, Inc. ("ADC") filed a federal lawsuit alleging that Westchester County ("County") had violated the False Claims Act by making certain certifications in its applications to the U.S. Department of Housing and Urban Development ("HUD") regarding its compliance with the Civil Rights Act of 1964 and the Fair Housing Act.   Additionally, the County was required to certify that it would affirmatively further fair housing ("AFFH"), which requires conducting an analysis of impediments to fair housing choice ("AI") that specifically addresses impediments based on racial discrimination or segregation.

After this Court ruled that the County had made misrepresentations in its applications, the County and HUD reached a settlement, the terms of which are laid out in the Stipulation and Order of Settlement and Dismissal ("Stipulation") approved by this Court on August 10, 2009.   After months of consideration of the Stipulation and several public hearings, the County Board of Legislators ("BOL") approved the Stipulation on September 22, 2009. Among the requirements of the Stipulation, the County agreed to spend $51.6 million over seven years to develop at least 750 units of "Affordable AFFH Housing" (*see* ¶ 7[1]), primarily in municipalities with overwhelmingly white populations, without setting any racial or ethnic quotas for the eventual residents of the units.   The County also agreed to affirmatively market these units in Westchester and nearby communities with large non-white populations. Pursuant to the Stipulation, the County has also committed itself to develop an Implementation Plan ("IP") "setting forth with specificity the manner in which the County

---

[1]      Unless indicated otherwise, all paragraph citations refer to the Stipulation.

plans to implement the provisions of this Stipulation and Order, set forth in paragraph 7, concerning the development of Affordable AFFH Units."   ¶ 18; *see also* ¶ 22 (specifying activities the County must undertake in developing the IP); ¶ 24 (requirement that the IP include benchmarks); ¶ 25 (listing components that the IP must include).

In addition to the development and affirmative marketing of the Affordable AFFH units, the County has also undertaken to develop an AI that is deemed acceptable by HUD. ¶ 32.  Additionally, the County, through the County Executive, agreed to promote legislation to ban "source of income" housing discrimination.  ¶ 33(g).

The Court appointed me to serve as a Monitor to oversee and facilitate the implementation of the Stipulation's terms.  This report is submitted to provide the Court with an update on what has taken place since the filing of the first Monitor's report in February 2010, with an emphasis on the status of the County's IP and the revisions that must be made before the IP can be deemed acceptable.

## II.     Monitor's Activities

Since the filing of the Monitor's first report in February 2010, the Monitor's activities have fallen into roughly three categories:   capacity building; meeting with the public to discuss the Stipulation; and review and assessment of the submitted IP.  The Monitor has also devoted time to mediating the dispute between the County and HUD stemming from the County Executive's veto of "Source of Income" legislation recently passed by the BOL.  *See* Section III.E below.

### A.      Capacity Building

When the Stipulation was first announced, both parties expressed the view that the approach was unprecedented and permitted the Monitor to engage a Housing Advisor and other experts, as needed to assure proper oversight over the County's efforts.  *See* ¶ 13(f). The Stipulation also permitted the Monitor to seek technical assistance.  The Monitor has acquired such assistance and secured outside funding to support these efforts, discussed in additional detail in Section II.A.2 below.  All of this was intended to ensure that this effort had adequate resources devoted to oversight.

### 1.      Housing Advisor

The Stipulation contemplated the appointment of a Housing Advisor to advise and assist the Monitor in exercising oversight.  The Housing Advisor first selected is a prominent expert in housing development in Westchester County and well-regarded by all parties for her probity and ability to develop creative, practical solutions to housing problems.  As set forth in the Monitor's First Report, however, it became clear to both the Monitor and the Housing Advisor that the Advisor's day-to-day work would lead, on a regular basis, to questions about the propriety of the Housing Advisor being both a major actor in the field representing both not-for-profit and for-profit developers, and serving as the principal aide to the Monitor responsible for evaluating proposals in which those same clients may have a substantial interest.  Efforts to construct ethical walls and procedures to avoid the conflicts yielded potential results that would neither give the public confidence in the impartiality of the Monitor team nor give the Monitor the full benefit of the considerable capacity and resources of the Housing Advisor.  Accordingly, the Monitor and the Housing Advisor agreed to

terminate the relationship.  The Monitor then commenced a process to secure a replacement Housing Advisor.

Informed by numerous briefings from Westchester County officials and experts at HUD, the Monitor sought a Housing Advisor who was familiar with land use and housing planning in Westchester County, real estate finance and the development of affirmative marketing plans for housing.  The Monitor interviewed five candidates for the position, all but one of whom had the support of either a law firm, a consulting firm or an academic institution.  At the end of a process that involved the review of resumés, capacity, interviews, and a written submission reflecting each candidate's view of critical path items for the short term, the Monitor selected a team from the Graduate Center for Planning and the Environment ("GCPE") at the Pratt Institute.

The Pratt team is led by GCPE Chair John Shapiro, who previously worked for twenty-five years as a planner in private practice, including as a partner at Phillips Preiss Shapiro Associates, one of the region's leading planning consultancies.  In that capacity, Shapiro prepared affordable housing strategies and comprehensive plans for numerous municipalities, including several in Westchester.  Other team members include:

- Alan Mallach, a nonresident senior fellow at the Brookings Institution, who served as the Director of Trenton's Department of Housing and Economic Development from 1990 to 1999.  Mallach is well-recognized as one of the nation's leading experts in affordable housing, and provides frequent advice to HUD; and

- Ron Shiffman, trained as an architect and urban planner, who founded and for nearly forty years directed the Pratt Center for Community Development, perhaps the nation's leading university-based planning technical assistance and advocacy organization.  Shiffman served as a Commissioner of the New York City Planning Commission from 1990 to 1996.

As a whole, the Pratt team represents leaders in the fields of affordable housing, innovative financing, and community-based planning.

The Pratt team provided rigorous review of the IP (the team's final report is attached hereto as Exhibit 1), and has and will continue to evaluate the appropriateness of development proposals presented by the County.

### 2.        Financing Consultant and Legal Advice

One of the critical issues in the implementation of the Stipulation is financing for the proposed real estate developments.  In an effort to encourage broad thinking, the Monitor engaged Forsyth Street Advisors, consultants specializing in real estate, affordable housing, and public finance.

The Monitor also engaged a team of attorneys from Orrick Herrington & Sutcliffe LLP with expertise in public finance to provide legal advice on issues related to the creation of a revolving fund to finance development.  Both Forsyth and Orrick will be funded through a grant from the Ford Foundation.  This grant is administered by the Furman Center for Real Estate and Urban Policy at New York University and arose out of meetings the Monitor and Furman personnel had with the Ford Foundation in the fall.

\*   \*   \*

The Monitor is confident that the team assembled has the capacity to enable the Monitor to discharge his responsibilities over the near- and long-term requirements of the Monitorship.

5

B.      **Meetings with County Legislators, Municipal Leaders and Input from the Public**

The Monitor's responsibilities include being an advocate for the Stipulation, an avenue for public comment about the Stipulation, and a contributor to efforts to educate the public about the Stipulation.  Since the last report, the Monitor has served in all of the foregoing functions.

1.      **The Board of Legislators**

After the First Report was issued, the Monitor met with the County Executive and his team on February 16, 2010 to discuss concerns with the first IP.  Immediately following that meeting, the Monitor met with members of the BOL who expressed their continued support for the Stipulation and repeated their intention to remain engaged in the process and to continue to discharge their oversight and policymaking responsibilities with respect to the Stipulation.  The Monitor has maintained an open door with the BOL, and has welcomed its members' insight and input.  In addition to informal phone conferences, the Monitor met with the BOL on May 7, 2010 and has had related communications with a smaller group of legislators who are closely monitoring the County Executive's performance under the Stipulation.

2.      **Municipal Leadership**

On March 11, 2010, the Monitor spoke at the monthly gathering of the Westchester Municipal Officials Association.  The Stipulation generally was the topic of the discussion, with a particular emphasis on the Monitor's problem-solving approach.  Municipal leaders asked a range of questions, but the greatest focus was on the County's flexibility in meeting

the terms of the agreement and a clear interest in technical assistance to be provided under the agreement.

### 3.       Not-for-Profit Organizations and Members of the Public

The Monitor has spoken to and received comments from a wide range of not-for-profit groups focused on fair housing, civil rights, and government reform.  On April 16, 2010, the Monitor met with the Executive Director of the Lawyers' Committee for Civil Rights Under Law and learned about the approaches of other communities focused on housing desegregation.   On April 23, 2010, the Monitor met with Craig Gurian of the Anti-Discrimination Center to discuss previously received detailed written reports (*see* Prescription for Failure, Anti-Discrimination Center (Feb. 2010), attached hereto as Exhibit 2, and Draft IP, Anti-Discrimination Center (Mar. 25, 2010), attached hereto as Exhibit 3) and receive a briefing conveying the ADC's perspectives on the County's efforts to date.   On May 19, 2010, the Monitor was the guest speaker at the annual meeting of the League of Women Voters of New Castle.  The Monitor's remarks at this event focused on the Monitor's role in the implementation process.  The Monitor also held an extensive question-and-answer session regarding specific provisions of the Stipulation.

In addition to these meetings, the Monitor has received or been copied on correspondence from nearly one hundred organizations expressing concern about the pace of Westchester's implementation of the terms of the Stipulation.   The organizations' written comments are attached as Exhibit 4.

*   *   *

These meetings and correspondence have both given the Monitor an opportunity to further explain the Stipulation and to receive valuable input about the performance of both parties, as well as the Monitor, as work continues to fulfill the purposes of the Stipulation.

## III.    The County's Performance

The core of the Monitor's work is to exercise oversight over the County's efforts to implement the Stipulation and facilitate problem-solving as called for, either by the County or between the County and HUD.  Put another way, the touchstone of the Monitor's job is to assess the County's compliance with the Stipulation and use the available tools, including application to the Court, to compel compliance if necessary.  The Stipulation establishes a framework for developing at least 750 affordable AFFH units and expanding opportunity with a view toward providing African American and Hispanic families seeking housing a meaningful chance to reside in communities that such families have not been able, for a variety of reasons, to call home.  Full compliance requires attention to all aspects of the Stipulation.  Providing the units is an essential component of the strategy, but not the only key element.

Compliance is to be assessed in both substantive and procedural terms.  The Monitor must assess not only the results of the effort but, particularly should the County fall short of the benchmarks, the manner in which the County attempted to fill its obligations under the Stipulation.  Fairness to the County and its citizens requires regular reporting on both. Indeed, before the first unit receives financing or acquires building approval, the most important question is that of how the County approaches its task.  The record, so far, is mixed.

The remainder of this report will do three things:  summarize and assess the County's performance as described in the first two quarterly reports; review and assess the County's

second iteration of its implementation plan; and assess the County's procedural compliance. The facts upon which this report are drawn from submissions by the County, information provided by experts, and meetings and conferences held by the Monitor and his team with either one or the other or both of the County and HUD, which were frequent and often lengthy.

Almost any compliance review, to be thorough, must assess a critical factor in compliance: "tone at the top." Employees take their cues from their leaders' messages, how they spend their time, and how they employ their resources. In subsequent reports, the Monitor will provide information concerning the steps County leadership has undertaken in support of the Stipulation. Review of the tone at the top is critical in circumstances, where, as here, an Executive decision has led to an objection by HUD and has raised questions, by other County leaders and at least one editorial board, about the Administration's willingness to comply with all aspects of the Stipulation. Specifically, on June 25, 2010, the County Executive vetoed Source of Income Legislation called for by the Stipulation. The integrity of the Stipulation and fairness to all involved require this issue to be explored carefully. Accordingly, on June 28, 2010, in response to the veto, the Monitor requested information concerning the reasons for that veto. *See* Section III.E below. After receiving that information, the Monitor expects to be in a better position to provide the Court with a more fully rounded assessment of the tone at the top.

### A.      First IP

On January 29, 2010, in compliance with an extended deadline, the County submitted the first iteration of its IP to the Monitor, as well as to HUD. The County also made the IP publicly accessible via its website. The Monitor did not accept that plan, and in accordance

with paragraph 20 of the Stipulation, provided the County with specific comments about its deficiencies.  Those comments were also provided to the Court in February 2010 as part of the Monitor's first report to the Court.  As detailed in that report, the primary shortcoming of the first IP was a lack of specificity with respect to accountability, timeframes and processes.

**B.      Revised IP**

After a series of discussions in which the Monitor, the County, and HUD participated, the County submitted a revised IP on March 12, 2010  (the "Revised IP"), which is publicly available at http://www.westchestergov.com/housingsettlement and attached hereto as Exhibit 5.  Although the County has made progress on a number of aspects of the IP, the revised submission still falls short of a true plan to comply with either the Stipulation's specific terms or its overarching goal of building a more integrated Westchester.  The following comments and instructions are provided in accordance with the Monitor's authority under paragraph 20(d) to "specify revisions or additional items that the County shall incorporate into" the IP "[i]n the event that the Monitor deems the revised plan submitted by the County insufficient to accomplish the objectives and terms set forth in [the] Stipulation." The Monitor directs the County to comply with the below instructions no later than August 9, 2010.

Complying with the Stipulation will require creativity and hard work, but the County can and should look for guidance from previous examples of affordable housing that affirmatively furthers fair housing throughout the nation, as well as from experts with experience in the field.  The Pratt Report includes specific examples of past successes that can be built upon in Westchester.

### 1.    Strategy and Benchmarks

The Revised IP's discussion of timetables and benchmarks is an improvement on the first version, which simply repeated the benchmarks set forth in the Stipulation (¶¶ 23-24) and did not include any plan for the following six months, in violation of paragraph 19 of the Stipulation.  First IP (attached to Monitor's First Report as Exhibit 1) at 19.  The County now provides a lengthy list of tasks it will address over the next six months, as well as certain goals to be reached by the one-year anniversary of the Stipulation in August 2010.  Revised IP at 27-28.  Nevertheless, the Revised IP still fails to spell out long-range timetables beyond the numerical goals for unit financing and permits as already set forth in the Stipulation, explaining that the County will provide the Monitor with updates on progress made as part of the County's quarterly reports.  The County should develop more concrete long-term benchmarks now, as part of the strategy presented in the IP itself, even if it later becomes necessary to revise the benchmarks.

As in the first version, the Revised IP lacks concrete medium- and long-term strategies for how the County plans to develop at least 750 Affordable AFFH Units as required by the Stipulation.  *See* ¶ 7.  For example, the Revised IP still does not lay out a strategy for allocating the $51.6 million the County must spend on "land acquisition, infrastructure improvement, construction, acquisition," and other development costs.  ¶ 5.  In addition to spelling out a plan for anticipated resource allocation, an acceptable IP must also state with specificity the process the County will use to make decisions regarding allocation of resources to particular developments.

The County should formulate an overarching strategy for allocating the types of units it will use to reach the 750 minimum, for example:  $x$ units will be generated through

inclusionary zoning, *y* units through the acquisition of foreclosed properties, *z* units from new construction, and so forth. These figures will almost surely shift over time, but it is crucial for the County to develop an overall strategy at the outset for most effectively utilizing the $51.6 million to develop the required minimum of 750 units, rather than making resource-allocation decisions on a purely ad hoc basis, particularly given that the types of housing carry very different costs to the County.

As before, the Revised IP lacks a system for tracking the number of units in progress for each of the locational criteria categories (¶¶ 7(a)-(c)) or units that count toward the limits on the number of age-restricted units (¶ 7(f)) or existing housing (¶ 7(h)). The County should remedy this deficiency in the final IP.

### 2.       Site Identification and Assessment

The Revised IP includes a list of activities that the County will undertake to identify potential sites, but does not set forth internal guidelines for site identification. Revised IP at 14-15. Such guidelines might include, for example, who within the County's implementation team will take the lead on liaising with banks and financial institutions, and the timeline for doing so. Generally, the IP should explain how and when the activities on its list will be carried out.

The IP should also include the County's strategy as to how the 750 (or more) units will be distributed throughout the eligible municipalities. Significantly, the Revised IP does not indicate that the County has complied with the Stipulation requirements that it promote "sustainable, inclusive communities" (¶ 22(a)) or, significantly, how it plans to "maximize the development of Affordable AFFH Units in the eligible municipalities and census blocks with the lowest concentrations of African American and Hispanic residents." ¶ 22(f).

As part of its site assessment activities, the County should consider using a fair share allocation. A useful starting point is the November 9, 2005 *Westchester County Housing Opportunity Commission Affordable Housing Allocation Plan (2000-2015)*, with specific attention paid to the "Remaining Obligation" in Table C thereof. This Allocation Plan is attached as Exhibit 6. *See also* Pratt Report at 9.

In its process of site identification, the County also should focus particular attention on the possible benefits of low-scale housing typologies or mixed-use development on County- or municipal-owned land. Two-to-four family homes, in which multiple residential units are contained in a structure that from the outside appears to be a large single-family home, can be an attractive alternative to large apartment buildings or townhouses, and may work well in areas with limited sewer, water, or transportation infrastructure. Pratt Report at 11. Other examples of low-scale housing typologies include: upstairs ("above the store") units, both in village centers and above commercial structures in greyfields; accessory units; conversion of non-residential buildings; and acquisition of foreclosed condominiums. *Id*. at 11-13.

### 3. Model Ordinance

#### a. Preferences

The County's model ordinance, as currently worded, continues to include impermissible preferences for local seniors, employees, and volunteers. Preferences for seniors (who reside in the municipality or whose immediate family members reside in the municipality) would preserve the demographic status quo, directly cutting against the County's obligation to AFFH. As currently worded, the workforce preferences in the model ordinance would not AFFH. It is conceivable that workforce preferences could further the goals of the Stipulation. That is likely under limited circumstances where the workforce is

13

more diverse than the existing resident population.  These issues should be addressed on a case-by-case basis rather than with a general approach to be embodied in the model ordinance.  Housing allocated under such preferences should not exceed 25% of the units in a particular development.

### b.      Inclusionary Zoning

With respect to the 10 percent inclusionary zoning benchmark in the model ordinance, the County should consider a more flexible approach that would mandate a higher percentage in those municipalities where property values are high enough that developers can fill in a gap in net profit without needing to produce many additional market-rate units.  Therefore, a higher mandate could be pegged to the median income or income distribution of each municipality or a more sophisticated analysis.  *See* Pratt Report at 28.

### c.      Approvals

The Revised IP's discussion of the model ordinance continues to emphasize the County's lack of authority with respect to zoning and land use controls.  *Compare* First IP at 6 *with* Revised IP at 7.  The discussion and chart illustrating local approval processes and obstacles thereto reflect a pessimistic view without exploring possible remedies that could make these processes faster and smoother for developments with an affordable AFFH component.  As detailed in the Pratt Report, there may be a number of ways to bring about such an acceleration, with the goal of encouraging developers to include affordable housing in their projects.  *See* Pratt Report at 25-26.

###### d.    Promotion

The Revised IP still lacks a concrete plan to promote the model ordinance (as required by paragraph 25(a) of the Stipulation) beyond letters from the County Executive and Deputy County Executive to municipal officials that do not contain real enforcement mechanisms. Revised IP Appendix D-1(ii).[2]  The IP should clearly state the County's additional plans for promotion of the model ordinance.  Further, the IP should include the County's plan to condition municipalities' adoption of the ordinance on something else to make it meaningful, such as membership in the Urban County Consortium (through which municipalities receive federal funding through HUD's Community Development Block Grant ("CDBG") program and other funding sources).

###### 4.    Relationships with Municipalities; Incentives and Penalties

The Revised IP continues to demonstrate a lack of creativity as to how the County plans to encourage municipalities to comply with the terms of the Stipulation.  One prime example is the discretionary funding allocation policy, which has not been modified or expanded in any meaningful way—even after the Monitor and HUD repeatedly stressed its potential usefulness.  Instead of adding to the list of funding that will be conditioned on compliance (or stating the types of activities required for compliance), the Revised IP still mentions only that this discretionary funding is "including, but not limited to, CDBG funds and the County Open Space funds."  Revised IP at 8.  This is exactly what the first IP

---

[2]    The County is also required, through the County Executive, to promote "source of income" legislation. ¶ 33(g).  The Revised IP does not indicate that the current administration has done anything whatsoever to promote the legislation, and on June 25, 2010, County Executive Robert P. Astorino vetoed "source of income" legislation that had been passed by the Westchester County Board of Legislators on June 14, 2010. *See* Section III.E for further discussion of this issue.

provided—in both instances restating the Stipulation's minimum requirements.  To have meaningful effect, the policy should be expanded so that it goes above and beyond what is already required through the Urban County Consortium cooperation agreements, to which the vast majority of eligible municipalities are already party.

To gain a fuller sense of the range of funding that could potentially fall within the discretionary funding allocation policy, the Monitor directs the County to provide, by July 30, 2010, a list of all of the types of funding or other assistance that flow from the County to municipalities.  This list should differentiate between discretionary and mandatory funding, with an explanation of the legal basis underlying the designation of a particular funding source as mandatory.

For purposes of making determinations as to the withholding of discretionary funding or other penalties, the IP should define what constitutes non-cooperation and formulate a process for executing the appropriate penalty.  For example, the IP should indicate that those municipalities that do not cooperate by meeting certain clearly defined benchmarks will be ineligible for funding for a defined period.

The Stipulation explicitly states that the County "shall use all available means as appropriate," including "pursuing legal action," to address a municipality's failure to act to promote the objectives of paragraph 7 (which lays out the general requirements for the required AFFH units), or actions that hinder those objectives.  ¶ 7(j).  However, the Revised IP contains merely a recitation of this requirement, rather than any meaningful exploration of what shape such legal action might take.  Revised IP at 9.

More generally, the County should consider requiring municipalities to report on obstacles to developing the Affordable AFFH Units, including identifying the steps that can

be taken to overcome these obstacles.  Noncompliance with this reporting requirement would trigger the penalties available for overall failure to comply with the terms of the Stipulation. At a minimum, the IP should include the County's plan for monitoring local approval processes and municipalities' cooperation with the County's efforts to implement the Stipulation.[3]

### 5.      Financing

Although the Revised IP provides more information regarding financing than the previous version, it still lacks an overarching plan to leverage the $51.6 million.  *See generally* Section III.B.1 above (discussion of strategy and benchmarks).  The IP should include a clear breakdown of the different types of financing tools the County will use, perhaps summarized in chart format.  Additionally, the Revised IP does not spell out how financing decisions will be made.  The decision-making process should include input from a person or team (perhaps a consultant outside the County's existing staff) with significant experience in putting together deals to develop affordable housing.

As a piece of the overall financing picture, the County should revisit its assessment of the feasibility of utilizing a revolving loan fund (which is, notably, more thorough in the Revised IP than the assessment provided in the first IP).  Revised IP Appendix F-1.  This is an area in which the County would benefit greatly from the creative thinking of experts with extensive experience in housing finance, as well as outside legal advice to evaluate the

---

[3]      The Pratt Report contains an expanded discussion of incentives, penalties, and other policy and planning tools the County should consider in further revising its IP.  *See* Pratt Report at 8-9 (describing, *inter alia*, the potential use of a County trust fund, tax abatements or exemptions, adjustments to County transit, and a role for the Westchester Industrial Development Agency).

County's assumptions with regard to state constitutional and legal issues. *See* Pratt Report at 17-18. The Monitor will provide additional comments in this area subject to the analysis of the Orrick team, which is ongoing. The County should also consider more creative options to leverage its funds, such as employer-assisted housing and financing from pension fund managers. *See* Pratt Report at 15-16.

### 6. Marketing and Outreach

The Affirmative Fair Housing Marketing Plan ("AFHMP") suffers from two primary deficiencies. First, and easily remedied, the AFHMP states that the Marketing and Outreach Area "must be designated as Westchester County and Contiguous Counties for all County-funded projects." Revised IP Appendix G-1, at 8. This restriction to contiguous counties has the effect of excluding all boroughs within the City of New York other than the Bronx, as each borough is its own county. Paragraph 33(e) of the Stipulation specifies that the County shall "affirmatively market affordable housing within the County and in geographic areas with large non-white populations outside, but contiguous *or within close proximity to*" Westchester County (emphasis added). To be most effective, the Marketing and Outreach Area should be expanded to include those New York City boroughs with a higher percentage of African-Americans or Hispanics than that of Westchester County as a whole.

Second, the AFHMP places the bulk of the marketing burden on the developer. Revised IP at 21 ("Developers or other professional entities which receive funding by or through the County of Westchester for the development of fair and affordable housing units shall be required to comply with the provisions of this Plan."); Revised IP Appendix G-1 at 4 ("This manual is a guide to assist Developers . . . "); *id.* at 5 ("In formulating the AFHM Program, the Developer must do the following . . . "). As explained in the Pratt Report, a

developer-focused strategy may work well for large-scale developments, but is not likely to be effective for low-scale typologies such as accessory units.  *See* Pratt Report at 31.  The AFHMP should be revised to include a clear role for the County in marketing activities beyond monitoring the marketing plan's use.  *See* Revised IP Appendix G-1 at 2-3.

The Revised IP states that the County is giving consideration "to hiring an advertising agency with experience in outreach to underrepresented populations."  Revised IP at 23.  The Monitor directs the County to engage an outside agency or agencies to assist both with (1) outreach and marketing to potential residents of the AFFH units; and (2) general outreach to current residents of the eligible municipalities about the benefits of inclusive communities.  For the latter, the County leadership should study successful efforts to promote inclusive communities elsewhere in New York State and the nation generally.  The Monitor requests that the County report on such activities in each of the next four quarterly reports.

With regard to outreach, the Revised IP again states that the County will not proceed with its outreach obligations under paragraph 33(h) of the Stipulation until its centralized intake tool is ready, without a sufficient explanation as to why this is the case.  Revised IP Appendix H-1 at 2.  The County's target completion date for the intake tool is September 1, 2010.  *See* Revised IP at 21.  The IP should include a fully developed plan for outreach and education, and detail the County's efforts in these areas to date.

Other than a brief mention of "housing counseling," Revised IP at 21, the Revised IP lacks a discussion of housing mobility outreach and counseling for new residents moving into low-poverty, high-opportunity areas for the first time.  This assistance will be vital to ensuring that those who move into the Affordable AFFH units can make the most of the increased opportunities available in their new communities.  The County should look to the numerous

examples of successful mobility assistance programs implemented elsewhere.  Again, the Monitor directs the County to report on these activities in its next four quarterly reports.

### 7.   Capacity

In accordance with the Monitor's comments on the first IP, the revised submission specifies who within County government will be responsible for each set of tasks.  Despite this improvement with regard to accountability, the Revised IP and an overall assessment of the County's capacity still suggest a need for additional expertise in certain areas.  The Monitor urges the County to consult outside experts regarding, at a minimum, housing finance (particularly the use of a revolving loan fund), zoning, and marketing (as discussed above).  Such experts can provide substantial assistance and leadership in both developing and carrying out an acceptable IP.  The Monitor team has already provided the County with several suggestions for outside expertise and will continue to do so.  The Monitor notes that, since the Revised IP was submitted, the County has engaged two HUD-certified agencies to assist with housing counseling services.  *See* June 30, 2010 Quarterly Report, attached as Exhibit 9, at 6.

The Monitor also recommends that the County consider creating an independent advisory panel that would include leaders from various sectors, including but not limited to major local employers and community, religious, and labor organizations.  *See* Pratt Report at 6.

### 8.   Reporting

As noted above, the County continues to maintain regular contact with the Monitor team.  However, the Revised IP's plan for ongoing reporting to the Monitor about the

development of the Affordable AFFH Units continues to focus on the County's quarterly reporting schedule. Revised IP at 26. As before, the Revised IP does not specify the point at which the County will seek approval from the Monitor or HUD during the site identification or assessment process, despite a stated commitment to have a "continuous and open dialogue with both the Monitor and HUD." *Id.* at 28. The Monitor recognizes the County's legitimate concern that making certain information available to the public might jeopardize the development of the housing units, and appreciates the County's ongoing efforts to keep the Monitor informed about particular projects. Nevertheless, for purposes of the IP and to provide transparency to the public, the Monitor directs the County to explain in greater detail the process by which it will seek and obtain approvals. *See also* Section III.F below.

### C.      First and Second Quarterly Reports

On March 30, 2010 and June 30, 2010, the County submitted its first and second quarterly reports as required by paragraph 28 of the Stipulation and informed by letter of the Monitor dated February 1, 2010 (attached as Exhibit 7). The reports, attached as Exhibits 8 and 9 hereto, provide information concerning:

- All affordable AFFH units including those approved, in progress and completed;

- Local approval efforts and impediments;

- Detailed descriptions of the Affordable AFFH Units;

- Census analysis;

- Available land;

- Financing and expenditures;

- Outreach and advertising;

- Overall progress; and

- The County's assessment of its need for expert assistance.

### 1.  Affordable AFFH Units

In the first and second quarterly reports, the County reported four projects, representing 30 units, in the public review process.  Three of those projects have received local government approvals:  Edgar Place, in the City of Rye, Freedom Gardens in the Town of Yorktown and 55 Pleasant Avenue in the Village of Pleasantville.

### 2.  Census Analysis and Efforts to Identify Sites.

In the first and second quarters, the County undertook steps to identify potential sites for the development of Affordable AFFH Units including analysis of census data; meetings with municipal officials; and studying, among other things, current land use, transportation, sewage, water and environmental features.  This activity, however, has yet to produce new sites for development.  The County has requested permission to reclassify a development previously listed as an Excluded Property pursuant to ¶ 13(h) of the Stipulation because the property will not move forward without funding from the $51.6 million in required by the Stipulation.  The Monitor is in the process of evaluating the County's request.

### 3.  Outreach and Advertising

In the first and second quarters, County officials met with municipal officials, developers and property owners as well as organizations of local leaders and not-for-profits with an interest in the development of Affordable AFFH Units.  In neither quarter were there steps taken to fulfill the Stipulation's requirements to engage in affirmative marketing or advertise Affordable AFFH Units because units were not identified.  That said, the reporting

22

indicates no activity to reach out to any organization, whether not for profit, religious or advocacy, that has as its primary constituents either African American or Hispanic potential homebuyers or renters.  The County is encouraged to engage with such groups immediately rather than waiting until housing is identified.  The foundation for such efforts cannot be built overnight.

### 4. Local Approval Processes

In the first and second quarters, the County has distributed the revised model ordinance contained in the most recent implementation plan (the Monitor's assessment of which is presented in Section III.B.3 above).  The County Planning Board has received and commented on a total of 13 referrals and site plan applications from the 31 eligible Municipalities related to affordable AFFH.  Significantly, the County encouraged the City of Rye to eliminate a restriction placed on a housing development that units be limited to a population of 55 and older.

### D. Terminology

The County uses the term "fair and affordable" throughout its submissions to the Monitor, as well as on its website.  Although this term at first may appear to address the County's AFFH obligations under the Stipulation, the County also uses the label on its website to describe housing developments that completely lack an AFFH component, such as 102 Ringgold Street in Peekskill and 330 Riverdale Avenue in Yonkers.  *See* Exhibit 10 ("Fair and Affordable Rental Developments," Westchester County Website, http://homes.westchestergov.com/index.php?option=com_content&task=view&id=2564&Ite mid=4429).  The term "fair and affordable" conflates fair housing with affordable housing

and obscures the County's obligations to AFFH.  Going forward, the County should use the precise language of the Stipulation—"Affordable AFFH Units"—when referring to the housing it is required to develop under the Stipulation.  The distinction is not merely semantic.  Clarity is vital to the public's understanding of, and confidence in, the County's efforts to meet its obligations under the Stipulation.

### E.    Source of Income Legislation

Paragraph 33(g) of the Stipulation requires the County to "promote, through the County Executive, legislation currently pending before the Board of Legislators to ban 'source-of-income' discrimination in housing."  Despite an expanded discussion of outreach efforts, it is not clear from the Revised IP that the current County administration ever took any action on this front.  *See* Revised IP at 6 (only recent action appears to relate to website regarding Housing Choice Voucher Program website, not Source of Income legislation); IP Appendix C-3(ii)-(iii) (letters sent by former County Executive Andrew Spano to the Westchester County Board of Legislators and fair housing advocates; no correspondence from current administration).  After a version of the Source of Income legislation was passed on June 14, 2010, current County Executive Robert P. Astorino vetoed it on June 25, 2010.  *See* Exhibit 11 (June 25, 2010 Veto Message from Robert P. Astorino to BOL).  In a June 28, 2010 letter (attached hereto as Exhibit 12), the Monitor directed Mr. Astorino to explain how this action complied with his specific obligation under paragraph 33(g).  The lack of a reference to this requirement—or to the Stipulation at all—in Mr. Astorino's veto message is troubling, to say the least.  The County Executive's responses to the Monitor's requests regarding the veto will be filed in a subsequent report to the Court.

F.      **Inquiries to the Monitor**

The County has contacted the Monitor regarding a number of specific developments and questions of interpretation as to the meaning and application of Stipulation provisions. These inquiries raise two sets of concerns.

First, the inquiries have lacked sufficient detail for the Monitor to reach conclusions without substantial additional information.  Going forward, the Monitor has directed the County to include the following information in its requests:

- The tax block and lot in which the development is located;

- The County's best estimate of the timeframe within which a decision by the Monitor must be made so as to obtain the necessary financing or approvals for the development;

- The provision(s) of the Stipulation under which the proposed development is purportedly eligible; and

- Information about opportunity indicators (with regard to education, employment, and the other criteria set forth in paragraph 22(a) of the Stipulation) for the location of the proposed development (even if this information has already been provided as part of the County's quarterly reporting).

The Monitor has also directed the County to submit inquiries at least thirty days before the expiration of the necessary financing or approvals for the development.

Second, the inquiries regarding specific developments highlight the County's lack of an overall strategy to "maximize the development of Affordable AFFH Units in the eligible municipalities and census blocks with the lowest concentrations of African American and Hispanic residents."  ¶ 22(f).  Several of these inquiries instead appear to relate to sites that meet the less restrictive criteria of paragraph 7(c), under which the County can develop units only after building permits are in place for 175 units that meet the more stringent

requirements of paragraph 7(a).[4]   Further, the proposed developments presented to the Monitor to date may be indicative of an overall weakness in addressing the County's duty, in developing the IP, to assess the potential of available sites to "provide access to services and facilities that will promote sustainable, inclusive communities, such as employment and educational opportunities."   ¶ 22(a).   In order to meet these obligations, it is crucial for the County to develop long-term strategies, as discussed in Section III.B.1 above.


Dated:   July 7, 2010
             New York, New York

                                                    Respectfully submitted,

                                                    /s/ James E. Johnson
                                                    James E. Johnson
                                                    (jejohnsn@debevoise.com)
                                                    Debevoise & Plimpton LLP
                                                    919 Third Avenue
                                                    New York, NY 10022
                                                    *Monitor*

---

[4]   The Monitor has not completed an analysis of all of the County's inquiries to date, and these comments are preliminary.