UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------X
                                        :
UNITED STATES OF AMERICA ex rel., ANTI- :
DISCRIMINATION CENTER OF METRO NEW       :
YORK, INC.,                              :     06 Civ. 2860 (DLC)
                    Plaintiff/Relator,   :
                                        :        OPINION & ORDER
             -v-                         :
                                        :
WESTCHESTER COUNTY, NEW YORK,            :
                         Defendant.      :
                                        :
----------------------------------------X

APPEARANCES:

For intervenor:

Robert H. Stroup
Levy Ratner, P.C.
80 Eighth Avenue, 8th Floor
New York, NY 10011

Craig Gurian
Anti-Discrimination Center, Inc.
54 West 21st Street, Suite 707
New York, NY 10010

For plaintiff:

Benjamin H. Torrance
Assistant United States Attorney
86 Chambers Street
New York, NY 10007

For defendant:

Robert F. Meehan
Westchester County Attorney
148 Martine Avenue, 6th Floor
White Plains, NY 10601

DENISE COTE, District Judge:

The Court exercises continued jurisdiction over this action pursuant to a consent decree between the United States ("the Government") and Westchester County, New York ("Westchester" or "the County").  The Anti-Discrimination Center of Metro New York, Inc. ("ADC") has moved to intervene, for the stated purpose of "enforcing" that consent decree.  For the following reasons, ADC's motion is denied.


Background

I.  The False Claims Act Litigation

ADC is a non-profit organization that advocates for policies to combat discrimination in housing, employment, education, and public accommodation.  In 2006, ADC brought suit as relator for the Government against Westchester, alleging that Westchester violated the False Claims Act, 31 U.S.C. § 3729, et seq. ("FCA"), through certifications made to the Secretary of Housing and Urban Development ("HUD") between April 2000 and April 2006 to obtain over $52 million in federal funding for housing and community development.  In essence, Westchester had successfully applied for HUD Community Development Block Grants ("CDBG"), and in doing so had certified to HUD that it was affirmatively furthering fair housing ("AFFH"), see 42 U.S.C. §§ 5304(b)(2), 12705(b).  In order to fulfill its obligation to

AFFH, however, Westchester was required to perform an analysis
of impediments ("AI") to fair housing in its jurisdiction,
taking into account the impact of race on housing opportunities
and choice, and to take appropriate action to overcome the
effects of those impediments.

On February 24, 2009, the Court granted partial summary
judgment to ADC, finding that Westchester had falsely certified
to HUD that it was fulfilling its commitment to AFFH while
failing to analyze impediments to fair housing in the County
related to race.  See United States ex rel. Anti-Discrimination
Center of Metro New York, Inc. v. Westchester County, 668
F.Supp.2d 548, 561-63 (S.D.N.Y. 2009).  Both ADC's and
Westchester's summary judgment motions were denied, however, on
the issue of whether the County had knowingly submitted false
certifications to HUD.  Id. at 567-68.  A trial date was set.
On May 5, the trial date was adjourned after the Court was
informed that the Government, ADC, and Westchester had
memorialized the framework for a settlement of claims against
the County.

On August 10, 2009, the Government exercised its statutory
right, see 31 U.S.C. § 3730(c)(3), and filed its complaint in
intervention.  Alongside its FCA claims, the Government alleged
violations of the Housing and Community Development Act
("HCDA"), 42 U.S.C. § 5301 et seq., seeking mandatory and

injunctive relief against Westchester.  At the same time, the Government submitted two settlement stipulations.  The first, a consent decree between the Government and the County (the "Consent Decree"), dismissed the FCA claims against the County. The ADC is not a party to the Consent Decree.  The second settlement stipulation, entitled "Stipulation and Order of Settlement of Relator's Share and Release" ("ADC Release"), was between the Government and the ADC.  In the ADC Release, the ADC accepted a relator's award of $7.5 million, agreed that the Consent Decree was "fair, adequate, and reasonable," and released the Government from claims relating to the allegations in the ADC's FCA complaint.

II.  The Consent Decree

The Consent Decree established a framework for ensuring that the County would comply with its obligations under the Fair Housing Act to AFFH.  This Court has retained jurisdiction over the Consent Decree and the parties to it, including any application to enforce provisions of the Consent Decree.  Under the Consent Decree, the County agreed to pay $30 million to the Government to settle the monetary claims against it under the FCA.  Of that amount, $21.6 million would be deposited in the County's account with HUD, to be made available to the County for the development, consistent with the terms of the Consent

Decree, of new affordable housing units that will AFFH in the County.  Westchester agreed to pay ADC $2.5 million as expenses, attorney's fees, and costs in full settlement of the ADC's <u>qui tam</u> claims against the County.

The County also undertook to allocate an additional $30 million for fiscal years 2009 through 2014 to comply with the Consent Decree.  The core provision of the injunctive relief set forth in the Consent Decree is Westchester's commitment to develop at least 750 new affordable housing units in areas of the County with low black and Hispanic populations ("the Affordable AFFH units") in the seven years following the entry of the Consent Decree.  The County "shall use all available means as appropriate" to develop the Affordable AFFH units, and,

> [i]n the event that a municipality does not take actions needed to promote the objectives of [the commitment to develop the Affordable AFFH units], or undertakes actions that hinder the[se] objectives . . . the County shall use all available means as appropriate to address such action or inaction, including . . . pursuing legal action.

The Consent Decree provides for the appointment of a monitor (the "Monitor") to review the County's progress toward the Consent Decree's benchmarks, and to take steps as necessary to ensure compliance.  The Monitor's powers include the authority to review County actions for compliance with the Consent Decree, to recommend additional actions the County should take to ensure compliance, and to resolve disputes

between the Government and Westchester regarding the implementation of the Consent Decree.[1]  The Consent Decree provides for monetary sanctions against the County in the event the County does not fulfill its obligation to develop the Affordable AFFH units as specified in the Consent Decree, or fails to meet interim benchmarks.  The Monitor is given discretion to waive or alter the imposition of these penalties. From August 10, 2009, James E. Johnson has served as the Monitor.

The Consent Decree requires that the County submit, within 120 days of entry of the Consent Decree, an implementation plan ("IP") detailing with specificity how the County intends to implement its commitment to develop the Affordable AFFH units. The Monitor must review the proposed IP, and "in the Monitor's discretion . . . accept or reject the proposed plan."  If the IP is rejected, the Consent Decree provides for an additional period where the County must seek to cure its IP in response to the deficiencies identified by the Monitor.  Then, "[i]n the event that the Monitor deems the revised plan submitted by the

---

[1] Pursuant to the Consent Decree, in the event of a dispute between the County and the Government, the parties must notify the Monitor in writing of the nature of the dispute.  The Monitor must then issue a written report and recommendation to the parties addressing the dispute.  Either party may seek additional review of the Monitor's report and recommendation from the magistrate judge assigned to this case, and ultimately from the Court.

County insufficient to accomplish the objectives and terms set forth in [the Consent Decree], the Monitor shall specify revisions or additional items that the County shall incorporate into its [IP]." The County's IP must include a "model ordinance" that the County will promote to municipalities to advance fair housing by ensuring that new development projects include affordable units and are marketed to minority communities.

The Consent Decree also requires that the County complete an AI compliant with HUD's Fair Housing Planning Guide.  The AI must be deemed acceptable by HUD.  The County must then take all actions identified in its AI.

Commencing on December 31, 2011, the Monitor must complete a biennial report assessing the County's efforts and progress to meet its commitments under the Consent Decree.  As part of the report's assessment of the County's record of compliance,

> the Monitor may consider any information appropriate
> to determine whether the County has taken all possible
> actions to meet its obligations . . . including . . .
> exploring all opportunities to leverage funds for the
> development of Affordable AFFH Units, promoting
> inclusionary and other appropriate zoning by
> municipalities by offering incentives, and, if
> necessary, taking legal action.

III.  Implementation of the Consent Decree

The County has thus far failed to develop an IP acceptable to the Monitor or submit an AI acceptable to HUD.  After being granted an extension, as permitted under the Consent Decree, the

County submitted its first IP to the Monitor and HUD on January 29, 2010 ("the January 2010 IP").  The Monitor found the January 2010 IP to be unacceptable, lacking "specificity with respect to accountability, timeframes, and processes."  The County's revised IP, submitted on March 12, 2010, was also rejected by the Monitor.  The County submitted its second revised IP on August 9, 2010 ("the August 2010 IP").  In October 2010, the Monitor approved the "model ordinance" contained in the August 2010 IP, but, pursuant to the Consent Decree, the Monitor undertook to direct revisions to the August 2010 IP to render it compliant.  In late 2010, the Monitor "established an approach to develop and complete the IP's remaining components [involving] obtaining input from major Stakeholders in the [Consent Decree], not just the parties."  That process remains ongoing.

The County's AI submissions have been rejected on repeated occasions by HUD.[2]  The most recent rejection of the County's AI occurred on July 13, 2011, when HUD rejected the County's June 13 revised AI submission ("the June 2011 AI").  In particular, HUD found that the County had not passed legislation against source-of-income discrimination ("Source of Income Legislation"), as the Consent Decree required it to do, and that

---

[2] The Consent Decree does not give the Monitor a central role in the AI submission process, as it does for the IP process.

the County had not yet developed a legal strategy to challenge exclusionary zoning practices utilized by municipalities.

Following the rejection of the June 2011 AI, the Government and the County requested that the Monitor resolve two disputes: first, whether the County has complied with the Consent Decree in promoting Source of Income Legislation; and second, "the nature and scope of the County's duty to address local zoning ordinances that may hinder efforts to [AFFH]," and how that duty should be addressed in its AI.  The Monitor, in a November 17 Report and Recommendation (the "November 17 Report"), found the County in breach of its obligation to promote Source of Income Legislation and directed the County to analyze municipal zoning ordinances in connection with its AI by February 29, 2012.  The County has sought review of the November 17 Report from the magistrate judge assigned to this case.

Since entry of the Consent Decree, ADC has lobbied the Government, the County, and the Monitor on behalf of ADC's fair housing goals.  It now seeks to intervene in the remedial stages of this action to "enforce" the Consent Decree.

Discussion

ADC filed two motions on May 31, 2011.  First, it moved for intervention as of right under Fed. R. Civ. P. 24(a).  Second, it moved for Court enforcement of provisions of the Consent

Decree, alleging in essence that the County had failed to comply

with the Consent Decree and the Government and Monitor had

abdicated their responsibility to enforce it.  At a conference

held on June 7, the Court scheduled briefing on the motion to

intervene and denied ADC's motion to enforce the Consent Decree

without prejudice for refiling after resolution of the

intervention motion.  Both the Government and the County

separately opposed ADC's motion to intervene.  The motion became

fully submitted on September 16.

> Rule 24(a)(2) provides:
>
> On timely motion, the [district] court must permit
> anyone to intervene who . . . claims an interest
> relating to the property or transaction that is the
> subject of the action, and is so situated that
> disposing of the action may as a practical matter
> impair or impede the movant's ability to protect its
> interest, unless existing parties adequately represent
> that interest.

Fed. R. Civ. P. 24(a)(2).  Intervention as of right is granted

when the movant meets the following four conditions:

> (1) the motion is timely; (2) the applicant asserts an
> interest relating to the property or transaction that
> is the subject of the action; (3) the applicant is so
> situated that without intervention, disposition of the
> action may, as a practical matter, impair or impede
> the applicant's ability to protect its interest; and
> (4) the applicant's interest is not adequately
> represented by the other parties.

MasterCard Int'l Inc. v. Visa Int'l Serv. Ass'n, Inc., 471 F.3d

377, 389 (2d Cir. 2006).

The requirements for intervention must also be read in connection with the definition of a necessary party in Rule 19(a), Fed. R. Civ. P.  Rules 24(a)(2) and 19(a) "are intended to mirror each other."  MasterCard, 471 F.3d at 390.  A party is "necessary" if it "claims an interest relating to the subject of the action and is so situated that the disposition of the action in the [party]'s absence may as a practical matter impair or impede the [party]'s ability to protect that interest."  Fed. F. Civ. P. 19(a)(2)(i).  Thus, "[t]he requirements for intervention embodied in Rule 24(a)(2) must be read . . . in the context of the particular statutory scheme that is the basis for the litigation and with an eye to the posture of the litigation at the time the motion is decided."  United States v. Hooker Chem. & Plastics Corp., 749 F.2d 968, 983 (2d Cir. 1984).  "If a party is not 'necessary' under Rule 19(a), then it cannot satisfy the test for intervention as of right under Rule 24(a)(2)." MasterCard, 471 F.3d at 389.

The parties dispute whether ADC's motion is timely. Because ADC has failed to show that its interest in the Consent Decree between the Government and the County is sufficient to support intervention as of right, the timeliness of ADC's motion need not be addressed.

For an interest in the underlying action to be cognizable by Rule 24(a)(2), "it must be direct, substantial, and legally

protectable." <u>Bridgeport Guardians v. Delmonte</u>, 602 F.3d 469, 473 (2d Cir. 2010) (citation omitted).  "An interest that is remote from the subject matter of the proceeding, or that is contingent upon the occurrence of a sequence of events before it becomes colorable, will not satisfy the rule." <u>Brennan v. N.Y.C. Bd. of Educ.</u>, 260 F.3d 123, 129 (2d Cir. 2001) (citation omitted).

ADC sets forth three interests in the Consent Decree between the Government and the County that entitle it to intervention as of right.  None is sufficient to conclude that it is a necessary party to this action or that it has a direct and legally protectable right in the enforcement of the Consent Decree.

First, ADC argues that but for its diligence in prosecuting the initial FCA action as relator for the Government, there would be no Consent Decree and no commitment by the County to AFFH.  ADC's role as relator in initiating the <u>qui tam</u> action does not provide it with an ongoing legally protectable interest in the litigation.

The FCA "is designed to help combat fraud against the federal government by persons who provide goods and services to it," and to that end, includes "<u>qui tam</u> provisions that allow private citizens who learn of fraud to bring suit in the name of the government and to share in any recovery." <u>United States ex</u>

rel. Kirk v. Schindler Elevator Corp., 601 F.3d 94, 98-99 (2d
Cir. 2010), rev'd on other grounds, 131 S.Ct. 1885 (2011).
While a relator does have an interest sufficient to support
Article III standing, that interest is limited and bounded by
the particular structure of FCA litigation.  "[T]he Supreme
Court [has] specifically identified the source of relator-
standing in False Claims Act qui tam actions, concluding that
relators have standing to sue not as agents of the United
States, but as partial-assignees of the United States' claim to
recovery."  United States ex rel. Eisenstein v. City of New
York, 540 F.3d 94, 101 (2d Cir. 2008) (citing Vermont Agency of
Natural Resources v. United States ex rel. Stevens, 529 U.S.
765, 773-74 (2000)).  While the statute effects a partial
assignment of the claim to the relator, "the injury, and
therefore, the right to bring the claim belongs to the United
States."  United States ex rel. Mergent Serv. v. Flaherty, 540
F.3d 89, 93 (2d Cir. 2008).  "While relators indisputably have a
stake in the outcome of . . . qui tam actions they initiate, the
Government remains the real party in interest in any such
action."  Id. (citation omitted).[3]  The FCA statute enables the

---

[3] Recognizing that "the case, albeit controlled and litigated by
the relator, is not the relator's 'own case' as required by [the
federal pro se statute], nor one in which he has 'an interest
personal to him,'" the Second Circuit has held that a relator
may not bring an FCA claim pro se.  Flaherty, 540 F.3d at 93
(citation omitted).

Government to defend its predominant interest and assert control over the claim at various stages of the litigation.  Numerous FCA provisions "protect the government's ability to maintain control of cases in which it is pursuing an investigation or otherwise wishes to assert its own interests against those of the qui tam relator."  Schindler Elevator, 601 F.3d at 110 n.9.

ADC brought a qui tam action against the County through a partial assignment of the Government's interest in the FCA claims asserted.  In August 2009, the Government intervened and, consistent with its status under the FCA as the real party in interest, settled the FCA claims against the County.  Pursuant to that settlement, ADC received a relator's bounty of $7.5 million.  ADC stipulated at that time that the Government's FCA settlement with Westchester was "fair, adequate, and reasonable under all the circumstances."  See 31 U.S.C. § 3730(c)(2)(B). The Court's approval of the settlement terminated the FCA claims against Westchester, and ADC's role in the action.  ADC cannot satisfy Rule 24(a)'s requirement that ADC have a legally protectable interest by reference to an interest that did not survive approval of the settlement.

Second, ADC argues that its organizational purpose -- "ending segregation [] in Westchester and elsewhere" -- constitutes a sufficient interest for intervention as of right. ADC's interest in combating segregation does not make it a

14

necessary party to the process in which the Government and Westchester are currently engaging. ADC is not a party to the Consent Decree between the Government and Westchester. Furthermore, the Consent Decree, which ADC seeks to "enforce", provides for injunctive relief pursuant to the HCDA. ADC could not have brought an HCDA claim or secured the injunctive relief against the County. See 42 U.S.C. § 5311 (establishing HCDA enforcement scheme through HUD referral to Attorney General).[4] ADC filed its action as a relator under the FCA, and those causes of action were fully resolved by the settlement and do not survive.

Thus, ADC has no greater status than any other stranger to this litigation. Pursuant to the mechanisms established by the Consent Decree, the Monitor issued his November 17 Report; the

---

[4] A HUD referral to the Attorney General to initiate an enforcement action of that part of the HCDA which pertains to CDBG grants is the exclusive means of enforcement. See 42 U.S.C. §§ 5304(b)(2), 5311; accord Greater New Orleans Fair Housing Action Ctr. v. United States Dep't of Housing and Urban Dev., 723 F.Supp.2d 14, 24-26 (D.D.C. 2010). A plaintiff seeking to enforce a statute through either an implied right of action or § 1983 must first demonstrate that "Congress intended to establish a federal right." Gonzaga v. Doe, 536 U.S. 273, 283 (2002). "[T]he question whether Congress intended to create a private right of action is definitively answered in the negative where a statute by its terms grants no private rights to any identifiable class. For a statute to create such private rights, its text must be phrased in terms of the persons benefited." Id. at 283-84 (citation omitted). The HCDA provision governing AFFH certifications to HUD for CDBG grants, 42 U.S.C. § 5304(b)(2), is not phrased in terms of a beneficiary class. Rather, it sets forth terms under which a grantee may receive funding from HUD.

magistrate judge is currently reviewing Westchester's objections to that report.  Nothing in the Consent Decree confers upon ADC any role in this particular process or in the enforcement of the Consent Decree generally.  Given the procedural posture of this case -- in its remedial stages with remaining conflicts resolved through the mechanisms established by the Consent Decree -- ADC has no legally protectable interest in the Consent Decree to support intervention.

Nor can ADC bootstrap its intervention motion by moving to enforce the Consent Decree and thereby creating the ongoing litigation in which it would then intervene.  ADC does not have standing to initiate such litigation.

> "To have standing, a plaintiff must demonstrate an actual and imminent, not conjectural or hypothetical threat of a concrete and particularized injury in fact that is fairly traceable to the challenged action of the defendant and that a favorable judicial decision will likely prevent or redress."

New York Civil Liberties Union v. N.Y.C. Transit Auth., 652 F.3d 247, 255 (2d Cir. 2011) (citation omitted).  An organization can establish standing either by showing that "some particular member of the organization would have had standing to bring the suit individually," or else in its own right, in which case the organization "itself must meet the same standing test that applies to individuals."  Id. (citation omitted).  ADC has not

shown that it has standing to initiate litigation for the alleged lax enforcement of the Consent Decree.

ADC relies principally upon Sagebrush Rebellion, Inc. v. Watt, 713 F.2d 525 (9th Cir. 1983), for the proposition that "a public interest group [i]s entitled as a matter of right to intervene in an action challenging the legality of a [government] measure it ha[s] supported." Id. at 527.  In Sagebrush Rebellion, an organization dedicated to multiple use management of public lands challenged the legality of actions taken by the Secretary of the Interior to conserve acres of public land.  Id. at 526-27.  The Ninth Circuit permitted the Audubon Society to intervene based on its interest in the preservation of birds and their habitats.  Id. at 528; see also Prete v. Bradbury, 438 F.3d 949, 954 (9th Cir. 2006).

Sagebrush Rebellion is inapposite.  It did not address a relator's surviving interest in a consent decree.  Even if one accepts its statement that the right to intervene extends to organizations that supported government action whose legality is challenged in litigation,[5] that principle is of little benefit to ADC.  The legality of the Consent Decree is not at stake here.

---

[5] Given the marginal relevance of Sagebrush Rebellion to the issues raised by this motion, it is unnecessary to explore whether its holding represents an accurate statement of the reach of Rule 24 in this circuit.

Both the Government and the County continue to be bound by its provisions, and neither purports to argue otherwise.

ADC's reliance upon <u>Trbovich v. United Mine Workers</u>, 404 U.S. 528 (1972), is similarly misplaced.  In <u>Trbovich</u>, no party chose to dispute before the Supreme Court the intervenor union member's interest in his union's election procedures; rather, the parties disputed whether there was adequacy of representation by the Secretary of Labor.  <u>Id.</u> at 538.

Finally, and for the first time in its reply papers, ADC asserts that it seeks to "invest in the development of housing in Westchester that would require elimination of exclusionary zoning barriers."  Arguments raised for the first time in a reply memorandum are waived and need not be considered.  <u>See Connecticut Bar Ass'n v. United States</u>, 620 F.3d 81, 91 n.13 (2d Cir. 2010); <u>Cioffi v. Averill Park Central School Dist. Bd. of Educ.</u>, 444 F.3d 158, 169 (2d Cir. 2006).[6]

---

[6] ADC has not explained why it waited until its reply to make this third argument.  Its contention that it seeks to invest in housing in Westchester is premised on letters it sent to Westchester and Westchester municipalities in January 2011.

Conclusion

    ADC's May 31, 2011 motion to intervene is denied.

    SO ORDERED:

Dated:    New York, New York
           January 4, 2012

                              DENISE COTE
                  United States District Judge