UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
                                                               :

UNITED STATES OF AMERICA, ex rel.
ANTI-DISCRIMINATION CENTER OF                 :
METRO NEW YORK, INC.                             OPINION AND ORDER
                                                               :
              Plaintiff,                       06 Civ. 2860 (DLC) (GWG)
                                                  :
    -v.-
                                                  :
WESTCHESTER COUNTY, NEW YORK,
                                                  :
              Defendant.
                                                  :
------------------------------------------------------------X

**GABRIEL W. GORENSTEIN, UNITED STATES MAGISTRATE JUDGE**

      Westchester County ("the County") and the Government presented certain disputes to a special master appointed to oversee the implementation of the settlement that resolved this action. The special master issued a report and recommendation regarding the disputes. See Monitor's Report and Recommendation Regarding Dispute Resolution, filed Nov. 14, 2011 (Docket # 383) ("Report"). The County now objects to the special master's Report.[1] For the reasons stated below, the County's objections are sustained in part and overruled in part.

---

[1] The objections were the subject of briefing by the parties. See County's Objections to the Monitor's Report & Recommendation, filed Dec. 7, 2011 (Docket # 386) ("Cnty. Mem."); Response of the United States to Westchester County's Objection to Monitor's Report & Recommendation, filed Dec. 22, 2011 (Docket # 388) ("Gov. Mem."); County's Reply to the Government's Response to the Objections to the Monitor's Report & Recommendation, filed Jan. 6, 2012 (Docket # 390) ("Reply"). After briefing was completed, the Court directed the parties to make additional submissions. See Order, filed Jan. 26, 2012 (Docket # 392); Letter from Robert Meehan to the Hon. Gabriel Gorenstein, filed Feb. 3, 2012 (Docket # 393) ("Cnty. Supp. Br."); Letter from Benjamin Torrance to the Hon. Gabriel Gorenstein, filed Feb. 3, 2012 (Docket # 394) ("Gov. Supp. Br."); Declaration of Benjamin Torrance, filed Feb. 6, 2012 (Docket # 395).

I.     BACKGROUND

In 2006, the Anti-Discrimination Center of Metro New York, Inc. filed this lawsuit under the False Claims Act, 31 U.S.C. § 3729, as a qui tam relator to the United States alleging that the County had made false statements to obtain funding from the United States Department of Housing and Urban Development ("HUD").  Eventually, the United States intervened in the action, see Complaint-in-Intervention of the United States of America, filed Aug. 10, 2009 (Docket # 324), and submitted a stipulation settling the case, which the district court entered on August 9, 2009, see Stipulation and Order of Settlement and Dismissal, filed Aug. 10, 2009 (Docket # 320) (the "Settlement").

The Settlement obligates the County to take a number of actions that "affirmatively further fair housing" within the County, including the construction of affordable housing units. Settlement ¶¶ 7–8.  It also authorizes a court-appointed special master – referred to as the "Monitor" – to, inter alia, review the parties' compliance with the consent decree and make recommendations that will ensure compliance. Id. ¶¶ 9-13.  The Monitor's powers include the authority to resolve any disputes between the County and the Government relating to the Settlement.  See id. ¶ 14.  The Monitor's report and recommendation as to a given dispute is a final determination of the matter unless a party seeks additional review by presenting objections within ten business days to the magistrate judge assigned to this case.  See id. ¶¶ 14(c)–(d).

The issues before this Court concern (1) the County's obligation to "promote . . . legislation . . . to ban 'source-of-income' discrimination in housing," id. ¶ 33(g); (2) the County's obligations with respect to zoning practices of municipalities within the County; and (3) whether the Monitor erred in refusing to resolve a dispute between the County and HUD.

The Settlement provides that this Court's review of a report and recommendation of the

Monitor is governed by "the relevant provisions of the Federal Rules of Civil Procedure, the Local Rules and the Court's Individual Rules." Id. ¶ 14(d). The parties agree that the standard of review is de novo. See Gov. Mem. at 7; Cnty. Mem. at 2; 28 U.S.C. § 636(b)(1).

## II.    GOVERNING PRINCIPLES

Courts construe consent decrees, such as the Settlement here, "according to the general interpretive principles of contract law." Mastrovincenzo v. City of New York, 435 F.3d 78, 103 (2d Cir. 2006) (citation omitted). The primary objective of a court interpreting such agreements is to "give effect to the intent of the parties as revealed by the language they chose to use." Seiden Assocs., Inc. v. ANC Holdings, Inc., 959 F.2d 425, 428 (2d Cir. 1992) (citing Slatt v. Slatt, 64 N.Y.2d 966, 967 (1985)).

"The threshold question in a dispute over the meaning of a contract is whether the contract terms are ambiguous." Revson v. Cinque & Cinque, P.C., 221 F.3d 59, 66 (2d Cir. 2000); accord Parks Real Estate Purchasing Grp. v. St. Paul Fire & Marine Ins. Co., 472 F.3d 33, 42 (2d Cir. 2006) ("Whether a contract is ambiguous, however, is a 'threshold question of law to be determined by the court.'") (quoting Duane Reade, Inc. v. St. Paul Fire & Marine Ins. Co., 411 F.3d 384, 390 (2d Cir. 2005)). The meaning of an unambiguous settlement agreement "is a question of law for the court to decide," Revson, 221 F.3d at 66 (citing K. Bell & Assocs. v. Lloyd's Underwriters, 97 F.3d 632, 637 (2d Cir. 1996)), and is determined solely by reference to the "four corners of the agreement," Abundance Partners LP v. Quamtel, Inc., 2012 WL 32350, at *8 (S.D.N.Y. Jan. 5, 2012). The meaning of an ambiguous agreement is a question of fact to be determined by the factfinder where extrinsic evidence exists to guide the interpretation of the parties' intentions. Revson, 221 F.3d at 66 (citing cases). However, the meaning of an ambiguous agreement as to which no extrinsic evidence exists is a question of law to be

3

determined solely by the court.  Id. (citing cases).

A court interpreting a consent decree must read the language selected for its "plain meaning" and according to the chosen words' "normal usage."  Mastrovincenzo, 435 F.3d at 103 (quoting City of Hartford v. Chase, 942 F.2d 130, 134–35 (2d Cir. 1991)).  Where possible, a consent decree's terms should be read so as not to render any provision superfluous or meaningless.  See Galli v. Metz, 973 F.2d 145, 149 (2d Cir. 1992).  Additionally, "the language of a consent decree must dictate what a party is required to do and what it must refrain from doing."  Perez v. Danbury Hosp., 347 F.3d 419, 424 (2d Cir. 2003) (citing United States v. O'Rourke, 943 F.2d 180, 187 (2d Cir. 1991)).  The scope of the obligations a consent decree imposes on its signatories should be given a "narrow construction," id., and "must be discerned within its four corners, . . . not by reference to what might satisfy the purposes of one of the parties to it," id. (quoting United States v. Armour & Co., 402 U.S. 673, 682 (1971)).  Therefore, "courts must abide by the express terms of a consent decree and may not impose supplementary obligations on the parties even to fulfill the purposes of the decree more effectively."  Id. (citing cases).  This prohibition on imposing additional obligations applies "no matter how much of an improvement it would make in effectuating the decree's goals."  Id. (quoting United States v. Int'l Bhd. of Teamsters, 998 F.2d 1101, 1107 (2d Cir. 1993)).

III.   ANALYSIS

Three issues have been presented to this Court for resolution: (1) whether the Settlement obligated the County Executive to sign legislation banning housing discrimination on the basis of a tenant's source of income; (2) whether the Monitor could properly require the County to state its intentions with respect to the potential need to challenge zoning policies of municipalities in Westchester; and (3) whether the Monitor erred by refusing to resolve a dispute

between the County and HUD.  We address each separately.

    A.    <u>Source-of-Income Legislation</u>

        1.    <u>Background</u>

To interpret the language of the Consent Decree, we begin by reviewing the decree overall, as it provides some context for the specific language at issue.  The Settlement requires the County to pay $30 million to the United States, of which the United States agreed to credit $21.6 million into the County's account with HUD for the development of new affordable housing units.  Settlement ¶¶ 2–3.  The Settlement also requires the County to "ensure the development of" 750 new affordable housing units, id. ¶ 7; to develop an implementation plan for doing so, id. ¶ 18; to amend its "Long Range Land Use Planning Policies," id. ¶ 27; to adopt a policy statement favoring fair housing, id. ¶ 31; and to complete an "analysis of the impediments to fair housing choice" ("AI") acceptable to HUD and take all actions identified in the AI, id. ¶ 32.

Paragraph 33 of the Settlement contains the obligation with respect to source-of-income legislation.  That paragraph imposes a number of additional obligations on the County, including the obligation to solicit proposals from community leaders and public interest groups for community development block grants that would further fair housing, id. ¶ 33(a); to advertise fair housing rights, id. ¶ 33(b); to create and fund pro-fair housing campaigns, id. ¶ 33(c); to educate realtors and others regarding fair housing, id. ¶ 33(d); to affirmatively market affordable housing, id. ¶ 33(e); and to pay for consultants and public education, outreach, and advertising regarding fair housing, id. ¶ 33(h).  Included in paragraph 33 is the following obligation:

> As part of its additional obligations to [affirmatively further fair housing], the County also shall . . . promote, through the County Executive, legislation currently before the Board of Legislators to ban "source-of-income"

5

discrimination in housing.

Id. ¶ 33(g).

On the date the Settlement was entered by the district court, August 10, 2009, legislation to ban source-of-income discrimination in housing was pending before the County's Board of Legislators ("BOL"). See Report at 2–3. In October 2009, the County Executive at that time, Andrew J. Spano, wrote to the leadership of the BOL urging passage. Id. at 3. In November 2009, he also wrote letters to five housing advocacy organizations urging them to support and advocate for the legislation. Id. Although the 2009 bill failed to pass and expired at the close of the 2009 legislative session, the bill was reintroduced in the subsequent legislative session on January 19, 2010. Id. On June 14, 2010, the BOL passed legislation banning source-of-income discrimination in housing, the terms of which differed from the bill that had been introduced in 2009. See id. at 4. County Executive Robert P. Astorino, who took office on January 1, 2010, vetoed that legislation on June 25, 2010. See id. at 3–4. The County has not taken any action with respect to source-of-income legislation since then. See id. at 3.

The Monitor concluded that the six letters the County Executive sent to the BOL and to housing advocacy organizations in 2009 failed to satisfy the County's obligation to promote source-of-income legislation. See id. at 8. The Monitor further concluded that County Executive Astorino's veto of source-of-income legislation "vitiated any prior act of promotion and placed the County in breach of the Settlement." Id. The Monitor viewed the Settlement as imposing upon the County a continuing obligation to promote the legislation, which it has not done in any capacity since June 2010. See id. at 8–10. The Monitor concluded as follows: "'promotion' of legislation could encompass, at a minimum, requesting that the legislature reintroduce the prior legislation, providing information to assist in analyzing the impact of the

legislation, and signing the legislation passed." Id. at 10.

In this Court, the County's Objection focuses almost exclusively on the Monitor's conclusion that the Settlement required the County Executive to sign the legislation. The Government defends the Monitor's decision. The resolution of this question turns on the meaning of the word "promote" in paragraph 33(g).

    2.    <u>Analysis</u>

"A sound method for determining the plain meaning of words is to look at their dictionary definitions," <u>CBS Corp. v. Eaton Corp.</u>, 2009 WL 4756436, at *4 (S.D.N.Y. Dec. 7, 2009) (citation and internal quotation marks omitted), although a "strained alternative" definition will not be considered where it was "plainly not the understanding of the contracting parties," <u>In re Delta Air Lines, Inc.</u>, 608 F.3d 139, 147–48 (2d Cir. 2010). Here, the Government contends, and the County does not dispute, that "[t]he relevant dictionary definition of 'promote' is '[t]o urge the adoption of; advocate.'" Gov. Mem. at 10 (quoting American Heritage Dictionary of the English Language (4th ed. 2000)). In other words, an obligation "to promote" a particular piece of legislation is an obligation to urge the adoption of or to advocate for that legislation. This obligation could have been met in any number of ways, and the Settlement does not spell out which particular means must be employed. The only issue before this Court, however, is whether the obligation to promote meant that the County Executive had to sign the source-of-income legislation once the County BOL passed it.[2]

---

[2] Because of our resolution of this question, it is unnecessary to reach the County's alternative argument that if the County Executive had an obligation to sign the legislation, that obligation extended only to legislation pending during the 2009 session of the BOL. See Cnty. Mem. at 5–6. The Court notes that there is some force to this argument inasmuch as the clause "currently before the Board of Legislators" is not set off by commas, the usual method by which a non-restrictive clause is indicated. See, e.g., Gravatt v. Gen. Star Indem. Co., 1998 WL

7

The Government argues that "[n]o possible definition of 'promoting' legislation would include vetoing it," and, in a similar vein, that "[u]nder no reasonable reading can the County Executive be said to have 'urged the adoption' of legislation whose adoption he prevented, or to 'advocate' such legislation he vetoed." Gov. Mem. at 10. But these arguments, while having some surface appeal, miss the point. The issue here is not whether vetoing comes within the meaning of "promote" – it obviously doesn't – but rather whether the obligation imposed on the County Executive to "promote" legislation included an obligation to sign it. To illustrate the problem with the Government's argument: had the Settlement imposed an obligation on the County Executive merely to "send letters" explaining the benefits of source-of-income legislation, it would be quite obvious that the parties did not intend this language to require that the County Executive sign the legislation. And, in such a circumstance, we would find irrelevant an argument that "no possible definition of 'sending letters' to support legislation would include vetoing such legislation." The argument would be irrelevant because it fails to address the critical question: whether the obligation to "send letters" imposed on the County Executive a duty not to veto the legislation.

Turning to the language of the Settlement, it is plain from the use of the word "promote" – and it is undisputed by the Government, see Gov. Mem. at 11 n.9 – that the County's obligation to promote source-of-income legislation did not require the County to enact such legislation. Accord Report at 7 ("[T]he Settlement does not mandate the ultimate adoption of Source of Income legislation . . . ."). If the parties intended for the County to enact a ban on source-of-income legislation, the Settlement could have contained language stating as much.

---

842351, at *4 n.5 (S.D.N.Y. Dec. 2, 1998); K & K Merch. Grp., Inc. v. Shalala, 1996 WL 183023, at *5 (S.D.N.Y. Apr. 17, 1996).

8

See Spallone v. United States, 493 U.S. 265, 276 (1990) (implicitly upholding a city's obligation to enact legislation agreed to in a consent decree). Indeed, elsewhere the Settlement required that the County "adopt" a certain policy statement, Settlement ¶ 31, and "amend" its written land use policies, id. ¶ 27. The Settlement does not contain such language with respect to source-of-income legislation and instead only requires that the County Executive promote – that is, "advocate for" or "urge" the adoption of – such legislation. This language is in accord with similar obligations imposed on the County in paragraph 33, including the obligation to "solicit" pro-fair housing proposals, id. ¶ 33(a); to "advertise" fair housing rights, id. ¶ 33(b); to fund pro-fair-housing "campaigns," id. ¶ 33(c); to "educate" regarding fair housing, id. ¶ 33(d); to "market" affordable housing, id. ¶ 33(e); and to pay for "public education, outreach, and advertising" regarding fair housing, id. ¶ 33(h). All of these obligations involve acts of persuasion, and the intended meaning of "promotion" must be understood in this context. See 11 Williston on Contracts § 32:6 (4th ed. 2007) ("[T]he meaning of unclear words may be gleaned by reference to other words associated with them. . . .").

Even the dictionary definitions of promotion – involving the concepts of "advocating" and "urging," to use the Government's preferred definitions – encompass only acts of persuasion. An act of persuasion, however, is very different from – and does not include – taking steps to effectuate the goal of that persuasion. In other words, a person's agreement to engage in acts of persuasion toward achieving a goal does not require that person to take all steps necessary to achieve that goal.

Here, the passage and signing of source-of-income legislation are unquestionably the ultimate goals of the "promot[ion]" mandated by paragraph 33(g). But the concept of "promotion" simply does not denote the undertaking of an act that (1) does not involve any act

9

of persuasion or (2) is unique to the legislative process, such as the casting of a vote by a member of the BOL or, in the case of the County Executive, the signing of a bill.

It is certainly unusual – not to mention awkward and apparently self-defeating – for a person or entity to promote a goal and then not undertake a step within its lawful power to accomplish the goal of that promotion.  But it is not illogical that the parties might have agreed to such a result with respect to actions by the County Executive, particularly in light of the fact that the BOL has the power to enact legislation by a two-thirds vote notwithstanding any veto by the County Executive.  See Westchester County Charter, § 107.71.  More importantly, as already noted, it is common ground that the Settlement does not impose on the County as a whole the obligation to accomplish the goal that the County Executive's mandated promotional efforts furthered: that is, the enactment of the legislation into law.  It thus follows that the Settlement does not require any particular constituent political actor of the County government – such as the County Executive – to take a step within his power to accomplish the goal of the promotion.  The act of signing legislation is a potential step in the process of enacting a bill.  It is not an act of persuasion.

For all these reasons, we conclude that the parties did not intend that the County's duty to "promote" obligated the County Executive to sign source-of-income legislation passed by the BOL.  The Court's conclusion is further buttressed by the fact that the language of paragraph 33(g) actually places the obligation to "promote" on the County as a whole.  Had the County Executive not been mentioned in paragraph 33(g), it would have been even more obvious that by agreeing merely to "promote" legislation, the County was not agreeing to take the much more significant – and qualitatively different – step of enacting it.  That the clause makes reference to the County's obligation to promote being undertaken "through the County Executive" should not

change the fundamental nature of the obligations created by the word "promote."  Moreover, the extrinsic evidence provided by the parties on the inclusion of the "through the County Executive" language shows that it was added at the County's request, not the Government's, because of the County's desire to "[m]odify language throughout as appropriate to distinguish between [the] County Executive and [the] Board of Legislators (i.e., promote 'source of income' legislation)."  Memorandum, dated July 8, 2009 (annexed as Ex. E to Cnty. Supp. Br.); accord Cnty. Supp. Br. at 2.  It is illogical that the County's requested modification was intended to place a signing obligation exclusively on the County Executive where, as it is conceded, no obligation to enact was being placed on the BOL or on the County as whole.

    The Government argues that "the implied covenant of good faith and fair dealing inherent in any settlement agreement" precludes the County Executive from "undertak[ing] to 'promote' a ban on source-of-income legislation [and] then veto the passed legislation."  Gov. Mem. at 10–11 (quoting Handschu v. Special Servs. Div., 2007 WL 1711775, at *10 n.10 (S.D.N.Y. June 13, 2007), reconsideration denied, 2008 WL 515695 (S.D.N.Y. Feb. 27, 2008)) (internal quotations omitted).  The implied covenant of good faith and fair dealing was not breached, however, because the County did not deprive the Government of any "benefits under their agreement."  Frankini v. Landmark Constr. of Yonkers, Inc., 937 N.Y.S.2d 80, 83 (2d Dep't 2012) (citing cases).  The covenant of good faith and fair dealing "cannot create obligations inconsistent with, or beyond the scope of, [the] terms of the contractual relationship." Hertzog, Calamari & Gleason v. Prudential Ins. Co. of Am., 1996 WL 221616, at *2 (S.D.N.Y. May 1, 1996); accord Alpine Bank v. Hubbell, 555 F.3d 1097, 1104–05 (10th Cir. 2009) ("[The duty of good faith and fair dealing] does not obligate a party to accept a material change in the terms of the contract or to assume obligations that vary or contradict the contract's express

provisions.") (citation omitted).  Because the Settlement does not impose any obligation on the County or County Executive to enact source-of-income legislation, it does not violate the covenant of good faith and fair dealing for the County Executive to veto such legislation.  See Perez, 347 F.3d at 424 ("[C]ourts must abide by the express terms of a consent decree and may not impose supplementary obligations on the parties even to fulfill the purposes of the decree more effectively.") (citing cases).

Accordingly, we conclude that the able Monitor erred in concluding that the County Executive violated the Settlement by vetoing the source-of-income legislation enacted by the BOL.  In light of this ruling, the Monitor is free to reexamine the question of whether the County breached the duty in paragraph 33(g) in other ways and what measures, if any, should be taken by the County to remedy any breach that may be found.

    B.    Zoning

        1.    Requirements of the Settlement

The Settlement requires the County to ensure the development of at least 750 new affordable housing units within seven years that are to be constructed with various characteristics and in certain geographic and demographic markets.  See Settlement ¶¶ 7(a)–(h).  It further requires the County to:

> use all available means as appropriate to achieve the [building of the 750 units], including, but not limited to, developing financial or other incentives for other entities to take steps to promote the objectives of this paragraph, and conditioning or withholding the provision of County funds on actions that promote the objectives of this paragraph.

Id. ¶ 7(i).  The Settlement states that the parties "anticipate[] that the County will accomplish the objectives of this paragraph by leveraging the funds that it is expending pursuant to paragraphs 2, 3 and 5 [of the Settlement] with supplemental funds."  Id.  The Settlement further provides:

> In the event that a municipality does not take actions needed to promote the objectives of this paragraph, or undertakes actions that hinder the objectives of this paragraph, the County shall use all available means as appropriate to address such action or inaction, including, but not limited to, pursuing legal action. The County shall initiate such legal action as appropriate to accomplish the purpose of this Stipulation and Order to [affirmatively further fair housing ("AFFH")].

Id. ¶ 7(j).[3]

As for the Monitor's role in effectuating the Settlement, the Monitor is required to periodically "conduct an assessment of the County's efforts and progress related to the obligations set forth in this Stipulation and Order, particularly those described in paragraph 7." Id. ¶ 15. For purposes of conducting this assessment, the Monitor "may consider any information appropriate" that will help him "determine whether the County has taken all possible actions to meet its obligations under this Stipulation and Order, including, but not limited to, exploring all opportunities to leverage funds for the development of the Affordable AFFH Units, promoting inclusionary and other appropriate zoning by municipalities by offering incentives, and, if necessary, taking legal action." Id.

Additionally, paragraph 28 of the Settlement requires the County to prepare quarterly reports for the Monitor and the Government in which it must provide "all information deemed necessary by the Monitor." Id. ¶ 28. Finally, paragraph 32 of the Settlement provides that the County must complete an AI, containing an analysis of the impediments to fair housing choice in Westchester County. The Settlement requires that the County, in the AI,

> (b) identify and analyze, inter alia:

---

[3] Consistent with this language, the parties agreed in a "whereas" clause that "it is appropriate for the County to take legal action to compel compliance if municipalities hinder or impede the County in its performance of such duties, including the furtherance of the terms of this Stipulation and Order." Id. at 2.

>    (i) the impediments to fair housing within its jurisdiction,
>    including impediments based on race or municipal resistance to the
>    development of affordable housing; [and]
>
>    (ii) the appropriate actions the County will take to address and
>    overcome the effects of those impediments . . . .

Id. ¶ 32(b).

### 2. The Instant Dispute

As part of his assessment, the Monitor recommended that the County submit an analysis of the impacts of certain zoning practices. Specifically, the Monitor stated that

> [t]he County should, at a minimum, assess the impact of each of the following zoning practices or explain why the analysis of the listed practices ("Restrictive Practices") would not be helpful to understanding the impact of the zoning ordinances taken as a whole:
>
> - Restrictions that limit or prohibit multifamily housing development;
> - Limitations on the size of a development;
> - Limitations directed at Section 8 or other affordable housing, including limitations on such developments in a municipality;
> - Restrictions that directly or indirectly limit the number of bedrooms in a unit;
> - Restrictions on lot size or other density requirements that encourage single-family housing or restrict multifamily housing; and
> - Limitations on townhouse development.

Report at 13–14. The County does not object to this recommendation. Cnty. Mem. at 15.

On the question of local zoning ordinances, the County indicated that it would undertake the following actions: "(1) identify[] specific zoning issues that may have exclusionary impacts by December 31, 2012[4]; (2) review[] specific zoning ordinances that promote, permit or restrict the development and preservation of affordable housing that limit multi-family housing

---

[4] The County has agreed to comply with the Monitor's recommendation that it accomplish this task by February 29, 2012. Cnty. Mem. at 15.

development; and (3) communicat[e] to municipalities the County's recommendations on changes that could be made to local regulations so as to enable the local officials to take the necessary corrective action." Report at 14 (quoting County's Statement of Position, dated Oct. 7, 2011 (annexed as Ex. 3 to Report) at 8).

The Monitor concluded that these steps were not sufficient, however, and directed the County to (1) "develop a clear strategy that encourages compliance by municipal governments" and "explain[s] how [the County] intends to persuade municipalities to follow [its] recommendations and what additional steps, if any, it will take if those recommendations are not followed;" (2) "[d]evelop a process for notifying municipalities of zoning issues that hinder the County's obligations under the Settlement and changes that must be made, and if not made, the consequences of municipalities' failure to make them;" (3) "[d]evelop a process to involve municipal decision-makers in consultation regarding changes in zoning and land use restrictions;" and (4) "[p]rovide a description of how these requirements will be included in future contracts or other written agreements between the County and municipalities." Report at 15–16. The Report concludes that "litigation is a powerful lever the County may exercise to bring municipal governments into compliance, and that the County must identify the types of zoning practices that would, if not remedied by the municipality, lead the County to pursue legal action." Id. at 18.

In its objections, the County disputes (1) "whether the County is required to specify a strategy to overcome exclusionary zoning practices" and (2) "whether the County is required to identify the types of [municipal] zoning practices that would, if not remedied by the municipality, require the County to pursue legal action." Cnty. Mem. at 14–15 (quoting Report at 11–12).

15

3.     Analysis

With respect to the first of these disputes – whether the County must supply its "strategy" for overcoming exclusionary zoning practices – the County's main argument seems to be that, due to the progress of the building of the 750 units, the Settlement does not at this time actually require it to undertake any of the actions underlying the "strategy" sought by the Monitor, Reply at 7, or that the request by the Monitor constitutes a "remedial measure," id. at 8–9.  This argument fails, however, because the Court does not understand the Monitor to be requiring the County at this time to take any particular step to overcome exclusionary zoning laws.  Rather, the Monitor merely seeks information from the County: specifically an "expl[anation] of how [the County] intends to persuade municipalities to follow [its recommendations regarding zoning practices] and what additional steps, if any, it will take if those recommendations are not followed."  Report at 15 (emphasis added).

As noted, the Settlement vests considerable power in the Monitor as to the information he may seek from the County.  Paragraph 28 of the Settlement broadly requires the County to provide "all information deemed necessary by the Monitor."  Settlement ¶ 28.  The subject area of the information sought by the Monitor is within the scope of the Settlement, which directs that "the Monitor may consider any information appropriate to determine whether the County has taken all possible actions to meet its obligations under this Stipulation and Order, including, but not limited to, . . . promoting inclusionary and other appropriate zoning by municipalities by offering incentives, and, if necessary, taking legal action."  Id. ¶ 15.  Accordingly, we reject the County's objection that the Monitor could not require it to "specify" a strategy that it intends to employ to overcome exclusionary zoning practices.  See Cnty. Mem. at 14.  In light of the fact that the County has declined to provide its strategy on this front at all – or has done so only in

16

the vaguest terms – we do not view as ripe any question as to whether whatever strategy the County intends to pursue in this area does or does not come within its settlement obligations. That dispute may be brought to the Court's attention, if necessary, at a later time. All that is required now is that the County provide the strategy document required by the Monitor.

As to the question of whether the Monitor could properly require the County to identify the types of municipal zoning practices that would, if not remedied by the municipality, cause the County to pursue legal action, we similarly find that requiring the County to provide this information is within the Monitor's power. The Settlement specifically contemplates that "[i]n the event that a municipality does not take actions needed to promote" the development of affordable housing units or "undertakes actions that hinder" the development of affordable housing, "the County shall use all available means as appropriate to address such action or inaction, including, but not limited to, pursuing legal action" against such municipalities. Settlement ¶ 7(j). That the eventuality contemplated by this clause allegedly has not occurred – or is "premature" to use the County's word, see Reply at 9 – is not a basis for sustaining the County's objection. The Monitor is entitled under paragraph 32 to seek information from the County as to its intentions in this regard, including in situations that may arise in the future. The Monitor's direction to the County to "identify the types of zoning practices that would, if not remedied by the municipality, lead the County to pursue legal action," Report at 18, is tailored to the County's obligation in the Settlement to pursue litigation where necessary. Thus, it is within the Monitor's power to require this information.

      C.    <u>The Monitor's Refusal to Consider the Adequacy of the County's AI</u>

As noted, paragraph 32 of the Settlement requires the County to conduct an analysis of the impediments to fair housing choice within its jurisdiction. This AI must contain certain

information and analyses, comply with HUD's Fair Housing Planning Guide, and "be deemed acceptable by HUD."  Settlement ¶ 32.  HUD has rejected five iterations of the County's AI proposals, Report at 1 n.1; Cnty. Mem. at 22, and HUD rejected the County's most recent AI because the County "provided insufficient evidence to support the accuracy of the County's AFFH certification," Letter from Westchester County to the Monitor, dated July 20, 2011 (annexed as Ex. H to Cnty. Mem.).

The County requested that the Monitor resolve the impasse between it and HUD.  See id.  The Monitor declined to rule on the propriety of HUD's rejection of the AI, however, because "[t]his issue is not properly joined for resolution."  Report at 1.  The County argues that the Monitor erred in refusing to consider the adequacy of its submissions to HUD because the County's AI submissions fully complied with the Settlement's requirements.  See Cnty. Mem. at 22.  The issue presently before the Court, however, is not the adequacy of the County's submissions to HUD, but whether it was appropriate for the Monitor to refuse to consider the adequacy of those submissions on the ground that the issue was not properly before him.

The County argues that HUD has acted unreasonably, but it does not explain why the question of the adequacy of its AI was a matter to be adjudicated by the Monitor.  The County has not argued that the Settlement vests in the Monitor any authority to require HUD to accept an AI or to adjudicate disputes as to the adequacy of the AI.  Indeed, the Settlement vests authority for such approval of the AI exclusively in HUD.  Id. ¶ 32 (AI must "be deemed acceptable by HUD").  Accordingly, the County has not proffered any basis for this Court to find that the Monitor erred in refusing to consider the sufficiency of the County's AI submissions, and its objection to the Report on this ground is therefore overruled.

III.    CONCLUSION

For the foregoing reasons, the County's objections to the Monitor's Report (Docket # 386) are sustained in part and overruled in part.

Dated: March 16, 2012
       New York, New York

                                                                                      _____
                                                                                    GABRIEL W. GORENSTEIN
                                                                                    United States Magistrate Judge

For the foregoing reasons, the County's objections to the Monitor's Report (Docket # 386) are sustained in part and overruled in part.

Dated: March 16, 2012
      New York, New York

                                                      GABRIEL W. GORENSTEIN
                                                     United States Magistrate Judge