UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------X
                                        :
UNITED STATES OF AMERICA ex rel., ANTI- :
DISCRIMINATION CENTER OF METRO NEW      :
YORK, INC.                              :    06 Civ. 2860 (DLC)
                     Plaintiff/Relator, :
                                        :    OPINION & ORDER
             -v-                        :
                                        :
WESTCHESTER COUNTY, NEW YORK,           :
                          Defendant.    :
                                        :
----------------------------------------X

APPEARANCES:

For the Government:

David J. Kennedy
Benjamin H. Torrance
United States Attorney's Office
86 Chambers Street
New York, NY 10007

For Westchester County, New York:

Robert F. Meehan
James F. Castro-Blanco
Carol F. Arcuri
Linda Trentacoste
Shannon S. Brady
Adam Rodriguez
Westchester County Attorney's Office
138 Martine Avenue, 6th Floor
White Plains, NY 10601

DENISE COTE, District Judge:

     The United States ("Government") has objected to the

Opinion of March 16, 2012 ("Opinion") issued by the Honorable

Gabriel Gorenstein insofar as it sustained the objection of

1

Westchester County ("County") to one portion of the Report and Recommendation of the Monitor James E. Johnson ("Monitor") dated November 14, 2011 ("Report").  At its essence, this dispute concerns whether the veto of legislation breached the duty to promote the legislation.  For the following reasons, the Government's objection to the Opinion is well-founded, and the Monitor's Report is upheld in its entirety.


BACKGROUND

     This litigation began six years ago.  In 2006, the Anti-Discrimination Center of Metro New York, Inc., acting as a qui tam relator, sued the County for violation of the False Claims Act ("FCA").  The lawsuit asserted that the County had received money from the federal government after falsely certifying that it was affirmatively furthering fair housing.  As described in the pertinent federal regulations, the task of affirmatively furthering fair housing ("AFFH") required the County to conduct an analysis of the impediments to fair housing choice and to take appropriate actions to overcome the effects of any such impediments.

     Following the completion of discovery, partial summary judgment was entered against the County.  United States ex rel. Anti-Discrimination Ctr. v. Westchester County, New York, 668

2

F.Supp.2d 548 (S.D.N.Y. 2009).  This Court found, <u>inter alia</u>, that the County had not analyzed race in conducting its Analysis of Impediments ("AI"), and had thereby submitted false certifications to the Department of Housing and Urban Development ("HUD").  <u>Id.</u> at 561-63.  Since the County had submitted false certifications to receive approximately $52 million from HUD, it was liable for over $150 million in damages pursuant to the treble damages provision of the FCA.  A trial was scheduled to determine whether the violation had been willful.

On August 10, 2009, the Government intervened and elected to proceed with this action, filing its own complaint.  The Government's complaint alleged violations of the FCA and of the Housing and Community Development Act.  Simultaneously, the Government submitted an executed settlement of the litigation ("Settlement").

The Settlement provided for the County to pay the Government $30 million, with $21.6 million of that amount credited to the County's account with HUD for development of housing in accordance with the Stipulation.  The County was also required to secure $30 million in additional funding for such housing development over six years.

3

The Settlement also provided for injunctive relief.  Among other things, a Monitor was appointed and given authority, <u>inter alia</u>, to resolve disputes between the Government and the County, and to assess every two years, starting on December 31, 2011, the County's progress in fulfilling its obligations under the Settlement.

In the Settlement, the Country agreed to affirmatively further fair housing in a variety of ways.  These included the development of 750 units of new affordable housing ("Affordable AFFH Units") over the course of seven years in areas with low black and Hispanic populations.  Of particular significance to this dispute, the Settlement required the County to "promote, through the County Executive, legislation currently before the [County's] Board of Legislators to ban 'source-of-income' discrimination in housing," and to "incorporate" that undertaking in the Country's AI, which the County was required to submit to HUD.  As the Monitor noted in his December 31, 2011 biennial report, legislation to ban source of income discrimination in housing (herein "source-of-income legislation") "if it were to become law, would prevent landlords from refusing to rent to tenants solely on the grounds that a person's income is derived from government programs such as Section 8, Social Security, or disability benefits."  The County

4

itself has noted that "Section 8 vouchers are a major source of assistance for low and very low income families and that reluctance by landlords to accept Section 8 continues to be a challenge." Westchester, 668 F.Supp.2d at 558 (quoting County's 2004 AI).

In addition, the Settlement required the Country to identify specific zoning practices within the County that hinder the development of Affordable AFFH Units.  The Country agreed to establish a process for notifying the implicated municipalities of changes that must be made to such zoning practices and the consequences for a failure to make those changes.

At the time of the Settlement, the Country's Board of Legislators ("Board") had legislation before it that prohibited housing discrimination by landlords based on source of income. While the Board approved the Settlement, it did not approve the legislation before the end of its session in December 2009. Nonetheless, County Executive Andrew J. Spano ("Spano") had written to the Board in October 2009 urging the passage of the legislation and in November had written letters to five housing advocacy organizations urging them to advocate for passage of the legislation.

On January 19, 2010, source-of-income legislation was reintroduced in the Board's new legislative session.  The Board

5

held at least eight meetings on the proposed legislation, as well as public hearings.  Spano's successor, County Executive Robert Astorino ("Astorino"), who took office on January 1, did not participate in any of the meetings or hearings.  The Board's Committee on Legislation ("the Committee") submitted an amended version of the legislation to the Board on May 10.  In a May 10 memorandum accompanying the proposed legislation, the Committee stated that source-of-income legislation "would prevent the growing trend of discrimination based upon a person's source of income, which creates an extreme hardship for individuals with lower incomes, including the disabled and the elderly, and for families transitioning from welfare to work."  The Committee further stated that the proposed legislation "complies with the County's obligations in its fair housing contract with [HUD]."

On June 14, the Board passed the source-of-income legislation.  Astorino vetoed it on June 25.  That veto is at the heart of the dispute before this Court.

Through a letter of July 13, 2011, HUD notified the County that the County's revised AI did not meet the requirements of the Settlement since it did not incorporate the corrective actions which HUD had specified in a May 13 letter regarding "promotion of source-of-income legislation or plans to overcome exclusionary zoning practices."  HUD therefore rejected the

County's certification that it would affirmatively further fair housing, as well as the County's FY 2011 Annual Action Plan ("FY 2011 Plan").  As a consequence of HUD's disapproval of the FY 2011 Plan, the County ceased being a grantee of federal Community Planning and Development programs covered by the County's AI, effective May 1, 2011.[1]

In response to the federal funding cut-off, the County invoked the dispute-resolution procedures in the Settlement and sought the Monitor's assistance on July 20 in resolving its dispute with HUD.  The Government also invoked the dispute-resolution procedures of the Settlement in an August 18 letter. It identified two relevant issues as the Country's failure to promote legislation prohibiting discrimination on the basis of source-of-income and its failure to establish a process for addressing exclusionary zoning practices.

With respect to the County's obligation to promote source-of-income legislation, the Government requested in its August 18 letter that the Monitor resolve the following dispute between the parties:

> Whether [the County] has fully complied with
> paragraph[s] 33(g) and 33(i) of the [Settlement],

---

[1] In a July 20, 2011 letter to the Monitor, the County stated that the funding cut-off would force the County to lay off housing staff and would hinder its ability to comply with its obligation to develop the Affordable AFFH Units.

requiring the County, as part of its additional
obligations to affirmatively further fair housing, to
"promote, through the County Executive, legislation
currently before the [BOL] to ban 'source-of-income'
discrimination in housing," and to 'incorporate' that
undertaking in the County's analysis of impediments to
fair housing choice within its jurisdiction.  If not,
what actions the County must take to satisfy this
obligation.

On November 14, the Monitor issued his Report responding to
the parties' requests.  Among other things, he found that the
County was in breach of its obligation to promote source-of-
income legislation, and that by February 29, 2012, it should
analyze zoning ordinances in connection with the required
Analysis of Impediments.

The Report explained in detail the legal and factual bases
for its finding that the County was in breach of its obligation
to promote source-of-income legislation.  It identified the key
questions for resolution as "(a) what does it mean to 'promote'
the Source of Income legislation through the County Executive;
(b) over what period of time did that duty exist; and (c) did
the County Executive discharge that duty."  The Monitor
concluded that while the "Settlement does not mandate the
ultimate adoption of Source of Income legislation," the acts
undertaken by the County Executive were insufficient to
constitute promotion.  The Report reviewed definitions of
promotion that included "to help or encourage to exist or

8

flourish," "to bring or help bring into being," and "to contribute to the growth, enlargement, or prosperity of."  Using these and similar definitions of the term "promote", the Report found that "[n]either the single letter [sent by Spano] to the [Board], nor the five letters to advocacy organizations, taken separately or together, can be credibly considered as acts sufficient" to constitute promotion, and that the veto by Astorino "vitiated any prior act of promotion and placed the County in breach of the Settlement."

The County appealed these and other determinations to the Magistrate Judge.  In a March 16, 2012 Opinion, the Magistrate Judge sustained the County's objection to the Monitor's finding that the Settlement required the County Executive to sign the source-of-income legislation.

The Government has filed an objection seeking review by this Court of the portion of the Opinion that concluded that the County Executive's veto of source-of-income legislation passed by the Board did not violate the Settlement.  No party has filed objections to the remainder of the Opinion, which sustained other portions of the Monitor's Report.  The briefing on the Government's objection was fully submitted on April 13.[2]

---

[2] On April 16, the Government submitted an additional letter in response to the County's April 13 opposition, addressing

9

<u>DISCUSSION</u>

A district court "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge."  28 U.S.C. § 636(b)(1)(C).  The court shall conduct a <u>de novo</u> review of those sections of a report to which a party timely objects.  <u>Id.</u>  To accept those portions of the report to which no timely objection has been made, a district court "need only satisfy itself that there is no clear error on the face of the record."  Fed. R. Civ. P. 72(b), Advisory Committee Notes.

I.  The County's Jurisdictional Argument

As an initial matter, the parties dispute whether this Court has jurisdiction over the Government's objection to the Opinion. The County argues that the parties consented in ¶ 14 of the Settlement to the Magistrate Judge issuing a final order resolving any dispute between them, pursuant to 28 U.S.C. § 636(c).

Upon the consent of the parties, a [magistrate judge] may conduct any or all proceedings in a jury or nonjury civil matter and order the entry of judgment in the case[.]"  28 U.S.C.

---

jurisdictional and constitutional arguments raised in the County's opposition.

§ 636(c).  The consent of each party to the magistrate judge exercising plenary jurisdiction under § 636(c) must be "clear and express."  New York Chinese TV Programs, Inc. v. U.E. Enterprises, Inc., 996 F.2d 21, 24 (2d Cir. 1993).

Paragraph 14(d) of the Settlement does not constitute the parties' consent to the magistrate judge's plenary jurisdiction. To the contrary, the Settlement provides in ¶ 14(d) that should a party to the Settlement seek review of the Monitor's report and recommendation from the magistrate judge, "the relevant provisions of the Federal Rules of Civil Procedure, the Local Rules and the Court's Individual Rules governing reports and recommendations from a magistrate judge shall apply."  Under those provisions, a timely objection from a party to the magistrate judge's report and a recommendation must be resolved de novo by the district court.  Fed. R. Civ. P. 72(b)(3). Moreover, the County's argument that the parties consented to the magistrate judge's plenary jurisdiction is entirely inconsistent with ¶ 58 of the Settlement, through which this Court "retain[s] exclusive jurisdiction over [the Settlement], including, but not limited to, any application to enforce or interpret its provisions, and over each party to the extent its obligations remain unsatisfied."  The Court will therefore decide the Government's objection on the merits.

II.  The Scope of the County's Obligation to "Promote" Source-of-Income Legislation

Resolving the Government's objection requires interpretation of the Settlement, a consent decree between the Government and the County.  Consent decrees "reflect a contract between the parties (as well as a judicial pronouncement), and ordinary rules of contract interpretation are generally applicable."  Doe v. Pataki, 481 F.3d 69, 75 (2d Cir. 2007).  "[D]eference is to be paid to the plain meaning of the language of a decree and the normal usage of the terms selected."  United States v. Broadcast Music, Inc., 275 F.3d 168, 175 (2d Cir. 2001) (citation omitted).  In interpreting a consent decree, as when interpreting a contract, "the court is to consider its particular words not in isolation but in the light of the obligation as a whole and the intention of the parties as manifested thereby."  JA Apparel Corp. v. Abboud, 568 F.3d 390, 397 (2d Cir. 2009) (citation omitted).

"[W]hen faced with unclear language in a consent decree, a court of equity may, in construing the provision, consider the purpose of the provision in the overall context of the judgment at the time the judgment was entered."  Broadcast Music, 275 F.3d at 175.  "[A] consent decree is an order of the court and thus, by its very nature, vests the court with equitable

12

discretion to enforce the obligations imposed on the parties."

United States v. Local 359, United Seafood Workers, 55 F.3d 64,

69 (2d Cir. 1995).  While "the factual findings of an

administrator [of a consent decree] are entitled to great

deference," id. at 68 (citation omitted), an administrator's

conclusions of law are not entitled to deference.  See N.L.R.B.

v. J.P. Stevens & Co., Inc., 563 F.2d 8, 14 (2d Cir. 1977) (Fed.

R. Civ. P. 53 Master's report and recommendation).

Paragraph 33(g) of the Settlement provides:  "As part of

its additional obligations to [affirmatively further fair

housing], the County shall . . . promote, through the County

Executive, legislation currently before the Board of Legislators

to ban 'source-of-income' discrimination in housing."  As the

Monitor noted, "the key questions" for resolving whether the

County has breached the Settlement by failing to fulfill this

obligation are:

> (a) what does it mean to "promote" the Source of
> Income legislation through the County Executive; (b)
> over what period of time did that duty exist; and (c)
> did the County Executives discharge that duty.

The parties effectively agree that the County's obligation

to "promote" source-of-income legislation must be understood in

accordance with the plain meaning and normal, everyday usage of

the term.  As the Second Circuit has recently observed, "[t]he

ordinary meaning of 'promote' includes 'to bring or help bring

13

into being,' to 'contribute to the growth, enlargement, or
prosperity of,' or to 'encourage' or 'further'."  <u>United States</u>
<u>v. Awan</u>, 607 F.3d 306, 314 (2d Cir. 2010) (citing <u>Webster's</u>
<u>Third New Int'l Dictionary</u> 1815 (2002)).  <u>See</u> <u>also</u>
Dictionary.com, "Promote", http://dictionary.reference.com
/browse/promote?s=t (last visited April 22, 2012) ("to help or
encourage to exist or flourish; further").

Thus, the answer to the first "key" question is
straightforward.  The County's obligation to "promote" source-
of-income legislation required the County Executive to take
active steps to foster and facilitate passage of the
legislation.  Those obligations are not limited to hortatory
steps.

The answer to the second question is also easy to discern
from the structure and terms of the Settlement itself.  The
County's obligation to promote source-of-income legislation is
an ongoing obligation, and did not terminate upon the expiration
of the 2009 legislative session.  Paragraph 33, the paragraph
that requires the County to promote source-of-income
legislation, does not contain any time limitation.  In contrast,
the parties were careful to set forth specific time limitations
and deadlines for other obligations imposed by the Settlement,
and to provide mechanisms by which the County might seek an

14

extension of those deadlines, for example, in connection with the implementation plan mandated by ¶ 18 of the Settlement.[3]

Any other interpretation of the County's obligation to promote source-of-income legislation would also be inconsistent with the structure of the County's obligations under the Settlement as a whole, and thus is disfavored.  The Settlement requires the County to "incorporate each undertaking set forth in [¶ 33] in the the County's AI."  Settlement ¶ 33(i).  The County was originally required to submit its AI to HUD 120 days after the Settlement was entered.  The Settlement provided a mechanism by which the County could seek an extension of that deadline.  At the earliest, therefore, the Settlement contemplated an AI submission deadline of December 9, 2009, only weeks before the end of the 2009 BOL session.  The County took advantage of the opportunity for an extension, however, and did not submit its AI to HUD until July 23, 2010.  As noted, the Settlement required the County to address at that time within its AI, its obligation to promote, through the County Executive, the legislation currently before the Board to ban source-of-income discrimination in housing.  Thus, the settlement

---

[3] Paragraph 18 of the Settlement requires that the County submit an implementation plan to the Monitor and the Government within 120 days of entry of the Settlement.  It further provides that if "the Government, in its sole discretion, provides written consent, the Monitor may extend the deadline once for the submission of the implementation plan."

contemplated a continuing duty to advise HUD of the County's efforts to promote source-of-income legislation.

Finally, the County breached its obligation to promote source-of-income legislation.  The County does not dispute that County Executive Spano's single letter to the Board and five letters to advocacy organizations during the fall or 2009 do not constitute efforts sufficient to discharge the County's obligation to promote, through the County Executive, source-of-income legislation.  It is also undisputed that the sole action the County Executive has taken since December 2009 in relation to the legislation he is obligated to promote is to veto it.  It is unnecessary to decide the precise contours of the duty to promote that the Settlement imposed on the County.  Under no reasonable understanding of the term can the County Executive be said to have discharged the obligation to promote source-of-income legislation when he vetoed the legislation.  The veto was an unambiguous breach of the duty to promote.

Paragraph 13(c) of the Settlement grants the Monitor authority to "[i]dentify, recommend, and monitor implementation of additional actions by the County needed to ensure compliance with [the Settlement]."  The Monitor has recommended, pursuant to ¶ 13(c), that

> a reasonable interpretation of "promotion" of
> legislation could encompass, at a minimum, requesting

16

that the legislature reintroduce the prior
legislation, providing information to assist in
analyzing the impact of the legislation, and signing
the legislation passed.

"Until parties to [a consent decree] have fulfilled their

express obligations, the court has continuing authority and

discretion -- pursuant to its independent, juridical interests -

- to ensure compliance." E.E.O.C. v. Local 580, Int'l Ass'n of

Bridge, Structural and Ornamental Ironworkers, Joint Apprentice-

Journeyman Educ. Fund, 925 F.2d 588, 593 (2d Cir. 1991).   The

Monitor's recommendation properly describes the steps the County

must take to comply with its obligation to promote source-of-

income legislation, and the Court adopts it.

The County raises disputes at each stage of the analysis

above.   First, the County argues that actions of promotion

encompass acts of persuasion or advocacy only.   While the County

points to the Awan court's reasoning, the Court of Appeals'

decision cannot be read so narrowly.

In Awan, the Second Circuit interpreted a sentencing

enhancement for terrorism, which applies where the defendant's

offense "involved, or was intended to promote, a federal crime

of terrorism[.]"   U.S.S.G. § 3A1.4 (emphasis added).   Noting the

disjunctive phrasing of § 3A1.4, the court held that since the

enhancement "must be interpreted to avoid redundancy, the

'intended to promote' prong must be applicable in some

17

circumstances in which the 'involved' prong is not, _i.e._, where the defendant's offense or relevant conduct does _not_ include a federal crime of terrorism." _Awan_, 607 F.3d at 314.  It reasoned that a person "promoting" an act or event takes an active role in bringing that act or event to fruition.  In the terrorism context, "an offense is 'intended to promote' a federal crime of terrorism when the offense is intended to _bring about, encourage, or contribute to_ a federal crime of terrorism[.]"  _Id._ (emphasis supplied).

_Awan_ does not stand for the proposition that there is a "dichotomy" between promoting a goal and the actual accomplishment of the goal, as the County would have it, or that the two concepts are mutually exclusive.  While the _Awan_ court held that a defendant who intends to promote a crime of terrorism has "not necessarily" completed the crime, it did not suggest the converse.  _Id._ at 315.  It did not suggest that a person who completes a crime cannot be said to have promoted it. The phrase "intended to promote" is differentiated from the word "involved" by being broader, not by being exclusive.  The _Awan_ court's discussion of the import of the term "promote" is therefore entirely consistent with a finding that the County breached its obligation to promote the source-of-income legislation when the County Executive exercised his veto.

18

The County also argues that other obligations it assumed in
¶ 33 of the Settlement indicate its obligation under ¶ 33(g) to
promote source-of-income legislation is limited to acts of
persuasion.  It argues that the other tasks and actions set
forth in ¶ 33 require it only to undertake acts of persuasion.[4]
But, several of the County's obligations under the remaining
subsections of ¶ 33 require it to act, rather than merely to
attempt to persuade others to act.  For example, the County is
required to "affirmatively market affordable housing within the
County", and to include legal language in all agreements with
developers that developers will affirmatively market affordable
housing.  Settlement ¶ 33(e).  The County must also "centralize
the intake of potential home buyers for affordable housing that
AFFH".  Settlement ¶ 33(f).  The collective obligations under ¶
33 of the Settlement, therefore, include actions for the County
to do by itself and with others.  Together, these activities
would materially enhance the County's efforts to desegregate
housing within the County.

Next, the County contends that ¶ 33(g) applies only to
legislation before the BOL during its 2009 session.  The County

---

[4] For example, the County is obligated under ¶ 33(b) to
"advertise the rights of all persons to fair housing and avenues
to redress allegations of housing discrimination . . . ."  Under
¶ 33(h), the County is obligated to "pay for consultants and
public education, outreach, and advertising to AFFH . . . out of
County resources . . . ."

emphasizes that the phrase "currently before the [BOL]" is not set off by commas. When ¶ 33(g) is read not in isolation, but in the context of the County's Settlement obligations as a whole, it is clear that the obligation did not terminate with the end of the 2009 legislative session. Such a reading would frustrate the clear intention of the parties that the County's commitment to promote source-of-income legislation be incorporated as an ongoing obligation into its AI. The more reasonable reading of "currently before the [BOL]" is as a description of the type of legislation the County has an obligation to promote: the bill then pending before the BOL or legislation sufficiently similar to it. The County has not pointed to any material differences between the source-of-income legislation pending before the Board in August 2009 and the amended version passed by the Board in June 2010.

With respect to the question of whether the County breached the Settlement, the County argues that the Settlement did not obligate the County Executive to sign source-of-income legislation. As a preliminary matter, this is an overly narrow characterization of the parties' dispute. The scope of the dispute addressed by the Monitor is whether the County has fully complied with its obligation under ¶ 33(g) of the Settlement to promote source-of-income legislation, or whether the County has

breached that obligation.  Paragraph 33(g) of the Settlement
vests the County's obligation to promote source-of-income
legislation in the County Executive, and it is sufficient for
purposes of finding a breach of that obligation to note that the
only actions a County Executive has taken towards furthering
such legislation or bringing it into being are Spano's letters
prior to December 2009.  Since that time, the sole action a
County Executive has taken in relation to source-of-income
legislation is Astorino's June 25, 2010 veto of the June 14 bill
passed by the Board.  These actions are insufficient to
constitute promotion.

        The Monitor also correctly found that Astorino's veto
constituted, by itself, a breach of the County's obligation
under ¶ 33(g) of the Settlement.  The County is correct that the
term "promote" has a different meaning from the term "enact".
While the Settlement did not require the County to guarantee
passage of the legislation, it required the County Executive to
promote that passage.  As already discussed, the terms "promote"
and "enact" are not mutually exclusive; failing to take an
action which is necessary to enact legislation -- particularly
when it is the final act -- may also constitute a failure to
promote that legislation, i.e. to "bring [the legislation] into
being."  Awan, 607 F.3d at 304.  To the extent the Magistrate

                                  21

Judge found otherwise, it was through reliance on an overly narrow definition of the term "promote", encompassing only hortatory acts, and his failure to consider the definition in Awan, id. Astorino's veto effectively killed source-of-income legislation in Westchester.[5]   The County Executive's action constituted the very opposite of what was required under the Settlement, and placed the County in breach.

III.  The County's Remaining Arguments

The County claims that constitutional principles would be violated if the Monitor's interpretation and application of ¶ 33(g) is upheld.  None of these arguments has merit.[6]

The County cites to dicta in Horne v. Flores, 557 U.S. 433, 129 S.Ct. 2579 (2009), to argue that ¶ 33(g) of the Settlement

---

[5] The fact that the Board might have overridden Astorino's veto by a supermajority vote is irrelevant to the question of whether or not the County complied with its obligation to promote, through the County Executive, source-of-income legislation.

[6] The Government argues that the County forfeited several of these arguments by failing to raise them before the Monitor.  It is true that the County did not present its reserved powers, unmistakability, and Guarantee Clause arguments to the Monitor. The County was on notice that the Monitor might interpret the Settlement to find the County in breach based upon the County Executive's veto, and in fact argued that such an interpretation would raise federalism concerns.  It is unnecessary to decide whether the County forfeited its other constitutional arguments by "fail[ing] to make the timely assertion of a right," United States v. Olano, 507 U.S. 725, 733 (1993), as these arguments fail on the merits regardless.

"improperly deprive[s] future officials of their designated
legislative and executive powers." Horne, 557 U.S. at ___, 129
S.Ct. at 2594 (citation omitted). In Horne, the Supreme Court
found that a lower court had "strayed" from the correct legal
standard when it evaluated a state's Fed. R. Civ. P. 60(b)(5)
motion for relief from a final judgment based on changed
circumstances. Id. at 2595. Federalism concerns played a large
role in the Court's discussion of the proper standard to apply
to a state's Rule 60(b)(5) motion for relief from a remedial
order. Id. at 2595-98. But Horne is inapposite here, where the
County has not sought modification of a consent decree but has
instead flouted one of its provisions. As the Monitor aptly
noted, "[n]othing in Horne suggests that any party has the right
to undertake an extra-judicial change of a consent decree's
terms."

The County raises two related arguments that proceed from
the assumption that an interpretation of ¶ 33(g) of the
Settlement obliging the County Executive to sign source-of-
income legislation passed by the Board involves a surrender of
"sovereign power." The County argues that such an
interpretation would violate the "reserved powers doctrine."
The County also argues that the "unmistakability doctrine"
should be applied to construe the Settlement so as not to oblige

the County Executive to sign source-of-income legislation passed

by the Board.  These arguments will be addressed in turn.

The reserved powers doctrine "describe[s] the

uncontroversial proposition that a state may not enter a

contract that 'surrenders an essential attribute of its

sovereignty' and that, as a consequence, the Contracts Clause

may not be used to compel a state to adhere to a contract that

purports to achieve such a result." Matsuda v. City and County

of Honolulu, 512 F.3d 1148, 1153 (9th Cir. 2008) (citing U.S.

Trust Co. v. New Jersey, 431 U.S. 1, 23 (1977)).  State powers

constituting "essential attributes of sovereignty" include the

police power and the power of eminent domain.  Matsuda, 512 F.3d

at 1153.

The County is incorrect that this dispute implicates the

reserved powers doctrine.  First, the County has failed to point

to a case supporting the proposition that the reserved powers

doctrine applies to an agreement entered into by a county, as

opposed to a state.  Second, even if the doctrine applies to a

consent decree entered into by a county, the County Executive's

exercise of his veto is not an "essential attribute of

sovereignty", akin to the police power or the power of eminent

domain.  Rather, it is a prerogative of the County Executive

within Westchester's system of governance, established by local

24

code.[7]  See Westchester County, N.Y. Code, § 110.11 (11).

Finally, the reserved powers doctrine does not apply where an

agreement binds a sovereign to exercise its powers, rather than

to refrain from using them.  See Matsuda, 512 F.3d at 1154.  As

the Supreme Court has noted, "a State is without power to enter

into binding contracts not to exercise its police power in the

future."  U.S. Trust Co., 431 U.S. at 23 n.20 (emphasis added).

In short, ¶ 33(g) of the Settlement does not mandate that the

County refrain from using its police powers or any other power

that could be deemed an "essential attribute of sovereignty."

       The unmistakability doctrine is a rule of contract

construction which provides that in "a contract with a sovereign

government . . . an ambiguous term of a grant or contract [will

not] be construed as a conveyance or surrender of sovereign

power."  United States v. Winstar Corp., 518 U.S. 839, 878

(1996).  "[A] clear statement of intent to surrender a state's

legislative authority is even more appropriate when the alleged

_____

[7] The County also seeks to argue that the Settlement cannot be
interpreted to require the County Executive not to veto source-
of-income legislation, because the County Executive's veto power
may only be altered by local referendum.  But the Settlement
does not alter the County Executive's veto power.  Indeed, the
County Executive did veto the source-of-income legislation.  The
Settlement instead governs the legal consequences of that veto,
consequences that arise out of the litigation the Settlement
brought to a conclusion.  In consenting to the Settlement, a
consent decree that allowed the County to evade potentially
enormous damages, the County agreed to comply with its
provisions or face the sanctions described therein.

restrictions on future law-making power are part of an agreement authorized and enforced by a federal court." Pataki, 481 F.3d at 79.  As discussed, an interpretation of ¶ 33(g) of the Settlement that obliges the County Executive to sign source-of-income legislation passed by the Board does not require surrender of any "sovereign power" that may be possessed by the County.  Equally significant, the obligation addressed herein does not arise from an ambiguous term of the Settlement.  The unmistakability doctrine is therefore inapposite.

Finally, the County argues that the interpretation of ¶ 33(g) of the Settlement adopted here violates the Constitution's Guarantee Clause.  See U.S. Const. art IV, § 4 ("The United States shall guarantee to every State in this Union a Republican Form of Government.").  The courts have traditionally held that arguments premised upon the Guarantee Clause present nonjusticiable political questions.  See Padavan v. United States, 82 F.3d 23, 28 (2d Cir. 1996).  Even if the County's Guarantee Clause challenge to the Settlement were justiciable, it would fail.  Cf. New York v. United States, 505 U.S. 144, 185 (1992).  The County cannot show the denial to any state of a republican form of government.  Finding a breach of the Settlement simply enforces an agreement which the County

voluntarily entered to avoid liability of approximately $150 million.

IV.  Additional Disputes

The Magistrate Judge's Opinion overruled the County's objections to several other portions of the Monitor's Report. The Opinion agreed with the Report that the County must specify its strategy for overcoming exclusionary zoning practices, and that the Monitor may require the County to identify the types of municipal zoning practices that would, if not remedied by the municipality, cause the County to pursue legal action.  The Opinion also overruled the County's objections to the Monitor's refusal to rule on the propriety of HUD's rejection of the County's AI.  Neither party has objected to these portions of the Opinion, and the Magistrate Judge's findings with respect to these three issues are not clearly erroneous.  The Court therefore adopts these sections of the Opinion.

Conclusion

The Government's objection to the Magistrate Judge's March 16 Opinion is sustained.  The Court adopts those sections of the Monitor's Report dealing with the County's obligation to promote

27

source-of-income legislation.  The remaining sections of the

March 16 Opinion are adopted.

   SO ORDERED:

Dated:    New York, New York
          May 3, 2012


                              _____
                                   DENISE COTE
                              United States District Judge