UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------X
                                        :
UNITED STATES OF AMERICA ex rel. ANTI-  :
DISCRIMINATION CENTER OF METRO NEW      :
YORK, INC.,                             :          06 Civ. 2860 (DLC)
                          Plaintiff,    :
                                        :          OPINION AND ORDER
             -v-                        :
                                        :
WESTCHESTER COUNTY, NEW YORK,           :
                          Defendant.    :
                                        :
----------------------------------------X

APPEARANCES:

For the U.S. Government:
David J. Kennedy
United States Attorney's Office
86 Chambers Street
New York, NY 10007

For Westchester County, New York:

Robert F. Meehan
Westchester County Attorney's Office
138 Martine Avenue, 6th Floor
White Plains, NY 10601

DENISE COTE, District Judge:

     On August 10, 2009, the County entered into a Consent

Decree that required it, among other things, to ensure the

development of at least 750 new affordable housing units by

2016.  In February 2012, the County sought approval from the

Monitor to include among that number 28 units to be built at

Chappaqua Station in the Town of New Castle.  That approval was

granted in September 2012, but the New Castle units remain

unbuilt.  The land for the development was not purchased by the County until January 29, 2016, and as of today, New Castle has only granted a site remediation permit for that land.  This Opinion addresses the debate between the parties about whether the County has breached ¶¶ 7(i)-(j) and 23 of the Consent Decree by failing to act more diligently in connection with the New Castle development.

The current litigation arises out of the Report of Monitor James E. Johnson dated May 8, 2015 ("Report").  The United States ("Government") has objected to the Opinion of November 19, 2015 ("Magistrate Opinion") issued by the Honorable Gabriel Gorenstein insofar as it sustained the objections of Westchester County ("County") to portions of that Report.  The County also objected to the Magistrate Opinion on more limited grounds.  As explained below, the County timely satisfied the financing in place interim benchmark imposed by ¶ 23 of the Consent Decree for the period ending December 31, 2014, but breached the obligations imposed on the County under the Decree's ¶ 7(i)-(j).  Decision is reserved on the question of whether sanctions should be imposed for that breach.

## Background

The procedural history giving rise to this dispute has been described in previous opinions issued by this Court and the Second Circuit Court of Appeals.  See, e.g., United States ex

rel. Anti-Discrimination Ctr. of Metro N.Y., Inc. v. Westchester
Cnty., 495 F. Supp. 2d 375 (S.D.N.Y. 2007) (denying motion to
dismiss False Claims Act lawsuit against the County); United
States ex rel. Anti-Discrimination Ctr. of Metro N.Y., Inc. v.
Westchester Cnty., 668 F. Supp. 2d 548 (S.D.N.Y. 2009) ("2009
Opinion") (finding that County's Certifications to obtain CPD
Funds were false but reserving on County's scienter); U.S. ex
rel. Anti-Discrimination Ctr. of Metro New York, Inc. v.
Westchester Cnty., N.Y., No. 06cv2860 (DLC), 2012 WL 1574819
(S.D.N.Y. May 3, 2012) (adopting Monitor's conclusions in part
and Magistrate Judge's opinions in part); United States ex rel.
Anti-Discrimination Ctr. of Metro N.Y., Inc. v. Westchester
Cnty., 712 F.3d 761 (2d Cir. 2013) ("2013 Appeal Opinion")
(affirming holding that the County had breached promotion
requirement); Cnty. of Westchester v. U.S. Dep't of Hous. &
Urban Dev., No. 13cv2741 (DLC), 2013 WL 4400843 (S.D.N.Y. Aug.
14, 2013) (dismissing APA claims for lack of jurisdiction and
statutory claim for pleading deficiency); Westchester v. U.S.
Dep't of Hous. & Urban Dev., 778 F.3d 412 (2d Cir. 2015)
(vacating in part 2013 Opinion and remanding on issue of
jurisdiction); Cty. of Westchester v. U.S. Dep't of Hous. &
Urban Dev., 116 F. Supp. 3d 251 (S.D.N.Y. 2015) ("2015 Opinion")
(holding that HUD's administration of grant programs at issue
was lawful); Cty. of Westchester v. U.S. Dep't of Hous. & Urban

Dev., 802 F.3d 413, 418 (2d Cir. 2015) ("2015 Appeal Opinion") (affirming this Court's finding that HUD did not violate federal administrative law).  The Court assumes familiarity with those Opinions.  Only the facts necessary to resolve the present dispute are described below.

A. False Claims Act Litigation and the 2009 Consent Decree

This litigation began in 2006 when the Anti-Discrimination Center of Metro New York, Inc. ("ADC") sued the County as a qui tam relator under the False Claims Act ("FCA"), 31 U.S.C. § 3729 et seq.  ADC claimed that the County received more than $52 million from the federal government for housing and community development after falsely certifying that it affirmatively furthered fair housing ("AFFH").  In the 2009 Opinion, the Court ruled that the County's certifications to HUD were false as a matter of law.  668 F. Supp. 2d at 571.  The Court scheduled a trial on the issue of the County's knowledge in making the false statements.  Id.  If a verdict was entered against it, the County faced an adverse judgment of as much as $156 million. 2013 Appeal Opinion, 712 F.3d at 775.  The Government intervened after the 2009 Opinion was issued but before the remaining issues in the case were tried, and the County entered into a Consent Decree with the United States Department of Housing and Urban Development ("HUD") on August 10, 2009 ("Settlement").

4

The Consent Decree consists of thirty-eight pages and imposes many obligations on the County.  The County was required to spend $51,600,000 as a remedy for violating the False Claims Act.  Of this sum, $21,600,000 was paid into the County's account with HUD, which would make the funds available to the County to meet the requirements of the Community Development Block Grant program and other terms and conditions.  See Settlement ¶¶ 2, 3, 5.

The Settlement also has as a central goal the construction of new affordable housing units.  Paragraph 7 of the Consent Decree requires that the County "ensure the development of at least 750 new affordable housing units" by 2016.  The County was required to secure funding of $30,000,000 for land acquisition and other necessary costs of development of the new units.  Settlement ¶ 5.  The new units must meet a series of demographic and affordability requirements in order to ensure that they AFFH.  For example, 630 of the units must be built in municipalities that, according to 2000 Census data, have a "single race African-American only" population of less than 3% and a Hispanic population of less than 7%.  Settlement ¶ 7(a)(i).  Paragraph 7(d) further requires that at least half of the 750 new units must be rental units, of which at least 20% shall be "affordable to and occupied by households with incomes at or below [50%] of Area Median Income."  The remaining units

must be "affordable to and occupied by households with incomes at or below [65%] of the [Area Median Income]." <u>Id.</u>  Paragraph 7(e) describes additional affordability requirements that are tied to the County's median income.  Moreover, no more than 25% of the units "shall be units intended for occupancy by senior citizens that are controlled by age restrictions."  Settlement ¶ 7(f).  The Settlement also gives priority to "sites within qualifying municipalities and census tracts that are located in close proximity to public transportation."  Settlement ¶ 7(g). These requirements, read holistically along with the other provisions of the Consent Decree, confirm that the overall goal of ¶ 7 is to develop 750 new affordable housing units whose occupancy will AFFH.

Paragraph 7(i) of the Consent Decree further provides that the County must "use all available means as appropriate" to ensure the development of the 750 new units.  These include, but are not limited to, "developing financial or other incentives for other entities to take steps to promote" the development of the new affordable housing units.  These incentives may involve "conditioning or withholding the provision of County funds on actions that promote the objectives" of ¶ 7.  This affirmative obligation in ¶ 7(i) is a requirement that the County must meet throughout the duration of the Consent Decree's implementation. It is not contingent on municipal action (or inaction) and

ensures that the County diligently pursues the ultimate 750-unit goal using "all available means as appropriate."

Paragraph 7(j) is in some ways similar to ¶ 7(i) but it operates differently.  Paragraph 7(j) requires that, "[i]n the event that a municipality does not take actions needed to promote" development of the 750 housing units or "undertakes actions that hinder" such development, the County must "use all available means as appropriate to address such action or inaction, including, but not limited to, taking legal action." Moreover, the "County shall initiate such legal action as appropriate to accomplish the purpose of this [Consent Decree]." In other words, the Settlement contemplates a distinct set of County obligations that are triggered by municipal opposition to new affordable housing developments.  If a municipality "hinder[s]" the objectives of ¶ 7 or "does not take actions needed to promote" the goal of developing 750 units, the County must address that opposition using "all available means as appropriate."  This specific obligation is in addition to the consistent obligation to "use all available means as appropriate" to ensure the development of 750 affordable housing units that is found in ¶ 7(i).

Paragraph 23 of the Consent Decree provides for interim benchmarks to ensure the County's progress towards the 750-unit construction goal.  By the end of 2014, the County was required

to have financing in place for 450 units and building permits
for 350 units.  By the end of 2015, the County needed financing
in place for 600 units and building permits for 525 units.  By
the end of 2016, the County must have financing in place and
building permits for all 750 new affordable housing units.

The Settlement also provides for the appointment of the
Monitor until the County satisfies these and other obligations.
The Settlement requires that the Monitor conduct compliance
assessments every two years "to determine whether the County has
taken all possible actions" under the Settlement.  The Monitor
also has discretion in approving sites for the 750 units,
resolving disputes between the County and the Government, and
determining appropriate penalties for breaching the Consent
Decree in certain circumstances.

The final provision of the Consent Decree that is of
particular importance to this dispute is its description of the
penalties that the County faces if it fails to comply with ¶ 7
or ¶ 23.  Paragraph 38 of the Settlement provides that, in the
event of a breach, "as further mandatory and injunctive relief"
the County must "make available additional resources . . . for
the development of affordable housing to AFFH in addition to the
Affordable AFFH Units required pursuant to paragraph 7."  As a
penalty for failing to meet its ¶ 23 benchmarks to ensure the
development of the 750 units described in ¶ 7, the County is

required to set aside $30,000 on the first day of its failure and "for each and every month the non-compliance persists, make available additional resources funded by [$60,000]" for developing additional units.  The Monitor "shall determine the formula for calculating the number of Additional Affordable AFFH Units required each time a specified amount in imposed penalties is accumulated."  The Monitor also has discretion to "waive or alter the imposition of penalties or the number of additional Affordable AFFH Units required pursuant to this paragraph."  The penalties are doubled if the County violates ¶ 7 or ¶ 23 by more than 50 percent.

B. Chappaqua Station Development

Chappaqua Station is a proposed 28-unit affordable housing development ("Development") that will be located at 54 Hunts Lane in the Town of New Castle ("New Castle" or "Town").[1] Conifer Realty LLC ("Conifer") is the project's developer.  In 2009, the County began working with the owner of the property and the Town to consider using the property for multi-family housing.  In July 2010, New Castle rezoned the location for the Development to allow workforce housing.  The site is near the Chappaqua Metro-North Railroad station and Chappaqua's commercial center.  In February 2011, the then-Town Supervisor

---

[1] The vast majority of New Castle residents are white.  The Town is 1.6% black and 4% Hispanic.

indicated that the Town supported Conifer's efforts to build the Development.

In February 2012, the County, New Castle, and Conifer approached the Monitor about including the Development as part of the 750 affordable housing units under the Consent Decree. In September 2012, the Monitor approved Conifer's modified proposal and found that the 28-unit development would further the goals of the Settlement.  On August 6, 2013, the Westchester County Planning Board passed a resolution recommending that the County provide $2,825,000 in financing towards the Development.

## 1. 2013-2014: Issuance of Special Permit & State Variance Approval Process

 On September 10, 2013, New Castle granted Conifer a special permit to develop the property ("Special Permit").  That permit was conditioned upon Conifer obtaining certain variances under the building and fire codes.  Specifically, the Special Permit initially required three building code variances and five fire code variances, at least two of which were required before Conifer could be issued a building permit.  The variances would need to be obtained from the Town's Building Inspector and from the New York State Hudson Valley Regional Board of Review ("State Board").  The Special Permit also provided that "[o]ther variances may be required upon further review, upon receipt of a complete Building Permit application, and/or upon final design."

After the Town granted the Special Permit, local opposition to the Development grew.  Robert J. Greenstein ("Greenstein") ran for Town Supervisor.  Opposing the Development was an important part of his campaign platform.  Greenstein's campaign was successful and he was elected as the Town Supervisor in November 2013.  He continues to hold that position.

On December 10, 2013, the State Board heard testimony about Conifer's application for variances.  At the hearing, Greenstein testified against Conifer's application for variances and emphasized that he "ran on a platform against this" Development. New Castle's Building Inspector, William Maskiell ("Maskiell"), also opposed the requested variances.  The County's Deputy Commissioner of Planning Norma Drummond ("Drummond") testified briefly in support of Conifer's petition for state variances at the hearing.  The State Board ultimately adjourned the December 10 hearing.  Six days later, the Westchester Board of Legislators ("BOL") voted against the funding proposal for the Development.  The State Board then held further hearings on the petition for state variances on April 8, July 2, December 9, 2014, and on January 22, 2015.  At the July 2, 2014 hearing, some but not all of the state variances were granted.[2]

-------------------

[2] On June 26, 2014, the Monitor issued an annual report.  In that report, the Monitor outlined briefly some of the facts set forth here and described the approval process for the Chappaqua Development as "stalled."  He noted that the County and

On September 24, 2014, the County submitted a notice to the
Monitor that it planned to include the Chappaqua Station units
in the 2014 "financing in place" benchmark.  On November 17,
Conifer presented a revised proposal for the Development and a
new petition for variances to the State Board.

### 2. November and December 2014: County Bond Legislation & Initial Correspondence on "Financing in Place"

On November 24, 2014, the BOL passed two pieces of
legislation that authorized the issuance of $2,925,000 in bonds
to finance the Development and authorized the acquisition of the
necessary land.  The legislation explicitly provided that the
issuance of the bonds was "subject to the approval of all
required State and Municipal variances."  Act No. 213-2014 § 1;
Act No. 214-2014 § 1.  Both statutes further provided that the
"county intends to finance, on an interim basis, the costs or a
portion of the costs of said objects or purposes for which bonds
are herein authorized, which costs are reasonably expected to be
reimbursed with the proceeds of debt to be incurred by the
County."  Act No. 213-2014 § 3; Act No. 214-2014 § 3.  The
County contends that no further action by the County was
necessary to authorize funds for the Development.

On December 15, 2014, the Monitor wrote to HUD and United
States Department of Justice ("DOJ") officials seeking their

---

municipal support "ha[d] wavered considerably" and contributed
to uncertainty surrounding the Development.

opinion about whether the Chappaqua units could count towards the 2014 "financing in place" benchmark even though issuance of the bonds was conditional.  On the same day, the Monitor wrote a similar letter to County officials indicating his preliminary view that the units should not count towards the 2014 benchmark and requesting further submissions on that subject.  The Monitor wrote that he believed that receiving building permits was a "condition precedent to awarding credit for units with financing in place."

The County responded on December 18, pointing to ¶ 23 of the Settlement and arguing that building permits could not be a requirement for the "financing in place" benchmark because the building permit benchmark is lower than the financing in place benchmark.  In other words, the County argued that receiving building permits could not be a prerequisite for achieving the "financing in place" benchmark because there was a separate, lower benchmark that applied to units with building permits.  In a letter of December 23, DOJ agreed with the County insofar as units do not need to have building permits to satisfy the "financing in place" benchmark.  DOJ further wrote that, in its view, "'[f]inancing in place' means that the project must have a written commitment for the full amount of funds necessary for construction of the project."  The letters of mid-December 2014 addressed the earlier dispute about whether building permits

were necessary to achieve financing in place; the letters did
not address the issue being litigated here, which is whether the
units may be counted towards the "financing in place" benchmark
if the financing is "subject to" obtaining both state and
municipal variances.  As of December 31, 2014, the required
state variances had not yet been approved by the State Board.

### 3.  2015: State Board Approval of Variances

On January 22, 2015, the State Board provisionally approved
all of Conifer's requested state variances despite the Town's
opposition.  The building code variances were approved subject
to two conditions: Conifer was required to enter into an
agreement with the Metropolitan Transportation Authority ("MTA")
for a no-build zone adjacent to the property and to install
sprinklers above the windows that would face the MTA's railroad
tracks.  The fire code variances were granted subject to several
conditions, including expansions to the building's standpipe
system, improvements to the Saw Mill River Parkway's off-ramp,
and other modifications to the building's design.

On February 17, 2015, the Town Board of New Castle ("Town
Board") requested that the State Board reconsider its decision
to grant the variances discussed above.  The Town Board's letter
expressed concern that the Development would not adequately
ensure the safety of its residents, the public, and first
responders who may be called to assist in the event of an

14

emergency.  In a letter to the Monitor dated April 15, New Castle officials stated that construction on the Development could not proceed until the State Board issued a final written determination that memorialized its decision granting the state variances.  On April 17, the State Board denied New Castle's request to reconsider granting the state variances.  On April 27, the State Board issued a written decision memorializing its conditional approval of Conifer's requested state building and fire code variances.

**4.  2015: Litigation Between Conifer and New Castle**

Conifer and New Castle were entangled in litigation about the September 2013 Special Permit while the disputes over state variances were ongoing.  On February 3, 2015, Conifer wrote to New Castle to confirm the length of the Special Permit.  In a letter of February 5, New Castle responded that Conifer's Special Permit was only valid for 18 months under Town Code § 60-430(M).  As such, the Town claimed that Conifer's Special Permit expired on March 20, 2015, but Conifer could seek an extension by submitting a letter to the Town Board.  On February 19, Conifer sued New Castle seeking a declaratory judgment that its Special Permit does not expire for 25 years under a different provision of the municipal code, Town Code § 60-430(O)(15)(m).  On May 6, the Supreme Court of the State of New York, Westchester County dismissed Conifer's suit.  Conifer

appealed the dismissal.  The County did not intervene or participate in the litigation concerning the Special Permit.  On May 26, the Town passed a resolution extending Conifer's Special Permit until November 2016.

On March 26, 2015, during the course of the litigation, Conifer met with New Castle officials to discuss the building permit application, which is separate from the Special Permit discussed above.  Maskiell, the Town's Building Inspector, indicated that he would not begin work on Conifer's application for a building permit until the approximately $152,000 permit fee was paid.  He also stated that, even when the fee was paid, the application would "go all the way to the bottom of the pile," implying that it would be given the lowest priority among the applications awaiting review.

### 5.  2015:  Monitor Questions Whether County Has Met 2014 "Financing in Place" Benchmark or Breached ¶ 7(i)-(j)

Based on these events, the Monitor was concerned that the Development's 28 affordable housing units should not be counted towards the 2014 "financing in place" benchmark.  Thus, on April 1, 2015,[3] the Monitor submitted information requests to the DOJ, HUD, the County, and New Castle seeking their views on whether

---

[3] Also on April 1, the Monitor released his progress report concerning the 2014 calendar year.  In that report, he took the position that he adopted in his May 8, 2015 report: that the financing was not "in place" until all variances were approved and the legislative contingencies were satisfied.

the units should count towards the benchmark.  The Monitor also
sought information from the County about how it had addressed
New Castle's opposition to the Development and whether the
County's efforts complied with the terms of the Consent Decree.
The Monitor's information request specifically mentioned ¶ 7(i)-
(j) when he inquired about the Town's opposition.

In a letter of April 15, the County claimed that all the
financing for Chappaqua was in place by the end of 2014 and that
New Castle's opposition to the Development would not compromise
its ability to meet the affordable housing interim benchmark.
The County argued -- as it continues to do -- that "Paragraph
7(j) of the Settlement only requires action by the County if its
ability to build 750 units is compromised by a municipality.
The situation contemplated by that provision has not occurred."
The County proceeded to identify several steps it has taken to
"ensure the County continues to meet its interim benchmarks" and
the successful completion of the Development.  These steps
included: (1) multiple meetings and conference calls with
Conifer; (2) negotiations surrounding the Development's
infrastructure work; and (3) obtaining approval to purchase and
close on the property when Conifer is ready.  These activities
do not address Town opposition to the Development, in part
because the County denies that its ¶ 7(j) duties were triggered
with respect to the Development.  The letter further claimed

that all of the municipal and state variances had been approved, presumably referring in part to the January 22, 2015 State Board approval discussed above.  The County's April 15 letter did not identify the municipal variances that were approved with any specificity.  The County's position was therefore that it had complied with the "financing in place" and both of the "all available means" provisions of the Settlement.

The DOJ's view was that the County should not receive credit for the Chappaqua units because the financing was contingent upon conditions that had not yet occurred by the benchmark's deadline of December 31, 2014.  Moreover, the DOJ contended that the County did not use "all available means" to further the Settlement under ¶ 7(i) and that New Castle's actions triggered the County's affirmative duty under ¶ 7(j) to "use all available means" to counter New Castle's hostility towards the Development.  The DOJ further stated that the County failed to satisfy the affirmative obligations in ¶ 7(j).  New Castle responded to the Monitor's information request on April 15.  In that letter, New Castle indicated that its opposition to the Development was grounded in safety concerns and argued that Conifer should relocate the Development to downtown Chappaqua.

**6. 2015: Monitor's May 8 Report**

The Monitor released his Report on the County's compliance with the Consent Decree on May 8, 2015.[4]  In that Report, the Monitor found that the County breached two provisions of the Consent Decree.  First, the Monitor found that the County violated ¶ 23, which required that the County have "financing in place" for 450 affordable housing units by December 31, 2014. The Monitor found that the County's legislation providing funding for the 28-unit Development included preconditions that were not met until after the deadline for the 2014 benchmark. Specifically, the November 2014 legislation conditioned the issuance of bonds on the granting of required state and municipal variances.  According to the Monitor, financing is only "in place" under the Consent Decree when legislative preconditions to the County's commitment of funds are satisfied.

The Monitor determined that the appropriate penalty for this violation was $30,000 for the first day of noncompliance and $60,000 for each month of continued noncompliance.  See Settlement ¶ 38.  The Monitor sought further submissions from the parties concerning the Settlement's other penalty, which includes requiring construction of additional affordable housing

---

[4] For a detailed description of the Monitor's reports between 2009 and 2015, as well as litigation that occurred during that time period, see 2015 Opinion, 116 F. Supp. 3d at 262-75; 2015 Appeal Opinion, 802 F.3d at 418-28.

units beyond the 750 units described in ¶ 7.  Nothing in the record suggests that the parties have made such submissions to the Monitor.

Second, the Monitor found that the County breached ¶ 7(i)-(j) of the Settlement.  The Monitor concluded that New Castle's opposition to the Development was sufficient to trigger the County's ¶ 7(j) obligations to counter it with "all available means."  Specifically, New Castle had criticized the Development publicly, testified against Conifer's variance application, sought reconsideration of the conditional state variance grant, advocated for the project's relocation, and threatened to delay review of Conifer's building permit application.  The Monitor rejected the County's claim that its ¶ 7(j) duties are only triggered if a municipality actually compromises the County's ability to construct the 750 units.  The Monitor concluded that, with the 2016 benchmarks looming, "the County's compliance with Paragraph 7 is plainly imperiled by New Castle's stance."  The Monitor further wrote that the County has failed to take any actions that directly address the Town's opposition to the Development.  Thus, he determined that the County breached ¶ 7(j).

The Monitor also found that the County had not satisfied its other affirmative obligation to use "all available means as appropriate," including "financial or other incentives," to

ensure that the 750 units progressed towards construction.
Settlement ¶ 7(i).  The Monitor pointed to a February 27, 2015
letter from the Drummond in which she wrote that the County had
not considered using incentives contemplated in ¶ 7(i).  The
Monitor characterized the County's role in New Castle's battle
with Conifer over the Development as that of a "spectator."  The
Monitor noted that the County had not used its discretionary
funding policy to address New Castle's opposition or ensure the
Development's progress, had not submitted testimony at public
hearings, and had not intervened in or filed an amicus brief in
the litigation between New Castle and Conifer.  He referred
these issues to the DOJ for appropriate action, which "may
include an action for contempt."

### 7. 2015 and 2016:  Subsequent Developments for Chappaqua Station

On July 1, 2015, Conifer paid the Town $152,862 for the
building permit application fee.  The County contends through a
declaration of its Director of Urban Design in the Department of
Planning Antonio Zaino ("Zaino") that, between August 1 and
December 31, Zaino made consistent and regular efforts to ensure
that the issues with the Development were resolved.
Specifically, Zaino claims that he had weekly conference calls
with representatives from Conifer about the scope of the public
bids for the site work; he obtained approval to issue public

bids for work related to the Development; he met with consulting engineers to discuss revisions to construction documents; he visited the Development's site in November 2015 with Town representatives; and he attended a meeting with the New York State Department of Transportation ("NYSDOT"), among other activities.

Declarations from Drummond and Senior Assistant County Attorney David Vutera ("Vutera") also list various actions they undertook to further the Development.  Drummond claims that, between August and December 2015, she spoke with the Town's attorney several times regarding the building permits for the Development.  She also states that she spoke with Conifer representatives on many occasions during that time period to discuss issues related to the Development.  Vutera's declaration outlines his various duties associated with negotiating, drafting, and reviewing deeds, covenants, easements, and contracts in connection with the Development.  These activities appear to address the affirmative obligation to "use all available means as appropriate" to ensure the 750 units' development under ¶ 7(i); they are not specifically aimed at countering the Town's opposition to the Development.

On September 22, Maskiell, the Town's Building Inspector, wrote a letter to Conifer indicating that he had reviewed its building permit application.  The Town had authorized its staff

to work overtime to accelerate its review of the application. The Maskiell letter included 87 questions and outstanding pieces of information or revisions needed to approve the building permits.  Conifer responded on October 12.  Conifer's letter addressed many of Maskiell's concerns and indicated that more information would be produced at a later date.  Conifer and Maskiell exchanged additional letters and met on at least one occasion.  On December 29, Maskiell issued Conifer a "Building - Fill/Grading Permit" for site remediation.  This is the first in a series of at least four permits that will be necessary in order to build the 28 units in the Development.  The remaining three permits include: a permit for building the foundation and related site and utility work; a permit for the building's shell; and "fire suppression."  The December 29 permit does not allow Conifer to begin actual construction of the Development.

On January 29, 2016, the County purchased the land for the Development for $1,275,000.  It then sold the land to Conifer for $1.  On February 9, the Town Board held a meeting.[5]  The meeting was held in response to Conifer's November 25, 2015

---

[5] The Government described this February 9 meeting for the first time in its March 25 reply.  Because the County submitted its brief in opposition on March 8, however, the County had an opportunity to describe the events of the February 9 meeting but chose not to do so in its brief.  The February 9 meeting is mentioned in a declaration of Edward J. Phillips ("Phillips"), an attorney for the Town, which was annexed to the County's March 8 brief.

letter requesting to amend the 2013 Special Permit in order to implement some of the modifications to the project.  At the meeting, Greenstein expressed that he and the Town Board unanimously preferred moving the Development to a different site.  Greenstein accused Conifer of "dig[ging] its heels in and press[ing] ahead with a bad project."  Another Town Board member urged Conifer to "end the rancor" and "scale down the project . . . or perhaps make a bigger project in an alternate location."

The Town Board raised several safety issues at the February 9 meeting.  A focal point was the statement of the Town's Fire Chief, who was concerned because the NYSDOT had rejected Conifer's proposal to install a fence over a bridge to the property.  The Fire Chief had previously claimed that the absence of a fence created a safety problem.  The Town Board required Conifer to provide some assurances that it would be able to undertake safety remediation measures in light of the fact that the NYSDOT rejected the fence that the Fire Chief claimed was necessary.  Specifically, Greenstein stated that Conifer is "caught between a rock and a hard place" because the Fire Chief required the fence but the NYSDOT rejected it.  Greenstein also claimed that the dispute is Conifer's "issue to work out."  Greenstein also discussed the Town Board's desire to

maintain the appropriate population density for the area of the Development.

At the meeting, the Town approved some but not all of the modifications to Conifer's Special Permit.  Even as it did so, it continued to urge Conifer to reconsider the planned location for the Development.  Moreover, a member of the Town Board and Conifer's attorney agreed that Maskiell would not issue a building permit without all of the necessary approvals.  The Town Board adjourned the meeting until March 29, 2016 to consider the remaining safety concerns further.

At the March 29 meeting, the Town Board passed six resolutions approving additional modifications to Conifer's Special Permit.  The Town Board also extended the Special Permit until November 2017.  The March 29 meeting did not result in the issuance of a building permit; indeed, Greenstein stated that Conifer "still need[s] the building permit.  There are a lot of other conditions.  They are not at the finish line."  An attorney for Conifer also noted that the company "still [doesn't] have a building permit."  Thus, Conifer still has only received the site remediation permit from December 29, 2015.

### 8. 2015:  Magistrate Opinion

On June 16, 2015, the County filed its objections to the Monitor's Report.  The County raised three principal objections to the Report: (1) the Monitor violated ¶ 40 of the Consent

Decree by failing to meet with the County and the Government before filing the Report; (2) the County complied with the "financing in place" provision and therefore met its 2014 benchmark; and (3) the County did not breach ¶ 7(i)-(j) of the Consent Decree.  On July 21, the Government submitted its response in support of the Monitor's findings.[6]  In its opposition, the Government also requested that Magistrate Judge Gorenstein hold the County in contempt.  The objections became fully submitted on August 11.  In conjunction with its August 11 reply, the County submitted new evidence and four additional declarations.  This evidence, it contends, supported its arguments opposing contempt sanctions.[7]  Notably, the declaration from Town counsel Phillips asserted that the review process for the Development would conclude by the end of September 2015.[8]

---

[6] The Government also proposed that the County pay $1.6 million into escrow, which the County could recover if it caught up to the next benchmark by December 31, 2015.

[7] Part of the County's objection to the Government's request for contempt is procedural.  The County contends that the United States did not make a proper motion for contempt under Rule 7(b)(1), Fed. R. Civ. P.

[8] If this representation was intended to convey that the permitting process would conclude in September 2015, then it was misleading.  As discussed above, in September 2015, based on his review of Conifer's application, Maskiell posed 87 questions to the developer.  By December 2015, Maskiell had only issued a grading permit for the Development.  Whether that permit constitutes a "building permit" within the meaning of ¶ 23 is in dispute and is addressed below.

The Magistrate Opinion was issued on November 19, 2015.  It declined to decide whether the Monitor violated ¶ 40 of the Settlement because, even if he had, the court is still obligated to determine whether the County breached the Consent Decree. The Magistrate Opinion sustained the County's other two objections.

The Magistrate Opinion states that financing "'in place' is best understood to be financing that is ready or in force -- that is, in existence and available to be accessed as a practical matter without restriction."  It held that the conditions on the County's bond issuance did not operate to affect the availability of money to build the Development.  The County uses its available funds for capital projects and afterwards issues bonds to reimburse itself.

Regarding the alleged violations of ¶ 7 of the Settlement, Magistrate Judge Gorenstein found that New Castle's actions and inaction constituted opposition within the meaning of ¶ 7(j),[9] and therefore triggered the County's obligations to use "all available means as appropriate" to counter the opposition. Magistrate Judge Gorenstein did not, however, take the next step and explicitly determine whether the County had breached ¶ 7(j)

_____

[9] In its objections to the Monitor's Report, the County defended the Town.  The County took the position that New Castle's action were "not contrary to the Settlement" and were actions that encouraged the construction of quality affordable housing units.

27

of the Consent Decree by failing to use such means to counter
the Town's opposition.[10]   Instead, he considered whether the
County should be held in contempt for not undertaking specific
actions identified in the Report, and decided that it should
not.

In concluding that the County should not be held in
contempt, the Magistrate Opinion found that there was fair
ground to doubt the wrongfulness of the County's failure to take
the specific actions.  For instance, it was not clearly wrongful
for the County not to offer financial incentives to overcome the
Town's failure to issue variances and permits, and not to
intervene in the litigation brought by Conifer in pursuit of its
"absurd" argument that the Special Permit had a 25 year
duration.  The Magistrate Judge also found that the Settlement
did not clearly require the County to reach out to New Castle to
address its opposition or to submit testimony at public
hearings.

### 9. 2016:  Objections to the Magistrate Opinion

While it was the County that objected to the Monitor's
Report, it was the Government that lodged the principal
objections to the Magistrate Opinion.  Because the Magistrate

---

[10] The Magistrate Opinion suggests that the activities to which
the County pointed as fulfilling its obligation were inapposite.
The Opinion characterized those steps as taken "to promote the
development of Chappaqua Station" as opposed to steps used "to
counter municipal opposition."

Opinion was not issued until late in 2015, the Government
proposed to extend its deadline to object in order to afford the
County a chance to catch up to its 2015 benchmarks and to allow
the Government time to take limited supplemental discovery of
the County.

The Government issued an interrogatory requiring the County
to identify all efforts it had taken during the fall of 2015 to
address the Town's resistance to the Development.  In response,
the County listed meetings and conversations between County and
Town officials, but gave minimal information about the content
of those discussions.

In its January 22 submission, the Government objected to
the Magistrate Opinion's findings that the County met its 2014
¶ 23 interim financing in place benchmark and that it should not
be held in contempt for violating ¶ 7(i)-(j).  The Government
agreed, however, that the County had met its December 31, 2015
benchmarks, even without counting the Development's units.[11]  The
Government contends that the County should still be subject to
monetary penalties for its late compliance with the 2014
benchmark.  Because the bonds to be issued to finance the
Development are expressly contingent on the State and municipal

---

[11] The Government reserved its right to retract this concession
when the Monitor has had an opportunity to review the County's
2015 final report.

approval of all required variances, and the Town may still require more municipal variances as part of its approval process, the Government claims that financing is still not "in place" for the Development.[12]

The Government also argues that the County's violation of ¶ 7 is ongoing because it has not used all available means to advance the development of the 750 new units (¶ 7(i)) or to address the Town's continued resistance to the Chappaqua Development (¶ 7(j)).[13]  The Government requests that the Court order the County to take five separate actions to counter the Town's opposition to the Development and increase the likelihood that the units may count towards the 2016 benchmarks.[14]

---

[12] The Government agrees with the County that all State variances were granted as of April 27, 2015, when the State Board issued its written decision.  The County contends that the State variances should be deemed granted as of January 22, 2015, when they were orally granted on the record of a State Board meeting. These dates are important to the extent that they may affect the penalties the County were to face if a breach of the "financing in place" benchmark occurred.

[13] The Government also objects that the Magistrate Judge failed to rule on the Monitor's finding that the County had breached ¶ 7, and contends that civil contempt penalties are appropriate for the County's failure to meet its obligations under ¶ 7.

[14] These five actions include: (1) Meet with the Monitor every 60 days that the building approval process remains pending before the Town and provide the Monitor with all the information he requests in advance of such meetings; (2) Publish its May 11, 2015 letter on the County's website and pay for the letter to be printed in a Sunday edition of the Journal News, thereby publicly affirming its commitment to the Development; (3) Write follow up letters to New Castle once per month inquiring about

The Government acknowledges that the County has worked with Conifer and to some extent with the Town to obtain a lease of land from the NYSDOT for the Development.  But it complains that the County never provided funds to assist Conifer or the Town to prepare and review the documents essential to the permit process, that the County rejected financing for the Development until late 2014, and that the County made few efforts to encourage the Development in 2014 and 2015.[15]  According to the Government, as of December 30, 2015, no building permit has been issued to Conifer.[16]

The County raises more limited objections to the Magistrate Opinion:[17] it objects to Magistrate Judge Gorenstein's finding

---

the status of the building permit approval process and any municipal variance approvals, ask why the approvals have not bene granted, and share these communications with the Monitor; (4) Commit to providing any information useful to New Castle in making its determinations with respect to the Development; and (5) Attend all public hearings, if any, in connection with the approval process of the Development.

[15] According to the Government, the County's efforts have been limited to a fifteen minute meeting with the Town Supervisor, monthly phone conversations with County representatives, and several email and telephone exchanges between County and Conifer officials, among other activities.

[16] The Government produced the County's internal emails that first refer to the 2015 Chappaqua permit as a grading/fill permit, but then reference it as a "building permit" in quotation marks.

[17] The County abandons its objection to the Monitor's Report on the ground that he failed to meet in person with County officials before issuing the Report.

that the Town's actions were sufficiently obstructionist to
trigger the affirmative duties in ¶ 7(j) of the Consent Decree,
and contends the Magistrate Judge erred by not deciding whether
the County had breached the Settlement before addressing whether
contempt sanctions were appropriate.[18]   The County argues that it
has not breached the Consent Decree.   It also offers its opinion
that the Development's units will count toward the 2016
benchmarks, with financing already in place and the required
building permit already issued.   As for the five requested
actions listed by the Government, the County argues that it has
already engaged in similar actions and been criticized that its
actions were inadequate.

**10.   2016:  Building Permit Benchmarks and May 23 Hearing**

As discussed above, the Government now seeks a ruling that
the Development does not currently satisfy the 2016 building
permit interim benchmark in ¶ 23.   In support of its argument,
the Government contends that the site remediation permit is not
a "building permit" within the meaning of ¶ 23 because it does
not allow Conifer to begin constructing the building.   While the
County objects to the Government's request, arguing that the
issue is not yet ripe for the Court's review, the County also
contends that the 2015 site remediation permit for the

---

[18] The County also contends that the Government's application for
contempt was procedurally improper and should not have been
reviewed on the merits.

Development satisfies the 2016 "building permit" benchmark in ¶ 23.

To address this dispute, the Court issued an order on April 26, 2016.  The Court notified the parties that the building permit issue would be discussed at the May 23 hearing.[19]  The Court also ordered that the parties must be prepared to provide evidence regarding the following topics:

(1)  The specific steps that must be completed for the Town to issue the remaining three building permits listed above;

(2)  Any municipal or other variances that Conifer will need to obtain before these other building permits will be granted;

(3)  An estimated timeline for completing the building permit approval process and issuing the remaining three permits; and

(4)  The steps that the County plans to take to address the Town's opposition to the development, and to "ensure the development of at least" 750 new affordable housing units.

The County provided its written submission on these topics on May 11.  The Government filed its response on May 17, and the County replied on May 19.  The Town also submitted a letter in response to the Order on May 17.  The Monitor, the County, Drummond, and the Government appeared at the May 23 conference. A representative of the Town did not attend.

---

[19] The May 23 hearing date had already been identified in connection with the parties' litigation about the Monitor's March 17, 2016 report regarding the County's compliance with ¶ 33(c).  Paragraph 33(c) of the Settlement requires the County to "create and fund campaigns to broaden support for fair housing," among other things.

As these issues were being addressed, the Monitor issued his Third Biennial Compliance Assessment on April 28, and the ADC submitted a letter on May 11.  A conference has been scheduled on July 8 to address additional issues raised in those submissions.

## Discussion

A "district judge must determine de novo any part of the magistrate judge's disposition that has been properly objected to."  Fed. R. Civ. P. 72(b)(3); 28 U.S.C. § 636(b)(1)(C).  The district court "may accept, reject, or modify the recommended disposition."  Fed. R. Civ. P. 72(b)(3).

The parties' objections all require interpretation of the Consent Decree.  "Consent decrees reflect a contract between the parties (as well as a judicial pronouncement), and ordinary rules of contract interpretation are generally applicable."  2013 Appeal Opinion, 712 F.3d at 767 (citation omitted).  "This requires that deference be paid to the plain meaning of the language of a decree and the normal usage of the terms selected."  Id. (citation omitted).  Relevant provisions of the Consent Decree must not be considered "in isolation," but rather "in the light of the obligation as a whole and the intention of the parties manifested thereby."  Id. (citation omitted).

Additionally, the "court has inherent power to enforce consent judgments, beyond the remedial 'contractual' terms

34

agreed upon by the parties." E.E.O.C. v. Local 580, Int'l Ass'n of Bridge, Structural & Ornamental Ironworkers, Joint Apprentice-Journeyman Educ. Fund, 925 F.2d 588, 593 (2d Cir. 1991); see NLRB v. Local 3, Int'l Bhd. of Elec. Workers, 471 F.3d 399, 406 (2d Cir. 2006).  In other words, consent decrees "are construed largely as contracts, but are enforced as orders." Berger v. Heckler, 771 F.2d 1556, 1568 (2d Cir. 1985).

This is so because, "[u]nlike a private agreement, a consent judgment contemplates judicial interests apart from those of the litigants." Local 580, 925 F.2d at 593.  Indeed, "[u]ntil parties to such an instrument have fulfilled their express obligations, the court has continuing authority and discretion -- pursuant to its independent, juridical interests -- to ensure compliance." Id.  To ensure such compliance, a court may use its broad discretionary power to fashion equitable remedies "even absent a finding of contempt." Berger, 771 F.2d at 1569.  Therefore, a court's interest "in protecting the integrity of a consent decree justifies any reasonable action taken by the court to secure compliance." CBS Broad. Inc. v. FilmOn.com, Inc., 814 F.3d 91, 101 (2d Cir. 2016) (citation omitted).  This "inherent power to enforce a consent judgment extends beyond the remedial contractual terms agreed upon by the parties." Id. (citation omitted).  Ultimately, "though a court cannot randomly expand or contract the terms agreed upon in a

consent decree, judicial discretion in flexing its supervisory
and enforcement muscles is broad." 2013 Appeal Opinion, 712
F.3d at 767 (citation omitted); King v. Allied Vision, Ltd., 65
F.3d 1051, 1058 (2d Cir. 1995) (finding that a "district court
has broad equitable discretion to enforce the obligations of the
decree").  These powers must be exercised in light of the
general principle that a court may not supplement the terms of
the Consent Decree.  E.g., Pandora Media, Inc. v. Am. Soc. of
Composers, Authors & Publishers, 785 F.3d 73, 77 (2d Cir. 2015)
("A court may not replace the terms of a consent decree with its
own." (citation omitted)); Perez v. Danbury Hosp., 347 F.3d 419,
424 (2d Cir. 2003) ("[T]he scope of a consent decree must be
discerned within its four corners, and not by reference to what
might satisfy the purposes of one of the parties to it."
(citation omitted)).

I.   "Financing in Place"

The Consent Decree requires the County to meet interim
benchmarks "[t]o ensure the satisfaction" of its overarching
obligation to develop 750 new affordable housing units.  One of
those interim benchmarks was that sites for 450 housing units
would have "financing in place" by the end of 2014.  Settlement
¶ 23.  To meet that interim benchmark, the County relies on its
November 24, 2014 legislation, in which the County (1) stated
that it "intends to finance, on an interim basis, the costs or a

36

portion of the costs of said objects or purposes for which bonds
are herein authorized, which costs are reasonably expected to be
reimbursed with the proceeds of debt to be incurred by the
County"; and (2) authorized the issuance of bonds to reimburse
the County for expenditures related to the Development up to
$2,925,000.  The issuance of the bonds was explicitly "subject
to the approval of all required State and Municipal variances."
The parties agree that the County failed to meet the 2014
interim benchmark if this legislation did not effectively put
"financing in place" for this project.

The Government contends that the legislation did not put
"financing in place" until all of the variances to which it
refers are approved.  The County disagrees.  It asserts that
contingencies associated with the issuance of the bonds are
irrelevant because the November 24, 2014 legislation authorized
the County to spend the required money for the project and the
bonds act as a mechanism for reimbursing the County for those
expenditures.  Thus, according to the County, the conditions had
no practical effect on the availability of the County's funding
for the Development.

Caselaw and dictionary definitions indicate that financing
is "in place" where there is a firm commitment to provide funds
for a project and those funds are available for immediate use.
This commitment is not satisfied by a mere promise or

unsupported claim that the funds are available to perform the contract.  In the analogous context of real estate sales agreements, a party's "unsubstantiated assertions that a line of credit could be secured or that a closely-related corporation would supply the funds" are insufficient to satisfy its burden of showing that it is financially "ready, willing, and able" to purchase real estate.  Internet Homes, Inc. v. Vitulli, 778 N.Y.S.2d 534, 535 (2d Dep't 2004).  Additionally, courts have held that "approvals and financing were in place" where the closing of a loan was "contingent on a signed contract to purchase the property" at issue.  Am. Baptist Churches of Metro. New York v. Galloway, 710 N.Y.S.2d 12, 14 (1st Dep't 2000).  The most common ways of securing financing include "issuance of . . . bonds or notes."  GPIF-I Equity Co. v. HDG Mansur Inv. Servs., Inc., No. 13cv547 (CM), 2013 WL 3989041, at *6 (S.D.N.Y. Aug. 1, 2013).  In the bankruptcy context, courts have determined that funding sources are "untenable" where there was no "firm financing in place and no evidence of any commitment to such financing."  In re Ralph C. Tyler, P.E., P.S., Inc., 156 B.R. 995, 997 (Bankr. N.D. Ohio 1993); In re Payless Cashways, Inc., 268 B.R. 543, 546-47 (Bankr. W.D. Mo. 2001) (the "bare promise of a priority administrative expense claim" is not sufficient to constitute "post-petition financing in place").[20]

---

[20] The Government cites an additional case in support of its view

Dictionary definitions provide further guidance and indicate that there is some flexibility in the phrase "financing in place."[21]  Webster's online dictionary defines "financing" as either "the act or process . . . of raising or providing funds" or "the funds thus raised or provided."  Merriam-Webster Unabridged Dictionary (2016 online ed.).  There are also several definitions of the phrase "in place."  The online edition of the Oxford English Dictionary defines "in place" as "set up, ready for action; in force, operative."  Webster's online dictionary defines the phrase as "in the state of being used or active."  Taking these definitions together, sites have "financing in place" when the necessary funds are committed and ready for immediate use.

In light of this guidance, Magistrate Judge Gorenstein correctly ruled that the November 24, 2014 bond act legislation constitutes "financing in place" as that phrase is used in ¶ 23 of the Settlement.  Thus, the County met its interim benchmark

---

that the 2014 bond legislation did not satisfy the benchmark: Irving Capital Corp. v. Serologicals Acquisition, Inc., No. 85cv6383 (WCC), 1986 WL 2763, at *2 (S.D.N.Y. Feb. 27, 1986). In that case, the court recited a party's view that the purchase contract at issue required "a binding written commitment for all financing in place" by a particular date.  Id.

[21] It is well-established that courts may consult dictionaries to aid in interpreting contractual, statutory, or other texts.  See Davis v. Shah, ---F.3d---, 2016 WL 1138768, at *12 (2d Cir. Mar. 24, 2016); Chesapeake Energy Corp. v. Bank of New York Mellon Trust Co., 773 F.3d 110, 116 (2d Cir. 2014).

by December 31, 2014, and penalties for late compliance are not
warranted.

The 2014 bond issuance legislation provides that the County
will fund the project up to an amount of almost $3 million in
the interim period between the passage of the legislation and
the issuance of the bonds.  The Government has not argued that
the amount authorized in the 2014 legislation was insufficient
to meet the benchmark's requirements.  The County already spent
almost half of the money addressed in the legislation when it
purchased the land for the project on January 29, 2016.[22]  There
is no suggestion in the record that the County is unable
immediately to fund the remaining portion of the commitment.
Indeed, at the May 23 conference, the County confirmed that it
could expend the money now without waiting for the bonds to be
issued or seeking other approvals from the BOL.  Its payment of
almost one half of the amount covered by the bond legislation
before those bonds have issued underscores how divorced the bond
issuance is from the actual funding decisions the County makes
in the interim regarding the Development.  The conditions
imposed on issuance of the bonds simply mean that the bonds

---

[22] As described at the May 23, conference, the County is expected
to provide an additional $1.65 million to finance construction
of necessary infrastructure for the Development, such as the
modifications to the Saw Mill Parkway off-ramp.  The County
plans to treat this like any other public works project and will
initiate a bidding process to hire contractors to perform this
work.

themselves will not be issued until the municipal and state approval processes for the Development are complete.  Since the County has a system in place for fulfilling its commitment to fund the project in the interim, it had financing in place when the November 2014 legislation was enacted.

The Government's arguments to the contrary are unavailing. The Government relies heavily on State v. Strong Oil Co., 433 N.Y.S.2d 345, 348 (N.Y. Sup. Ct. 1980), in claiming that the County's bond legislation does not take effect until the conditions it contemplates are satisfied.  This is true, according to the Government, because "while most laws are complete when passed, they sleep until the contingency contemplated sets them in motion."  Id. (citation omitted); cf. New York State Elec. & Gas Corp. v. FirstEnergy Corp., 766 F.3d 212, 221-22 (2d Cir. 2014) (discussing conditions precedent in contract law and noting that the occurrence of substantive conditions precedent is required before the parties have a duty to perform the contract).  Although it appears to be true that the County will not issue bonds until the project receives its variances and is ready for construction, this fact does not address the fundamental point that the bond issuance legislation puts a financing system in place for reimbursing the County for funds it has already expended in funding the Development.  The County has assured this Court that, with the passage of the 2014

legislation, the County will finance the project in the interim and reimburse itself from bonds issued later.

The Government also points to October 15, 2012 bond authorization legislation for the Waterwheel project, another development that is part of the Settlement.  That legislation does not contain the contingency regarding state and municipal variances.  Act No. 152-2012 § 1.  The Government then argues that the inclusion of the contingencies in the 2014 legislation must have real force because they were not present in the Waterwheel legislation.  But, as discussed above, even assuming that the contingencies in the 2014 Development legislation present real impediments to the ultimate issuance of the bonds contemplated in the legislation, those obstacles do not undermine the financing system set up by the 2014 legislation. The bonds are a reimbursement mechanism and will be issued after the County spends the funds contemplated by the legislation.[23] Finding that financing was in place by December 31, 2014 does not require the Court to ignore the variance contingencies or render them superfluous.

The Government's final argument is built upon a "main purpose" of the Settlement, to wit, the construction of the 750

---

[23] This interim financing provision was also included in the bond legislation for the Waterwheel development.  Act No. 152-2012 § 3.

affordable housing units.  It asserts that a narrow
interpretation of the benchmark undermines that overarching
goal.[24]  See 2015 Appeal Opinion, 802 F.3d at 431 ("[T]he consent
decree largely involves a promise to construct 750 new
affordable housing units and a series of promises peripheral to
that goal.").  Other provisions of the Settlement, however,
impose additional obligations on the County in connection with
its commitment to construct affordable housing.  The County is
required to work with municipalities and developers to advance
the approval processes and counter local opposition to
affordable housing developments.  It is to those commitments
that this Opinion turns next.

## II.  The County's Obligations Under ¶ 7(i)-(j)

     The Government's second objection to the Magistrate Opinion
involves ¶ 7(i)-(j) of the Settlement.  As both parties agree,
Magistrate Judge Gorenstein erred when he considered the
Government's application for contempt on the merits before first
considering and deciding whether the County had in fact breached
¶ 7(i) or (j).  The Government and the Monitor are correct that
the County in fact breached both subsections of ¶ 7.  First, the

---

[24] According to the Monitor, "[t]his goal is more effectively
achieved if the County only receives credit for financing that
has satisfied all preconditions" because "such a policy provides
an incentive for the County to work with municipalities,
developers and other stakeholders to ensure that legislative
preconditions are satisfied as efficiently as possible."

County failed to fulfill its affirmative duty in ¶ 7(i) to "use all available means as appropriate" to promote the development of the 750 new units.  Moreover, the Town's opposition to the Development triggered the County's duties under ¶ 7(j) to "use all available means as appropriate" to counter that opposition. The County has not satisfied its obligations to use all available means to address New Castle's opposition.  Indeed, the County continues to claim that the Town's resistance to the Development has not been sufficiently sustained even to trigger the duties listed in ¶ 7(j).

As described above, ¶ 7 generally requires the County to ensure the development of at least 750 new affordable housing units that AFFH and details some of the steps the County must take to advance that goal.  The two subsections of ¶ 7 that are at issue here each impose a duty upon the County to ensure the development of the 750 new affordable housing units.

In sum, Paragraph 7(i) requires that the County "shall <u>use all available means</u> as appropriate to achieve" the objectives set forth in ¶ 7, "including . . . developing financial or other incentives for other entities to take steps to promote" the objectives of ¶ 7."  (Emphasis added.)[25]  Somewhat similarly,

---

[25] Paragraph 7(i) further contemplates that the County will condition or withhold County funds on actions that promote the objectives of ¶ 7, and leverage County funds that it is expending pursuant to other provisions of the Settlement.

¶ 7(j) provides that, "[i]n the event that a municipality does not take actions needed to promote the objectives of [¶ 7], or undertakes actions that hinder the objectives of [¶ 7][,] . . . the County shall use all available means as appropriate to address such action or inaction."  (Emphasis added.)  These means include, but are not limited to, "pursuing legal action," and ¶ 7(j) specifically provides that the "County shall initiate such legal action as appropriate to accomplish the purpose of this" Settlement.

Thus, the duties in ¶ 7(i) and (j) are similar but contemplate different circumstances.[26]  The County always has a duty to "use all available means as appropriate" to achieve the development of 750 new units.  In other words, the County must be consistently diligent in pursuing the goals of the Settlement.  In addition to that required diligence, the Consent Decree has specific requirements for addressing municipal opposition to affordable housing developments.  The drafters of the Consent Decree evidently envisioned that such resistance was possible, and therefore made it explicit that, should such resistance arise, the County must again "use all available means

---

[26] The submissions considered in this Opinion have not always been vigilant about separating the County's ¶ 7(i) duties from its ¶ 7(j) duties.

as appropriate" to neutralize that resistance and advance the
goals of the Settlement.

### A.   Breach of ¶ 7(i)

Although Magistrate Judge Gorenstein did not reach the
question of breach, the Magistrate Opinion acknowledges that
"there were additional steps that the County could have taken
that were 'available' and 'appropriate'" beyond the limited
steps it did take to support the Development.  The steps the
County took to further the Development principally included:
purchasing land in 2016 for the Development, reviewing zoning
amendments, Drummond testifying briefly in favor of the project
before the State Board, requesting additional funding for the
project,[27] and writing letters in support of state variance
requests.[28]  The other steps that either the Monitor, the

---

[27] Examples of such a request for outside funding include a
January 2013 application to the New York State Department of
Homes and Community Renewal for funding under a low-income
housing credit program.

[28] It is worth noting two of these letters in particular, both of
which were addressed to Neil Mastropietro ("Mastropietro"),
Deputy Director of the MTA's Real Estate Department.  On May 21,
2014, the County wrote to Mastropietro requesting an easement
and a lease from the MTA to assist Conifer with the Development.
One year later, on May 11, 2015, the County wrote again to
request the same lease and easement, referencing its 2014
letter.  The fact that the County waited one year to follow up
on its request for a vital lease and easement indicates that it
was not using "all available means" to pursue approvals and
assist Conifer diligently.  There is no evidence in the record
of intervening efforts to advocate for Conifer on this
particular issue.

Government, or the Magistrate Judge have identified that were available and appropriate but not used by the County to further the Settlement include:

- using financial or other incentives to encourage the Town to embrace the Development (as explicitly listed in ¶ 7(i));
- providing funds for consultants, engineers, and other experts to assist the Town with its review of the plans for the Development;
- writing letters to stakeholders in support of Conifer's proposed development; and
- making public statements supportive of the Development, including appearing at Town Board meetings and testifying in Conifer's favor.

The County argues that it could not have taken the first two of these four steps.  It contends that it cannot use financial incentives to encourage the Town to complete the Development's approval processes because its Discretionary Funding Policy ("DFP") is only available when a municipality or its agent applies for funding related to the Settlement.  The County also urges that paying for experts or consultants would not constitute an "incentive" because doing so would "simply shift[] costs from the Town or Conifer to the County."

The record from the past four years demonstrates that the County has not used all available and appropriate means to ensure the development of the 28 units at Chappaqua Station. Although the County petitioned the Monitor in early 2012 to include the Development as part of the 750 ¶ 7 units, the County's support of the project has been inconsistent, slow, and

47

half-hearted.  It waited until late 2014 to authorize $2,925,000 for the Development.  It never provided any funds to Conifer or the Town to assist in the expenses associated with the building permit process, it did not purchase the land for the Development until early 2016, it did not attend and speak at Town Board meetings addressed to the Development even though Town officials had publicly opposed the Development since 2013,[29] and it has not developed any public outreach program to broaden support for the Development.

The County has not provided any persuasive reason that it was unable to provide resources to the Town or Conifer to further the goals of the Settlement, speed the project, and counteract the Town's obstruction.  Thus, wholly apart from the affirmative duties imposed by ¶ 7(j), the County has breached its obligations under ¶ 7(i) insofar as the 28 Chappaqua Station units are concerned.

**B.  Breach of ¶ 7(j)**

Magistrate Judge Gorenstein correctly held that New Castle's attempts to delay or hinder the Development triggered the County's ¶ 7(j) obligation to use "all available means" to address it.  To summarize briefly, New Castle officials have

---

[29] In their May 11 submission, County officials reveal that they attended the February 9 and March 29, 2016 Town Board meetings, both of which occurred after the Government asked this Court to require such attendance.  It does not appear that either spoke.

attempted to hinder the Development in at least the following ways: (1) Greenstein has repeatedly and publicly opposed the Development since becoming the Town Supervisor; (2) Maskiell indicated that he would delay the issuance of a building permit;[30] (3) Town Board members continue to oppose the current location of the Development; and (4) Town officials testified against the Development before the State Board.  This opposition continues to this day: as recently as February 9, the Town continued to implore Conifer to move the Development to a different site.  In its submission of May 17, 2016, the Town continues to advocate for the relocation of the Development, all the while acknowledging that a predecessor Town Board had approved the site for the Development.[31]  These actions are precisely the type of municipal opposition that the Consent Decree anticipated might occur and that impose upon the County the affirmative obligation to use "all available means as appropriate" to counteract such hostility.

---

[30] Despite Maskiell's statement in March 2015, the Town represents that it acted expeditiously to review Conifer's July 2015 application.  In its May 17, 2016 letter it promises "to work cooperatively with Conifer and other involved agencies" on the Development.

[31] In its submission, the Town also expresses its view that it has not in any way "hindered" the Development "for even a minute."  The Town blames Conifer for delays in submitting a complete building permit application, reiterates its safety concerns with the Development, and states that it does not generally oppose affordable housing within the municipality.

The County has not acknowledged to the Monitor, to the
Magistrate Judge, or to this Court the extent and nature of the
Town's opposition to the Development.  Moreover, it takes the
position that any opposition by the Town is inconsequential so
long as the County is able to meet the benchmarks in ¶ 23 of the
Consent Decree.  Because the County links the municipal
opposition trigger in ¶ 7(j) to the interim benchmarks in ¶ 23,
it argues that a municipality's actions cannot be said to
"hinder" the development of 750 affordable housing units unless
the County falls short of those benchmarks.

The County is correct to this extent.  Paragraph 7 requires
the County to take steps to ensure the development of the 750
housing units, within seven years, that meet the requirements of
the Consent Decree.  To the extent the County is relying on the
Development to meet that metric, ¶ 7(j) imposes on it the duty
to respond appropriately, with all available means, to the
Town's opposition to the Development.  In other words, a
municipality may express general opposition to affordable
housing without triggering the duties in ¶ 7(j).[32]  When a town
opposes a development on which the County is relying to achieve
the requirement that it develop 750 new units within seven years

---

[32] This Opinion is not the occasion to address whether municipal
opposition to the affordable housing goals of the Consent Decree
implicates other duties that the County agreed to assume when it
executed the Decree.

or to meet its interim benchmarks, however, ¶ 7(j) imposes obligations on the County.

Specifically, ¶ (7)(j) triggers the County's obligation to "use all available means" either when a County "undertakes actions that hinder the objectives" of the Settlement or when a municipality "does not take actions needed to promote" the development of new units.  Webster's online dictionary defines "hinder" as "to make slow or difficult the progress of," "to hold back," or "to delay, impede, or prevent action."  The online Oxford English Dictionary provides additional definitions, which include "delay, impede, deter, or obstruct." The term "hinder" thus does not mean that the municipality must successfully achieve its goal of blocking an affordable housing development to be said to have "hindered" the objectives of the Settlement.  Moreover, municipal inaction in the form of failing to "take actions needed to promote" a development can trigger the County's duty to act when those behaviors interfere with the objectives embodied in ¶ 7.

In 2012, the County obtained the Monitor's approval to include the 28 units in the Development among ¶ 7's 750 units. Since 2013, New Castle's opposition to the Development has been continuous and multi-faceted, and, as discussed below, unless New Castle issues a building permit this year for the Development, it appears that the County may not meet its ¶ 23

51

interim benchmark of obtaining building permits for 750 units in 2016.  The County's refusal to confront the Town's opposition to the Development not only breaches its duties in ¶ 7(j), but also risks breaching its duties in ¶ 23.  The very purpose of the affirmative duties embodied in ¶ 7(j) is to ensure the development of at least 750 new affordable housing units and to prevent the County from falling behind on its interim benchmarks by requiring it to act proactively in the face of municipal opposition to affordable housing units.

### III. Chappaqua's December 29, 2015 Site Remediation Permit and the 2016 Benchmark

As just described, the County contends that it has no duty to confront municipal resistance to the development of the 750 units so long as the interim benchmarks in ¶ 23 are met.  The County asserts that the grading permit the Town issued for the Development in December 2015 qualifies as a "building permit" for purposes of ¶ 23, and therefore that the 28 units count towards the 2016 building permit benchmark.[33]  For the following reasons, the County is in error.

---

[33] As already discussed, the County is also in error about the scope of the duties imposed under ¶ 7(j).  Those duties relate not only to achieving the interim benchmarks but also to ensuring the development more generally of at least 750 new affordable housing units within seven years of the issuance of the Consent Decree.

The permit at issue is titled a "Building-Fill/Grading Permit."  It allows the developer to perform "site remediation and preparation" and provides that "approval of erosion controls [is] required prior to commencing work."  This is the first in a series of at least four permits that Conifer must receive from the Town to complete construction of the Development.[34]  The remaining three permits that Conifer identified in its November 20, 2015 letter to the Town were permits for foundation and utility work, the building shell, and fire suppression.  In its May 11, 2016 submission, the County estimates that the first two of these three remaining permits will be issued by the Town "shortly after" the end of July, if all proceeds smoothly.  It explains that the fire suppression permit is not needed until well into the construction process.

The parties agree that the Settlement does not define the term "building permit."  Like other provisions of the Consent Decree, the term "building permit" must be interpreted according to its ordinary meaning, in light of the overall purpose of the

---

[34] On April 26, 2016, the Court ordered the County, the Government, the Monitor, and the Town (if it wished) to provide written submissions addressing several issues related to the building permit process.  Those issues included the remaining steps that must be completed before Conifer will receive the remaining building permits.  The facts recited herein come from the parties' briefs, those submissions, and the evidence presented at the May 23 hearing on the status of the Development's building permit application.

Settlement.  2013 Appeal Opinion, 712 F.3d at 767.  The purpose
of the interim benchmarks in ¶ 23 is "[t]o ensure the
satisfaction of the goals set forth in paragraph 7."  The goal
of ¶ 7 is to "ensure the development of at least" 750 new
affordable housing units that AFFH and that may timely be
occupied, as described further in that paragraph.  Indeed, the
¶ 23 benchmark does not refer to units with at least one of
several required building permits, it refers instead to "units
with building permits."  Thus, there is no indication in the
Consent Decree that an initial site remediation permit, which
does not allow Conifer to begin building the structure, would
satisfy the benchmark.  The building permit benchmark in ¶ 23
therefore refers to a permit that allows the actual construction
of housing units that meet the ¶ 7 requirements.

     This definition finds support in the industry definition of
"building permit" as well as other dictionaries.  At least one
construction-specific dictionary defines a "building permit" as
"[a] written authorization to an applicant (usually a builder)
for a specific project allowing him to proceed with
construction; granted by the municipal agency having
jurisdiction after plans have been filed and reviewed
favorably."  Dictionary of Architecture and Construction 148

(Cyril M. Harris ed., 4th ed. 2006).[35]  "Construction" in turn is

defined in several ways:

> (1)  "All the on-site work done in building or
> altering structures, from land clearance through
> completion, including excavation, erection, and
> the assembly and installation of components and
> equipment";
> (2)  "A structure"; or
> (3)  "The manner in which something is built."

Id. at 249.  Other industry-specific dictionaries define

"construction" as "[p]utting together and assembling of

materials in order to erect or build a structure" or equipment

for "alterations, enlargements, additions, moving, conversion,

razing, or demolition of buildings or structures."  Construction

Glossary at 34, 805.  The online Oxford English Dictionary

defines "construction" as the "action of framing, devising, or

forming, by putting together of parts; erection, building."

These definitions, taken together, reveal that "construction" is

a broad term that may encompass a number of activities related

to the task of erecting or altering a structure.

Accordingly, and as the County's Director of Urban Design

explains, there may be a series of separate permits for

different stages of work, allowing a developer to proceed with

---

[35] Other texts contain similar definitions, such as: "Permit
issued by appropriate governmental authority, usually paid for
by the contractor, allowing construction of a project in
accordance with approved drawings, specifications, and special
stipulation, if any, to proceed with construction in the field."
Construction Glossary: An Encyclopedic Reference and Manual 791
(J. Stewart Stein ed., 2d ed. 1993) ("Construction Glossary").

early stage site preparation and construction before the late-stage engineering plans are finalized.  But, whatever the complexity of the construction project may be, and the number of separate permits that are entailed in completing the project, a preparatory stage permit, such as a site remediation permit, cannot qualify as the building permit described in ¶ 23.

This reading of the term "building permit" in the Consent Decree also finds support in the provisions of the Town Code to which the parties have referred the Court.  Section 60-510(A) of the Town Code, which is entitled "Building Permits," provides that: "No building or structure shall be erected, constructed, enlarged, altered or moved or clearance or excavation made therefor or work begun thereon, until a permit therefor has been issued by the Building Inspector in accordance with . . . Chapter 48 of the [Town Code]."  Town Code § 48-12(A) provides in turn that a "building permit shall be required for any work . . . including, but not limited to, the construction, enlargement, alteration, improvement, removal, relocation or demolition of any building or structure or any portion thereof, and the installation of a building system, solid fuel burning heating appliance, chimney or flue."  Section 48-12(D) of the Town Code also provides that "[t]here shall be no clearance or excavation made . . . until a _permit_ therefor has been issued by the Building Inspector."  (Emphasis added.)  Although the

Building Inspector is responsible for issuing § 48-12(D) permits for "clearance or excavation," the Town Code refers to such approvals simply as "permits" rather than "building permits." Thus, to the extent that the Town Code provides any guidance on the matter, it suggests that excavation permits are not "building permits," or are at least in a different category of permit from building permits that cover the erection and construction of buildings, as described in § 48-12(A).

In addition to the Town Code provisions, the County relies on several letters to support its position that the Town's December 2015 site remediation permit qualifies as a ¶ 23 building permit.  For example, in his November 4, 2015 letter, Maskiell suggested to Conifer the "possibility of issuing a Building Permit that would be limited to performing environmental remediation on the project site."  In Maskiell's words, that permit would also be "limited to excavation and filling."  Additionally, Zaino summarized the building permit process in his May 11 affidavit.  Specifically, he stated that it is "standard practice for building permits from local municipalities in Westchester . . . to be issued in seriatim, beginning with permits granting the authority to perform preparatory site work."  This gradual permitting procedure combined with the fact that Maskiell referred to the site remediation permit as a "building permit" indicate, according to

the County, that the permit should satisfy the "building permit"
benchmark in ¶ 23.[36]

Even if it were appropriate to look at the Town's usage of
the term when defining "building permit," as it is used in ¶ 23
of the Settlement, the weight of the evidence is against the
County.  Repeatedly, the Town assured opponents of the
Development that it had not yet issued a building permit.
During meetings that took place on February 9 and March 29, 2016
-- after the issuance of the site remediation permit -- Town
officials and an attorney for Conifer both specified that
Conifer has not yet received a "building permit."  In those
meetings, members of the Town Board used the term "building
permit" in accordance with its ordinary, common meaning -- a
permit to construct or modify a building.

The goal of the Settlement is to construct 750 affordable
housing units where individuals and their families can
eventually reside.  This goal cannot be satisfied by obtaining a
site remediation permit and claiming that it is a "building

---

[36] The County also cites a HUD document that sets deadlines
around the "last building permit" issued.  <u>Fair Housing
Accessibility Guidelines</u>, U.S. Dep't of Hous. & Urb. Dev.,
http://portal.hud.gov/hudportal/HUD?src=/program_offices/fair_ho
using_equal_opp/disabilities/fhguidelines/fhefha1 (last visited
May 17, 2016).  This citation reveals only that HUD understands
that there may be multiple building permits issued for a
particular site.  It does not answer the question of how a
"building permit" should be interpreted under the Settlement
when that term is used for an interim benchmark.

permit" even though it does not authorize construction.  Of course, the County may still satisfy its 2016 interim benchmarks through other housing developments or by including the Chappaqua Development if the building permit process advances, as it predicts, during this calendar year.

## IV. Remedies

Having found that the County breached ¶ 7(i)-(j) of the Settlement, the scope and timing of relief for those breaches remains to be decided.  Recent statements by the County and the Town are particularly helpful in this regard.

The Court's April 26 Order required the County to identify the steps it plans to take to address the Town's opposition to the Development.  In its May 11 submission, the County acknowledges that the Town Board has objected to the Development, but contends that the Town now recognizes that the Development "is going to proceed."  The County points to the Town Board's unanimous approval of modifications to Conifer's Special Permit at the February 9 and March 29 meetings as evidence of the Town's willingness to go forward with necessary approvals despite its opposition.  The County is unaware of any outstanding variances that Conifer needs in order to obtain its remaining permits from the Town for the Development.  The Town's May 17 submission adopts the same tone.  It represents that its staff has and will continue to work cooperatively with Conifer

and others on the Development and that there is no need to impose remedies to address the Town's opposition.

Considering the entire record in these proceedings, as well as the most recent submissions for the County and the Town and the representations made at the May 23 conference, decision is reserved concerning the scope of any relief for the County's violations of ¶ 7(i)-(j).  The Government or Monitor may renew requests for relief no later than September 2016 if either conclude that it would be appropriate to do so.

Meanwhile, so long as the Town's approval process for the Development remains pending, the County shall take several steps to keep the Court, the Government, and the Monitor informed of its progress.  At the May 23 conference, the County indicated that it does not object to making periodic reports about the approval process for the Development.  Accordingly, the County shall be required to do the following:

- Meet with the Monitor every 30 days regarding the Development and provide the Monitor with all the information he requests regarding the Development in advance of those meetings;
- Discuss with the Town of New Castle at least once per month the status of the building permit approval process and any municipal variance approvals;
- Attend all public hearings, if any, in connection with the Development; and
- Write to the Court on July 5, August 1, and September 1, 2016, with copies to the Monitor and the Government, to update its May 11 projections regarding the Development, including its estimates of the dates on which the foundation and shell permits will be issued, and an

explanation of the steps or approvals that remain before they may be issued.

### Conclusion

The November 19, 2015 Report and Recommendation is affirmed in part.  The County timely met its obligation to have financing in place for 450 new affordable housing units by December 31, 2014.  The County has breached ¶ 7(i)-(j) of the Consent Decree, however, by failing to use all available means as appropriate to advance the construction of 750 affordable housing units and to counter New Castle's opposition to the Chappaqua Station Development.  The December 29, 2015 site remediation permit that the Town issued to Conifer is not a "building permit" within the meaning of ¶ 23 of the Consent Decree.  Decision is reserved on the Government's application for contempt and the imposition of other remedies for the breach of ¶ 7(i)-(j).  The County is required to take four actions to keep itself, the Court, and all parties informed of the status of the approval process for the Development.

Dated:    New York, New York
          May 24, 2016

_____
              DENISE COTE
       United States District Judge