```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------X
UNITED STATES OF AMERICA ex rel. ANTI-   :
DISCRIMINATION CENTER OF METRO NEW        :
YORK, INC.,                                :
                         Plaintiff,        :      06 Civ. 2860 (DLC)
                                           :
            -v-                            :      OPINION AND ORDER
                                           :
WESTCHESTER COUNTY, NEW YORK,              :
                         Defendant.        :
----------------------------------------X
```

APPEARANCES:

For the U.S. Government:

David J. Kennedy
United States Attorney's Office
86 Chambers Street
New York, NY 10007

For Westchester County, New York:

Robert F. Meehan
Westchester County Attorney's Office
138 Martine Avenue, 6th Floor
White Plains, NY 10601

DENISE COTE, District Judge:

This dispute arises from a report of James E. Johnson ("Monitor") of March 17, 2016 ("Report").  That Report found that Westchester County, New York ("County") has violated ¶ 33(c) of the August 10, 2009 Consent Decree ("Consent Decree" or "Settlement") between the County and the United States Department of Justice ("DOJ" or "Government").  The Monitor attached to the Report transcripts of depositions of several County witnesses that were taken in 2015.  The Government and

the Monitor seek to make the videotapes of those depositions publicly available, and the County opposes their doing so.  As described below, the County has breached ¶ 33(c) of the Settlement.  The Government and the Monitor's application to release the videotapes of the depositions to the public is granted.  The County's application for a stay of this Order pending appeal is also granted.

## Background

The procedural history giving rise to this dispute has been described in several previous opinions issued by this Court and the Second Circuit Court of Appeals.  See, e.g., United States ex rel. Anti-Discrimination Ctr. of Metro N.Y., Inc. v. Westchester Cnty., 495 F. Supp. 2d 375 (S.D.N.Y. 2007) (denying motion to dismiss False Claims Act lawsuit against the County); United States ex rel. Anti-Discrimination Ctr. of Metro N.Y., Inc. v. Westchester Cnty., 668 F. Supp. 2d 548 (S.D.N.Y. 2009) ("2009 Opinion") (finding that County's Certifications to obtain CPD Funds were false but reserving on County's scienter); U.S. ex rel. Anti-Discrimination Ctr. of Metro New York, Inc. v. Westchester Cnty., N.Y., No. 06cv2860 (DLC), 2012 WL 1574819 (S.D.N.Y. May 3, 2012) (adopting Monitor's conclusions in part and Magistrate Judge's opinions in part); United States ex rel. Anti-Discrimination Ctr. of Metro N.Y., Inc. v. Westchester Cnty., 712 F.3d 761 (2d Cir. 2013) ("2013 Appeal Opinion")

(affirming holding that the County had breached promotion requirement); Cnty. of Westchester v. U.S. Dep't of Hous. & Urban Dev., No. 13cv2741 (DLC), 2013 WL 4400843 (S.D.N.Y. Aug. 14, 2013) (dismissing APA claims for lack of jurisdiction and statutory claim for pleading deficiency); Westchester v. U.S. Dep't of Hous. & Urban Dev., 778 F.3d 412 (2d Cir. 2015) (vacating in part 2013 Opinion and remanding on issue of jurisdiction); Cty. of Westchester v. U.S. Dep't of Hous. & Urban Dev., 116 F. Supp. 3d 251 (S.D.N.Y. 2015) ("2015 Opinion") (holding that HUD's administration of grant programs at issue was lawful); Cty. of Westchester v. U.S. Dep't of Hous. & Urban Dev., 802 F.3d 413, 418 (2d Cir. 2015) ("2015 Appeal Opinion") (affirming this Court's finding that HUD did not violate federal administrative law); United States ex rel. Anti-Discrimination Ctr. of Metro New York, Inc. v. Westchester Cty., No. 06cv2860 (DLC), 2016 WL 3004662 (S.D.N.Y. May 24, 2016) ("2016 Opinion") (finding principally that the County met its 2014 "financing in place" benchmark and that the County breached ¶ 7(i)-(j) of the Settlement).  The Court assumes familiarity with those Opinions. Only the facts necessary to resolve the present dispute are described below.

**A. False Claims Act Litigation and the 2009 Consent Decree**

This litigation began in 2006 when the Anti-Discrimination Center of Metro New York, Inc. ("ADC") sued the County as a qui

tam relator under the False Claims Act ("FCA"), 31 U.S.C. § 3729 et seq. ADC claimed that the County received more than $52 million from the federal government for housing and community development after falsely certifying that it affirmatively furthered fair housing ("AFFH"). In the 2009 Opinion, the Court ruled that the County's certifications to HUD were false as a matter of law. 668 F. Supp. 2d at 571. The Government intervened after the 2009 Opinion was issued but before the remaining issues in the case were tried, and the County entered into a Consent Decree with the United States Department of Housing and Urban Development ("HUD") on August 10, 2009.

The Consent Decree consists of thirty-eight pages. In executing the Settlement, the County assumed many obligations. The County is required to spend approximately $51,600,000 as a remedy for violating the False Claims Act. As described in detail in the 2016 Opinion, the Consent Decree also requires the County to ensure the development of 750 new affordable housing units. Settlement ¶¶ 7, 23. Paragraph 7 makes it clear that the 750 new units are meant both to increase access to affordable housing and to improve racial diversity in the County. To that end, ¶ 7 requires that the units meet certain locational criteria. For example, ¶ 7(a)(i) requires that 630 units be in municipalities that have a "single race African-American only" population of less than 3% and a Hispanic

4

population of less than 7%.  See 2016 Opinion, 2016 WL 3004662,
at *2.  Thus, most of the affordable units must be developed in
areas with populations that are overwhelmingly white, signifying
that a key goal of the Settlement is to increase the County's
racial diversity.[1]  The Consent Decree further provides that a
Monitor be appointed to ensure the County's compliance with its
terms.  Settlement ¶¶ 9-10.

Three other provisions of the Settlement are particularly
pertinent to the current dispute.  The Consent Decree requires
that the County submit to HUD an acceptable analysis of
impediments to fair housing choice ("AI").  Paragraph 32 of the
Settlement provides that the "County shall complete, within one
hundred twenty (120) calendar days of the entry of this [Consent

---

[1] Indeed, ¶ 22(f) further provides that, in crafting its
implementation plan for the Consent Decree, the County was
required to "[a]ssess the means by which the County can maximize
the development of [AFFH] units in the eligible municipalities
. . . with the lowest concentrations of African American and
Hispanic residents."  The County's responsibility to prioritize
developing affordable housing in overwhelmingly white areas,
thus reducing racial segregation, is clear from multiple
provisions throughout the entire Settlement.  See, e.g.,
Settlement ¶ 25(a)(ii) (requiring a model zoning ordinance to
contain "standards for affirmative marketing of new housing
developments to ensure outreach to racially and ethnically
diverse households"); ¶ 28(a)-(b) (requiring the County to
include, in its quarterly report, "the racial and ethnic
demographic information of the municipality" where AFFH units
are being developed and "racial and ethnic demographic
information of the occupants of the [AFFH] units"); ¶ 31(a)
(requiring the County to adopt a policy statement providing that
"the elimination of discrimination," including "de facto
residential segregation are official goals of the County's
housing policies and programs").

Decree], an AI within its jurisdiction that complies with the guidance in HUD's Fair Housing Planning Guide."  Further, the "AI must be deemed acceptable by HUD.  The County shall take all actions identified in the AI."  Settlement ¶ 32.  The County was required to include the following in the AI:

(1)   A commitment "to collecting data and undertaking other actions necessary to facilitate the implementation of this [Consent Decree]" (¶ 32(a));
(2)   Identify and analyze, <u>inter alia</u>:
   a. "the impediments to fair housing within its jurisdiction, including impediments based on race or municipal resistance to the development of affordable housing" (¶ 32(b)(i));
   b. "the appropriate actions the County will take to address and overcome the effects of those impediments" (¶ 32(b)(ii)); and
   c. "the potential need for mobility counseling, and the steps the County will take to provide such counseling as needed." (32(b)(iii)).

Second, ¶ 33 of the Settlement requires the County to undertake a series of specific activities addressed to public opinion about affordable housing and racial diversity as well as marketing of affordable housing units.  Specifically, ¶ 33(c) of the Settlement provides that:

As part of its additional obligations to AFFH, the County also shall . . . (c) create and fund campaigns to broaden support for fair housing and to promote the fair and equitable distribution of affordable housing in all communities, including public outreach specifically addressing the benefits of mixed-income housing and racially and ethnically integrated communities.

Paragraph 33(h) provides that the County must "pay for consultants and public education, outreach, and advertising to

AFFH, as described in this paragraph, out of County resources and [Community Development Block Grant ("CDBG")] funds over five years . . . in an amount not less than [$400,000]."[2]

Third, there are provisions of the Consent Decree that require the County to take legal action against municipalities under certain circumstances.  As discussed in detail in the 2016 Opinion, 2016 WL 3004662, at *3, *16-*18, ¶ 7(j) of the Consent Decree imposes on the County certain obligations that are triggered by municipal inaction or resistance to developing new affordable housing units that are part of the 750-unit requirement.  In circumstances where a municipality "does not take actions needed to promote the objectives of this paragraph, or undertakes actions that hinder the objectives of this paragraph, the County shall use all available means as appropriate to address such action or inaction."  This may include "pursuing legal action."  Paragraph 7(j) also provides that the "County shall initiate such legal action as appropriate to accomplish the purpose of this [Settlement] to AFFH."[3]

---

[2] The CDBG program was established pursuant to 42 U.S.C. §§ 5301-5321.  The primary objective of the CDBG program is to provide high-quality housing to people of low and moderate incomes. CDBG applicants must certify that the grantee will use the money to AFFH.  See 2015 Opinion, 116 F. Supp. 3d at 257.

[3] In context, the phrase "such legal action" appears to refer back to specific "legal action" addressed to municipal resistance to building the 750 units, the development of which is governed by ¶ 7.  The subparagraphs of ¶ 7 explicitly

Similarly, ¶ 15 of the Settlement governs the Monitor's biennial assessments of the County's compliance with the Settlement.  In making these assessments, the "Monitor may consider any information appropriate to determine whether the County has taken all possible actions to meet its obligations . . . including, but not limited to, . . . if necessary, taking legal action."[4]

It has been nearly seven years since the County agreed to submit an acceptable AI to HUD, and it failed to fulfill this obligation.  The 2011, 2013, and 2015 litigation surrounding the County's series of attempts to submit an acceptable AI is chronicled in detail in the 2015 Appeal Opinion, 802 F.3d at 420-27.  For the purposes of this Opinion, it is sufficient to emphasize that the County failed to comply with HUD's requirements for a successful AI, in part by relying on "inaccurate data, conduct[ing] flawed analysis concerning whether zoning laws within the County were exclusionary, and fail[ing] to propose strategies for overcoming exclusionary zoning laws in certain municipalities."  Id. at 425.  As a

---

describe "the terms and conditions" under which the County is to "ensure the development of" the 750 new units.

[4] In the sixth Whereas Clause of the Settlement, the County also generally "agree[s] and acknowledge[s] that . . . it is appropriate for the County to take legal action to compel compliance if municipalities hinder or impede the County in its performance" of its duties, "including the furtherance of the terms of this [Consent Decree]."

result, the County has already lost access to approximately $25 million in funding from various federal programs, including CDBG funds.

### B. 2011-2014: Public Statements by County Officials About Local Zoning and HUD

The Report provides a detailed account of certain public statements made by County Executive Robert Astorino ("Astorino") concerning HUD, the AI, zoning, and the Settlement.  Those statements are summarized here, as they were without objection during the May 23, 2016 conference.  In general, the Monitor's view is that Astorino misrepresented the duties imposed on the County by the Consent Decree, thereby undermining the Decree and breaching its terms.  Those alleged misrepresentations fall into three main categories.

The principal statements at issue in the first category involve Astorino's repeated claims that HUD and the Monitor want to require the County to construct 10,768 affordable housing units, well above the 750-unit obligation in ¶ 7 of the Settlement.  The second category of statements involves Astorino's assertion that the true cost of the Settlement is somewhere between $700 million and $1 billion, when the Consent Decree in fact provides that the County spend only a fraction of that amount in furtherance of the Settlement.  The third type of statement involves Astorino's claim that HUD is attempting to

force the County to sue each municipality to dismantle local
zoning and build high rises.  Specifically, on several occasions
Astorino claimed that HUD seeks to control local communities by
eliminating all restrictions on "height, size, acreage, density,
number of bedrooms, and lack of water or sewers."  Astorino
claimed that, by insisting on an acceptable AI that analyzed
zoning, HUD planned to infringe on the "fundamental right of our
cities, towns, and villages to plan and zone for themselves."
As described above, the Settlement in fact does not require the
County to sue each municipality, or to dismantle municipal
zoning laws in order to construct high rise residential
buildings.  See 2015 Appeal Opinion, 802 F.3d at 433-34.

**C. 2014: Depositions of County Officials Compelled**

On March 17, 2014, the Monitor sent a request for
information ("RFI") to the County.  That RFI requested
information regarding the County's compliance with ¶ 33(c).  In
response, the County produced certain documents.  On June 26,
2014, the Monitor moved to compel certain County officials to
submit to depositions pursuant to ¶¶ 13(g) and 58 of the
Settlement.  The County opposed the motion on July 14, and it
became fully submitted on July 22.  At a conference on July 24,
2014, the Court granted the Monitor's motion to compel sworn
depositions of County witnesses.  At that conference, the Court
ordered that the depositions be videotaped.  Those videotapes

would remain confidential unless the Court granted an application for their release after providing the parties with an opportunity to be heard.  The Monitor took depositions from four County officials in 2015.  Those depositions concerned the public statements described above as well as the County's efforts to create a public education campaign concerning affordable housing as required by ¶ 33(c) of the Settlement.

### D. 2015: One Community Campaign

The County launched the One Community Campaign ("Campaign") in the fall of 2015, approximately six years after the County assumed the responsibility in ¶ 33(c) to create and fund campaigns to broaden support for fair housing, among other goals.  It is the County's only developed attempt to date to create and implement such a campaign.[5]

The Campaign consists of a website.  The website contains (1) a "letter of introduction from the County Executive that highlights the themes of the campaign, including the benefits of diversity and fair housing;" and (2) "links to various web-based resources for, among other things, understanding the importance

---

[5] In 2012, the County attempted to implement a Fair Housing Poster Initiative.  That attempt was abandoned after focus groups strongly disapproved of the proposed posters.  The Monitor and the County disagree about whether this campaign was directed at satisfying ¶ 33(c) or some other provision of the Settlement; however, there is no dispute that the poster campaign was abandoned and the County used posters generated by HUD and the National Fair Housing Alliance instead.

of fair and affordable housing and diversity."  The Campaign is,
according to the Monitor, the County's first public education
campaign that specifically mentions the benefits of diversity.
The Campaign's website contains resources for the public related
to affordable housing and lists some of the benefits of
"affordable, mixed-income housing and racially and ethnically
diverse neighborhoods."  There is also an "affordable housing
gallery" that contains images of affordable housing units to
show that they "look no different from market-rate housing and
fit right into their neighborhoods."

The Campaign is also advertised through posters in bus
shelters, placards on buses, and two large posters at the
Westchester County Airport.  The Campaign apparently did not
involve any public events with County officials or other
leaders, press releases highlighting its message, or appearances
by distinguished visitors that would attract public notice.

### E. 2016: Monitor's Report on Compliance with ¶ 33(c)

The Report argues that the County has breached ¶ 33(c) in
two principal ways.  The first is that the County failed to
launch a public education campaign prior to the Campaign, and
that the Campaign itself is insufficient to satisfy ¶ 33(c).
The Monitor's second argument is that, by making negative and at
times misleading public statements about the Consent Decree, the
County violated its duty to educate the public accurately about

the benefits of affordable housing.  Specifically, the Monitor

argues that "[a]ny reasonable effort to discharge [¶ 33(c)

duties] includes the obligation to speak accurately about the

terms and implications of the Settlement."  The Monitor contends

that the County essentially campaigned against implementing key

provisions of the Consent Decree by making negative public

statements in the press, at local government gatherings, and

elsewhere.  In sum, according to the Monitor, "the County cannot

claim to have discharged its duty to educate the public about

the benefits of integration and fair housing while repeatedly

disseminating false and misleading information about efforts to

achieve those very goals."

The Report contains several requests for relief.[6]  The

Monitor's request to make the videotapes of the depositions

---

[6] The Monitor's requested remedies also include: (1) a Court
declaration emphasizing the essential terms of the Settlement
and findings making clear that none of those terms have changed,
thereby rendering Astorino's statements false; (2) a Court order
requiring the County to distribute the declaration to leaders in
the eligible communities; (3) the County posting the declaration
prominently on its website; and (4) hiring a consultant to craft
a message and implement a campaign strategy that complies with
¶ 33(c).  On May 23, the Court ordered the County to retain a
public relations consultant and work with the Monitor and the
Government to craft a public information campaign that satisfies
the County's obligations under ¶ 33(c).  The County did not
object to this solution.  It notified the Court on June 10 that
it has retained the firm of Thompson & Bender to assist in
improving the One Community Campaign.  The County's submission
to the Court about its plan for improving the One Community
Campaign is now due on July 1.  The Court declines to decide

publicly available is being litigated here.  In its May 9
submission concerning the Report, the County requested that the
videotapes remain confidential.  On May 23, the Court gave the
County an opportunity to designate specific passages in the
videotapes that it believed should be redacted because of their
sensitivity.  On June 13, the County responded but did not
designate passages that it deemed particularly sensitive.
Instead, it argued again that the videotapes should remain
sealed in their entirety.[7]  Also on June 13, the Monitor and the
Government filed letters in support of disclosing the videotapes
to the public.

## Discussion

"Consent decrees reflect a contract between the parties (as
well as a judicial pronouncement), and ordinary rules of
contract interpretation are generally applicable."  2013 Appeal
Opinion, 712 F.3d at 767 (citation omitted).  "This requires
that deference be paid to the plain meaning of the language of a
decree and the normal usage of the terms selected."  Id.
(citation omitted).  Relevant provisions of the Consent Decree
must not be considered "in isolation," but rather "in the light

---

whether the Monitor's other requests for relief are appropriate
at this time.

[7] Technically the videotapes are not currently "sealed" because
they have never been submitted to the Court.  This term is used
here as the parties use it -- to refer to the County's request
to keep the videotapes inaccessible to the public.

of the obligation as a whole and the intention of the parties manifested thereby." Id. (citation omitted).

The Court also "has inherent power to enforce consent judgments, beyond the remedial 'contractual' terms agreed upon by the parties." E.E.O.C. v. Local 580, Int'l Ass'n of Bridge, Structural & Ornamental Ironworkers, Joint Apprentice-Journeyman Educ. Fund, 925 F.2d 588, 593 (2d Cir. 1991); see NLRB v. Local 3, Int'l Bhd. of Elec. Workers, 471 F.3d 399, 406 (2d Cir. 2006). In other words, consent decrees "are construed largely as contracts, but are enforced as orders." Berger v. Heckler, 771 F.2d 1556, 1568 (2d Cir. 1985).

This is so because, "[u]nlike a private agreement, a consent judgment contemplates judicial interests apart from those of the litigants." Local 580, 925 F.2d at 593. Indeed, "[u]ntil parties to such an instrument have fulfilled their express obligations, the court has continuing authority and discretion -- pursuant to its independent, juridical interests -- to ensure compliance." Id. To ensure such compliance, a court may use its broad discretionary power to fashion equitable remedies "even absent a finding of contempt." Berger, 771 F.2d at 1569. Therefore, a court's interest "in protecting the integrity of a consent decree justifies any reasonable action taken by the court to secure compliance." CBS Broad. Inc. v. FilmOn.com, Inc., 814 F.3d 91, 101 (2d Cir. 2016) (citation

15

omitted).  This "inherent power to enforce a consent judgment extends beyond the remedial contractual terms agreed upon by the parties." Id. (citation omitted).  Ultimately, "though a court cannot randomly expand or contract the terms agreed upon in a consent decree, judicial discretion in flexing its supervisory and enforcement muscles is broad." 2013 Appeal Opinion, 712 F.3d at 767 (citation omitted); King v. Allied Vision, Ltd., 65 F.3d 1051, 1058 (2d Cir. 1995) (finding that a "district court has broad equitable discretion to enforce the obligations of the decree").  These powers must be exercised in light of the general principle that a court may not supplement the terms of the Consent Decree. E.g., Pandora Media, Inc. v. Am. Soc. of Composers, Authors & Publishers, 785 F.3d 73, 77 (2d Cir. 2015) ("A court may not replace the terms of a consent decree with its own." (citation omitted)).

## I.   Breach of ¶ 33(c)

The County has breached ¶ 33(c) by failing timely to create, fund, and implement adequate public information "campaigns" to "broaden support for fair housing and to promote the fair and equitable distribution of affordable housing in all communities, including public outreach specifically addressing the benefits of mixed-income housing and racially and ethnically integrated communities."  The evidence of this breach is compelling and largely uncontested.

The only program crafted by the County that might qualify as any of the "campaigns" described in ¶ 33(c) is the Campaign it launched in 2015.  This was the County's first meaningful attempt to fulfill its ¶ 33(c) obligation to "create and fund campaigns" addressed to the issues described in that paragraph.  The Report identifies several specific failings in the Campaign: it did not include public events with County leaders, press releases, or other attempts to attract public attention.[8]  The Campaign essentially involves a dedicated section of the County's website and some posters in bus shelters and the Westchester County Airport.

Moreover, the County's delay in designing and launching the Campaign breached ¶ 33(c), although the Consent Decree does not prescribe a particular time within which the County must implement such campaigns.  "Where a contract does not specify a date or time for performance, New York law implies a reasonable time period."  <u>Guilbert v. Gardner</u>, 480 F.3d 140, 149 (2d Cir.

---

[8] The Campaign compares unfavorably with other public engagement campaigns created and conducted by the County that are unrelated to the Settlement, including Safer Communities and the Westchester Smart campaigns.  Safer Communities is a public safety campaign that was launched in February 2013 in response to the mass shooting at Sandy Hook Elementary School in Newtown, Connecticut.  The County launched Westchester Smart in January 2015, and it is an economic development campaign that included five specific initiatives and goals.  Both of these more robust campaigns involved coordinated efforts including press releases, reports, celebrity appearances, and symposia.  The Monitor suggests that the Campaign concerning affordable housing should include at least some of these elements to satisfy ¶ 33(c).

2007).  "What constitutes a reasonable time for performance depends upon the facts and circumstances of the particular case."  <u>Savasta v. 470 Newport Associates</u>, 82 N.Y.2d 763, 765 (1993); <u>see</u> <u>Baisch, Inc. v. Pike Co.</u>, 959 N.Y.S.2d 786, 787 (4th Dep't 2013) (same).  "Included within a court's determination of reasonableness are the nature and object of the contract, the previous conduct of the parties, the presence or absence of good faith, the experience of the parties and the possibility of prejudice or hardship to either one," among other factors.  <u>Zev v. Merman</u>, 73 N.Y.2d 781, 783 (1988); <u>see</u> <u>184 Joralemon, LLC v. Brooklyn Heights Condos, LLC</u>, 985 N.Y.S.2d 588, 591 (2d Dep't 2014) (same).

A reasonable time for performance of the County's ¶ 33(c) duties has lapsed.  The County has not been diligent in pursuing its affirmative obligations under ¶ 33(c).  The purposes of the Consent Decree are manifold, and include in ¶ 33 a detailed list of the County's obligations directed to public education, advertisement, marketing, and promotion of source-of-income legislation.  Paragraph 33 as a whole, therefore, requires the County to take steps to improve public acceptance of affordable housing and make lasting changes in public opinion surrounding racial integration and income diversity.  Such a goal requires that any public education campaign continue for some period of time in order to have the desired effects.  Indeed, ¶ 33(h)

requires that at least $400,000 be spent over a period of five years to advance the goals of that paragraph.  The Settlement thus explicitly acknowledges the fact that effective public outreach must take place over a period of years, not months.

One of the County's primary obligations under the Settlement -- to ensure the development of at least 750 new affordable housing units -- is set to conclude this year. Indeed, if the County had begun an appropriately designed ¶ 33(c) campaign within a reasonable period of time and funded it adequately, it may have led to less municipal resistance to the 750-unit provision and otherwise furthered the goals of the Settlement.  The County's eleventh-hour launch of the Campaign therefore comes too late to comply with ¶ 33(c).  In the context of the Settlement as a whole, the County's failure to begin the Campaign until 2015 is unreasonable.  Moreover, this failure prejudices the Government, and indeed, the citizens of Westchester County.  As just described, a ¶ 33(c) campaign must run for some time for there to be any legitimate hope that it might educate County residents and raise public awareness about affordable housing.  Paragraph 33 is a key provision of the Settlement that the Government and the County negotiated in 2009; an inability to enforce that provision would prejudice the Government by depriving it of the benefits of a bargained-for term of the Settlement.

Finally, one of the factors to be considered in determining a reasonable time for performance is the absence of good faith. The County has evinced bad faith related to its obligations under ¶ 33(c) in at least two ways.  First, it did not begin to work on the Campaign until the fall of 2015, after the Monitor compelled and took depositions of County officials concerning these very issues.  The County's unwillingness to fulfill its affirmative obligations until the Monitor seeks relief from this Court fails to satisfy the terms of the Consent Decree to which it voluntarily "chose to bind itself" in 2009.  2013 Appeal Opinion, 712 F.3d at 772.  The County provides no adequate explanation for these delays.

Second, as the Monitor thoroughly documented in the Report, the County sought to undercut public confidence in the Consent Decree by staging press events, writing op-eds, and incorporating the relevant statements into Astorino's public addresses.[9]  A few of these statements are worth noting in

---

[9] The County seeks to defend Astorino's statements by, among other things, characterizing them as political speech protected by the First Amendment.  But, "an individual may waive constitutional rights in a consent decree, provided that the waiver is voluntary, knowing, and intelligent."  United States v. Local 1804-1, Int'l Longshoremen's Ass'n, AFL-CIO, 44 F.3d 1091, 1098 n.4 (2d Cir. 1995).  Moreover, a public employee "by necessity must accept certain limitations on his or her freedom."  Lynch v. Ackley, 811 F.3d 569, 577 (2d Cir. 2016) (citation omitted).  Thus, in the context of employer discipline, when "public employees make statements pursuant to their official duties, the employees are not speaking as

particular.  In a series of op-eds, Astorino claimed that HUD

was "trying to use the settlement as a hammer to dismantle local

zoning," and that residents should fear a "high-rise next door"

if HUD had its way.[10]  At a series of public events, including

town halls and his yearly State of the County address, Astorino

at various points stated that "the neighborhood you live in

today could change over time" because a "five-story building . .

. could be put on your street."  He emphasized that the "goal of

the Federal Government" is to allow a "multi-family house" on

"any street" in a given municipality.  Instead of advocating <u>for</u>

increased racial and ethnic diversity and explaining the

"benefits of mixed-income housing and racially and ethnically

---

citizens for First Amendment purposes, and the Constitution does
not insulate their communications from employer discipline."
<u>Id.</u> (citation omitted).

    The County has not made a persuasive showing that the
public statements made by Astorino that are at issue here are
protected under the First Amendment, and even if they were, the
County waived such protections for the statements in the context
of the relief sought here, by voluntarily entering into the
Consent Decree.  It should also be noted that the Court is
neither censoring Astorino's speech nor dictating what he must
say.  When he chooses to speak in a way that implicates the
Consent Decree, and especially the Country's responsibilities
under the Decree, however, the Government and the Monitor may
request appropriate relief.

[10] Indeed, in a May 15, 2013 email about an op-ed in the <u>Daily
Voice</u>, Astorino wrote that he sought to "personalize" the fear
of high-rises, because the "abstract takes the emotion out and
gives people the false sense that [the high rise] will be built
somewhere else, and not next to them."  This intentional stoking
of personal fear of higher density, affordable housing is
especially demonstrative of bad faith in fulfilling the
affirmative obligations of ¶ 33(c).

integrated communities," as ¶ 33(c) specifically requires, Astorino intentionally generated fear that increasing available affordable housing and modifying exclusionary zoning laws would change neighborhoods for the worse.  These statements reveal a concerted effort to influence public opinion against the Settlement and its stated goal of improving communities by increasing racial and ethnic diversity.  This coordinated effort both evinces bad faith and exposes the deficiencies of the delayed Campaign.

The County presents a few, brief arguments in an unsuccessful effort to show that it satisfied ¶ 33(c).  First, the County discusses the 2012 Fair Housing Poster Initiative. After acknowledging that focus groups reacted negatively to the original posters, the County describes obtaining and disseminating two posters created by HUD and the National Fair Housing Alliance.  These posters addressed housing discrimination and the benefits of diversity in neighborhoods. The County distributed the posters to municipalities for display in public locations, and County officials regularly checked that the posters were displayed in municipalities across Westchester. Putting up posters crafted by other organizations does not constitute "creat[ing] and fund[ing] campaigns" that comply with ¶ 33(c).  Displaying posters does not contain other hallmarks of the far more robust public education campaigns the County has

undertaken to educate and shape public opinion on other issues it considered important, which included public events, press releases, or other activities that promote and advertise the initiative.

Second, the County appears to contend that the One Community Campaign is sufficient to satisfy ¶ 33(c).  For example, it touts the two posters advertising the Campaign at the Westchester County Airport,[11] the posters in bus shelters, and the resources available on the Campaign's section of the County's website.  The County implicitly acknowledges that there is room for improvement, however, when it states that it is prepared to work in good faith with the Monitor to develop the Campaign.  Thus, although the Campaign is a nod to the Settlement's requirements, the County's unreasonable delay in implementing it and the Campaign's clear deficiencies constitute a breach of ¶ 33(c).

Third, the County points to its officials' discrete instances of public outreach.  For example, between 2009 and 2016, County officials hosted, attended, and spoke at the annual Affordable Housing Expo, conducted trainings on affordable housing for municipal officials and residents, and spoke on several panels about affordable housing.  Moreover, the County's

---

[11] The County even points out that the more robust Westchester Smart campaign only has one poster at the airport, while the Campaign has two.

Human Rights Commission engaged in public outreach via presentations and housing discrimination training.  These appearances are at best individual instances of advocacy at specific events; they do not constitute "creat[ing] and fund[ing] campaigns" within the meaning of the Consent Decree, and the County does not suggest otherwise.  Indeed, during their June 2015 depositions, Astorino and Deputy Commissioner for Housing and Community Development in the County's Department of Planning Norma Drummond ("Drummond") stated that they could not recall any public outreach campaign related to satisfying ¶ 33(c) of the Consent Decree.[12]  Moreover, according to the Monitor, the first of the County's quarterly reports to mention anything that resembles a public campaign that would comply with ¶ 33(c) was submitted in the fall of 2015.

## II.  Remedy: Release of Videotapes

Making the videotapes public is an appropriate remedy for the County's breach of ¶ 33(c) and ordering their release is within the Court's equitable discretion to take reasonable steps to enforce the Consent Decree.[13]  To begin with, there can be little dispute that Astorino's public statements about zoning as

---

[12] In her deposition, Drummond referred back to the 2012 poster dissemination project discussed above.  As explained, this is not a "campaign" within the meaning of ¶ 33(c).

[13] As described above, the County has retained a public relations consultant to improve the Campaign as an additional remedy for breaching ¶ 33(c).

well as HUD's purported requirements that the County spend $1
billion to construct 10,768 units of affordable housing relate
directly to the Consent Decree.  These statements concern the
extent and nature of the County's obligations under the Decree,
including the County's duty to submit an AI acceptable to HUD.
Astorino's statements also reveal the County's eagerness to sway
public opinion against the Consent Decree instead of
implementing the public education campaigns required by ¶ 33(c).

The videotapes are of depositions taken to address these
very statements as well as the extent to which the County has
fulfilled its ¶ 33(c) obligations.  While it is true that
transcripts of the depositions are already available, public
disclosure of the images of the County officials delivering
their deposition testimony will materially supplement the
existing public record.  Videotapes are regularly taken of
deponents in civil litigation, despite the attendant expense,
because litigators understand that the videotaped witness
testimony is far more effective in conveying the substance and
meaning of the testimony to the fact finder than the dry words
on a printed page.  See, e.g., DiRienzo v. Philip Servs. Corp.,
294 F.3d 21, 30 (2d Cir. 2002) (noting that there is a
"preference for live testimony" because "demeanor evidence is
important," and "videotaped depositions . . . could afford the
jury an opportunity to assess" a witness's credibility); cf.

United States v. Crandall, 748 F.3d 476, 483 (2d Cir. 2014)
(noting that a "Court of Appeals must accord great deference to
the trial court's findings regarding credibility because the
trial judge is in the best position to evaluate a witness's
demeanor and tone of voice as well as other mannerisms that bear
heavily on one's belief in what the witness says" (citation
omitted)).

The videotapes thus may be an important tool for public
evaluation of the accuracy and reliability of Astorino's prior
assertions concerning the Consent Decree.  The public will have
an opportunity to evaluate the witnesses' statements and
credibility in a way that a cold transcript cannot provide to
them.  Releasing the videotaped depositions is an appropriate
remedy for the County's breach of ¶ 33(c) because Astorino's
public statements about the Settlement are important evidence of
the County's unwillingness to launch effective and robust public
education campaigns.

Second, two core goals of the Settlement are to promote
long-term public acceptance of affordable housing and improve
racial diversity in Westchester.  The Settlement contemplates
progressing towards these goals in several ways, including
construction of 750 new units pursuant to ¶ 7, zoning reform,
public information campaigns, and enacting source-of-income
legislation.  Astorino's public statements that stoke negative

public opinion about the Consent Decree undermine the goals of
the Settlement.  Releasing the videotapes of his and other
County officials' depositions may provide an incentive for the
County to embrace its obligations under the Consent Decree more
completely and publicly than it has done in the past.  Such an
incentive serves the broad purposes of the Consent Decree as
well as the specific obligations that it places on the County.
It is therefore within the Court's equitable enforcement power
to order the release of the videotaped depositions to ensure the
integrity of the Settlement.

The County's primary defense against release of the
videotapes is that Astorino's public statements did not relate
to the goals of the Settlement and therefore disclosure of his
deposition testimony about those statements is outside the scope
of the Court's authority.[14]  As viewed by the County, the Consent
Decree concerns the development of 750 affordable housing units,
and Astorino was not describing or criticizing that requirement

---

[14] The County also contends that the videos are not "judicial
documents" and therefore are not subject to the presumptions of
disclosure under the First Amendment or the common law.
Bernstein v. Bernstein Litowitz Berger & Grossmann LLP, 814 F.3d
132, 139 (2d Cir. 2016).  Neither the Government nor the Monitor
argue that the videotapes are judicial documents.  The
transcripts of the depositions are judicial documents.  They
were submitted to the Court as exhibits to the Monitor's Report
in support of his request that the County be found in breach of
¶ 33(c) and ordered to remedy that breach.  It is unnecessary to
decide whether the videotapes of those same depositions may also
be viewed as judicial documents.

of the Settlement.  The County asserts that Astorino's public statements referred instead to its dispute with HUD over the failed AI submission process and the litigation that arose from that failure.  This characterization does not help the County, however, because submitting an AI acceptable to HUD is also a requirement of the Consent Decree.[15]  Thus, when Astorino engaged in public discussions about the AI submissions and HUD's role in overseeing that process, he necessarily implicated a key provision of the Settlement.

The County next speculates that releasing the videotapes could undermine the Consent Decree, negatively impact the County's ability to attract residents, and discourage people from signing up for affordable housing.  It presents no support for this argument and it is counter-intuitive.  A principal purpose of the Consent Decree is to attract a more racially and economically diverse population for Westchester County.  If anything, it is Astorino's public statements that might discourage new residents from seeking affordable housing within the County.

The County also speculates that the videotapes may be used against Astorino in a misleading fashion at some point in the

---

[15] Whether the County should still be required to submit an adequate AI will be the subject of a conference to occur on July 8.

future by someone "as part of partisan political attacks" by,
for example, presenting heavily edited passages from the
videotapes.[16]  This speculation does not counsel against
disclosure.  First, the County has not identified any passage
that may be particularly susceptible to unfair manipulation.
The Court has given the County an opportunity to request
redactions from the videotapes before public disclosure.  It
declined to make such a request.  Moreover, it is significant to
note what the County has not argued.  It does not argue that any
information conveyed during the depositions was of a personal
nature, that the questioning concerned anything other than the
deponent's performance of his and her public duties, that the
questioning went beyond what was permitted by the Court, that
the questioning was abusive or otherwise unfairly prejudicial,
or that any of the witnesses' deposition answers requires
correction.  The County's only suggestion of prejudice arises
from the fact that Astorino was deposed in front of a white
wall.  The County suggests that viewers may infer incorrectly
from that setting that the testimony occurred in a courtroom.

---

[16]Stern v. Cosby, 529 F. Supp. 2d 417, 422-23 (S.D.N.Y. 2007), on
which the County relies, is inapposite.  Stern discusses the
judicial documents doctrine in the context of a deposition taken
in civil litigation, not release of videotaped depositions as a
remedy for breach of a Settlement or other agreement.  Moreover,
the deponent's "strong privacy interest" and the impact on
judicial efficiency also influenced the court's decision in
Stern not to release the videotape.  Id. at 422.  The County has
not raised these concerns here.

Whether given in a courtroom or not, the testimony was given under oath, pursuant to court order, and in connection with ongoing federal court litigation with the County.  Thus, an inference that Astorino's testimony was given in connection with court proceedings would not be wrong, and would not constitute unfair prejudice.  In any event, the import of the testimony comes from its substance, not its location.  And, of course, Astorino and the County would remain free to speak up and correct any misimpression about the location of the deposition that they felt had arisen.

The fundamental point remains that Astorino is a public figure and he was deposed about his public duties only.  His interest in keeping the videotapes of testimony about his public duties out of the public record does not outweigh the importance of full, open, public discourse on issues connected with the Settlement and its goals of improving access within the County to affordable and racially diverse housing.  As already described, the County has breached ¶ 33(c), and the release of the videotapes is an appropriate remedy for that breach.  That release may support improvements to the County's Campaign, which are expected to be outlined shortly, and will provide the public with more accurate information about the Settlement's requirements.

### III. **Stay of Order**

The County requested that, if the Court orders the release of the videotapes, the Order should be stayed pending the County's appeal.  In determining whether to issue a stay of a judgment or order pending appeal, a court must consider the following factors:

> (1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies.

S.E.C. v. Citigroup Glob. Markets Inc., 673 F.3d 158, 162 (2d Cir. 2012) (citation omitted).  These factors operate as a "sliding scale" where "[t]he necessary 'level' or 'degree' of possibility of success will vary according to the court's assessment of the other stay factors . . . [and] [t]he probability of success that must be demonstrated is inversely proportional to the amount of irreparable injury [a party] will suffer absent the stay."  Thapa v. Gonzales, 460 F.3d 323, 334 (2d Cir. 2006) (citation omitted).  A stay is an "intrusion into the ordinary processes of administration and judicial review, and accordingly is not a matter of right."  Nken v. Holder, 556 U.S. 418, 427 (2009) (citation omitted).

The County's application for a stay of this Order pending appeal is granted on the condition that it file its appeal

promptly and seek expedited review.  The reasons to decline the requested stay include the following.  The County has not shown it is likely to succeed in any appeal or identified any cognizable injury it will sustain from release of the videotapes.  Moreover, it is in the public interest to be as well-informed as possible about the positions and performance of its elected officials on matters of public importance.  But, as the County notes, once the videotapes are made public, it will be impossible to re-seal them effectively.  Moreover, the transcripts of the depositions are already publicly available. Accordingly, a brief stay will be entered so long as the County acts expeditiously to appeal this Order.

## Conclusion

The Monitor's March 17, 2016 request to make public the videotapes of 2015 depositions of County officials is granted. The videotapes shall be made available to the public in their entirety.  As described in an accompanying scheduling order, this Order is stayed pending appeal as long as the County pursues its appeal promptly and seeks expedited review.  The parties shall promptly inform the Court when the appeal process is complete.

Dated:   New York, New York
         June 27, 2016

_____
         DENISE COTE
United States District Judge