```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------X
UNITED STATES OF AMERICA ex rel. ANTI-  :
DISCRIMINATION CENTER OF METRO NEW      :
YORK, INC.,                             :
                      Plaintiff,        :    06 Civ. 2860 (DLC)
                                        :
             -v-                        :    OPINION AND ORDER
                                        :
WESTCHESTER COUNTY, NEW YORK,           :
                      Defendant.        :
---------------------------------------X
```

APPEARANCES:

For the United States:
David J. Kennedy
United States Attorney's Office
86 Chambers Street
New York, NY 10007

For Westchester County, New York:

Robert F. Meehan
Westchester County Attorney's Office
138 Martine Avenue, 6th Floor
White Plains, NY 10601

DENISE COTE, District Judge:

This dispute arises from the Third Biennial Assessment of

Westchester County's Compliance, prepared by James E. Johnson

("Monitor") of April 28, 2016 ("Report").  The Report found that

Westchester County, New York ("County") has violated certain

provisions of the August 10, 2009 Consent Decree ("Consent

Decree" or "Settlement") between the County and the United

States Department of Justice ("DOJ" or "Government").  The

Monitor found two principal failures: (1) the County has not

completed an analysis of impediments to fair housing choice within its jurisdiction ("AI") as required by ¶ 32 of the Settlement; and (2) the County has failed to promote the model zoning ordinance described in ¶ 25(a) of the Consent Decree by providing municipalities with incentives or engaging in litigation.

This Opinion finds that the County breached ¶ 32 of the Consent Decree.  Decision is reserved regarding the County's alleged breach of ¶ 25(a).  As the Monitor and Government request, the County is ordered to retain a consultant to prepare an AI acceptable to the U.S. Department of Housing and Urban Development ("HUD").

## **Background**

The procedural history giving rise to this dispute has been described in several previous opinions issued by this Court and the Second Circuit Court of Appeals.  Of particular significance to the issues addressed in this Opinion are:  United States ex rel. Anti-Discrimination Ctr. of Metro N.Y., Inc. v. Westchester Cnty., 495 F. Supp. 2d 375 (S.D.N.Y. 2007) ("2007 Opinion") (denying motion to dismiss False Claims Act lawsuit against the County and discussing the AI requirement in detail); United States ex rel. Anti-Discrimination Ctr. of Metro N.Y., Inc. v. Westchester Cnty., 668 F. Supp. 2d 548 (S.D.N.Y. 2009) ("2009 Opinion") (finding that County's certifications to obtain

certain HUD funds were false but reserving on County's
scienter); Cty. of Westchester v. U.S. Dep't of Hous. & Urban
Dev., 116 F. Supp. 3d 251 (S.D.N.Y. 2015) ("2015 Opinion")
(holding that HUD lawfully rejected the County's AI
submissions); Cty. of Westchester v. U.S. Dep't of Hous. & Urban
Dev., 802 F.3d 413, 418 (2d Cir. 2015) ("2015 Appeal Opinion")
(affirming this Court's finding that HUD did not violate federal
administrative law); United States ex rel. Anti-Discrimination
Ctr. of Metro New York, Inc. v. Westchester Cty., No. 06cv2860
(DLC), 2016 WL 3566236 (S.D.N.Y. June 27, 2016) ("33(c)
Opinion") (finding that the County breached its duty to create
and fund public education campaigns).  The Court assumes
familiarity with these Opinions.  Only the facts necessary to
resolve the present dispute are described below.

## A. False Claims Act Litigation, the 2009 Consent Decree, and the Analysis of Impediments Requirement

This litigation began in 2006 when the Anti-Discrimination
Center of Metro New York, Inc. ("ADC") sued the County as a qui
tam relator under the False Claims Act ("FCA"), 31 U.S.C. § 3729
et seq.  ADC claimed that the County received more than $52
million from the federal government for housing and community
development after falsely certifying that it affirmatively
furthered fair housing ("AFFH").  The County moved to dismiss
the action by arguing that it had no duty to consider race or

race discrimination when identifying impediments to fair housing choice, and therefore that its certifications that it would "affirmatively further fair housing" were not false.  The Court rejected that argument and denied the County's motion to dismiss.  2007 Opinion, 495 F. Supp. 2d at 377.

Following discovery, the Court granted partial summary judgment to ADC and ruled that the County's AFFH certifications to HUD were false as a matter of law.  2009 Opinion, 668 F. Supp. 2d at 571.  As explained in the Opinion, to receive certain federal funding, the County was required to certify that it would AFFH, among other things.  To AFFH, the law required the County to conduct an analysis of impediments (or "AI") to fair housing choice within its jurisdiction, to take appropriate actions to overcome the effects of any impediments identified through that analysis, and to maintain records reflecting its analysis and actions.  Id. at 551.  For the period at issue, the County presented two AIs to HUD to support its certifications. In those AIs the County focused on affordable housing in the County rather than fair housing.  Id. at 559.  As a consequence, it did not undertake an analysis of whether the production of affordable housing "had the effect of increasing or decreasing racial diversity in the neighborhood in which the housing was built."  Id.  And "[w]ithout a targeted analysis of race as a potential impediment to fair housing, the County was unprepared

4

to grapple with the second component of its AFFH duty to take appropriate action to overcome the effects of any racial discrimination or segregation it might identify as an impediment." Id. at 562.  Finally, "[b]ecause the County never did the required analysis of race-based impediments, it never created a contemporaneous record of how its management of the HUD-acquired funds or any other 'appropriate' steps it could take would overcome the effects of those impediments." Id. at 565.

The Government intervened after the 2009 Opinion was issued but before the remaining issues in the case were tried, and the County entered into a Consent Decree with the Government on August 10, 2009.  Had the County lost at trial, it risked paying over $150 million in damages for its violation of the FCA.

The Consent Decree consists of thirty-eight pages and imposes many obligations on the County.  For example, the County was required to spend $51,600,000 as a remedy for violating the FCA.  The Consent Decree also requires the County to ensure the development of 750 new affordable housing units.  Settlement ¶¶ 7, 23.  Paragraph 7 contains detailed demographic and other criteria for determining which municipalities are "eligible" for the development of the 750 new units.  See 33(c) Opinion, 2016 WL 3566236 at *2.  As explained in the 33(c) Opinion, ¶ 7(a)(i) makes it clear that decreasing racial segregation is a core goal

5

of constructing the new units.  For example, ¶ 7(a)(i) provides
that at least 630 of the 750 new units must be in municipalities
that have a "single race African-American only" population of
less than 3% and a Hispanic population of less than 7% after
undertaking certain calculations.  Paragraph 7(a)(ii) also
prohibits any of those 630 units from being developed in a
census block that had an African-American population of more
than 10% or a Hispanic population of more than 10%.  The Monitor
and the parties refer to communities eligible for the new
affordable housing units as "eligible communities," and they
include 31 municipalities throughout the County.

Another provision of the Consent Decree is one that is
central to the current dispute.  It is the requirement that the
County submit an acceptable AI.  Until 2015, any municipality or
government unit seeking federal funds under the Community
Development Block Grant ("CDBG") and certain other programs
administered by HUD was required to submit an AI to HUD.  2007
Opinion, 495 F. Supp. 2d at 386.  An AI "involves an assessment
of conditions, both public and private, affecting fair housing
choice for all protected classes."  Id. at 387 (citation
omitted).  Impediments to be analyzed included "actions,
omissions or decisions" that "restrict housing choices or the
availability of housing choices" based on "race, color,
religion, sex, disability, familial status, or national origin."

6

Id. (citation omitted).  According to HUD's Fair Housing

Planning Guide, which is specifically referenced in the

Settlement, an AI provides "essential and detailed information

to policy makers, administrative staff, housing providers,

lenders and fair housing advocates" and it "[a]ssists in

building public support for fair housing efforts both within the

[jurisdiction's] boundaries and beyond."  HUD, Fair Housing

Planning Guide at 2-8 (1996), available at

http://www.hud.gov/offices/fheo/images/fhpg.pdf.

Paragraph 32 of the Settlement provides that the "County

shall complete, within one hundred twenty (120) calendar days of

the entry of this [Consent Decree], an AI within its

jurisdiction that complies with the guidance in HUD's Fair

Housing Planning Guide."  Further, the "AI must be deemed

acceptable by HUD.  The County shall take all actions identified

in the AI."  Settlement ¶ 32.  The County was required to

include the following in the AI:

(1) A commitment "to collecting data and undertaking other
    actions necessary to facilitate the implementation of
    this [Consent Decree] (¶ 32(a));
(2) Identify and analyze, inter alia:
    a. "the impediments to fair housing within its
       jurisdiction, including impediments based on race or
       municipal resistance to the development of affordable
       housing" (¶ 32(b)(i)); and
    b. "the appropriate actions the County will take to
       address and overcome the effects of those impediments"
       (¶ 32(b)(ii)).

7

See 2015 Appeal Opinion, 802 F.3d at 419 (discussing the AI requirement in ¶ 32).

The second key provision of the Consent Decree at issue here is ¶ 25(a)'s requirement that the County include a model zoning ordinance ("Model Zoning Ordinance" or "Ordinance") in its implementation plan.[1]  Specifically, the County was to include a "model ordinance" that the "County will promote to municipalities to advance fair housing."  Settlement ¶ 25(a). Paragraph 25(a)(i)-(iv) of the Decree further provides that the "model ordinance shall include, inter alia:"

1. "a model inclusionary housing ordinance that requires new development projects to include a certain percentage of affordable units, including criteria and standards for the affordable housing units and definitions of who is eligible for affordable housing;"

2. "standards for affirmative marketing of new housing developments to ensure outreach to racially and ethnically diverse households;"

3. "standards for expedited review of proposals for affordable housing that AFFH including procedures for streamlining the approval process for the design, permitting, and development of these units;" and

4. "standards for legal mechanisms to ensure continued affordability of new affordable units."

---

[1] According to ¶ 18 of the Settlement, the County was to submit, within 120 days, an implementation plan "setting forth with specificity the manner in which the County plans to implement the provisions of" ¶ 7 of the Consent Decree.  Paragraphs 19-26 of the Settlement enumerate the detailed requirements for this implementation plan.

Paragraph 15 of the Consent Decree requires the Monitor to
"conduct an assessment of the County's efforts and progress
related to the obligations" in the Settlement "every two years"
until the Settlement expires.  That same paragraph also provides
that the Monitor must assess "whether the County has taken all
possible actions to meet its obligations, . . . including . . .
promoting inclusionary and other appropriate zoning by
municipalities by offering incentives, and, if necessary, taking
legal action."  Finally, ¶ 39 gives the Monitor the authority to
submit reports that contain "recommended steps or activities to
improve the County's performance" of its duties under the
Settlement.

**B. Litigation Over the Consent Decree**

In the years since the County executed the Consent Decree,
the Government and the County have frequently engaged in
litigation regarding the County's obligations under the Consent
Decree.  The litigation has principally implicated four aspects
of the Decree and has resulted in findings that the County
breached the Consent Decree by failing to promote source-of-
income discrimination, U.S. ex rel. Anti-Discrimination Ctr. of
Metro New York, Inc. v. Westchester Cty., N.Y., 712 F.3d 761,
771 (2d Cir. 2013) ("2013 Appeal Opinion"); that it was
reasonable for HUD to reject the County's proposed AI and to
reallocate approximately $25 million to other communities

9

because of that failure, 2015 Appeal Opinion, 802 F.3d at 436;
that the County failed to use all available means to promote the
development of at least 750 new affordable housing units and to
address municipal resistance to those developments, United
States ex rel. Anti-Discrimination Ctr. of Metro New York, Inc.
v. Westchester Cty., No. 06 CIV. 2860 (DLC), 2016 WL 3004662, at
*16-*18 (S.D.N.Y. May 24, 2016); and that the County breached
its duty to create and fund public information campaigns, 33(c)
Opinion, 2016 WL 3566236 at *6-*7.  The litigation over the
County's proposed AI is described in more detail below.

## C. 2010-2016:  Creating and Promoting the Model Zoning Ordinance

As noted, the Monitor contends in its Report that the
County has failed to comply with the duty under ¶ 25(a) of the
Consent Decree to promote the Ordinance.  In 2010, the County
created a Model Zoning Ordinance, as required by ¶ 25(a) of the
Consent Decree.  In 2011, six communities adopted the Ordinance,
including New Castle, Ossining, Scarsdale, Yorktown, Rye Brook,
and Tarrytown.  Five more municipalities adopted the Ordinance
in 2012: Irvington, Bedford, Pleasantville, North Salem, and
Ardsley.  In 2013, three municipalities adopted the Ordinance:
Hastings on Hudson, Pound Ridge, and the Town of Mamaroneck.  In
2014, North Castle was the only municipality to adopt the
Ordinance.  No town or village adopted the Ordinance in 2015,

but Lewisboro adopted certain provisions informed by the

Ordinance.  The remaining municipalities in the County have not

adopted the Ordinance; indeed, in April 2016, Yorktown announced

that it is considering repealing its version of the Ordinance.

**D. 2011-2015:  Litigation Surrounding the AI Dispute**

The County's ¶ 32 AI was initially due on December 8, 2009.

2015 Appeal Opinion, 802 F.3d at 420.  HUD granted several

extensions to the County, and the County submitted its first

post-settlement AI on July 23, 2010.  Id.  On December 21, 2010,

HUD rejected that AI in a "six-page letter . . . in which HUD

described actions the County could take to make its AI

acceptable."  Id. at 420-21.  These actions included

"identifying the steps it would take to ban 'source-of-income'

discrimination and to overcome 'exclusionary zoning practices.'"

Id. at 421 (quoting HUD's letter).  The County submitted another

AI on April 13, 2011, which HUD rejected in a letter of April

28.  2015 Opinion, 116 F. Supp. 3d at 263.  On May 13, 2011, HUD

wrote a nine-page letter and "explained the reasons for the

April 28 rejection of the AI, which it characterized as

'substantially incomplete and unacceptable to HUD.'"  Id.  The

AI's deficiencies were numerous and principally included the

County's' failure to examine the availability of family rental

housing and exclusionary zoning.  Id. at 263-64.

On July 11, 2011, the County submitted another AI that HUD rejected in a July 13, 2011 letter.  2015 Appeal Opinion, 802 F.3d at 421.  HUD wrote to the County that "it did not incorporate the Corrective Actions that HUD had earlier specified," including "plans to overcome exclusionary zoning practices."  Id.  In February 2012, the County submitted the first in "a series of zoning analyses to HUD, all of which were rejected."  Id. at 423.  These submissions were rejected because they contained "flawed data analysis, failed to address whether zoning practices were exclusionary under state and federal law, and lacked adequate strategies for bringing about changes to problematic zoning practices."  Id.

The County made an additional AI submission on April 24, 2013, and its eighth zoning submission on July 23.  On August 9, 2013, HUD wrote that the July 23 zoning analysis "demonstrated meaningful progress" but that it "continued to fail in critical aspects previously identified by HUD."  2015 Opinion, 116 F. Supp. 3d at 270.  On May 9, 2014, the County informed HUD that it would not be seeking additional HUD funds in the future.  2015 Appeal Opinion, 802 F.3d at 427.  In 2015, the Second Circuit held that HUD was within its statutory authority to reject the County's post-2009 AI submissions for their failure adequately to analyze the impediments that municipal zoning laws presented to fair housing choice.  Id. at 428.

12

E. 2013-2014:  Monitor's Assessments of Local Zoning

The County's flawed 2013 analysis of local zoning codes, created as part of the Settlement's AI process, prompted HUD and the Chair of the County's Board of Legislators to request that the Monitor conduct his own analysis of local zoning regulations in light of Berenson v. Town of New Castle, 38 N.Y.2d 102 (1975), and Huntington Branch, NAACP v. Town of Huntington, 844 F.2d 926 (2d Cir. 1988).  The "state-law Berenson standard considers whether zoning practices are 'exclusionary' based on socioeconomic status."  2015 Appeal Opinion, 802 F.3d at 424. The "federal Huntington standard considers whether facially neutral zoning laws have a discriminatory impact on racial and ethnic minorities."  Id. at 424-25.  The hope was that the County would adopt the Monitor's analyses, incorporate them into an AI, and submit the AI to satisfy ¶ 32 of the Settlement.

The Monitor therefore prepared two reports: the September 2013 "Berenson Report" and the September 2014 "Huntington Report."  The Monitor worked with a team of housing consultants in connection with these reports.[2]  The reports together found that ten communities had some form of exclusionary zoning.

In the Berenson Report, the Monitor found that seven eligible municipalities had zoning ordinances that limited

_____

[2] In performing these and other tasks, the Monitor's law firm has absorbed more than $4 million in pro bono fees and expenses.

affordable housing access or made the development of affordable housing "practically infeasible."  Those communities were: Croton-on-Hudson, Harrison, Lewisboro, Mamaroneck, Ossining, Pelham Manor, and Pound Ridge.

The Monitor also analyzed data provided by the County pursuant to the Huntington methodology.  The Huntington Report is 125 pages long and it analyzes the discriminatory impact each municipality's zoning code has on the County's minority residents; it does not make findings with respect to whether the discrimination was intentional, it focuses only on disparate impact.  The Huntington Report ultimately found a prima facie violation of Huntington in six municipalities: Harrison, Larchmont, North Castle, Rye Brook, Lewisboro, and Pelham Manor. The report found that these municipalities had zoning regulations that either perpetuated clustering by restricting multifamily housing to districts that have disproportionately high minority household populations or disparately impacted minority populations by restricting the development of housing types most often occupied by minority residents.

The Monitor invited comment on the Huntington Report.  On September 24, 2014, HUD identified what it deemed to be errors in the Huntington Report and requested that certain portions of the report be withdrawn.  That letter operated on the assumption that the Monitor's report would "replace portions of the [AI]

14

prepared and submitted by the County to HUD that pertained to exclusionary zoning."  On October 24, the DOJ suggested nine changes to the Huntington Report.  Like HUD, the DOJ expressed its view that the Huntington Report is "a proposed analysis of zoning impediments that could be incorporated into the County's [AI]."  DOJ further wrote that, if its suggested changes were made, "the County's inclusion of the Report would be deemed acceptable by HUD to satisfy the County's obligation to identify and analyze local zoning impediments" in the County.  Despite assurances that the Monitor's analyses would satisfy the zoning portion of the Consent Decree's AI requirement, the "County declined to adopt the [M]onitor's reports or to incorporate any of the findings of the reports into its own future AIs."  2015 Appeal Opinion, 802 F.3d at 426-27.

Since releasing these two reports, the Monitor has worked directly with municipalities on zoning and fair housing issues. As described below, the Monitor believes some progress has been made.

### F. 2016: Monitor's April 28 Report

The Monitor's April 28 report is his third biennial assessment, as required under ¶ 15 of the Settlement.  The Report describes the County's "mixed" record of compliance with the Consent Decree over the past two years.  The Report addresses, among other things, the County's progress in meeting

its interim benchmarks for new affordable housing units under ¶ 23 of the Settlement.  See also United States ex rel. Anti-Discrimination Ctr. of Metro New York, Inc., 2016 WL 3004662, at *3-*4 (explaining the benchmark requirements).  The Report emphasizes that the completed ¶ 7 affordable housing units have increased racial and ethnic diversity in the County.

The Report also describes two provisions of the Consent Decree that the Monitor claims that the County has breached. The first is ¶ 32, which contains the County's obligation to submit an AI that is acceptable to HUD.  The second is ¶ 25(a), which requires the County to take certain actions to create and promote a model zoning ordinance to municipalities.  According to the Monitor, the County has not provided economic incentives or brought necessary litigation to encourage eligible municipalities to adopt the Ordinance.  Moreover, this breach is connected with the County's refusal to analyze municipal zoning with appropriate rigor.  See 2015 Appeal Opinion, 802 F.3d at 433.  The Monitor contends that the County "essentially informed the municipalities that the zoning currently in place should not be challenged."  Indeed, as described in the 33(c) Opinion, 2016 WL 3566236, at *8, County Executive Robert Astorino ("Astorino") falsely stated on multiple occasions that HUD sought to dismantle local zoning entirely.  The Monitor posits that these

public statements have slowed progress in municipalities that
were considering adopting the Model Zoning Ordinance.[3]

     In a letter of July 7, as well as in his Report, the
Monitor provides an update regarding the ten municipalities he
originally identified as violating either Berenson or
Huntington.  Mamaroneck revised its land use regulations in
2013, and the Monitor determined in 2014 that these revisions
provided adequate opportunities for development of affordable
housing that will AFFH.  Ossining and Pound Ridge have also
revised their zoning codes in a way that conforms to the
Ordinance; in April 2015, the Monitor removed those communities
from the list of localities found to have exclusionary zoning.
The Monitor believes that North Castle and Rye Brook have also
made significant strides recently in improving their zoning
codes.  As a consequence, in the Monitor's view, five
municipalities still have zoning ordinances that violate either
Berenson or Huntington, or both: Croton-on-Hudson, Harrison,
Lewisboro, Pelham Manor, and Larchmont.

     The Monitor proposes four core remedies to address the
breaches of ¶¶ 32 and 25(a).[4]  The County submitted its opening

---

[3] The Monitor describes the negative effect that he believes
Astorino's statements have had on the local government in
Yorktown, which adopted the Ordinance in 2011, but now appears
to believe that it does not have the legal authority to adopt or
enforce a central provision of the Ordinance.

brief regarding the Report on June 17.  The County contends that it has not breached ¶¶ 32 or 25(a), and it opposes each of the Monitor's proposed remedies.  The Government and the Monitor filed their briefs on June 24.  The County's reply was filed on July 1.[5]

At a conference on July 8, the Court observed that the County had failed to produce an AI acceptable to HUD and

---

[4] In response to the Court's Order, the Monitor's specific requests are contained in a separate document of May 25, 2016. The four requests are that (1) the County be required to select, with the Monitor's approval, and retain a consultant to prepare an AI to submit to HUD; (2) the Court require the AI to contain certain elements, including a determination of affordable housing needs in the County, an analysis of whether local zoning violate either Berenson or Huntington, and a detailed strategy to overcome the identified impediments; (3) the Court order the County to implement the strategy to overcome the impediments identified in the AI; and (4) that the County bear the costs incurred by the Monitor in overseeing this remedial plan.  The Report also contained recommendations for actions by the DOJ that were not included in the May 25 submission: (1) The DOJ is encouraged to bring litigation against municipalities that have been identified as having zoning that imposes impediments to fair and affordable housing in violation of federal law; and (2) the DOJ should give serious consideration to bringing legal action against one or more of seven municipalities that specifically violate the Berenson or Huntington analysis.

[5] On May 11, ADC filed a proposed amicus submission that the Court rejected on July 6.  The Court reserved decision concerning whether to accept an expert report attached to ADC's proposed amicus brief.  Also on July 6, the Court rejected an amicus submission from ten other entities that perform work related to affordable housing.  As required in the Court's May 13 Order, the parties' briefs concerning the Report also addressed ADC's submission.  The Government, the County, and the Monitor all agreed that the ADC submission should not be accepted and that its requests for relief should not be granted.

proposed that, as of now, it adopt only some of the Monitor's requests for relief.  The Court explained that its primary goal would be the completion of an AI acceptable to HUD.[6]  That would require the selection of a consultant to prepare the AI, with the County involved as fully as it is willing to be (so long as it does not delay the process of preparing the AI) and with HUD sharing its expertise.  The parties and Monitor were each given an opportunity to be heard at the conference.  HUD represented that it was willing to engage in an interactive process with the consultant and the County to assist in the completion of the AI. The Court declined to require the AI to include any specific content.

This Opinion addresses each of the arguments the parties have made regarding the use of a consultant to prepare the County's AI.  The parties cooperated after the conference to prepare a proposed order addressing the selection of the consultant, and that order is also being issued today.

## Discussion

The standards on which this Court has relied in determining whether there has been a breach of the Consent Decree as well as the appropriate relief for any breach have recently been described, and those legal standards are incorporated by

---

[6]As described at the conference, the Monitor will also supplement the record to describe the actions the Monitor and the County each took to promote the Model Ordinance.

reference here.  33(c) Opinion, 2016 WL 3566236, at *6.  In brief, the ordinary rules of contract interpretation are generally applicable when determining whether the Consent Decree has been breached.  But, where there has been a breach, a court has the inherent power to enforce consent judgments since a consent decree reflects judicial interests as well as the interests of the litigants.  Id. (citing E.E.O.C. v. Local 580, Int'l Ass'n of Bridge, Structural & Ornamental Ironworkers, Joint Apprentice-Journeyman Educ. Fund, 925 F.2d 588, 593 (2d Cir. 1991)).  A court's interest "in protecting the integrity of a consent decree justifies any reasonable action taken by the court to secure compliance."  CBS Broad. Inc. v. FilmOn.com, Inc., 814 F.3d 91, 101 (2d Cir. 2016) (citation omitted).  Nonetheless, a court must exercise its power with restraint since it may not supplement the terms of the Consent Decree.  E.g., Pandora Media, Inc. v. Am. Soc. of Composers, Authors & Publishers, 785 F.3d 73, 77 (2d Cir. 2015) ("A court may not replace the terms of a consent decree with its own." (citation omitted)).

## I. County Breached ¶ 32

As outlined above, ¶ 32 of the Settlement requires the County to "complete, within [120] calendar days . . . an AI within its jurisdiction that complies with the guidance in HUD's

Fair Housing Planning Guide."  The Settlement specifically
provides that the "AI must be deemed acceptable by HUD."

There is no dispute that HUD has not accepted any AI that
the County has submitted since it entered the Consent Decree.
The 2015 Opinion and the 2015 Appeal Opinion explain that failed
process in the context of HUD's legal authority to reject those
submissions under the Administrative Procedure Act.  In sum,
nearly seven years after the parties and the Court signed the
Consent Decree, the County has not fulfilled an explicit
obligation that was to be met by December of 2009.  This breach
is clear and cannot credibly be questioned.

The County argues that it has not breached ¶ 32 for two
principal reasons.  The first is that the County has actually
satisfied ¶ 32 by submitting an AI that complies with HUD's 1996
Fair Housing Planning Guide and the Monitor's earlier guidance.
The second is that, even if its AI did not comply with ¶ 32, it
should be relieved of its ¶ 32 duties because the AI requirement
is now "academic" due to changed circumstances.  Neither of
these arguments has merit.

First, the County claims that its efforts have satisfied
the requirements of the Settlement.  The County relies
principally on its claim that it followed HUD's 1996 Fair
Housing Planning Guide and the specific requirements for its AI
described in ¶ 32(a)-(b) of the Consent Decree.  The County's

21

argument that it has fulfilled the Settlement's AI requirement misses a critical point: in order to satisfy ¶ 32, the County's AI "must be deemed acceptable by HUD."  The County's lengthy description of its attempts to draft an AI wholly ignores this explicit provision of the Consent Decree.  It also ignores the fact that ¶ 32 states that the AI must "identify and analyze, inter alia," certain impediments and local needs.  The use of the phrase "inter alia" acknowledges that ¶ 32 is not an exclusive list, and therefore an acceptable AI is not limited to ¶ 32's subparagraphs.  It must also be acceptable to HUD.

In concluding that HUD's rejection of the County's AI was neither arbitrary nor capricious, the Court of Appeals observed that "it was reasonable for HUD to require the County to include in its AI an analysis of its municipalities' zoning laws." 2015 Appeal Opinion, 802 F.3d at 432.  Moreover, "HUD reasonably relied on detailed reports from the monitor, which examined the relevant laws and analyzed empirical data, and which refuted the County's conclusion that no municipality had ordinances that were exclusionary under state or federal law." Id.  HUD was therefore within its legal authority to reject the County's AIs as resting on "inaccurate data" and on "flawed analysis," and as

inappropriately reaching "boilerplate conclusion[s]" concerning each municipality's zoning.[7] Id. at 426, 433.

In its reply brief, the County does not dispute that the Consent Decree required the County to submit an AI acceptable to HUD and that HUD was entitled to require the County to analyze the impediments that local zoning laws may present to fair housing.  Instead, it raises a new argument.  This new argument, albeit untimely, may be swiftly rejected.  The County contends that the goal of the Monitor and Government is to force the County to declare certain local zoning ordinances "illegal under the Fair Housing Act" and to pursue legal action against those localities.  There is no such application by either the County or the Government before this Court at this time.  Nor has the County shown that HUD's rejection of its prior AI submissions was for the County's failure to make such declarations or promise such corrective action.  As explained by the Court of Appeals, those submissions were rejected because they were

---

[7] In its reply, the County seeks to undermine the relevance of the Court of Appeals' decision by emphasizing that the appellate court was reviewing whether HUD had acted arbitrarily and not whether it had acted unreasonably or in bad faith when it rejected the County's AI.  The County's attempt to distinguish the decision is unavailing.  The County does not attempt to show how it was either unreasonable or an act taken in bad faith for HUD to decline to accept an AI resting on inaccurate data, flawed analyses, and boilerplate conclusions.

incomplete and not conducted with sufficient integrity and rigor.  2015 Appeal Opinion, 802 F.3d at 426.

The County's next argument is that the requirement that it submit an AI acceptable to HUD is "academic" for two reasons: (1) since the County no longer plans to seek Community Planning and Development funds from HUD, preparing an AI serves no purpose and is no longer a "material" provision of the Settlement;[8] and (2) HUD regulations have dispensed with the AI requirement and now require submission of an Assessment of Fair Housing ("AFH") in connection with grant applications.  Again, neither argument carries the day.

The AI requirement remains an enforceable provision of the Settlement even though the County currently takes the position that it will no longer seek the federal funds that required an AI.  The continued relevance of ¶ 32 is demonstrated at least in part by the fact that the Government -- the other party to the Consent Decree -- asks the Court to find that the County has

---

[8] The law on which the County relies in making its materiality argument is inapposite.  Under New York law, when "a party has breached a contract, that breach may excuse the nonbreaching party from further performance if the breach is 'material.'" New Windsor Volunteer Ambulance Corps, Inc. v. Meyers, 442 F.3d 101, 117 (2d Cir. 2006) (citation omitted).  In other words, rescission is permitted only for a breach that is "material and willful, or, if not willful, so substantial and fundamental as to strongly tend to defeat the object of the parties in making the contract." Id. (citation omitted).  Here, the Government is not seeking to rescind the Consent Decree based on the County's breach.

breached ¶ 32 and to order the County to remedy that breach. Equally importantly, the Consent Decree does not condition preparation of an AI on the County's future applications for federal funding. Quite the contrary. The Consent Decree explicitly links the AI to the County's earlier deficient AIs and to other independent and ongoing commitments it made in the Decree.

The Decree's preface recites how the County was obligated as a recipient of certain HUD funds to certify that it would AFFH and to conduct an analysis of impediments to fair housing choice within its jurisdiction (the AI), and the qui tam relator's allegations that the "County had failed to conduct a meaningful AI and failed to take appropriate steps to overcome existing and known impediments to fair housing arising from racial discrimination and segregation." As a result of these failures, the relator asserted that "the County's certifications to the United States to receive CDBG and other federal funds were false."

Paragraph 32's requirement that the County submit within 120 days an AI acceptable to HUD is directly linked to this recitation. It is a remedy for the prior false AFFH certifications that the County filed from 2000 through 2006 and the two flawed AIs that accompanied those certifications. Those AIs omitted any analysis of the impediments to fair housing

presented by racial discrimination and segregation.  2009
Opinion, 668 F. Supp. 2d at 557-58.  Thus, a breach of ¶ 32
occurs even if the County does not presently intend to seek
further federal funding related to an AI.  As the Court of
Appeals recently observed, "[t]he County also promised to submit
an adequate AI within 120 days of the consent decree, and
failure to do so could, therefore, constitute both a breach of
the consent decree and grounds for rejection of its future"
grant applications.  2015 Appeal Opinion, 802 F.3d at 431.

Moreover, completion of an "acceptable" AI serves a more
forward-looking purpose that is entirely divorced from any grant
applications that the County may choose to submit in the future
to HUD.  Roughly halfway through the Decree, there is a general
heading: "The County's Implementation Plan, Benchmarks,
Additional Obligations to AFFH, and AI;" this heading includes
¶ 32.  None of these four categories of obligations depends upon
future applications for federal funds.  Indeed, the duty to
create an AI that is acceptable to HUD is presented as one of
several interlocking obligations.  For instance, the County was
required to develop, within 120 days, an "implementation plan"
setting forth how the County would implement provisions of
Decree.  That implementation plan was to be incorporated into
the County's AI.  Settlement ¶¶ 18, 21.  The AI was also
supposed to include a commitment to "collecting data and

undertaking other actions necessary to facilitate the implementation of this" Settlement.  This implementation plan and an "acceptable" AI would, in turn, assist the County to take the several other remedial actions to which the County obligated itself, such as the duty to ensure the development of 750 new affordable housing units (¶ 7), to create and fund public campaigns to educate County residents about the benefits of diversity (¶ 33(c)), and to market affordable housing in non-white areas (¶ 33(e)).  Again, none of these duties hinges on the County's future applications for federal funds, nor do they assume that such applications will be made.

Finally, as described above, every AI has the potential to inform and improve local decision-making, wholly apart from any benefit the locality may receive in the form of federal funds. See HUD, Fair Housing Planning Guide at 2-8 (1996), available at http://www.hud.gov/offices/fheo/images/fhpg.pdf.  These other purposes will be served even if the County abandons all future efforts to obtain HUD funds.  Thus, as a remedy for its past inadequate AIs and false certifications, in support for its ongoing commitments in the Settlement to further fair housing through a variety of means, and in recognition of the many uses and virtues of an AI, the County's commitment in the Consent Decree to submit an AI acceptable to HUD stands entirely

independent from the County's current decision to refrain from
submitting HUD grant applications.

The County's next assertion is that, without the AI, the
Government has received the central benefit of the Settlement it
bargained for in 2009.  The County rests this claim on its
belief that it is on track to meet its benchmark to develop the
750 new ¶ 7 units by the end of this calendar year.  It contends
that the submission of an adequate AI is simply a promise that
is "peripheral" to the development of those housing units.  This
interpretation of the Consent Decree ignores both the scope and
plain meaning of the Decree.  While the development of hundreds
of new housing units is an important feature of the Decree, it
is only one of several important features.

This argument also fails to recognize the extensive
litigation that has already taken place to enforce many
provisions of the Decree that are entirely unrelated to ¶ 7's
750 units, including source-of-income legislation and the
creation of public education campaigns.  And, as emphasized
above, the materially flawed AIs that the County submitted to
HUD in 2000 and 2004 were central to this litigation when it was
filed.  See 2009 Opinion, 668 F. Supp. 2d at 557.  The Consent
Decree cannot be cabined in the way the County proposes.

The County's second principal argument is that HUD's
elimination of the AI requirement constitutes "changed

circumstances" that warrant erasing ¶ 32 of the Consent Decree. The County is correct that, as of 2015, HUD no longer required grant applicants to submit an AI.  Instead, grant applicants submit an AFH.  In replacing the AI, HUD commented that the AI "has not been as effective as originally envisioned." Affirmatively Furthering Fair Housing, 80 Fed. Reg. 42,272 (July 16, 2015).  Thus, HUD's new rule "refines the prior approach by replacing the [AI] with a fair housing assessment that should better inform program participants' planning processes with a view toward better aiding HUD program participants" to certify that they AFFH.  Id.  HUD recognized that the "AFH process will be a substantial change from the current AI process," but it plans to provide more support to grant applicants in order to assist with preparing a comprehensive AFH.  Id. at 42,348.

HUD's new AFFH regulations "[r]eplace the AI with a more effective and standardized [AFH] through which program participants identify and evaluate fair housing issues, and factors contributing to fair housing issues."  Id. at 42,273. In connection with submitting the AFH, grant applicants are still required to "certify that they will affirmatively further fair housing" when the "statutes and regulations governing HUD programs" so require.  24 C.F.R. § 5.166(a); see 24 C.F.R. § 91.225(a)(1) ("Each jurisdiction is required to submit a certification that it will affirmatively further fair housing,

which means it will take meaningful actions to further the goals
identified in the AFH.").

The AFH is defined in 24 C.F.R. § 5.152 as "an analysis of
fair housing data, an assessment of fair housing issues and
contributing factors, and an identification of fair housing
priorities and goals."  As a general matter, the "AFH's
analysis, goals, and priorities will address integration and
segregation; racially or ethnically concentrated areas of
poverty; disparities in access to opportunity; and
disproportionate housing needs based on" a series of
characteristics, including race and sex.  Id. § 5.154(d).  The
regulations further require that the AFH contain (1) a summary
of fair housing issues and capacity; and (2) an analysis of data
that identifies patterns in integration, segregation, and other
disparities in access to opportunity for protected classes.  Id.
§ 5.154(d)(1)-(2).  The AFH must also "identify the contributing
factors for segregation, racially or ethnically concentrated
areas of poverty, disparities in access to opportunity, and
disproportionate housing needs."  Id. § 5.154(d)(3).  In its
explanation of these new regulations, HUD states that: "Zoning
and land use laws that are barriers to fair housing choice and
access to opportunity can be quite varied and often depend on
the factual circumstances in specific cases."  80 Fed. Reg. at
42,272.

This change in the regulatory scheme does not relieve the County of its duty to comply with its commitments in the Consent Decree.  Of course, "a court has the authority to alter the prospective effect of an injunction in light of changes in the law or the circumstances."  Benjamin v. Jacobson, 172 F.3d 144, 161 (2d Cir. 1999) (en banc).  The Supreme Court has held that, in general, "courts should apply a flexible standard" when "deciding whether a significant change in facts or law warrants revision of a consent decree."  2015 Appeal Opinion, 802 F.3d at 436 (citation omitted); see Rufo v. Inmates of Suffolk Cty. Jail, 502 U.S. 367, 381 (1992).

The law governing "changed circumstances" and consent decrees, on which the County relies, largely arises in the context of adjudicating a motion under Rule 60(b)(5)-(6), Fed. R. Civ. P.[9]  Rule 60(b) "provides a means by which a party can ask a court to modify or vacate a judgment or order if a significant change either in factual conditions or in law renders continued enforcement detrimental to the public interest."  Horne v. Flores, 557 U.S. 433, 447 (2009) (citation omitted).  The "changed circumstances" doctrine is particularly pertinent where the injunction at issue "remain[s] in force for

---

[9] Notably, the County has not made a Rule 60(b) motion for relief from any provision of the Consent Decree.  It instead relies on the "changed circumstances" doctrine to excuse its breach of ¶ 32.

many years," because "the passage of time frequently brings
about changed circumstances -- changes in the nature of the
underlying problem, changes in governing law or its
interpretation by the courts, and new policy insights," which
"warrant reexamination of the original judgment."  Id. at 448.

The party "seeking relief bears the burden of establishing
that changed circumstances warrant relief."  Id. at 447; United
States v. Apple, Inc., 791 F.3d 290, 336 (2d Cir. 2015), cert.
denied 136 S. Ct. 1376 (2016) (same).  If the party meets this
burden, "the court must then consider whether the modification
proposed is suitably tailored to the changed circumstance."
Barcia v. Sitkin, 367 F.3d 87, 99 (2d Cir. 2004) (citation
omitted).  Ultimately, if a party "establishes reason to modify
the decree, the court should make the necessary changes; where
it has not done so, however, the decree should be enforced
according to its terms."  2015 Appeal Opinion, 802 F.3d at 436
n.118 (citation omitted).

The County has not shown that the changed circumstances
doctrine relieves it of its obligation to submit an acceptable
AI to HUD.  To begin with, the revision in the regulations --
HUD's replacement of the AI requirement with an AFH -- is simply
irrelevant.[10]  The County announced in 2014 that it would no

---

[10] Were the County using the ¶ 32 AI to apply for federal money
in the future, it could seek to renegotiate that provision of

longer seek federal funding.  2015 Appeal Opinion, 802 F.3d at
427.  This announcement preceded the regulatory change in 2015
on which the County's changed circumstances doctrine argument
hinges.[11]

Second, despite this significant amendment to the grant
application process, it is important to recognize that the broad
purposes of the AI and the AFH are identical: both involve
analyzing and addressing barriers to fair housing choice with a
focus on protected characteristics including race and ethnicity.
HUD, Fair Housing Planning Guide at 2-7 (1996), available at
http://www.hud.gov/offices/fheo/images/fhpg.pdf.  HUD
regulations make it clear that assessing barriers to fair
housing using rigorous data analysis remains essential to a
truthful AFFH certification.  This AFFH certification was at the
core of the 2006 qui tam litigation and remains an important
aspect of HUD's review of grant applications.  Accordingly, the
contents of a successful AFH are sufficiently similar to those
of an AI that the ¶ 32 requirement is not rendered academic by
the change in HUD's regulatory regime.  Even more significantly,
virtually the only piece of the County's AI that has not been

_____

the Consent Decree to require an AFH instead.  This it has not
done.

[11] Of course, if the County had submitted an acceptable AI to HUD
in 2009, which was the schedule to which it agreed in the
Settlement, that obligation would have been met years before HUD
adopted the AFH framework.

accepted by HUD is its analysis of local zoning.  That very analysis would have to be done for an AFH as well.

Helpfully, at the July 8 conference, the Government represented that HUD remains willing to work with the County to prepare its AI, that HUD will review the AI under the standards that applied to AIs, and that preparing an AI will constitute a step towards preparing a robust AFH.  Accordingly, the revision in HUD regulations will not impede the County's compliance with its obligations under the Consent Decree or be a waste of resources in the event the County alters its posture and applies for HUD funds in the future.

Finally, as discussed above, the Consent Decree's requirement that the County prepare an AI is not dependent on the County choosing to seek further HUD funding.  It is a remedy for the County's prior false certifications to HUD, which were false because of the County's flawed AIs, among other things. An adequately prepared AI also supports and promotes several of the other commitments that the County made in the Consent Decree.  The County chose to enter the Consent Decree rather than go to trial and risk facing a judgment of over $150 million.  It has not shown that changed circumstances justify erasing this key provision of the Settlement.

## II.  Monitor's Requests for Relief

The Monitor requests that the County be required to retain a consultant to prepare and submit an acceptable AI to HUD on behalf of the County.  The Consent Decree explicitly gives the Monitor authority to recommend additional steps the County should take to improve its performance in implementing the Settlement.  See 2015 Appeal Opinion, 802 F.3d at 420 (discussing the Monitor's authority to "recommend additional actions needed to ensure compliance").

After nearly seven years, the County failed to submit an AI that complies with its obligations under the Consent Decree. This failure occurred despite the receipt of significant assistance from the Monitor and detailed guidance from HUD.  The County's argument that it has complied with ¶ 32, or alternatively that it no longer must do so, reveals that it does not plan to fulfill its obligations under ¶ 32.  Thus, the use of a consultant to prepare an acceptable AI is an appropriate remedy for the County's breach of ¶ 32.[12]  Ordering the County to retain a consultant is also within the scope of the Court's equitable discretion.  Requiring that the County take steps to

_____

[12] Indeed, the Court recently required the County to retain a consultant to assist the County in developing the One Community Campaign to fulfill its obligations under ¶ 33(c).  The County did not object to hiring the consultant, and it appears that the parties are making progress towards development of an improved public campaign.  33(c) Opinion, 2016 WL 3566236 at *5 n.6.

fulfill its plain ¶ 32 obligations is both appropriate and necessary.

The County observes that the Settlement does not require the County to hire a consultant to complete the AI, and thus argues that an order to do so is "outside the scope" of the Settlement.  In making this argument, the County fails to acknowledge the provisions of the Consent Decree that give the Monitor the authority to recommend additional steps the County should take to improve its compliance with the Settlement. Settlement ¶¶ 13(c), (e), and 39.  Moreover, the County does not address the Court's equitable discretion to take reasonable steps to ensure compliance with its orders.  Thus, as a general matter, the County's objection that the requested relief is not explicitly enumerated in the Settlement is without merit.  The relief granted here is narrowly tailored to the breach.

The County next complains that the appointment of a consultant will "strip" it of any role in the development of the AI.  That need not be true.  The Court has encouraged the County to be actively involved with and of assistance to the consultant in the creation of the AI.  It is to be hoped that the County will seize this opportunity to engage fully and in good faith

with the preparation of an AI that is acceptable to HUD.[13]  What
it may not do, however, is delay or impede the creation and
submission of the AI.

While it would have been preferable for the County timely
to fulfill the AI requirement under ¶ 32, that did not happen
either in 2009 or in any year since then.  The process the
Monitor has identified is reasonable in light of the County's
abdication of its contractual commitment.  The County will have
an opportunity to choose an appropriate consultant and
participate in crafting the consultant's AI submission.[14]  The
County's complaints that the Monitor has asked for "unfettered"
discretion to approve or reject its selection of a consultant
are unfounded.  If the County and the Monitor disagree about the
selection of the consultant, the parties may bring any such
dispute to this Court.  Thus, the Monitor is not being given
unfettered discretion, nor is there any suggestion that he seeks
such discretion.  Indeed, the Monitor proposed that the County

---

[13] At the July 8 conference, the Court urged the County to
consider identifying a County employee to work constructively
with the consultant to prepare the AI.

[14] The County also objected to the Monitor's requests that the AI
contain a needs assessment and a zoning analysis under Berenson
and Huntington.  As explained at the July 8 conference, the
Court declines to order that the AI contain any specific
analysis.  The adequacy of its contents is for HUD to decide.
The County, the consultant, and the Monitor are encouraged to
confer about the AI's contents.  HUD has promised its
assistance.

have the initial opportunity to select an appropriate consultant to prepare the AI.

Finally, the County objects to being required to pay "sight unseen" the Monitor's expenses in supervising the remedial relief.  This argument is unavailing.  The fact that the Monitor does not yet know the amount of those expenses does not defeat his application for relief.  As described in the accompanying order, any disputes over these expenses may be brought to either the Magistrate Judge or directly to this Court, at the County's election.

### III. The Model Zoning Ordinance

In his Report, the Monitor found that the County breached ¶ 25(a) of the Settlement, and he requested that the Court order corresponding remedies.  Paragraph 25(a) requires the County to "promote to municipalities" a "model ordinance" to expand the availability of affordable housing.[15]  In the Monitor's assessment, the County has not "taken all possible actions to meet its obligation, including promoting inclusionary and other

---

[15] In the context of the Settlement, "promote" means "to bring or help bring into being, to contribute to the growth, enlargement, or prosperity of, or to encourage or further."  2013 Appeal Opinion, 712 F.3d at 768.  Thus, "promotion requires affirmative action by the obligated party to help bring the object in question into being."  Id. at 769.  Promotion "does not require insurance," but it also is "not met by taking no action or taking an action that detracts from, rather than furthers, the end goal."  Id.

appropriate zoning by municipalities by offering incentives."
¶ 15.

Decision is reserved regarding the County's breach of
¶ 25(a).  As the AI process concludes, the Court will revisit
this issue and allow supplemental submissions from the parties
and the Monitor.  The analysis in the AI that the consultant
will submit to HUD may be of particular assistance in assessing
whether a breach has occurred, the nature and extent of any such
breach, and the appropriate remedies for any breach.

## Conclusion

The County has breached ¶ 32 of the Consent Decree by
failing to submit an AI that is acceptable to HUD.  Decision is
reserved regarding the County's alleged breach of ¶ 25(a).  The
Monitor's requested remedies listed in his May 25 submission are
granted in part, as described in a separate Order.  Among other
things, the County will be required to retain a consultant to
prepare an AI that is acceptable to HUD.


Dated:    New York, New York
          July 18, 2016

_____
DENISE COTE
United States District Judge