UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------- x

UNITED STATES OF AMERICA *ex rel.*     :
ANTI-DISCRIMINATION CENTER OF     :
METRO NEW YORK, INC.,     :
    :
         Plaintiff,     :
    :    No. 06 Civ. 2860 (DLC)
     v.     :
    :    ECF Case
WESTCHESTER COUNTY, NEW YORK,     :
    :
         Defendant.     :

---------------------------------------------------------------- x

## MONITOR'S ASSESSMENT OF WESTCHESTER COUNTY'S COMPLIANCE

**Table of Contents**

I.      Introduction ...............................................................................................................1

II.     Executive Summary ...................................................................................................2

        A.      Overview ...................................................................................................2

        B.      Background on Lawsuit and Settlement ....................................................3

        C.      History of the Monitorship...........................................................................4

        D.      Requirements under the Settlement ............................................................7

III.    Affordable AFFH Units ...........................................................................................10

IV.     Model Ordinance .....................................................................................................13

        A.      Current Status of Municipal Adoption.......................................................13

        B.      County's Efforts to Promote Model Ordinance .........................................19

        C.      Discretionary Funding Policy ...................................................................23

        D.      Conclusion ...............................................................................................26

V.      Analysis of Impediments .........................................................................................27

VI.     Needs Assessment....................................................................................................41

VII.    Marketing .................................................................................................................49

VIII.   Areas of Continuing Concern ..................................................................................57

IX.     Conclusion ...............................................................................................................58

## I. Introduction

This report of the Monitor ("Report") is respectfully submitted pursuant to Paragraph 15 of the Stipulation and Order of Settlement and Dismissal ("Settlement") entered in this matter on August 10, 2009.[1] This Report discusses significant developments related to the efforts of Westchester County ("County") to comply with the obligations set forth in the Settlement. This Report covers the period January 1, 2016 through December 31, 2020. This Report relies principally on the following sources of information: (i) information contained in the County's quarterly compliance reports concerning its implementation of the Settlement in calendar years 2016-2020[2]; (ii) County responses to the Monitor's requests for information; (iii) the County's Tenth Zoning Submission dated July 13, 2017; (iv) the County's Needs Assessment report dated November 2019; and (v) meetings and discussions with County officials.

Following an Executive Summary and Background section, Section III of this Report assesses the County's compliance with the Settlement's affordable housing development benchmarks. Section IV assesses the County's efforts to promote the adoption of the Model Ordinance and the status of adoption by individual municipalities. Section V assesses the County's analysis of impediments ("AI") to fair housing choice within its jurisdiction, as contained in its Tenth Zoning Submission. Section VI addresses the County's November 2019 Needs Assessment. Section VII discusses the status of the County's affirmative marketing,

---

[1] In accordance with Paragraph 40 of the Settlement, the Monitor has conferred with representatives of the County and the United States Department of Justice to discuss remedial recommendations and other matters included in the Report.

[2] The County is required to submit quarterly compliance reports pursuant to Paragraph 28 of the Settlement. The County submitted quarterly reports covering its compliance with the Settlement in calendar years 2016 through 2020. The quarterly reports for the years 2016, 2017, 2018, and 2019 are attached hereto as Exhibits 1, 2, 3, and 4, respectively. The 1Q, 2Q, 3Q, and 4Q 2020 quarterly reports are attached as Exhibits 5, 6, 7, and 8, respectively.

public education, and other outreach efforts.  Section VIII addresses several topics of continuing concern following submission of this Report.

## II.    Executive Summary

### A.    Overview

The *sine qua non* of the Settlement is twofold: 1) that 750 units of affordable housing be built in the County; and 2) that the County, acting in good faith, take all reasonable steps to encourage the municipalities within the County to set the conditions that allow for additional affordable housing to be built.

The Settlement is positive, not punitive, practical, not political.  The need for affordable housing in the County and indeed across many communities in this state and country is undeniable.  To acknowledge that need is not an indictment of the County but a recognition of housing patterns that are decades, if not centuries, in the making.  The question before the County from the moment the Settlement was signed was whether to embrace this reality and use this moment for necessary change or to engage in a craven political battle that separates housing for wealthier County residents from any practical options for the people who cook and care for them, teach their children, and perform many of the necessary tasks that a connected modern society needs to function.

George Latimer, the County Executive, and a majority of the County's component municipalities have acknowledged the reality of housing disparities in the County and to varying degrees embraced the difficult and fraught mandate to address those inequalities.  Building 750 units of affordable housing in a county of almost one million residents was not intended to be the end goal but instead a runway for the County and its constituent municipalities to construct a process that enables the County to understand and address its affordable housing needs.  At the

2

same time, it should be acknowledged that no process is going to be perfect, and that aligning a critical mass of public support behind measures that may sometimes appear to be inconsistent with pecuniary interests is daunting.

The County Executive, at the prompting of community advocates and ultimately the federal court, has accepted the challenge. The County has begun to align policy and practice with a focus on affordable housing, supporting its stated belief that "affordable housing, appropriately executed, makes the County stronger."

When considering all the measures the County has and continues to implement, I believe that the County has substantially met its obligations under the Settlement.

### B.      Background on Lawsuit and Settlement

In April 2006, the Anti-Discrimination Center of Metro New York, Inc., a non-profit organization, filed a whistleblower lawsuit in the Southern District of New York alleging that the County had violated the False Claims Act by failing to abide by the terms of a federal housing grant provided by the U.S. Department of Housing and Urban Development ("HUD"). The County receives federal funds under a number of HUD programs, including the Community Block Grant Program ("CDBG"). As a recipient of CDBG funds, the County is required to comply with provisions of the Housing and Community Development Act to affirmatively further fair and affordable housing. These obligations included accurately reporting how the County is managing funds, performing an analysis of impediments to fair housing choice that focuses on impediments based on racial discrimination or segregation, and taking appropriate action to overcome the effects of those impediments. The U.S. Department of Justice ("DOJ") intervened in the lawsuit and entered into a court-approved Settlement with the County on August 10, 2009.

Under the Settlement, the County is required to fulfill a number of duties that aim to affirmatively further fair housing (or "AFFH") and thus create opportunities to racially and ethnically integrate communities, promote sustainable residential patterns, and increase fair and equal access to economic, educational, and other opportunities. The County has already satisfied many of the requirements in the Settlement, as detailed in past Monitor reports. This Report is focused on four outstanding requirements, some of which have been the subject of ongoing controversy and litigation. These include the County's responsibilities to: (1) develop at least 750 AFFH units in communities with low African-American and Hispanic populations (Settlement ¶ 7); (2) promote to all eligible municipalities a model inclusionary housing ordinance that advances fair housing (*id.* ¶ 25(a)); (3) complete a satisfactory AI (*id.* ¶ 32); and (4) affirmatively market affordable housing within the County and in areas close to the County that have large non-white populations (*id.* ¶ 33(e)).

### C.      History of the Monitorship

Under the Settlement, the Monitor is charged with overseeing the County's progress, examining its programs, policies, procedures, records, and correspondence, and making recommendations to bring the County into compliance with the Settlement. *Id.* ¶ 13. The Monitor must periodically submit a report to the Court that details shortcomings in the County's compliance, the adequacy of the County's efforts, and recommended steps or activities to improve the County's performance. Before submission, the Monitor must meet with representatives of the County to discuss matters included in the report. *Id.* ¶¶ 39-40. The prior Monitor, James E. Johnson, served from August 10, 2009 until August 10, 2016 and submitted fifteen reports detailing the County's progress and shortcomings. *See* Order of Judge Cote, *United States v. Westchester Cnty.*, 06 Civ. 2860 (DLC), Dkt. 675 (S.D.N.Y. Dec. 2, 2016). On

February 23, 2017, I was appointed as Monitor.  *See* Order of Judge Cote, *United States v. Westchester Cnty.*, 06 Civ. 2860 (DLC), Dkt. 703 (S.D.N.Y. Feb. 23, 2017).

The County, HUD, and the previous Monitor had a long history of disagreement and litigation over three aspects of the Settlement and the adequacy of the County's performance. These controversies will be explained in more detail in their respective sections below, but a brief word on them is appropriate here.  First, in 2011, the parties litigated HUD's rejection of the County's third proposed AI.  Judge Cote ordered the County to provide the Monitor with an analysis of the zoning ordinances in the eligible municipalities.  *See* Order of Judge Cote at 8, *United States v. Westchester Cnty.*, 06 Civ. 2860 (DLC), Dkt. 402 (May 3, 2012).  On April 24, 2013, the County filed a new complaint in this Court challenging HUD's denial of federal funding based on the County's failure to produce an acceptable AI.  *See* Complaint at 31-34, *Cnty. of Westchester v. United States Dep't of Hous. and Urban Dev.*, No. 13 Civ. 2741 (DLC), Dkt. 1 (Apr. 24, 2013).  The County then filed a second lawsuit on March 17, 2015, challenging HUD's decision to withhold funds based on its rejection of the County's "certifications" that it would AFFH ("AFFH Certifications").  *See* Complaint at 11-12, *Cnty. of Westchester v. United States Dep't of Hous. and Urban Dev.*, No. 15 Civ. 1992 (DLC), Dkt. 1 (Mar. 17, 2015).  The Court dismissed the County's complaints in their entirety and held that HUD had not acted inappropriately.  The Second Circuit affirmed on September 25, 2015.  *See Cnty. of Westchester v. United States Dep't of Hous. and Urban Dev.*, No. 15-2294, Dkt. 64-1 (2d Cir. 2015); *see also* Section V, *infra*.

Second, in 2013, the parties litigated then-County Executive Robert Astorino's veto of proposed County legislation to ban source-of-income discrimination in housing.  The DOJ and Monitor argued that the veto contravened the County's duty under the Settlement to *promote*

such legislation.  This Court agreed, and the Second Circuit affirmed on appeal.  The Second

Circuit stated that "[t]he ordinary meaning of 'promote' includes 'to bring or help bring into

being'" or "encourage" or "further."  *United States ex rel. Anti-Discrimination Ctr. of Metro

N.Y., Inc. v. Westchester Cnty.*, 712 F.3d 761, 768 (2d Cir. 2013) (citation omitted).  The Court

held that, at a minimum, "promotion requires" the County to take affirmative action to try to

bring the legislation into being, even if the County could not ensure that such legislation would

be passed.  *Id.* at 769.  Therefore, the Court found that the County Executive's veto of the

legislation violated the Settlement.  *Id.* at 775.

Third, the Monitor clashed with the former County Executive over the County's failure to

market affordable housing efforts pursuant to Settlement Paragraph 33.  Settlement ¶ 33(c).  On

March 17, 2016, the Monitor issued a report addressing this issue, which concluded that the

County had made false and misleading public statements about the terms of the Settlement and

HUD's role including: that HUD had attempted to dismantle local zoning; that the cost of

compliance with the Settlement was $1 billion (when the cost was actually $51.6 million); and

that HUD sought to build high-rise apartment buildings in Westchester's residential

neighborhoods.  The Monitor recommended that the County correct these falsehoods to provide

the public with a clear understanding of the requirements of the Settlement and its

implementation.

In the time since the Monitor's April 28, 2016 Biennial Assessment, the County has

elected a new Executive, George Latimer.  As a general matter, under the leadership of Mr.

Latimer, the County has demonstrated a renewed commitment to satisfying its obligations under

the Settlement.  I have been encouraged by the good faith efforts of the Latimer administration to

fulfill the terms of the Settlement on several key metrics.  In particular, the County has made

laudable progress toward building affordable AFFH housing, marketing the new housing units to those least likely to apply, and educating the public and realtors about the benefits of integration.

### D.      Requirements Under the Settlement

As noted above, this Report focuses on four of the County's obligations under the Settlement: (1) the construction of 750 AFFH units; (2) the promotion of a model zoning ordinance; (3) the submission of an adequate AI; and (4) the marketing and advertisement of AFFH units.  This section summarizes the County's progress toward fulfilling each obligation.

Paragraph 7 of the Settlement requires the County to develop at least 750 "Affordable AFFH Units" in 31 eligible municipalities.  As of this writing, the County has "completed" 723 of the required 750 units, representing 96.4% of the County's obligations.  4Q 2020 Quarterly Report, attached hereto as Ex. 8, at 1.  The County has also achieved significant milestones beyond the 723 units that are technically "complete."  By the end of December 2020, 911 units had financing in place, 853 units had building permits in place, 810 units had deed restrictions filed upon them, affirmative fair housing marketing was completed for 798 units, and 739 units had Certificates of Occupancy in place.  *Id.* at 2.  The County has stated that an additional 28 AFFH units at 54 Hunts Place in New Castle are "very near completion."  *Id.*  Once these units are completed, the County will have exceeded the 750 unit requirement.  Taking these figures together, and in light of the County's demonstrated good faith efforts to meet the affordable AFFH unit requirements under the Settlement, this Report concludes that the County has substantially complied with Paragraph 7.

Paragraph 25(a) of the Settlement obligates the County to "promote" a model zoning ordinance.  The County developed a model ordinance (the "Model Ordinance") that met the Settlement's requirements in 2010.  *See* Westchester County Fair and Affordable Housing

Implementation Plan, Appendix D-1(i): Model Ordinance Provisions, Aug. 9, 2010, attached hereto as Ex. 9. As of today, 19 of the 31 eligible municipalities have adopted Model Ordinance provisions into their zoning codes, and two other municipalities have adopted similar zoning provisions. None of the municipalities has adopted it in full. Although the County has not pursued litigation against any of the municipalities, it has undertaken substantial efforts to promote the Model Ordinance and encourage its adoption. These efforts have included: conditioning discretionary funding on adoption of the model provisions; sending letters to towns and villages that have not adopted the Model Ordinance; advocating for adoption of the Model Ordinance in meetings, seminars, and symposia; participating in public forums to discuss the model provisions; and other steps. For reasons discussed further below, I conclude that the County has met its obligations under Paragraph 25(a).

Paragraph 32 of the Settlement requires the County to conduct an AI to fair housing choice within its jurisdiction that is deemed acceptable by HUD. Roughly eight years after the Settlement was signed, HUD finally accepted the County's AI in July 2017—after three prior submissions and ten prior supplements were rejected and following protracted litigation in federal court. Despite the delay, it remains the case that the County has submitted an AI deemed acceptable by HUD, as provided for by Paragraph 32. Taking together HUD's acceptance of the AI and the County's expressed commitment to encourage municipalities to amend their zoning codes to make them more inclusionary, this Report concludes that the County has substantially complied with the AI requirement.

Paragraph 32 also requires that the AI "compl[y] with the guidance in HUD's Fair Housing Planning Guide" (the "Planning Guide"). Settlement ¶ 32. The Planning Guide states that an AI "involves . . . [a]n assessment of conditions, both public and private, affecting fair

housing choice for all protected classes," as well as "[a]n assessment of the availability of affordable, accessible housing in a range of unit sizes." HUD Planning Guide, Vol. I, attached hereto as Ex. 10, at 2-7. However, this Court previously ordered that the AI need not contain "any specific analysis" and found that HUD has discretion to determine the adequacy of the AI.[3] Accordingly, HUD's approval of the AI in July 2017 should have absolved the County of any further obligation under the Settlement to assess fair housing conditions as provided for in the Planning Guide. The Latimer administration's decision to commission such an assessment in 2018, despite having no legal obligation to do so, is thus a powerful indicator of the County's good faith and genuine commitment to furthering fair housing. The County's Needs Assessment, released in November 2019, estimates the shortage of affordable housing and the impediments to development, and provides a set of twelve recommendations for the County to effectively address housing need. The County has followed through on and provided funding for most of these recommendations. As discussed further below, I find that the totality of the County's actions satisfies its obligations under Paragraph 32 of the Settlement.

Finally, Paragraph 33 of the Settlement obliges the County to undertake marketing and outreach in support of its AFFH efforts. Specifically, the County must advertise fair housing rights, "create . . . campaigns to broaden support for fair housing . . . , educate realtors . . . , market affordable housing, [and] centralize the intake of potential home buyers for affordable housing." Settlement ¶ 33. The record clearly shows that the County has devoted significant

---

[3] In the Third Biennial Assessment, the Monitor requested that the AI contain both a needs assessment and a zoning analysis under *Berenson* and *Huntington*. Monitor's Third Biennial Assessment of Westchester County's Compliance at 47, *United States v. Westchester Cnty.*, 06 Civ. 2860 (DLC), Dkt. 576 ("Third Biennial Assessment"). The Court rejected this request in a subsequent order. Opinion and Order at 37, n.14, *United States v. Westchester Cnty*, 06 Civ. 2860 (DLC), Dkt. 659 (July 16, 2016) ("[T]he Court declines to order that the AI contain any specific analysis. The adequacy of its contents is for HUD to decide.").

time and resources to fulfilling its Paragraph 33 obligations.  As of August 2018, the County has spent more than $1 million on Paragraph 33 activities, which include advertising its affordable housing in local newspapers, hosting an annual Fair and Affordable Housing Expo, maintaining a website dedicated to affordable housing, and other marketing efforts.  As discussed further below, I find that the County has satisfied these obligations as well.

## III.    Affordable AFFH Units

Under the Settlement, the County is required to develop at least 750 "Affordable AFFH Units" in 31 municipalities that meet specified demographic criteria.  Settlement ¶ 7.[4]  As of December 31, 2020, the County had completed 723 of the required 750 units.  4Q 2020 Quarterly Report, Ex. 8, at 1.  In this case, to be "complete" means that "financing is in place, the units have building permits and Certificates of Occupancy, deed restrictions have been filed and the Marketing Consultant has completed the required affirmative fair housing marketing."  *Id*. These 723 units represent 96.4% of the County's obligation under the Settlement.  In addition, the County has completed 16 more units that cannot be counted toward the 750 unit requirement because they are above the 60 units allowed by Paragraph 7(b) and 7(c) of the Settlement.  *Id*. The County has also stated that an additional 28 AFFH units at 54 Hunts Place in New Castle are "very near completion" given that the affirmative fair housing marketing for this property started

---

[4] Of the County's 48 municipalities, 31 qualify as "eligible municipalities" based on the demographic criteria in Paragraph 7.  Under Paragraph 7(a)(i), at least 630 of the required 750 AFFH units must be located in municipalities that have "a 'single race African-American only' population [of] less than three (3) percent and a Hispanic population [of] less than seven (7) percent."  Under Paragraph 7(b)(i), a maximum of 60 AFFH units can be developed in municipalities with "a 'single race African-American only' population [of] less than seven (7) percent and a Hispanic population [of] less than ten (10) percent."  Lastly, under Paragraph 7(c)(i), a maximum of 60 AFFH units can be developed in municipalities that have "a 'single race African-American only' population [of] less than fourteen (14) percent and a Hispanic population [of] less than sixteen (16) percent."

on December 1, 2020. *Id.* at 2. Once these units are completed, the County will have exceeded the 750 unit requirement.[5]

More generally, the County reports that it has a total of 911 affordable AFFH units in progress, all of which have financing in place, 853 have building permits in place, 798 have completed the required affirmative fair housing marketing, and 739 have Certificates of Occupancy in place as of December 31, 2020. *Id.* at 2. The County exceeded the requirement for 750 units with financing in place in the second quarter of 2016. 2Q 2016 Quarterly Report, Ex. 1, at 2. In addition, 810 units "have a Declaration of Restrictive Covenants filed upon them requiring that the unit must be affirmatively marketed under the County's requirements and restricting the use of the unit as affordable housing for at least 50 years," surpassing the 750-unit requirement. 4Q 2020 Quarterly Report, Ex. 8, at 2.

Paragraphs 7(a) through 7(h) of the Settlement impose a number of more precise requirements for the County based on the 2000 U.S. Census and other metrics. The 4Q 2020 Sites Progress List, attached hereto as Ex. 12, shows that the County is on track to satisfy those requirements once it completes all 750 units.

- Paragraphs 7(a-c) regulate the number of units that must be developed in municipalities with low percentages of single race African-Americans and Hispanics. According to the Sites Progress List and other correspondence with the County, the County has completed all units allowed under Paragraphs 7(b) and 7(c). The County has nearly completed the 630 units required by Paragraph 7(a) and will surpass that threshold with the 54 Hunts

---

[5] In the second quarter of 2020, the County's progress on affirmatively furthering fair housing was hampered by issues relating to the COVID-19 crisis. For instance, development on several affordable housing units was halted when New York State shut down all businesses except for "essential services." Even after the State began to reopen, construction slowed at several sites due to staffing and supply issues. Aug. 7, 2020 Letter from John M. Nonna to Stephen C. Robinson, attached hereto as Ex. 11, at 9.

Place development.  *See* 4Q 2020 Sites Progress List, Ex. 12; Aug. 14, 2020 Letter from John M. Nonna to Stephen C. Robinson, attached hereto as Ex. 13, at 2.[6]

- Paragraph 7(d) requires at least 50% (or 375) of the AFFH units to be rental units and restricts the price of those units.  The County has stated that it will far exceed that requirement because 621 of the units will be rental units.  4Q 2020 Quarterly Report, Ex. 8, at 3.  Thus far, the County has completed 140 units that are affordable at 50% of Area Median Income ("AMI"), exceeding the requirements of Paragraph 7(d).[7]  A total of 149 rental units (about 24%) are expected to be affordable at 50% of AMI, where at least 20% is required.[8]  *See id.*; Dec. 8, 2020 Letter, Ex. 14, at 4-6.  The remainder of the rental units are affordable at or below 65% of AMI.  All the rental units are required by deed restrictions to remain AFFH units for at least 50 years.  Sept. 30, 2020 Letter from Norma V. Drummond to Stephen C. Robinson, Ex. 15, at 1-2.

- Paragraph 7(e) requires the remaining units to be available for purchase and regulates their affordability.  The County reports that 277 units will qualify under this section, which has a maximum of 375 units.  4Q 2020 Quarterly Report, Ex. 8, at 3.  The home ownership units are all affordable at or below 80% of AMI and controlled by deed restrictions to remain AFFH units for at least 50 years.  Sept. 30, 2020 Letter, Ex. 15, at 2.

- Paragraph 7(f) limits the number of units intended for occupancy by senior citizens that are controlled by age restrictions.  Of the 911 units with financing in place, 172 (19%) will qualify under this section, below the 25% maximum.[9]  4Q 2020 Quarterly Report, Ex. 8, at 3.

---

[6] In addition, of the 911 AFFH units included in the Sites Progress List, 775 units will qualify under Paragraph 7(a). 4Q 2020 Quarterly Report, Ex. 8, at 5.

[7] The County has provided deed restrictions and other documents to verify the affordability of 131 of 140 of the completed rental units.  For the remaining nine units, which include seven units at 54 Hunts Place, one unit at 17 Kaldenberg Place, and one unit at 37 Wildwood Rd, the County has stated that it is working to amend or execute the documents necessary to require affordability at 50% of AMI.  Dec. 8, 2020 Letter from John M. Nonna to Stephen C. Robinson, attached hereto as Ex. 14, at 4-6.

[8] In addition to the 140 completed units, the County has stated that there is financing in place for another nine rental units that will be affordable at 50% of AMI in the Route 22 development in Lewisboro.  Dec. 8, 2020 Letter, Ex. 14, at 6.

[9] Paragraph 7(g) provides that priority in the development of AFFH Units shall be given to sites located in close proximity to public transportation.  As noted in the Monitor's Biennial Assessment dated April 28, 2016, although the Settlement points towards an equitable distribution of affordable AFFH units throughout the County, it does not require developers to build units in particular locations.  That being said, the County reports that out of the 119 current active developments, 105 are within one mile of public transportation.  *See* 4Q 2020 Sites Progress List, Ex. 12.

- Paragraph 7(h) limits the number of AFFH Units that may be achieved through the acquisition of existing housing units. 135 units will qualify under this section, which has a maximum of 187 units. *Id*. at 3.

As mentioned, the County has now completed 96.4% of the units required by the Settlement. In correspondence and meetings, County officials have been resolute in their commitment to completing all 750 AFFH units as soon as practicable. Further, the record of the last several years shows that the County has continued to make incremental progress each quarter, and has demonstrated a good faith commitment to fulfilling its obligations. Accordingly, this Report concludes that the County has substantially complied with Paragraph 7.

## IV.     Model Ordinance

### A.     Current Status of Municipal Adoption

Under Paragraph 25 of the Settlement, in order to facilitate the development of the AFFH Units, the County must develop an implementation plan that includes a "'model ordinance' that the County will promote to municipalities to advance fair housing." Settlement ¶ 25(a).[10] The County developed a Model Ordinance that conformed to the Settlement in 2010. *See* Westchester County Fair and Affordable Housing Implementation Plan, Appendix D-1(i): Model Ordinance Provisions, Aug. 9, 2010, Ex. 9. As required by Paragraph 25(a)(i-iv), the County's Model Ordinance includes, *inter alia*: (i) a requirement that new development projects include a certain percentage of affordable units; (ii) "standards for affirmative marketing of new housing developments"; (iii) standards for expedited review and approval of affordable housing; and (iv) standards to ensure the continued affordability of newly constructed units. *Id.*

---

[10] *See also* Monitor's Report Regarding Westchester County's Compliance with Paragraph 33(c) at 32, *United States v. Westchester Cnty.*, No. 06 Civ. 2860 (DLC), ECF 562 ("Municipalities are not required to adopt the model ordinance, and if they decide to adopt its provisions, the model ordinance provisions 'are proposed to supplement existing municipal zoning codes in Westchester County.'") ("March 2016 Report").

The 2016 Biennial Assessment found that 15 communities had adopted the Model Ordinance by the end of 2014. Third Biennial Assessment at 34. However, Yorktown chose to repeal its ordinance in 2016. *Id.* Since that time, several additional municipalities have amended their zoning codes to adopt provisions of the Model Ordinance.[11] As of today, a review of municipal zoning ordinances shows that 19 municipalities have adopted the Model Ordinance in part: Ardsley, Bedford, Bronxville, Croton-on-Hudson, Dobbs Ferry, Hastings-on-Hudson, Irvington, Larchmont, Lewisboro, Mamaroneck, New Castle, North Castle, North Salem, Ossining, Pleasantville, Pound Ridge, Rye Brook, Scarsdale, and Tarrytown. No municipalities have adopted the Model Ordinance in full.

There is some variation across municipalities in terms of the number of provisions adopted from the Model Ordinance. For example, nearly all 19 municipalities adopted provision 1 (defining an AFFH unit), provision 4 (setting maximum rent and sale prices),[12] and provision 6 (primary residence requirement and restricting affordability for at least 50 years), with some slight differences in the individual ordinances. On the other hand, only 14 municipalities have prohibited the use of preferences to prioritize the selection of income-eligible residents consistent with provision 2(c), with Croton-on-Hudson, Mamaroneck, North Salem, Ossining, and Pound Ridge having no such provision.[13]

Two more municipalities—Cortlandt and Somers—have advised the County that their codes are effectively consistent with the Model Ordinance provisions. *See* 1Q 2014 Quarterly

---

[11] These include: Village of Dobbs Ferry (June 25, 2019), *see* Village of Dobbs Ferry Code § 300-40; Larchmont (December 19, 2016), *see* Village of Larchmont Code § 381-45; Croton-on-Hudson (November 5, 2018), *see* Village of Croton-on-Hudson Code § 230-48; Lewisboro (December 10, 2018), *see* Town of Lewisboro Code § 220-25.1; and Bronxville (January 11, 2021), *see* Village of Bronxville Code § 310-25.1.

[12] Lewisboro has no such provision.

[13] The County has produced a comparison of the provisions adopted by each municipality. *See* Model Ordinance Adoption Table, attached hereto as Ex. 16.

Report, attached hereto as Ex. 17, at 17. The County concurs in that view. *See, e.g.*, June 9, 2020 Letter from John M. Nonna to Stephen C. Robinson, attached hereto as Ex. 18, at 1-2. The County points to four mechanisms provided in Cortlandt's zoning code for advancing affordable housing: a special permit that allows for the redevelopment of existing multifamily parcels up to a 20% density bonus, so long as the new units meet the County's AFFH standards; another special permit that allows for the development of senior housing so long as those units meet the County's AFFH standard; a floating "Community Betterment District" that encourages mixed-use development and requires that a minimum of 10% of units meet the County's AFFH standard, but with a residency preference; and an allowance for accessory apartments in single-family zoning districts. *See* Town of Cortlandt Code § 307-94; 307-45. Further, Cortlandt allows the Town Board to grant a density bonus for good cause, including expanding affordable housing. *Id.* § 307-94(D)(1)(a).

Somers does not provide for mandatory inclusionary units town-wide, but only in six of its zoning districts. That being said, within those districts, the Town has surpassed the Model Ordinance provisions by requiring at least 15% of units to be affordable (compared to 10% in the Model Ordinance). *See* Town of Somers Code § 170-13; 170-15; 170-20; 170-23. In addition, as discussed in the County's AI, Somers has made progress on multi-family and townhouse development in these six zones. Somers has a total of 164 AFFH units that qualify under the Settlement—148 of which have been completed, with the remaining 16 still under development. *See* 4Q 2020 Sites Progress List, Ex. 12; July 13, 2017 Westchester County Analysis of Impediments ("County AI"), attached hereto as Ex. 19, at 3-73. Somers also provides density incentives to create additional units, allowing one additional market rate unit for each affordable unit above the 15% requirement, subject to an overall cap. *See* Somers Code § 170-13(A)(5)(a).

Finally, Somers also has provisions similar to the Model Ordinance for the integration of design, distribution of the number of bedrooms, occupancy standards, resale requirements, and maximum rents. *See id*. § 170-60. The County believes the Somers' zoning code has furthered the development of affordable housing, although the County will continue to encourage broader application of the inclusionary zoning to all zoning districts in the Town. Aug. 7, 2020 Letter from John M. Nonna to Stephen C. Robinson, Ex. 11, at 5.

Even if, at most, 21 municipalities have adopted the Model Ordinance or similar provisions, that leaves 10 of 31 eligible municipalities that have not adopted any model provisions at all. Of those 10, six municipalities—Briarcliff Manor; Buchanan; Eastchester; Mount Pleasant; Pelham; and Tuckahoe—had at one time opened a review process for potential adoption of the Model Ordinance provisions before ultimately deciding not to do so. May 15, 2020 Letter from Norma V. Drummond to Stephen C. Robinson, attached hereto as Ex. 20, at 3-5.[14] The four remaining municipalities—Harrison, Pelham Manor, Rye, and Yorktown—have also expressed clear opposition to adopting the Model Ordinance.

<u>Harrison</u>: The Monitor's Third Biennial Assessment found that Harrison's zoning laws could result in liability under both *Berenson* and *Huntington*, and encouraged the Department of Justice to determine if enforcement would be appropriate against the Town. On June 30, 2016, following up on the Monitor's recommendation, the DOJ sent the Town an information request regarding its zoning. The Town responded on July 29, 2016, stating in part: "The Town does not

---

[14] As to Briarcliff Manor, the County reports that the Village created a committee to review its zoning soon after the Settlement was executed, which led to the decision to include multi-family housing within its Business zone. That zoning change was the impetus for the development of a 14-unit condominium complex in an underutilized lot with a small commercial building. Further, the Village also recently joined the Urban County Consortium**,** which would require certifying that its zoning ordinance reflects the guidance of the Model Ordinance in order to receive grant funds. May 15, 2020 Letter, Ex. 20, at 4.

have any regulatory mechanisms that mandate affordability, as suggested in the Model Ordinance. Market forces have created well-differentiated housing options for individuals of various economic means." Jan. 18, 2019 Letter from John M. Nonna to Stephen C. Robinson, attached hereto as Ex. 21, at 229.[15]

Pelham Manor: In October 2014, Pelham Manor rejected a proposed zoning change that would have permitted mixed-use developments by special permit in one district. Third Biennial Assessment at 39. Since that time, Pelham Manor has followed a similar trajectory to Harrison. The Monitor's Third Biennial Assessment found that Pelham Manor had zoning that could result in liability under *Berenson* or *Huntington* and encouraged the Department of Justice to determine if enforcement would be appropriate. *Id.* at 38, 40. The Village responded to a DOJ information request on September 22, 2016, concluding, "The Village respectfully maintains that the Pelham Manor Zoning Code functions fairly and is not exclusionary." Jan. 18, 2019 Letter, Ex. 21, at 181. As of today, the Village has not adopted any model provisions.

Rye: The City of Rye has advised the County that its zoning code "includes important elements of the County's model ordinance." Email Exchange between Norma V. Drummond and Rye City Planner Christian K. Miller, attached hereto as Ex. 22. More specifically, Rye's City Planner has explained that Rye's "RA-1 District provides for a 'Moderate-Income Housing' use classification. Properties developed under this use classification are permitted a significant density bonus for the development of housing for those having incomes of '…no more than 80% of the Westchester County AMI…'" *Id.* The City asserts that in drafting this legislation in 2002—well before the Settlement—"it was the City's intent to give zoning relief for fair and

---

[15] The County reports that as of January 2019, there were 40 affordable housing units under construction in Harrison, and the Town anticipated more units would be developed as part of several new multi-family housing developments under review. Jan. 18, 2019 Letter, Ex. 21, at 3.

affordable housing that would be consistent with County and Federal housing program requirements." *Id.* Otherwise, Rye has not adopted any ordinances for affordable housing nor made any other changes to its housing zoning. May 15, 2020 Letter, Ex. 20, at 4. Separately, the City approved rezoning of property to allow for development of the Vienna, a 40-unit affordable senior housing complex that opened in early 2018. *Id.* The County has represented that, in its view, the City's zoning contains provisions that affirmatively further fair housing. *Id.*

Yorktown: Although Yorktown initially adopted a new ordinance that was based on the Model Ordinance, the Town repealed those affordable housing provisions in 2016. 2017 Quarterly Reports, Ex. 2, at 16-17. The County has asserted that it took proactive measures to dissuade the Town from repealing the ordinances, sending multiple letters expressing concerns about the proposed repeal and warning that the zoning change had not been referred to the County Planning Board for review. May 15, 2020 Letter, Ex. 20, at 4-5. The County continued trying to persuade Yorktown to reconsider its zoning after the repeal. For instance, after Yorktown submitted several referrals for residential developments to the County Planning Board, the Planning Board urged the Town to evaluate whether any potential building site was appropriate for affordable housing and cited the Model Ordinance. *Id.* After a new Town Supervisor took office in January 2020, the County renewed its efforts to encourage the Town and its Housing Board to adopt the Model Ordinance provisions, but those discussions have been placed on hold due to the COVID-19 pandemic. *Id.*[16] Finally, in just the last few months, the County has been in discussions with Yorktown regarding its request for millions of dollars in

---

[16] In February 2019, Yorktown submitted draft zoning changes similar to the Model Ordinance provisions, but with some modifications. The County reviewed and discussed that draft with representatives of the Town's Housing Board and returned comments on February 15, 2019. However, the Town never took a vote on the proposed zoning. May 15, 2020 Letter, Ex. 20, at 4-5.

discretionary funding to expand sewer access; the County has made clear that the Town would be required to comply with the Discretionary Funding Policy. That policy, which is discussed further below, would include a requirement that Yorktown adopt municipal zoning code provisions and/or policies that demonstrate a commitment to AFFH. Aug. 14, 2020 Letter, Ex. 13, at 4.

## B. County's Efforts to Promote Model Ordinance

As noted, the County is not obligated by the Settlement to ensure universal adoption of the Model Ordinance. But, it is required to "promote" the passage of that ordinance to municipalities to advance fair housing. The meaning of the term "promote" has been litigated earlier in this case. At a minimum, the County must take concrete steps "to help bring the object in question into being." *United States ex rel. Anti-Discrimination Ctr. of Metro N.Y., Inc. v. Westchester Cnty.*, 712 F.3d 761, 769 (2d Cir. 2013). That obligation is "not met by taking no action or taking an action that detracts from, rather than furthers, the end goal." *Id.*

There is some ambiguity in the Settlement as to whether the County is obligated to take legal action against individual municipalities to enforce adoption of the Model Ordinance. Outside of the recital paragraphs, the Settlement references legal action by the County in two instances. First, Paragraph 7(j) states that the County shall use all available means, including "pursuing legal action," if any municipality does not take actions needed to promote the objectives of Paragraph 7 or undertakes actions that hinder those objectives. Settlement ¶ 7(j). Thus, this obligation to bring legal action is explicitly limited to enforcing Paragraph 7. Second, Paragraph 15 provides that in making its biennial assessment, "the Monitor may consider any information appropriate to determine whether the County has taken all possible actions to meet its obligations under this Stipulation and Order, including, but not limited to, exploring all

opportunities to leverage funds for the development of the Affordable AFFH Units, promoting inclusionary and other appropriate zoning by municipalities by offering incentives, and, if necessary, taking legal action." *Id.* ¶ 15. It is less clear on its face whether the County's obligation under this Paragraph is also limited to enforcing Paragraph 7.

This Court addressed this topic in its order dated May 24, 2016 (ECF 608). The Court found that the County's affirmative obligations under Paragraph 7(j), including the obligation to bring legal action, is limited to enforcing Paragraph 7—specifically, ensuring the development of at least 750 new affordable housing units. *Id.* at 50-52. The Court's order did not consider or suggest that the Settlement requires the County to take legal action in connection with any other provision of the Settlement, such as the duty to "promote" the model ordinance under Paragraph 25(a).[17] I interpret this Court's order to mean that the Settlement does not require the County to sue individual municipalities to enforce adoption of the Model Ordinance.[18] *See also* Monitor's Submission Relating to the Monitor's Requests for Relief, June 24, 2016 (ECF 630, at 22) ("The Court has made clear that Paragraph 7(j) is only triggered in connection with the 750-units requirement. . . .").

Against this backdrop, the County's efforts to promote the Model Ordinance have focused principally on three areas. First, the County has encouraged municipalities to adopt the Model Ordinance through various public speaking engagements. The County states that:

> most of the advocacy performed by the County with respect to the Model Zoning
> Ordinance is in-person, in individual and group meetings, seminars, and symposia,

---

[17] *See also U.S. ex rel. Anti-Discrimination Ctr.*, 712 F.3d at 769 (holding that the duty to "promote" source of income legislation "certainly does not require the County Executive to ensure that the legislation be enacted into law").

[18] It is also not clear how the County would have standing to sue an individual municipality for declining to adopt the Model Ordinance. *Cf. Mhany Mgmt. v. Cnty. of Nassau*, 819 F.3d 581, 600-02 (2d Cir. 2016) (holding that standing to challenge a zoning ordinance requires a "'realistic opportunity'" for a housing development to proceed (citation omitted)).

and organizational meetings, such as meetings of the Westchester Municipal Planning Federation. These meetings often include some or all of the municipalities that have not adopted inclusionary/incentive zoning.

Jan. 18, 2019 Letter, Ex. 21, at 2. The County has kept up those efforts in the last two years, discussing the Model Ordinance at public forums including the Westchester County Planning Board, the Westchester Municipal Administrators Association, the Urban County Council, and a meeting with housing non-profit agencies. *Id.* The County has also led training programs and group sessions where the benefits of the Model Ordinance are discussed, including with the Westchester Municipal Planning Federation and the Pace Land Use Law Center. *Id.* The County is also working with the Westchester County Association (a local business council) to publish a playbook for development in Westchester that will include information on the Model Ordinance. *Id.*

Second, the County has exchanged written correspondence with municipalities that have so far, or previously, rejected the Model Ordinance. In 2016, the County sent letters to ten municipalities (Bronxville; Buchanan; Eastchester; Harrison; Mount Pleasant; Pelham; Pelham Manor; Rye; Tuckahoe; and Yorktown) that had not adopted the ordinance or other inclusionary/incentive zoning. *Id.* According to a sample produced by the County, the letter reminded the municipalities of the Settlement, the Model Ordinance, and the status of Model Ordinance adoption by other municipalities. *Id.* at 155. The letter also encouraged the municipality to review the Model Ordinance provisions to identify potential amendments to its local zoning code, and offered the assistance of the County Department of Planning in conducting such a review. *Id.* The letter enclosed both a copy of the Model Ordinance and a "questions and answers" sheet that addresses topics that have arisen in review sessions and discussions with local officials. *Id.* The County has renewed those efforts within the last few

months.  In September 2020, Mr. Latimer wrote to each municipality that has not yet adopted the

Model Ordinance.  According to a sample letter sent to the Village of Buchanan, Mr. Latimer

urged the town to consider adopting zoning provisions consistent with the Model Ordinance,

noted that adopting the Model Ordinance opened the door to discretionary funding grants, and

offered the County's assistance in updating Buchanan's zoning ordinance.  *See* Sept. 9, 2020

Letter from County Executive George Latimer to Village of Buchanan Mayor Theresa

Knickerbocker, attached hereto as Ex. 23.

The County's Planning Board has also recommended adoption of the Model Ordinance in

referral letters submitted under General Municipal Law Section 239.[19]  Jan. 18, 2019 Letter, Ex.

21, at 169-70.  For example, in 2018 alone, the Planning Board sent six reminders to Harrison in

response to referrals.  Aug. 15, 2018 Letter from John M. Nonna to Stephen C. Robinson,

attached hereto as Ex. 24, at 2.  In a December 4, 2017 letter to Harrison regarding a proposed

mixed use development, the Planning Board wrote: "We continue to recommend that the

Town/Village take steps to incorporate the Model Ordinance Provisions into the Town/Village

Code and work with the developer to provide additional affordable housing opportunities in this

new development."  *See* 4Q 2017 AFFH Referral Letters, attached hereto as Ex. 25, at 7.

Similarly, in a November 2017 letter responding to an application by the Village of Pelham to

develop a vacant lot with a 16-unit apartment building, the Planning Board noted that the

application did not indicate if any of the proposed residential units were to be developed as

AFFH units, urged the Village to adopt new zoning that incorporates the Model Ordinance

---

[19] General Municipal Law Sections 239-m and -n require cities, towns, and villages to refer certain actions, such as adoption and amendment of zoning ordinances and approval of site plans and subdivision plots, to the county planning agency.  N.Y. GML § 239.

provisions, and provided a link to the Model Ordinance. *Id*. at 13-14. The County has produced many other such examples. *Id*. at 2-19.

## C. Discretionary Funding Policy

The third way that the County has promoted the Model Ordinance is through conditioning discretionary funding on adoption of the model provisions. Under the Settlement, the County is required to include in its implementation plan a policy that conditions the use of public funds and resources on a municipality's commitment to "*inter alia*, (i) ban local residency requirements and preferences and other selection preferences that do not AFFH; (ii) offer the County a "right of first refusal" to retain and/or purchase land acquired in rem to be used for affordable housing that AFFH; and (iii) actively further implementation of [the Settlement] through their land use regulations and other affirmative measures to assist development of affordable housing." Settlement ¶ 25(d). The County fulfilled this obligation by adopting the Discretionary Funding Policy ("DFP") on January 10, 2012, which it still uses today. *See, e.g.* Dec. 18, 2018 Flood Mitigation Agreement with Village of Rye Brook, attached hereto as Ex. 26, at 27. The terms of the County's DFP mirror the language in Paragraph 25(d) of the Settlement.[20]

---

[20] The DFP states that each eligible municipality must commit to the County in writing that it is in compliance with the following terms and conditions:

> (a) [it has] adopted municipal zoning code provisions and/or policies which reflect the guidance provided in the Model Ordinance Provisions . . . including a ban on local residency requirements and preferences and other selection preferences that do not affirmatively further fair housing, except to the extent provided in the Model Ordinance Provisions; (b) [it will] offer the County a Right of First Refusal to retain and/or purchase any and all land acquired in rem to be used for housing that affirmatively furthers fair housing; and (c) [it will] actively further implementation of the Settlement Agreement through its land use regulations and other affirmative measures to assist the development of affordable housing.

Dec. 18, 2018 Flood Mitigation Agreement with Village of Rye Brook, Ex. 26, at 28. The DFP also requires eligible municipalities to ensure that AFFH units "be marketed in accordance with Westchester County's Affirmative Fair

The County's DFP requires that any eligible municipality that receives discretionary funds comply with certain terms, including adopting zoning code provisions or policies that demonstrate a commitment to AFFH. *Id.* The provisions must contain inclusionary zoning standards, prohibit preferences for the awarding of fair and affordable housing units except to the extent provided in the Model Ordinance, and require that affordable housing units adhere to the Affirmative Fair Housing Marketing Plan.[21] *Id.* The DFP also requires municipalities to adopt other affirmative measures to assist the development of affordable housing. *Id.*

The County has identified a number of discretionary funding pools subject to the DFP, including CDBG funds, East of Hudson grants, the County's Legacy Program, flood mitigation funding pursuant to the Storm Water Management Law,[22] Housing Infrastructure Funds, and County New Homes Land Acquisition Funds. As discussed below,[23] the County has committed $10 million to each of the two latter funds. Once a municipality complies with the DFP to receive one source of funds, it then has access to the other pools of funding, which should further incentivize adherence to the DFP. Aug. 14, 2020 Letter, Ex. 13, at 4.

With these discretionary funds, the County is able to leverage millions of dollars per year to encourage municipalities to adopt provisions of the Model Ordinance. As a recent example, Yorktown has requested millions of dollars in discretionary funding from the County to expand

---

Housing Marketing Plan approved pursuant to the Settlement Agreement, throughout the period of affordability." *Id.*

[21] The Settlement requires that the County include in its implementation plan "standards for affirmative marketing of new housing developments to ensure outreach to racially and ethnically diverse households." Settlement ¶ 25(a)(iii). This plan is appended to the County's Implementation Plan at Appendix G-1(ii). Marketing is conducted by the County, as discussed in Section VII, *infra*.

[22] As one example, the County entered into an agreement with the Village of Rye Brook on December 18, 2018 to provide funding for flood mitigation as long as Rye Brook certified compliance with the DFP, annexed as Schedule D to the agreement. *See* Dec. 18, 2018 Flood Mitigation Agreement with Village of Rye Brook, Ex. 26, at 7.

[23] *See* Section VI, Needs Assessment, *infra*.

sewer access.  To receive these funds, Yorktown will have to comply with the DFP and, accordingly, adopt at least some of the model provisions.  *Id.*

Another mechanism by which the County utilizes the DFP is the Urban County Consortium ("UCC").  HUD Regulations state that individual municipalities must have a population of at least 50,000 to qualify to receive grants from HUD directly.[24]  Only the four largest cities in the County meet this population requirement.  The purpose of the UCC is to allow municipalities with populations of less than 50,000 to join together to qualify to receive HUD grants.[25]  Each UCC member must agree to abide by the DFP if it accepts any grants through the County.[26]  *Id.* at 7-8.

Membership in the UCC opens the door to about $5 million that the County administers annually through three HUD grant programs: $3.7 million for the CDBG, which is given to municipalities to assist them in undertaking construction projects and providing public services that benefit low- and moderate-income households; $1 million for the HOME Investment Partnership Program ("HOME"), which goes directly to developers of affordable housing in UCC municipalities; and $311,000 for the Emergency Solutions Grant ("ESG"), which goes to nonprofit agencies that provide homeless and eviction prevention services to residents of the

---

[24] *See* U.S. Department of Housing and Urban Development, Community Development Block Grants (CDBG) (Entitlement), https://www.hud.gov/hudprograms/entitlement; *see also* 42 U.S.C. § 5302(a)(4)-(6).

[25] As long as the UCC has a total population of at least 200,000, the participating municipalities are eligible for HUD funds.  Aug. 14, 2020 Letter, Ex. 13, at 7.  As of June 18, 2019, the UCC had a total population of over 347,000 residents.  *See* Press Release, Westchester County Reestablishes Urban County Consortium and Is Awarded Federal Housing and Community Development Grants (June 18, 2019), https://www.westchestergov.com /home/all-press-releases/8049-westchester-county-reestablishes-urban-county-consortium-and-is-awarded-federal-housing-and-community-development-grants; *see also* 42 U.S.C. § 5302(a)(6).

[26] For example, the FY 2019-2021 UCC Agreement between the County and Village of Ardsley states, "If the Cooperating Municipality accepts any Grants through the County, the Cooperating Municipality agrees to abide by the County's Discretionary Funding Policy, as adopted in January 2012."  UCC Agreement with Village of Ardsley, attached hereto as Ex. 27, at ¶ 15.

UCC municipalities.  *Id.* at 8.  About $2.2 million in additional CDBG funding and $5.2 million in ESG funding has been awarded to the UCC in 2020 through the federal CARES Act to provide programs that benefit those impacted by the COVID-19 pandemic.  *Id.*

The County first established the UCC in 1976 and continued it through FY 2011, at which point HUD began to deny funding due to a dispute regarding the County's AFFH obligations.[27]  *Id.* at 8.  The County reestablished the UCC under the leadership of County Executive Latimer in 2018 with 25 municipalities, and added two more municipalities— Briarcliff Manor and North Salem—in 2019.  Sept. 30, 2020 Letter, Ex. 15, at 4.  The UCC currently consists of 27 municipalities with a total population of 380,752.  *Id.*  HUD has accepted the County's paperwork to add three more municipalities to the UCC for FY 2021 (New Castle, Tuckahoe, and Peekskill) for a total of 30 municipalities and a population of 428,390.  *Id.*  A number of the municipalities that have not adopted the Model Ordinance—such as Buchanan, Cortlandt, Pelham, and Yorktown—are members of the UCC.  *Id.* at 4-5.[28]  The County has emailed every eligible municipality every year since the spring of 2018 to encourage them to join the Consortium.  The County Executive, Deputy County Executive, and their staff have also followed up with phone calls to answer any of the municipalities' questions.  *Id.* at 5.

**D.    Conclusion**

Based on the record as it stands today, I find that the County has met its obligation to promote the Model Ordinance under Paragraph 25(a) of the Settlement.  The Settlement does not require all municipalities to adopt the Model Ordinance.  Rather, it obligates the County to

---

[27] *See* Section V, Analysis of Impediments, *infra* for a more detailed history of the litigation following HUD's denial of 2011 funds.

[28] *See* Westchester County Department of Planning, Westchester County Consortium Municipalities (Feb. 2019), https://planning.westchestergov.com/images/stories/MapPDFS/consortmunimap.pdf.

develop a model ordinance meeting certain requirements and then promote that ordinance to its constituent municipalities to advance fair housing. There is no argument that the County's Model Ordinance does not satisfy the requirements of the Settlement. Rather, the only question is whether the County has adequately "promoted" the Model Ordinance to the various towns, cities, and villages. To be sure, it is unfortunate that only 21 of 31 eligible municipalities have adopted the Model Ordinance or similar provisions furthering affordable housing. However, the County does not have unlimited powers to enforce adoption of the Model Ordinance by individual towns and villages. The record clearly establishes that the County, particularly under the current administration, has gone to great lengths to encourage all municipalities to adopt the Model Ordinance. I am also persuaded that the County will continue to look for ways to compel recalcitrant municipalities to adopt the Model Ordinance and otherwise advance fair housing. However successful those efforts turn out to be, I am satisfied that the County's actions to date have fulfilled its obligations under the Settlement.

**V.      Analysis of Impediments**

Paragraph 32 of the Settlement concerns the County's obligation to produce an AI acceptable to HUD. Since the submission of the last Monitor Report, HUD has accepted the County's AI as consistent with the terms of the Settlement. Nonetheless, HUD's acceptance of the AI was preceded by a long-running dispute with the County, which included mediation by the Monitor and litigation in federal court. I include a brief synopsis here.

Pursuant to the schedule set forth in the Settlement, the County's AI was originally due December 8, 2009. After HUD granted three extensions, the County submitted its first AI on July 23, 2010. HUD rejected that report on December 21, 2010, and described five actions the County could take to make its AI acceptable, including identifying steps to overcome

exclusionary zoning practices.  The County submitted a revised AI on April 13, 2011.  HUD

rejected that report two weeks later and listed six restrictive zoning practices that the County's

future submissions should address.  The County submitted another AI on July 11, 2011, which

HUD rejected two days later.  A dispute over HUD's order ended up before the Monitor and then

in this Court, which in 2012 ordered the County to provide the Monitor with an analysis of the

zoning ordinances across the County.[29]

       In response to that order, on February 29, 2012, the County submitted a Zoning

Submission to HUD (the "First Zoning Submission").  It summarized zoning ordinances adopted

by 43 County jurisdictions and addressed the restrictive practices identified by HUD for each

municipality.  Following correspondence with both HUD and the Monitor that noted numerous

deficiencies with that submission, the County submitted a Second Zoning Submission on July 6,

2012.  Later that year, the County submitted a Third, Fourth, and Fifth Zoning Submission in

response to requests from the Monitor.  HUD rejected the County's collected submissions on

March 13, 2013, concluding that they "fail to meet the Settlement's requirements for an

acceptable AI."  Mar. 13, 2013 Letter from Glenda L. Fussa to Kevin J. Plunkett, attached hereto

as Ex. 28, at 9.  On March 25, 2013, HUD advised the County that it planned to reallocate

approximately $7.4 million in FY 2011 funds because of the County's failure to provide a

satisfactory certification that it would comply with its obligation to AFFH.

       On April 24, 2013, the County submitted a fourth revised AI and a Sixth Zoning

Submission.  HUD found both the AI and Zoning Submission inadequate as well.  In June and

August 2013, the County made its Seventh and Eighth Zoning Submissions to HUD, which HUD

---

[29] The full litigation history is summarized in *Westchester v. HUD*, 116 F. Supp. 3d 251 (S.D.N.Y. 2015), and
*Westchester v. HUD*, 802 F.3d 413 (2d Cir. 2015).

also rejected.  On August 9, 2013, HUD stated that the "only issue holding up the acceptability of the County's AI is the inadequacy of its plans to overcome exclusionary zoning practices" and identified six restrictive zoning practices that HUD expected the County to analyze.  Aug. 9, 2013 Letter from Mark Johnston to Robert P. Astorino, attached hereto as Ex. 29, at 1.

Between 2013 and 2015, the dispute went back to court.  Ultimately, this Court and the Second Circuit rejected the County's complaints against HUD and held that HUD had not acted inappropriately.  On April 24, 2013, in addition to submitting the fourth revised AI, the County also filed a complaint in this Court challenging HUD's denial of FY 2011 funds and seeking injunctive relief.  After this Court denied the applications for injunctive relief and dismissed the complaint, the County appealed to the Second Circuit.  After denying the County's motion for a preliminary injunction, on February 18, 2015, the Court of Appeals affirmed the dismissal of the County's claims to the extent that they sought relief for funds that had already been allocated because any claim to those funds would be moot.  As for the funds that had yet to be reallocated, the Court of Appeals held that the County's claims were subject to judicial review and remanded the case.

On March 17, 2015, the County filed a second lawsuit in this Court, challenging HUD's denial of its AFFH Certifications.  After the Court denied the County's request for a preliminary injunction, both sides moved for summary judgment.  On July 15, 2015, this Court granted HUD's motion for summary judgment and dismissed the County's complaints in their entirety. The Second Circuit affirmed on September 25, 2015.

In December 2016, following the Monitor's last Biennial Assessment, the County made its Ninth Zoning Submission.[30]  It summarized and updated the plans and initiatives undertaken to overcome exclusionary zoning practices and provided an update on the initiatives by the five remaining communities to promote and provide fair and affordable housing.  On December 29, 2016, HUD rejected the Ninth Zoning Submission, noting that "while the submissions represent progress … [they] do not incorporate the changes that we stated in the letter dated October 24, 2014, needed to be made …  Further, the submissions lack any commitment on the part of the County to develop and implement strategies to overcome the effects of the exclusionary zoning practices identified in the [Monitor's 2013 and 2014 Reports].…"  Dec. 29, 2016 Letter from Jay Golden to Valerie Monastra, attached hereto as Ex. 30, at 2.

The County made its Tenth Zoning Submission to HUD on March 20, 2017 as a supplement to the 2013 AI.   The analysis, drafted by VHB Engineering, reviewed zoning regulations in the eight most diverse and the eight least diverse municipalities in the County and assessed the apparent impact of the zoning regulations on concentrations of Black and Hispanic populations.  On April 10, 2017, HUD rejected the Tenth Zoning Submission "because it continue[d] to lack appropriate analyses of impediments to fair housing choice and fail[ed] to identify forward-looking strategies to overcome these impediments."  Apr. 10, 2017 Letter from Jay Golden to Kevin J. Plunkett, attached hereto as Ex. 31, at 1.  After the County, through VHB Engineering, requested that HUD reconsider its position, HUD replied that it was "committed to reaching a resolution with the County and believes a resolution is close."  May 4, 2017 Letter

---

[30] In compliance with Judge Cote's July 18, 2016 Order after the Monitor's Third Biennial Assessment (which found that the County had failed to comply with the Settlement in part because it had not completed an AI), the zoning submission was drafted by a consultant, VHB Engineering, who was engaged by the County and approved by the Monitor.  *See United States ex rel. Anti-Discrimination Ctr. of Metro N.Y., Inc. v. Westchester Cnty.*, No. 06 Civ. 2860 (DLC), ECF 660, July 18, 2016; *United States ex rel. Anti-Discrimination Ctr. of Metro N.Y., Inc. v. Westchester Cnty.*, No. 06 Civ. 2860 (DLC), ECF 670, Aug. 26, 2016.

from Regional Director of the Office of Fair Housing and Equal Opportunity Jay Golden to Kevin J. Plunkett, attached hereto as Ex. 32, at 1. HUD said it reevaluated the zoning submission based on VHB Engineering's letter and noted that "the latest analysis submitted to HUD is an improvement over prior analyses" but "it continues to come to unsupported conclusions." *Id.* Following this letter and other correspondence between HUD, the County, and VHB, the County submitted a revised analysis on June 16, 2017. On June 23, 2017, HUD responded with suggested revisions in redline form. On July 13, 2017, the County submitted a revised AI that accepted HUD's changes. *See* Aug. 14, 2020 Letter, Ex. 13, at 6; July 13, 2017 Letter from Kevin J. Plunkett to Jay Golden, attached hereto as Ex. 33. The next day, HUD deemed the zoning supplement, and therefore the AI, acceptable. *See* July 14, 2017 Letter from Jay Golden to Kevin J. Plunkett, attached hereto as Ex. 34; *see also* Joseph De Avila, "Westchester County Wins HUD OK in Housing Dispute," Wall St. J., (July 18, 2017), https://www.wsj.com/articles/westchester-county-wins-hud-ok-in-housing-dispute-1500407638.

The primary impediment that the zoning submission explored was the relationship between concentrations of minority populations and the housing types and lot sizes permitted by local zoning laws.[31] Based on its analysis of the eight most and eight least diverse municipalities covered by the Settlement, the report concluded that there was "no pattern between the mix of housing types and single-family lot sizes permitted through zoning regulations in the communities with the lowest percentages of minority populations." July 13, 2017 County AI, Ex. 19, at 4-3. The report also concluded that "the communities with the highest percentage of

---

[31] The AI defined minority concentrations as areas where the percentage of a minority group (defined for purposes of the AI as single race Black/African Americans or Hispanics) is higher than the percentage of the same minority group in all of Westchester County, excluding group quarters.

minority populations have zoning regulations that contain a mix of housing types and single-family lot sizes," although "the specific mix of housing types in these communities differs." *Id*.

In some communities that are predominantly zoned to allow for two-family or multi-family housing, the actual land use pattern is medium- and large-lot single-family housing and the demographic is mostly White. Two municipalities that exhibit this pattern are Lewisboro and New Castle, which are also two of the least diverse municipalities in the County. In light of this land use data, the report concluded that zoning is not the sole driver of racial and economic diversity in Westchester County, and "zoning alone cannot create a diverse community." *Id*.

The report did find some relationship between zoning and racial demographics, including that communities with the highest percentage of minorities have zoning regulations that contain a mix of housing types (single-family, two-family, and multi-family) and minimum lot sizes for single-family housing. At the same time, it concluded that factors other than zoning appear to have a significant impact on racial and economic diversity. Environmental constraints, including watershed, open space, wetlands, and agriculture were cited as impediments to fair and affordable housing, as were septic systems, cost of living, housing tenures, and historic community growth.[32]

From my perspective, the County has met its obligation under Paragraph 32 to submit an AI satisfactory to HUD, albeit belatedly. The July 2017 submission also satisfies the County's obligations to "identify and analyze, *inter alia*, (i) the impediments to fair housing within its jurisdiction, including impediments based on race or municipal resistance to the development of

---

[32] The Northern Westchester Watershed Communities meet regularly with the County and the New York City Department of Environmental Protection to discuss issues including potential development of affordable housing. The impacted communities have also taken steps to address environmental impediments, including building salt sheds to limit contamination of road salt and implementing septic repair programs. *See* May 15, 2020 Letter, Ex. 20, at 5.

affordable housing; (ii) the appropriate actions the County will take to address and overcome the effects of those impediments; and (iii) the potential need for mobility counseling, and the steps the County will take to provide such counseling as needed."

Separate from HUD's approval, Paragraph 32 also requires the AI to comply with the guidance in HUD's Planning Guide. The Planning Guide, published in 1996, states that an acceptable AI "involves an assessment of conditions, both public and private, affecting fair housing choice for all protected classes." HUD Fair Housing Planning Guide, Ex. 10, at 2-7. However, as already noted, this Court rejected the previous Monitor's request that the AI contain such a needs assessment, and stated that HUD has the power to determine the adequacy of the AI.[33] As a result, even though the County's July 2017 AI did not contain a needs assessment, HUD's acceptance of that submission satisfies this component of Paragraph 32.[34]

Before determining whether the County has fulfilled all its obligations under Paragraph 32, I would like to address one other area of concern identified by the previous Monitor: whether certain municipalities have zoning codes that are potentially exclusionary under *Berenson v. Town of New Castle*, 38 N.Y.2d 102 (1975), or *Huntington Branch, NAACP v. Town of Huntington*, 844 F.2d 926 (2d Cir. 1988), *aff'd sub nom. Town of Huntington v. Huntington Branch*, 109 S. Ct. 276 (1988). Paragraph 39 of the Settlement authorizes the Monitor, in its reports to the Court, to address "recommended steps or activities to improve the County's performance." Settlement ¶ 39(d). In May 2016, the Monitor recommended that the AI include "an analysis of whether zoning regulations in each eligible municipality act as impediments to

---

[33] *See supra* note 3.

[34] Nevertheless, the County took it upon itself to commission and release a Needs Assessment in November 2019. *See* Section VI, *infra*.

fair and affordable housing under the state-law *Berenson* and federal-law *Huntington*

standards."[35]  Monitor's Specific Requests for Relief Arising from the Third Biennial

Assessment of Westchester County's Compliance at 2-3, *United States v. Westchester Cnty.*, No.

06 Civ. 2860 (DLC), ECF 609.  The AI approved by HUD undertook no such analysis.

    The Monitor first considered potential *Berenson* and *Huntington* issues in two expert

reports released in 2013 and 2014.  Those reports concluded that ten of the 31 eligible

municipalities had some form of exclusionary zoning under *Berenson* and *Huntington*.  Third

Biennial Assessment at 37.  After engaging directly with these ten communities, the Monitor

reported on July 7, 2016 that five municipalities continued to have zoning ordinances that could

be exclusionary under either *Berenson* or *Huntington* or both: Croton-on-Hudson, Harrison,

Lewisboro, Pelham Manor, and Larchmont.  *See id.* at 48; July 7, 2016 Letter from James E.

Johnson to Hon. Denise L. Cote, *United States v. Westchester Cnty.*, No. 06 Civ. 2860 (DLC),

ECF 656 ("July 7, 2016 Letter").  The Monitor recommended that the DOJ consider taking legal

---

[35] The *Berenson* line of cases analyze whether a municipality's zoning ordinance is exclusionary based on
socioeconomic status.  *See generally Berenson*, 38 N.Y.2d at 102-03; *Cont'l Bldg. Co. v. Town of N. Salem*, 211
A.D.2d 88, 91 (3d Dep't 1995); *see also* Monitor's Final Report on Westchester County's Analysis of Municipal
Zoning (Sept. 13, 2013), ECF 452 at 16-17 ("2013 Zoning Report").  Exclusionary zoning based on socioeconomic
status has the practical effect of excluding persons of low or moderate income from the municipality.  *See Cont'l
Bldg. Co.*, 211 A.D.2d at 94.  Under *Berenson*, zoning is legally deficient if as a whole: the zoning fails to provide a
properly balanced and well-ordered plan; fails to consider, weigh and balance both local and regional needs; and if
there is insufficient evidence that in practice its zoning is not exclusionary.  *See Berenson*, 38 N.Y.2d at 110-11;
*Cont'l Bldg. Co.*, 211 A.D.2d at 92.  The *Huntington* legal standard considers whether municipal zoning codes have
a discriminatory impact on racial and ethnic minorities by perpetuating segregation or by adversely impacting a
particular minority group.  *See Huntington*, 844 F.2d at 937.  In *Huntington*, the Second Circuit found that the
town's zoning ordinance restricted multi-family housing to a section of the town where more than half of the
residents were minorities, which had the effect of perpetuating segregation.  *Id.* at 937-38.  The court also held that
the town's refusal to rezone for an affordable housing development had a disparate impact because a
disproportionate number of Black families needed subsidized housing.  *Id.* at 938.  Under *Huntington*, once there has
been a showing that an exclusionary zoning provision establishes a discriminatory effect, the burden shifts to the
municipality to show that the challenged practice is necessary to achieve one or more substantial, legitimate,
nondiscriminatory interests of the local jurisdiction and those interests could not be served by another practice that
has a less discriminatory effect.  *Id.* at 941; *see also* 24 C.F.R. § 100.500(b).

action against these five municipalities, while commending Croton-on-Hudson on its progress. July 7, 2016 Letter at 2.

Since July 2016, Croton-on-Hudson, Larchmont, and Lewisboro have amended their zoning ordinances; Pelham Manor and Harrison have not.  I address the zoning changes in the first three municipalities in more detail below.  Because Pelham Manor and Harrison have made no effort to amend zoning ordinances that the Monitor and an expert deemed potentially exclusionary, I am unable to conclude that anything has meaningfully changed in those municipalities.[36]

Croton-on-Hudson: The *Berenson* report found that Croton-on-Hudson's zoning code did not appear to provide meaningful opportunities for the development of affordable housing to meet local need, partly due to its restrictive practices on multi-family housing.  *See* 2013 Zoning Report at 61.  Although the zoning code permits multi-family housing and other typically affordable housing types, only 1.9% of the acreage was zoned for as-of-right multi-family development and those districts were completely built out.  *Id*.  Further, accessory apartments were allowed by special permit only but were age- and size-restricted.  *Id*. at 63.  The *Berenson* report concluded that the Village needed to take additional actions to meet its share of regional affordable housing need, including: "adopting the model zoning ordinance and providing mandates and broader incentives for affordable housing, mapping additional areas where multi-family housing is permitted as-of-right, permitting accessory housing units as-of-right and for tenants other than seniors, and providing opportunities for additional types of development (such as quadraplexes or cottage-style housing)."  *Id*. at 65.

---

[36] That does not mean that the County should be faulted for their inaction.  As discussed above, the County has undertaken significant efforts to encourage both municipalities to adopt the Model Ordinance, including written correspondence and meeting with local officials.  I encourage the County to continue those efforts.

In 2015, after the *Berenson* report was issued, the Village "liberalized the conditions under which accessory apartments are permitted," including removing age restrictions and streamlining the approval procedures, and "expanded the opportunity for mixed-use housing development." June 9, 2020 Letter, Ex. 18, at 3-4; July 7, 2016 Letter, at 1-2. Additionally, on November 5, 2018, Croton-on-Hudson adopted amendments to its zoning code that included provisions of the Model Ordinance. Dec. 13, 2018 Letter from John M. Nonna to Stephen C. Robinson, attached hereto as Ex. 35, at 1. The amendments included provisions for mandatory affordable housing in new developments of ten or more units and an expedited and priority review process for developments that include AFFH units. *Id.*; *see also* Village of Croton-on-Hudson Local Law #9 2018, Sections 1(B)(1), 1(C)(1).

In sum, Croton-on-Hudson's zoning amendments adequately addressed the *Berenson* report's recommendation of providing mandates and incentives for affordable housing, removing age restrictions on accessory apartments, and expanding opportunities for additional types of development (specifically, mixed-use). However, the amendments do not address the two primary concerns with the Village's zoning: mapping additional areas where multi-family housing is permitted as-of-right and permitting accessory units as-of-right. The County acknowledges this and "continues to . . . advocate for the expansion of multi-family zoning . . . in Croton-on-Hudson." *See* Aug. 7, 2020 Letter, Ex. 11, at 7.

Larchmont: The *Huntington* report concluded that there was prima facie evidence that the Village's zoning code perpetuated minority clustering because 50.4% of Larchmont's minority household population resided in the only three zoning districts allowing as-of-right multi-family housing development. *See* Monitor's *Huntington* Analysis of Westchester County Municipal Zoning, Sept. 8, 2014, ECF 578-43 (Ex. 84) at 6. Those same districts were home to only 16.7%

of the Village's total household population and represent only 8% of the total acreage of the Village. *Id.* at 64; *see also* Apr. 10, 2017 Letter, Ex. 31. Additionally, while minority residents constituted 7.7% of the Village's total population, they represented 23.4% of the total household population in the three multi-family districts. ECF 578-43 at 64. The report noted that Larchmont's multi-family districts are primarily restricted to less desirable locations and suggested that the Village consider better integrating the minority household population by reforming its zoning code to expand districts that permit multi-family and other housing types that are disproportionately used by minorities. *Id.* at 65. The *Huntington* report also suggested that Larchmont create more opportunities for affordable housing development. *Id.* at 67.

On December 19, 2016, the Village updated its zoning code with "[s]upplementary standards for the provision of affordable housing units." *See* Village of Larchmont Code § 381-45. These amendments included provisions consistent with the Model Ordinance: developments of a certain size must include AFFH units, and applications for developments that include AFFH units will be given priority and subjected to an expedited review process. Jan. 18, 2019 Letter, Ex. 21, at 3; *see also* Larchmont Code § 381-45(B)(1), (M). Even though additional land has not been zoned for multi-family housing as-of-right, and the Village's small size (1.1 square miles) and lack of vacant or undeveloped land has made additional development difficult, over two-thirds of all housing units developed in Larchmont since 2010 were multi-family units, almost all of which were affordable units. *See* June 9, 2020 Letter, Ex. 18, at 3. To determine whether Larchmont's zoning code continues to raise *Huntington* concerns, it would be necessary to review current demographic data; however, new privacy protections in the not-yet-released 2020 Census data will make such a review difficult, if not impossible, and meaningful demographic

changes can take a significant amount of time.[37]  Even without such a review, it is promising that

Larchmont has both adopted the Model Ordinance and has permitted the development of multi-

family and affordable housing in recent years.  The County has also expressed that it

"encourages . . . the expansion of multi-family housing where the opportunities permit."  Aug. 7,

2020 Letter, Ex. 11, at 12.

Lewisboro:  The *Berenson* and *Huntington* reports concluded that Lewisboro, a town

located within the New York City watershed area, had zoning that was deemed exclusionary

under both standards.  First, the *Berenson* report found that the town's zoning code did not

provide meaningful opportunities for the development of affordable housing to meet its share of

regional affordable housing needs.  *See* 2013 Zoning Report at 120.  The report attributed this

finding in part to restrictive practices on multi-family housing; less than one percent (1%) of the

Town's total acreage was zoned for as-of-right multi-family development and only 0.25% of the

occupied residential area within the Town was occupied by multi-family residences.  *Id.* at 122-

23.  Additional restrictions on multi-family developments include large minimum lot sizes for

developments outside the water and sewer district (which encourages smaller developments) and

density restrictions.  *Id.* at 122.  There were other restrictions on affordable alternatives to multi-

family housing: accessory apartments are not allowed as-of-right and are size- and occupancy-

restricted.  *Id.* at 120-122.

The *Huntington* report found prima facie evidence that Lewisboro's zoning code had a

disparate impact on minorities because the Town restricted as-of-right multi-family housing

---

[37] *See* Aug. 7, 2020 Letter, Ex. 11, at 6; *see also* A History of Census Privacy Protections, U.S. Census Bureau (Oct. 10, 2019), https://www.census.gov/about/policies/privacy/statistical_ safeguards/disclosure-avoidance-2020-census.html; Gus Wezerek & David Van Riper, Changes to the Census Could Make Small Towns Disappear, N.Y. Times (Feb. 6, 2020), https://www.nytimes.com/interactive/2020/02/06/ opinion/census-algorithm-privacy.html.

development, did not possess a sufficient diversity of housing types, and had not adopted the Model Ordinance. Monitor's *Huntington* Analysis of Westchester County Municipal Zoning, September 8, 2014, ECF 578-43 (Ex. 84) at 67-68. The report noted that restricted housing types are used disproportionately by minority residents and that there were no meaningful opportunities for the development of multi-family, affordable, or rental housing. *Id.* at 30, 68. As a result of zoning restrictions, only 4.2% of the Town's occupied housing units were in multi-family housing, 1.4% of occupied housing units were in two-unit housing, and 10% of units were renter-occupied. *Id.* at 68. However, the report concluded that the Town's zoning code did not perpetuate the clustering of the minority household population. *Id.* at 67.

The reports concluded that additional actions were needed for the Town to provide viable opportunities for affordable housing. In particular, the Town could develop affordable housing in locations where sewage is not an issue (such as housing above stores) or promote low-density development models (for example, allowing two-family housing with one affordable unit instead of a similarly sized single-family home). *See* 2013 Zoning Report at 125; Monitor's *Huntington* Analysis of Westchester County Municipal Zoning, September 8, 2014, ECF 578-43 (Ex. 84) at 69.

The Town amended its zoning code on July 13, 2015. The changes included a significant expansion of the area zoned to permit multi-family housing. *See* Nov. 19, 2015 Letter from Lewisboro Town Supervisor, ECF 578-38, Ex. 80. In 2016, Lewisboro further amended its zoning code to allow for accessory apartments as-of-right. *See* June 9, 2020 Letter, Ex. 18, at 3; Town of Lewisboro, Article V Supplemental Regulations, § 220-40 Accessory apartments (last amended September 12, 2016, by L.L. No. 6-2016). The Town amended its zoning code again on December 10, 2018 to adopt provisions consistent with the Model Ordinance, including

mandating affordable housing in certain developments and providing incentives for developers who include AFFH units.[38]  In 2019, Lewisboro further expanded the districts allowing multi-family housing by special permit.  *See* June 9, 2020 Letter, Ex. 18, at 3; Town of Lewisboro, Article V Supplemental Regulations, § 220-43.8 Multifamily dwellings (added October 28, 2019, by L.L. No. 10-2019).

On this record, the fundamental issue underlying both the *Berenson* and *Huntington* violations in Lewisboro was the lack of opportunity for multi-family housing.  The Town's four amendments to its zoning code in the last five years each address that issue by expanding multi-family housing and liberalizing the use of accessory apartments, mandating affordable housing in new developments, and providing density, parking, and expedited review incentives.  Following the 2015 amendments, a 46-unit development was proposed to be constructed in one of the districts newly permitted for multi-family development.  *See* June 9, 2020 Letter, Ex. 18, at 3.  It was approved by the Lewisboro Planning Board in 2019 as a 42-unit development; however, town residents commenced a lawsuit challenging that decision.  The litigation is ongoing.[39] From 2014 to 2018, 19.7% of occupied housing units were either multi-family or contained accessory apartments.  *See* Aug. 7, 2020 Letter, Ex. 11, at 7.

---

[38] *See* Dec. 13, 2018 Letter, Ex. 35, at 1; Brian Marschhauser, Lewisboro Town Board Adopts Affordable Housing 'Model Ordinance' (Dec. 24, 2018), https://www.tapinto.net/towns/katonah-slash-lewisboro/sections/government/articles/lewisboro-town-board-adopts-affordable-housing-model-ordinance#:~:text=%E2%80%93%20Under%20pressure%20from%20the%20federal,governing%20affordable%20housing%20in%20town.&text=10%20meeting%2C%20weeks%20after%20federal,not%20adopted%20by%20years%20end.

[39] *See* Feb. 28, 2019 Letter from Lewisboro Town Supervisor Peter H. Parsons to Stephen C. Robinson, attached hereto as Ex. 36; Brian Marschhauser, Goldens Bridge Affordable Housing Complex Approved by Planning Board (Mar. 7, 2019), https://www.tapinto.net/towns/katonah-slash-lewisboro/sections/ government/articles/goldens-bridge-affordable-housing-complex-approved-by-planning-board; May 15, 2020 Letter, Ex. 20, at 2.

Overall, it is clear that the County has substantially complied with the requirements of Paragraph 32. The County completed an AI, albeit after significant delay, and that AI was deemed acceptable by HUD. That is all that Paragraph 32 requires. While I am disappointed that Pelham Manor and Harrison, two municipalities that have been found to have potentially exclusionary zoning under *Berenson* and *Huntington*, have still not adopted the Model Ordinance, I believe that the County is doing all it can in that regard. Similarly, the County has demonstrated its commitment to encouraging municipalities like Larchmont and Croton-on-Hudson to revise their zoning codes to remedy remaining impediments to fair and affordable housing. In that realm, the County's power is not limitless, but I am pleased with its efforts. Therefore, this Report finds that the County has substantially complied with its obligations under Paragraph 32 of the Settlement.

## VI.    Needs Assessment

Paragraph 32 requires that the AI comply with the guidance in HUD's Planning Guide, which states that an AI must include a local needs assessment. However, as discussed, this Court declined to order that the AI contain any specific analysis and stated that HUD has the power to determine the adequacy of the AI.[40] Pursuant to that order, HUD approved an AI in July 2017 that did not contain any such assessment. Nevertheless, in November of 2019, the County released a 175-page Affordable Housing Needs Assessment (the "Needs Assessment") that presented an array of metrics to scrutinize affordable housing needs in the County. In doing so, the County exceeded its remaining obligations under the Settlement. The Needs Assessment can fairly be seen as a sign of the County's renewed commitment to fulfilling both the letter and spirit of the Settlement and good faith effort to further affordable housing. Although the

---

[40] *See supra* note 3.

Assessment does not allocate the number of units that should be built by each municipality, it provides helpful data concerning demographics, affordability, and housing conditions.

The Westchester County Board of Legislators first sought a housing needs assessment in 2016 under then-County Executive Robert Astorino.[41]  The County's 2016 capital budget even allocated $100,000 for a housing needs assessment, but those funds were not released.  Third Biennial Assessment at 36.  With the election of County Executive Latimer in 2018, the County commissioned a needs assessment to "establish a data-based foundation for the creation and preservation of affordable housing in Westchester County."[42]

The Needs Assessment was created by the Hudson Valley Pattern for Progress ("Pattern"), a non-profit policy, research, and advocacy organization that aims to "enhance the growth and vitality of the Hudson Valley."[43]  Pattern based its findings on 2000 and 2010 Census data, as well as 2017 American Community Survey ("ACS") data.  Needs Assessment, attached hereto as Ex. 37, at 14.  The Assessment provides municipal housing "snapshots" for each municipality, which detail population changes, housing cost changes, the percentage of renters and owners, trends in home sales, home affordability matrices, and other metrics.[44]  *Id.* at 23.

According to the Assessment, 11,703 new affordable housing units are required to meet the County's housing need.  *Id.* at iv.  This figure is not meant to replace the 750 units legally

---

[41] Mark Lungariello, Westchester says it completed affordable housing deal (Dec. 28, 2016), https://www.lohud.com/story/news/local/westchester/2016/12/27/westchester-affordable-housing-settlement-finish/95867128/; Mark Lungariello, Westchester needs to build more than 11,700 new units of affordable housing, study shows (Nov. 21, 2019), https://www.lohud.com/story/news/local/westchester/2019/11/21/westchester-county-affordable-housing/4239879002.

[42] Housing Needs Assessment, https://homes.westchestergov.com/resources/housing-needs-assessment.

[43] Hudson Valley Pattern for Progress, https://www.pattern-for-progress.org.

[44] The Monitor has not conducted an independent study to determine the veracity of the data and findings in the Needs Assessment, but accepts it at face value when evaluating the County's efforts to affirmatively further fair housing in this Report.

required by the Settlement.  Rather, the data in the Assessment is intended to provide the County with information to set its own goals and benchmarks to address the housing need beyond the terms of the Settlement.  The Assessment also concludes that while the County is generally considered an affluent suburb of New York City, there are significant pockets of poverty and low-wage job holders.  *Id.* at 5.  The Assessment found that the population of individuals living in poverty actually increased by 13.8% from 2000 to 2017.  *Id.* at 7.

There is also a significant disparity in the homes that County residents can afford. Median household income in the County is $89,968, which would allow an individual to purchase a $245,000 home; however, the median sale price for a home in the County is $650,000—far higher than what is affordable based on the median income.  *Id.* at 69.  The Assessment found that the availability of affordable homes is "staggeringly below . . . demand." *Id.*  In February 2008, only 50 of the 3,000 homes listed for sale were priced at $245,000 or less. 41.4% (or 141,570) of households in the County are paying more than 30% of their income toward housing costs.  *Id.* at i.  Median household incomes also vary widely between municipalities.  For example, the median income in rent-occupied households in Peekskill was about $36,000 compared to $208,000 in Scarsdale.  *Id.* at ii.

Pattern contacted housing agencies, non-profit organizations, community groups, and municipalities to inquire about their concerns regarding affordable housing in the County.  From these communications, Pattern compiled a list of problems affecting the County's housing market, including: a shortage of affordable housing, especially for very low-income renters, people with disabilities, seniors, large families, and the homeless; substandard housing conditions; overcrowding; unscrupulous landlords; extremely high development costs for land, construction, material, and taxes; crumbling or non-existent infrastructure; limited

homeownership options for first time buyers; and a lack of education and services for those facing eviction and foreclosure. *Id.* at 18-20. The Assessment found that 2,556 households live in substandard housing, 4,523 households are severely overcrowded, and 75,271 units have one or more issues (substandard housing, severe overcrowding, and/or severe cost burden). 846 units are needed to house the homeless. *Id.* at iii. Of 218,074 owner-occupied units, 5,343 units, or 2.5%, are not occupied and provide possible opportunities for creating new affordable housing units. *Id.* at 55.

The Assessment also found that there have been significant changes in racial and age demographics throughout the County. Between 2000 and 2017, the County's population both increased and became more diverse. *Id.* at 31. The County had a total population of 923,459 in 2000, which grew to 975,321 in 2017. *Id.* at 26. From 2000 to 2017, the White population decreased from 71% to 65%, while the Black population grew by 11,545 people and the Asian population by 16,217 people. *Id* at 31. The Hispanic and Latino population grew in every municipality with the exception of Pound Ridge. *Id.*

As for age demographics, the under-19 age group declined by 1.3% from 2000 to 2017 and the 30-44 age group declined by 18.9%, which the Assessment stated may indicate a lack of affordable housing options for young families. The 65-74 age group, however, increased 23.8% and the over-85 group increased by 44.4%. This is significant given that, nationally, the over-85 population group increased by just 11.8%. *Id.* at 39. The Assessment states that this substantial increase in the older population is a critical consideration for future housing plans. It advises that houses will need physical modifications to make it accessible for aging people, and seniors may need affordable rental housing and/or housing with supportive services or assisted living. *Id.*

The Assessment also supplements the AI required by Paragraph 32 by identifying three impediments to constructing affordable housing. First, as of March 15, 2019, Consolidated Edison ("Con Ed") placed a moratorium on applications for new natural gas connections in most of the County's service area until it could align demand with available supply. *Id.* at 12. The moratorium is still in effect, and Con Ed has not stated when it will be lifted.[45] In April of 2019, Con Ed entered into an agreement with Tennessee Gas Pipeline to purchase 110,000 additional dekatherms of natural gas capacity. Though this would be enough energy to lift the moratorium, the additional capacity would likely only be available by November 2023.[46] Second, and more generally, the Assessment states that municipalities are hesitant to increase taxes to finance the cost of building and improving infrastructure, including sewers, roads, and bridges. *Id.* at 12. Third, the County is party to the NYC Watershed Memorandum of Agreement of 1997, which protects New York City's drinking water supply and thus restricts development potential in the northern region of the County. *Id.* at 44 n.1.[47] Twelve of the County's 45 municipalities lie within the boundaries of the New York City Watershed. There is also a lack of water and sewer infrastructure in that region, compounding the cost of land and construction. *Id.* at 44.

Since the Assessment was released, the County has taken several steps to utilize its findings to promote affordable housing. First, on November 19, 2019, Mr. Latimer held a

---

[45] *See* About the Westchester Natural Gas Moratorium, https://www.coned.com/en/save-money/convert-to-natural-gas/westchester-natural-gas-moratorium/about-the-westchester-natural-gas-moratorium; Lanning Taliaferro, Con Ed Pushes Geothermal Energy During Westchester Gas Moratorium (Sept. 15, 2020), https://patch.com/new-york/ossining/con-ed-pushes-geothermal-energy-during-westchester-gas-moratorium.

[46] *See* Julia Gheorgin, Con Edison announces deal to end Westchester moratorium on gas hookups (Apr. 25, 2019), https://www.utilitydive.com/news/con-edison-announces-deal-to-end-westchester-moratorium-on-gas-hookups/553448/.

[47] *See* Croton-Kensico Watershed, https://planning.westchestergov.com/croton-kensico#:~:text=In%201997%2C%20Westchester%20County%20was,York%20City's%20drinking%20water%20supply.&text=Westchester%20and%20its%20partners%20are,the%20New%20York%20City%20Watershed.

briefing on the report with several local non-profit housing organizations including Allied Community Enterprises, A-HOME, Community Capital New York, Community Housing Initiatives, and others. Second, Latimer reviewed the report with representatives from 43 municipalities, including Lewisboro, Larchmont, and Croton-on-Hudson during five regional meetings in January and February of 2020. *See* June 9, 2020 Letter, Ex. 18, at 4-5. The County provided each municipality with folders containing individualized data so they could more directly ascertain their affordable housing progress and need. Latimer encouraged each municipality to discuss the Assessment with their local boards and residents to improve understanding of housing need and work toward solutions. Several municipalities scheduled these discussions in March and April of 2020 but had to postpone them due to the COVID-19 shutdown. Only Croton-on-Hudson has been able to have a discussion about the Assessment thus far, at a Village Board meeting via Zoom video conference. The County has stated that it will again encourage the municipalities to have these local discussions once COVID-19 restrictions ease. *Id.* at 5-6.

Third, the County presented an overview of the Assessment to a number of stakeholders, including the Housing Action Council, the Westchester County Association, New York State Homes and Community Renewal, and the Board of Legislator Caucuses. Aug. 14, 2020 Letter, Ex. 13, at 6. Fourth, the County briefed a number of County Commissions and Advisory Boards, including the County Planning Board, Building Realty Institute, Housing Opportunity Commission, African American Advisory Board, and Hispanic Advisory Board. June 9, 2020 Letter, Ex. 18, at 5. The County plans to continue these presentations going forward.

The County also included funding in its 2020 budget, and has taken other steps, to begin making progress on eight of the twelve recommendations provided in the Assessment: (1)

46

establishing workshops to facilitate educational sessions on affordable housing; (2) conducting an update of the existing affordable housing inventory;[48] (3) designing a program to provide technical assistance to municipalities to draft model ordinances specifically targeted for affordable housing; (4) gathering support from local businesses, municipalities, and community organizations to meet affordable housing needs; (5) expanding existing eviction and foreclosure prevention programs; (6) establishing an Employer Assisted Housing program by creating public-private partnerships; (7) providing funding to non-profit housing agencies to cover pre-development costs related to construction and preservation of affordable housing; and (8) providing funding to implement each of these recommendations.  *See* Needs Assessment, Ex. 37, at iv-v.  Though these steps are not required by the Settlement or by this Report, they do provide a helpful set of actions for the County to maintain and further its progress with creating affordable housing.  Notably, the County included $10 million in its 2020 budget for its New Homes Land Acquisition program to purchase property for affordable housing development, as well as another $10 million for its Housing Implementation Fund for infrastructure improvements in support of affordable housing.  *See* May 15, 2020 Letter, Ex. 20, at 7.  These are the highest amounts ever budgeted for these programs in a single year.  1Q 2020 Quarterly Report, Ex. 5, at 5.

Additionally, the County reports that it has allocated $500,000 to help municipalities and non-profit developers cover the costs of the early stages of evaluating property for affordable housing development, and another $500,000 to work with employers to provide down payments and closing cost assistance that will be matched by the employer.  *Id.*  This will aid in increasing homeownership opportunities for families in the workforce.  The County will also grant

---

[48] *See* Section VII, *infra* at 53 for details on the online Homeseeker platform.

$300,000 to non-profit housing organizations to provide eviction and foreclosure prevention services to households at risk of becoming homeless—a risk that has only grown from the widespread loss of employment and income attributable to COVID-19.  *Id.*  The County also allocated $35,000 to provide housing-related training opportunities for non-profit organizations. The training covers counseling to assist individuals and families looking for a home or in need of other services such as eviction prevention, first-time home buying, foreclosure prevention, and reverse mortgage counseling.  The County states that these local training opportunities should enable non-profit organizations to use funds originally allocated for travel and training for other important services.  Sept. 30, 2020 Letter, Ex. 15, at 6.  The first of these trainings was scheduled for April 2, 2020, but was postponed due to the COVID-19 crisis.  The Planning Department has spoken to several non-profit organizations and training agencies, such as NeighborWorks, a community development non-profit, to determine which training program to bring to the County in 2020.  *See* June 9, 2020 Letter, Ex. 18, at 6.  Finally, the County will also invest $50,000 in homeownership counseling programs offered by HUD-certified counseling organizations, which will teach clients financial literacy and how to improve their credit and save for down payments. May 15, 2020 Letter, Ex. 20, at 6-7.

The County has also taken steps outside of creating a budget to meet the need for affordable housing.  In collaboration with its IT Department, the County designed an online searchable inventory of existing affordable housing units and developments throughout the County called "Affordable Housing in Westchester County."[49]  The inventory allows viewers to see the addresses, unit bedroom sizes, affordability requirements, and the number of units in each

---

[49] The site is located at https://wah.westchestergov.com/Planning.  *See* Sept. 30, 2020 Letter, Ex. 15, at 5.

development.  *Id.*  The site also offers a direct link to Westchester County's Homeseeker website so that interested individuals can apply for new affordable housing units.  Sept. 30, 2020 Letter, Ex. 15, at 5.  Further, the County has begun to distribute proposed model ordinances for adoption by the municipalities, including a model ordinance for accessory dwelling units, and is currently preparing a model ordinance on senior housing.  In collaboration with the Hunter College Graduate School of Urban Policy and Planning, the County will also soon begin preparing a model ordinance aimed at the adaptive reuse of under-utilized corporate office parks.  Aug. 7, 2020 Letter, Ex. 11, at 8.

Other recommendations from the Assessment that the County can implement include:

- Providing annual funding to cover tuition for professional certification programs in housing and community development.  Needs Assessment, Ex. 37, at 141.

- Creating a community land trust with a focus on capturing housing headed into foreclosure as an eviction prevention strategy.  This program would allow a homebuyer to purchase a house sitting on land owned by the community land trust.  The purchase price would be more affordable because the homeowner would only be buying the house, not the land.  The homebuyer could lease the land from the community land trust in a long-term (often 99-year) renewable lease.  The homebuyer must agree to sell the home at a restricted price to keep it affordable in perpetuity.  *Id.* at 146.

- Designing a program for the adaptive reuse of under-utilized, vacant, or no longer useful property to develop new affordable housing.  *Id.* at 150.

The Needs Assessment and the actions the County has taken since its release demonstrate the County's compliance with HUD's Planning Guide and Paragraph 32 of the Settlement.  I commend the County for commissioning and releasing the Needs Assessment and recommend that the County continue to pursue its recommendations to further affordable housing.

## VII.  Marketing

Paragraph 33 of the Settlement requires the County to undertake marketing and outreach in support of its AFFH efforts.  Specifically, the County must advertise fair housing rights, create

campaigns to broaden support for fair housing, educate realtors, market affordable housing, and centralize the intake of potential home buyers for affordable housing.  Settlement ¶ 33.  The County is required to spend at least $400,000 toward these ends.  *Id*.  The Settlement also requires the County to include in its implementation plan "standards for affirmative marketing of new housing developments to ensure outreach to racially and ethnically diverse households."  *Id*. ¶ 25(a)(ii).

On March 17, 2016, the Monitor issued a report evaluating the County's Paragraph 33 activities.  The report concluded that the County had made false and misleading public statements about the terms of the Settlement and HUD's role, including by stating that HUD had attempted to dismantle local zoning, that the cost of compliance with the Settlement was $1 billion (when the cost was actually $51.6 million), and that HUD sought to build high-rise apartment buildings in Westchester's residential neighborhoods.  The Monitor recommended that the County broadly correct the record in order to "enable the public to have both a clear understanding of the legal requirements of the Settlement and the facts related to its implementation."  March 2016 Report at 6.  The report also concluded that the County's attempts at marketing activities, including its poster campaign and fair housing training sessions, were insufficient to meet the County's Settlement obligations and failed to reach all of Westchester.

In the time since the Monitor's March 2016 Report, under the leadership of Mr. Latimer, the County has devoted significant time and resources to fulfilling its Paragraph 33 obligations. As of August 2018, the County had spent more than $1 million on marketing activities—more than double the amount required under the Settlement.  Aug. 15, 2018 Letter, Ex. 24, at 35. These activities include those geared toward promoting affordable housing generally and efforts to market particular affordable housing developments.  Based on the breadth of these activities

and the funds expended, this Report finds the County has substantially complied with its

obligations under Paragraph 33.

First, the County has made ample efforts to market affordable housing generally.  For the

term September 1, 2012, through December 31, 2013, the County entered into a $160,000

contract with Pace Law School under which the school's Land Use Law Center worked closely

with County staff and the Housing Action Council[50] ("HAC") to organize and hold activities that

would effectively market fair housing.  *See* Oct. 23, 2012 Contract with Pace University School

of Law Land Use Law Center, attached hereto as Ex. 38.  Pursuant to that contract, Pace and

HAC assisted the County in leading public education campaigns, executive roundtables,

workshops and clinics focused on promoting the Settlement, supporting the development of fair

and affordable housing, promoting the Ordinance, highlighting the value of diversity to

communities, and dispelling myths about affordable housing.  Aug. 15, 2018 Letter, Ex. 24, at

35-36.  The County also entered into two contracts with HAC directly: the first from June 25,

2010, through June 24, 2014, for $423,550, *see* County Contract with HAC, No. C-67-10-T17,

attached hereto as Ex. 39, and the second from September 1, 2014, through December 31, 2015,

for $80,000, *see* County Contract with HAC, No. C-PL-14-395, attached hereto as Ex. 40.  HAC

was retained to conduct outreach and education, including two three-day training sessions for

public and local officials on fair and affordable housing development.

---

[50] HAC is a regional not-for-profit organization dedicated to expanding housing opportunities for low- and moderate-income households throughout Westchester and other areas in New York State.  It provides technical assistance, through its Housing Development Center, to community-based organizations and inexperienced and small developers to develop affordable housing.  *See* https://www.housingactioncouncil.org/html/about.html.  HAC acted as a subcontractor for Pace under this contract and assisted with public education campaigns.

The County also provides an annual contract to Westchester Residential Opportunities ("WRO"), a non-profit organization whose mission is to "promote equal, affordable and accessible housing opportunities" in Westchester.  *See* County Contract with WRO, No. C-PL-20-501, attached hereto as Ex. 41; Aug. 7, 2020 Letter, Ex. 11, at 10.[51]  In 2020, the County committed to spend up to $31,518 through this contract, which will include educating realtors, outreach and education to condominium and cooperative boards, and hosting financial literacy workshops and workshops for first-time homebuyers.

Under their contracts with the County, the HAC and WRO also organize the annual Fair and Affordable Housing Expo.  The Expo is held every year at the Westchester County Center in White Plains, New York.  The County advertises the 2020 Expo on its website as follows: "Westchester County Executive George Latimer invites residents from across the County to attend, driving home the message that safe, affordable housing should be a basic right for everyone living in Westchester County."[52]  Attendees have the opportunity to meet with realtors, mortgage lenders, inspectors, and not-for-profit housing counselors.  Workshops are offered on various topics including affordable housing eligibility, the application and selection process, the legal landscape, renting versus owning, down payments, and credit.  The Expo is widely advertised, including on the County's Facebook page and municipalities' websites and by local newspapers and nonprofit organizations.[53]

---

[51] *See also* WRO website, https://wroinc.org/mission.

[52] *See* Press Release, Fair and Affordable Housing Expo at Westchester County Center, March 14 (Mar. 2, 2020), https://www.westchestergov.com/home/all-press-releases/8299-fair-and-affordable-housing-expo-at-westchester-county-center-march-14.  The 2020 Expo was not held in person due to COVID-19, but a virtual session was held with the Westchester County Association on the Needs Assessment in October 2020.

[53] *See generally* Westchester Residential Opportunities, Inc., Fair & Affordable Housing Expo 2019, (Mar. 9, 2019), https://www.facebook.com/events/westchester-county-center/fair-affordable-housing-expo-2019/287913878570285/; Valerie Musson, Rye Daily Voice, Affordable Housing Focus Of Expo At Westchester

Beyond the marketing activities performed under these contracts, the County's Planning

Department also engages in a variety of other marketing activities[54]:

- The County regularly attends meetings of the Westchester Housing Opportunity Commission ("HOC"), which educates, advocates, and advises on the need for fair and affordable housing in the County. County representatives are available at meetings to address questions and concerns and discuss related issues.

- County representatives meet with municipal officials and appear at public forums to discuss potential affordable housing opportunities and the benefits of affordable housing.

- County representatives appear at public hearings concerning amendments to municipal zoning laws.

- County representatives have met with representatives from local banks to educate them about affordable housing and to encourage banks to facilitate loans to developers and purchasers of affordable housing units.

- The County has developed fair housing posters intended to educate the public on fair housing and the benefits of diversity. The posters were distributed to municipalities, non-profits, and developers. The Planning Department ensured that the posters were posted in prominent public locations.

- The County has marketed its affordable housing and emphasized the diversity of the community with advertisements in several local newspapers, both in print and online.

- The County's Human Rights Commission (the "Commission") conducts fair housing education programs, including programs specifically for real estate brokers.

The County also maintains a website dedicated to affordable housing.[55] The website is

search engine-optimized; it is the first result when one searches for "Westchester affordable

County Center (Feb. 4, 2019), https://dailyvoice.com/new-york/rye/real-estate/affordable-housing-focus-of-expo-at-westchester-county-center/748814/; Fair & Affordable Housing Expo, https://www.lewisborogov.com/hc/page/fair-affordable-housing-expo; Ivette Ramos, Business Council of Westchester, Fair & Affordable Housing Expo 2019 (Feb. 28, 2019), https://thebcw.org/fair-affordable-housing-expo-2019/; WESPAC Foundation, Fair & Affordable Housing Expo (Mar. 9, 2019), https://wespac.org/event/fair-and-affordable-housing-expo/; Community Housing Innovations, Fair & Affordable Housing Expo 2019 (Mar. 15, 2019), https://chigrants.org/fair-affordable-housing-expo-2019/; Mount Vernon United Tenants, Fair & Affordable Housing Expo 2019 (Feb. 21, 2019), http://mvut.org/blog/2019/02/21/saturday-march-9-fair-affordable-housing-expo-2019-in-white-plains/.

[54] *See* Aug. 15, 2018 Letter, Ex. 24, at 2; Aug. 7, 2020 Letter, Ex. 11, at 10-11.

[55] *See* www.homes.westchester.gov.

housing." The website has information about financial assistance, buyer counseling, affordable housing eligibility, housing discrimination, and senior housing for both renters and buyers.

In addition to these marketing efforts promoting fair and affordable housing generally, the County, through HAC, develops individualized marketing plans for each AFFH development with five or more units; HAC combines marketing efforts for smaller developments. *See* Aug. 15, 2018 Letter, Ex. 24, at 2-3. Marketing begins with the development of written materials, including applications and brochures in both English and Spanish. *See* May 15, 2020 Letter, Ex. 20, at 8. On the County's affordable housing website, in the "Homeseeker" section, users can fill out an online interest form, browse the Homeseeker map of affordable properties, review available properties, and access applications.[56] Marketing materials are emailed or mailed to households registered on Homeseeker or on the HAC mailing list, and also available on the Homeseeker website. *See* May 15, 2020 Letter, Ex. 20, at 8. HAC also reaches out to community and human services organizations and houses of worship to provide information on new housing developments and to request assistance in marketing to their respective constituencies. *Id.* HAC also holds local informational workshops on new housing developments. *Id.* Moreover, depending on the size of the developments, HAC may secure advertising space in newspapers with high readership by those populations deemed "least likely to apply" ("LLA"), and provide information and marketing materials at cultural and other events frequented by these groups. *Id.* The LLA populations include persons of races and ethnicities that are under-represented in the area of the housing development relative to the County's overall demographics. *Id.*

---

[56] *See generally* https://homes.westchestergov.com/homeseeker-housing.

The County, through HAC, markets each development for approximately 90 days. At the end of the marketing period, HAC holds a lottery to establish the order in which applicants will have their eligibility for the unit or building reviewed. *Id.* Applications are first reviewed by HAC to determine whether applicants are within the maximum household income limit and whether they meet the occupancy standards. If the applicant meets those threshold requirements, HAC further reviews the applicant based on other criteria to determine whether the applicant can carry and sustain the lease or mortgage payments.[57] *Id.* at 8-9.

While the County's marketing efforts appear robust and comprehensive, it is important to assess whether the marketing efforts are meeting their intended purpose. One way to analyze the success of the marketing plans and activities in reaching racially and ethnically diverse households is to compare demographic data for the tenants and owners in occupied affordable housing units, the individuals who signed up for information about fair and affordable housing through the Homeseeker intake system, and applicants for housing lotteries. When compared to the overall demographics of the County, it is evident that the marketing campaign has reached "racially and ethnically diverse households" as required by the Settlement. Settlement ¶ 25(a)(ii).

- In 2019, the U.S. Census Bureau estimated that Westchester's population was 52.6% White, 16.7% Black, and 25.5% Hispanic.[58]

  - During the period September 30, 2010 to December 31, 2020, there were 20,153 active[59] households signed up on the Central Intake/Homeseeker database, including 444 new households in the fourth quarter of 2020. *See* 4Q 2020

---

[57] Denied applicants are sent a letter stating the reason for their denial and are given a minimum of ten days to appeal the determination. Appeals are heard by the Executive Director of the HAC. If the appeal is not resolved, HAC contacts the County for further review and a hearing is scheduled if necessary.

[58] United States Census Bureau, https://www.census.gov/quickfacts/westchestercountynewyork.

[59] "Active" households are those that are still receiving mail from Homeseeker and that have not reported that they have found housing or decided to end their search.

Quarterly Report, Ex. 8, at 4.  2,709 (13%) were White, 6,144 (30%) were Black, and 7,014 (35%) were Hispanic.  *Id.* Appendix II-2 at 4.

o   According to HAC data provided in summer 2020, from 2011 through the first quarter of 2020, 17,722 people applied for fair housing units.  Of those, 5,188 (29%) applicants were White, 5,031 (28%) were Black, and 5,229 (30%) were Hispanic.

o   According to the same HAC data, as of March 31, 2020, 759 affordable housing units were occupied, including 303 (40%) by White occupants, 159 (21%) by Black occupants, and 221 (29%) by Hispanic occupants.

The data makes clear that the marketing of affordable housing units has reached a broad and diverse range of individuals (as of the second quarter of 2020, there were more than 13,000 non-white individuals signed up for Homeseeker, representing 76% of the total sign-ups; as of the first quarter of 2020, 71% of affordable housing applicants were non-white or Hispanic). However, the disparity between whom the marketing has reached (as evidenced by Homeseeker signups and lottery applicants) and who actually occupies affordable housing units demonstrates that there is still room to achieve greater diversity in the County's affordable housing stock (60% of occupants were non-white or Hispanic as of March 31, 2020).  Despite that, the occupant demographics (40% White, 21% Black, and 29% Hispanic) generally mirror the demographics of the County as a whole (52.6% White, 16.7% Black, and 25.5% Hispanic), although Blacks and Hispanics are somewhat over-represented in occupancy of affordable housing units and Whites are somewhat under-represented.  This is an important measure of the success of the County's affordable housing efforts.

Although the County's work in marketing its affordable housing developments is not complete, in light of the above efforts, the apparent results, and the County's renewed commitment under Executive Latimer, this Report finds that the County has substantially complied with its obligations under Paragraphs 25(a) and 33(c) of the Settlement.

## VIII.   Areas of Continuing Concern

While I am satisfied with the County's performance and believe that it has met its obligations under the Settlement, I have concerns about certain municipalities: Briarcliff Manor, Buchanan, Eastchester, Mount Pleasant, Pelham, Tuckahoe, Cortlandt, Somers, Harrison, Pelham Manor, Rye, Yorktown, Croton-on-Hudson, and Larchmont.  These municipalities should take further action to change their zoning ordinances and further affordable housing.  I have discussed my concerns about these municipalities with the County and am satisfied that the County is aware and will take continuing action to address them.  Although I have identified the issues affecting each municipality above, I will reiterate and consolidate them here.

While the County does not have the power to mandate municipal adoption of the Model Ordinance, it has done what it can to promote adoption through discretionary funding, written correspondence, conversations with municipal officials, collaboration with housing non-profit agencies, and public speaking engagements.  Despite the County's efforts, twelve municipalities have not yet adopted the Model Ordinance: Briarcliff Manor, Buchanan, Eastchester, Mount Pleasant, Pelham, Tuckahoe, Cortlandt, Somers, Harrison, Pelham Manor, Rye, and Yorktown.  I urge these municipalities to do so to meet the goals of the Settlement.

I also have lingering concerns with respect to *Berenson* or *Huntington* issues for several municipalities.  The Monitor's Third Biennial Assessment found that Harrison, Pelham Manor, Croton-on-Hudson, and Larchmont had zoning laws that could result in liability under *Berenson* or *Huntington*.  Neither Harrison nor Pelham Manor modified its zoning ordinances following that report, meaning that potentially exclusionary zoning remains in place.  While Croton-on-Hudson has expanded the conditions under which accessory apartments are permitted, expanded the opportunity for mixed-use housing development, and adopted provisions of the Model

Ordinance, it still has not addressed two primary concerns: expanding the areas where multi-family housing is permitted as-of-right and permitting accessory units as-of-right.  As for Larchmont, the *Huntington* report concluded that its zoning code perpetuated minority clustering because more than half of Larchmont's minority population resided in the three zoning districts that permit as-of-right multi-family housing development.  While Larchmont has adopted provisions consistent with the Model Ordinance, it has not zoned additional land for multi-family housing as-of-right.  Both Croton-on-Hudson and Larchmont should implement these measures to maximize the potential for affordable housing development.

## IX.    Conclusion

This Report concludes that the County has complied with its Paragraph 25(a) and 33 requirements and has substantially complied with its Paragraph 7 and 32 requirements.  For the reasons discussed, I believe that the County has substantially satisfied its obligations under the Settlement.


Dated:          January 26, 2021
                New York, New York



                                    Respectfully submitted,

                                    /s/ Stephen C. Robinson

                                    Stephen C. Robinson
                                    Skadden, Arps, Slate, Meagher & Flom LLP
                                    One Manhattan West
                                    New York, NY  10001
                                    (Stephen.robinson@skadden.com)
                                    *Monitor*